# United States Court of Appeals
## For the First Circuit

---

No. 22-1317

MASSACHUSETTS LABORERS' HEALTH AND WELFARE FUND;
TRUSTEES OF THE MASSACHUSETTS LABORERS'
HEALTH AND WELFARE FUND, as Fiduciaries,

Plaintiffs, Appellants,

v.

BLUE CROSS BLUE SHIELD OF MASSACHUSETTS,

Defendant, Appellee.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor, IV, U.S. District Judge]

---

Before

Gelpí, Lynch, and Thompson,
Circuit Judges.

---

D. Brian Hufford, with whom Jason S. Cowart, Leila Bijan,
Zuckerman Spaeder LLP, Peter K. Stris, John Stokes, and Stris &
Maher LLP were on brief, for appellants.
Sarah M. Karchunas, Attorney, Plan Benefits Security
Division, Office of the Solicitor, Department of Labor, with whom
Seema Nanda, Solicitor of Labor, G. William Scott, Associate
Solicitor for Plan Benefits Security, Jeffrey M. Hahn, Counsel for
Appellate and Special Litigation, and Robin Springberg Parry,
Senior Regulatory Attorney, were on brief, for the Secretary of
Labor, amicus curiae.
Jeffrey M. Harris, Steven C. Begakis, and Consovoy McCarthy
PLLC on brief for PatientRightsAdvocate.org, Inc. and Families
USA, amici curiae.

Evan Miller, with whom David T. Raimer, Joseph P. Falvey, and Jones Day were on brief, for appellee.

Anthony F. Shelley and Miller & Chevalier Chartered on brief for Blue Cross Blue Shield Association, amicus curiae.

Allison S. Egan, Michael E. Kenneally, Deborah S. Davidson, Charles L. Solomont, Henry M. Marley, and Morgan, Lewis & Bockius LLP on brief for ERISA and Trust Law Professors, amici curiae.

---

April 25, 2023

---

**LYNCH**, <u>**Circuit Judge**</u>.  From 2006 to 2022, Blue Cross Blue Shield of Massachusetts ("BCBSMA") served under contract as a third-party administrator (a "TPA") for the self-funded multiemployer group health plan (the "Plan") administered by the Massachusetts Laborers' Health and Welfare Fund (the "Fund"). BCBSMA was also a TPA for other benefit plans during this period.

By contracting with BCBSMA, the Fund made available to the Plan's participants the discounted rates that BCBSMA negotiates with a network of medical providers.  Among other contractual obligations, BCBSMA was responsible for repricing participants' claims according to its provider arrangements and transmitting approved claim payments to providers on behalf of the Fund.

In 2021, the Fund sued BCBSMA, alleging that the Fund had discovered various instances in which BCBSMA paid providers in amounts exceeding the negotiated rates.  The Fund brought three claims under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 <u>et seq.</u>, all of which depended on the assertion that BCBSMA was a fiduciary of the Plan.

The district court granted BCBSMA's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), holding that the Fund had failed to plausibly allege that BCBSMA was an ERISA fiduciary with respect to the actions subject to the Fund's complaint.  <u>See</u> <u>Mass. Laborers' Health & Welfare Fund</u> v. <u>Blue Cross</u>

Blue Shield of Mass., No. 21-cv-10523, 2022 WL 952247, at *1 (D. Mass. Mar. 30, 2022).  We affirm.

## I.  Background

### A.  The Parties and Their Contractual Relationship

When reviewing the grant of a motion to dismiss for failure to state a claim, "we accept as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences therefrom in the [plaintiff]'s favor."  Legal Sea Foods, LLC v. Strathmore Ins. Co., 36 F.4th 29, 34 (1st Cir. 2022) (alteration in original) (quoting Alston v. Spiegel, 988 F.3d 564, 571 (1st Cir. 2021)).

The Fund operates the Plan for members of the Laborers' Local Union in Massachusetts and parts of northern New England. Because the Plan is self-funded, the Fund is responsible for paying all covered healthcare claims submitted on behalf of the Plan's participants.  The Fund is financed from employer contributions, which in turn are partly funded through deductions from participants' paychecks.

In 2006, the Trustees of the Fund, on behalf of the Fund, entered into a contract with BCBSMA to have BCBSMA help administer the Plan as a TPA. As a preferred-provider organization (a "PPO"), BCBSMA negotiates favorable rates with a network of healthcare providers.  This negotiation is independent from the relationship between BCBSMA and the Fund.  By contracting with BCBSMA, the Fund

was able to make the discounted rates available to all participants who received covered in-network medical care from BCBSMA's preferred providers.

The terms of the Fund's and BCBSMA's agreement were laid out in an administrative services agreement (the "ASA"),[1] which also referenced a summary plan description (the "SPD")[2] which was prepared by the Fund and distributed to Plan participants.  We describe the basic features of the ASA and SPD in turn and refer to further provisions of the documents throughout our legal analysis.[3]

### 1. The ASA

The parties executed the ASA in 2006 to govern the terms of their relationship.  The ASA provided that BCBSMA would "perform certain administrative services in connection with" the Plan.  "In

---

[1]    The ASA is titled "Administrative Services Account Agreement."

[2]    The SPD is titled "A Summary of Plan Features."  ERISA requires the distribution of summary plan descriptions to participants and beneficiaries.  See 29 U.S.C. § 1024(b).

[3]    Because the ASA and SPD were "cited in the complaint and attached to [BCBSMA's] motion to dismiss," In re Fid. ERISA Float Litig., 829 F.3d 55, 60 (1st Cir. 2016), and because no party challenges their authenticity, the district court properly reviewed the two documents, and we continue to consider them on appeal, see Beddall v. State St. Bank & Tr. Co., 137 F.3d 12, 17 (1st Cir. 1998) ("When . . . a complaint's factual allegations are expressly linked to -- and admittedly dependent upon -- a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6).").

performing [those] services," BCBSMA agreed to "be, and function as, an independent contractor to the Fund and as a service provider to the [Plan]."  The ASA was "not intended to create an agency, partnership or joint venture relationship between the parties."

The administrative services BCBSMA agreed to perform included "arranging for a network of health care providers[4] whose services [were] covered by the [Plan], providing services to network providers, claims processing, individual case management, medical necessity review, utilization review, quality assurance programs and disease monitoring and management services."  BCBSMA "reserve[d] the right to make changes to its provider network . . . at any time" and to "negotiate different claim payment rates and arrangements with its providers."  These rates and arrangements were influenced by various factors that were "based on all or a subset of [BCBSMA]'s book of business."

Of particular relevance here, BCBSMA agreed to "make its PPO network of preferred health care providers available to [p]articipants in the Plan."  In essence, by selecting providers from BCBSMA's PPO network, Plan participants could benefit from the volume discounts that BCBSMA had previously negotiated.  The claims determination process proceeded as follows.

---

[4]    The ASA defined the term "health care providers" as including "hospital, physician and ancillary service providers."

First, medical providers who administered care to Plan participants would submit claims to BCBSMA, which would "receive and reprice all covered claims . . . in accordance with [its] provider reimbursement arrangements."  To "reprice" the claims, BCBSMA would "conduct a medical necessity and utilization review" of the claims using the "medical policy, medical technology assessment guidelines and utilization review policies as set forth in" an attachment to the ASA.

After BCBSMA "repriced" the claims by calculating the appropriate payment rate, it would transmit the repriced claims to the Fund.  The Fund would then enter the claims into its "claims processing system" to "determine member eligibility, the availability of benefits and claims adjudication."  The Fund "adjudicated" the claims by determining whether they were covered under the Plan and by calculating deductibles and copayments. "Following the Fund's adjudication, the final approval or denial" was "forwarded by the Fund to [BCBSMA], including all applicable deductible, copayment and coinsurance information and limitations."

Finally, once BCBSMA received the Fund's final approval, BCBSMA would "remit the appropriate claim payment[5] to the network

---

[5]    The ASA defined "[c]laim [p]ayments" as "the amounts [BCBSMA] pays on behalf of the Fund for [p]articipants' health care benefits when billed by the provider[s]."

provider."  For any adjudicated claim that was disputed by a Plan participant, the Fund was solely "responsible to process and make a decision regarding such [an] appeal."

To compensate BCBSMA for its administrative services, the Fund agreed to pay BCBSMA an "administrative charge" in a "fixed dollar amount."  As the administrator of a self-funded plan, the Fund also "retain[ed] the ultimate financial responsibility and liability for all covered claims under the Plan."  "Because [BCBSMA] [would] pay providers . . . before being able to bill the Fund," the Fund agreed to pay a "working capital amount" to BCBSMA "for estimated [c]laim [p]ayments."  This working capital amount was "based on [BCBSMA]'s estimate of the amount needed to pay claims on a current basis."

The agreed-upon payment process was as follows.  First, in "weekly installments," the Fund would "pay a fixed monthly payment amount" which included both the working capital amount and the estimated administrative charge.  Then, in "one-month intervals," BCBSMA would perform a "settlement calculation" to determine whether the combined weekly payments had undercompensated or overcompensated BCBSMA for the actual claim payments it had transmitted to providers that month and the actual administrative charges it had incurred.[6]  If the settlement

---

[6]    In particular, BCBSMA added "[t]otal paid claims" and "actual administrative charges due" and then subtracted the "sum

calculation revealed that the Fund owed BCBSMA an additional amount, the Fund would "wire to [BCBSMA] such amount . . . with its next scheduled weekly payment."  But if the settlement calculation demonstrated that the paid amount had exceeded the amount actually due to BCBSMA, then BCBSMA would "apply (credit) such amount . . . to the Fund's next scheduled weekly payment," unless applying such a credit was "prohibited by applicable law," in which case BCBSMA would "promptly refund the difference . . . to the Fund."

The ASA also contemplated recovery operations for erroneously paid claims.  The original version of the ASA provided generally that each party would be "fully responsible" for its own errors that caused a claim to be paid "to or on behalf of an ineligible person," paid in "more or less than the correct amount" due, or paid to an "incorrect provider."

Two amendments to the ASA added more specific recovery provisions.  First, a 2010 amendment provided that BCBSMA could "pursue recoveries for claims paid as a result of fraud or abuse." BCBSMA could seek recovery directly or "through other appropriate recovery operations, including subrogation and provider claim

---

of weekly payments" received from the Fund.  After applying "adjustments" based on the previous month's settlement calculation, BCBSMA arrived at the net amount owed to, or due from, the Fund, representing both provider payments and administrative charges.

payment audits." If BCBSMA obtained recovery, it would credit to the Fund "the amount of the recovery attributable to services for" the Fund's participants, but would retain either a 20% "recovery fee" or, if "outside support costs" (such as fees for engaging outside counsel) were incurred in pursuing recovery, the Fund's "pro rata share" of those costs. The Fund agreed that "neither the [Fund], the [Plan], nor any [participant] ha[d] any legal or beneficial ownership interest in these recovery amounts retained by [BCBSMA]." However, BCBSMA was authorized to retain these amounts only if the need for recovery was "attributable to a third party and not attributable to an error made by [BCBSMA]."

Second, a 2016 amendment provided that if claim payments were "too high or too low due [to] reasons such as the use of incorrect claim payment rates," BCBSMA would "reprocess impacted claims and bill or credit the [Fund]." But if it was "not administratively practical or reasonable to reprocess impacted claims due to the specific situation," BCBSMA could "instead negotiate a settlement with the provider," in which case BCBSMA would "credit or bill the [Fund] based on its pro rata share of the settlement."

Although the ASA explicitly designated the Trustees of the Fund as ERISA fiduciaries, it did not do so for BCBSMA. In relevant part, the ASA provided the following:

- 10 -

> The Trustees are the "administrator" and
> "named fiduciary" of the Fund as that term is
> defined in Section 3(16)(A) and 402(a),
> respectively, of ERISA. [BCBSMA] is engaged
> as an independent contractor to perform the
> specific duties and responsibilities which the
> Trustees delegate to it. It is understood and
> agreed that [BCBSMA] exercises its duties
> within the framework of the Plan of Benefits
> established by the Trustees. [BCBSMA] and the
> Trustees of the Fund accept that the
> definitions of a fiduciary are contained in
> ERISA Section 3(21)(A).

### 2. The SPD

The Plan's terms were summarized in the SPD, which was referenced in the ASA and distributed to Plan participants. The SPD, which was prepared by the Fund, provided information to participants on benefits, coverage eligibility, and various other Plan terms.

The SPD informed participants that the Fund had "entered into an arrangement with a [PPO] that contracts with hospitals, physicians and other health care providers to provide [participants] with medical services at discounted rates." The SPD identified BCBSMA as "[t]he Fund's PPO . . . for most medical expenses," and explained that participants should select providers who participated in BCBSMA's network in order to "receive the highest benefit level." The SPD stated to participants that if they chose in-network providers, then the "billed charges that [would] be considered covered expenses [would] never be more than the negotiated rate." It also informed participants that "[a]ny

provider in the PPO network [would] be paid directly by [BCBSMA]" and that participants would be "responsible for [their] deductible and copayment amounts."

The SPD further stated that the "Trustees, the Fund Administrator and other individuals with delegated responsibility for the administration of the Plan [would] have discretionary authority to interpret the terms of the Plan and to determine eligibility and entitlement to Plan benefits in accordance with the terms of the Plan."  It also notified participants that they were "entitled to certain rights and protections under . . . ERISA," and stated the following:

> In addition to creating rights for Plan participants, ERISA imposes duties upon the people who are responsible for the operation of employee benefit plans.  The people who operate your plan, called "fiduciaries" of the plan, have a duty to do so prudently and in the interest of you and other Plan participants and beneficiaries.

### B.  The Allegations of Overpayment

The Fund regularly conducts performance audits of its contractors.  To that end, in July 2018, the Fund hired ClaimInformatics, LLC ("ClaimInformatics"), a company that audits healthcare claims to discover and recover improper payments.  The Fund asked ClaimInformatics to perform a "payment integrity review" of the Fund's claims that were paid by BCBSMA to providers.

After reviewing payments made between 2016 and 2018,[7] ClaimInformatics allegedly discovered thousands of claims that were erroneously paid or paid in the incorrect amount. In its first stage of review, ClaimInformatics purportedly identified 5,574 such claims and found that providers had been overpaid by over $1.4 million.

### C.  The Lawsuit

On March 26, 2021, the Fund sued BCBSMA in the U.S. District Court for the District of Massachusetts. The Fund's complaint, as later amended, asserted three claims under ERISA: Count One alleged a breach of fiduciary duty in violation of 29 U.S.C. § 1109(a); Count Two alleged self-dealing with Plan assets in violation of 29 U.S.C. § 1106(b)(2); and Count Three sought injunctive relief under 29 U.S.C. § 1132(a)(3). The complaint also asserted four state-law claims.

The complaint made two distinct sets of factual allegations against BCBSMA in support of the Fund's ERISA claims. The first concerned BCBSMA's behavior prior to paying providers; the second concerned BCBSMA's actions after payment.[8]

---

[7]    Because ClaimInformatics' review was of claims from 2016 to 2018, all relevant claims were paid after the 2016 amendment to the ASA, which took effect on January 1, 2016.

[8]    Throughout the complaint, the Fund noted that BCBSMA refused to provide the Fund requested documents and other information concerning BCBSMA's internal policies, provider contracts, medical records, and audit results. The Fund does not argue that these quarrels over nondisclosure and confidentiality

First, citing ClaimInformatics' audit results, the Fund alleged that BCBSMA failed to accurately price claims, resulting in millions of dollars in overpayments to providers. According to the Fund, ClaimInformatics identified various errors that caused the overpayments. First, ClaimInformatics allegedly noted a pattern of BCBSMA calculating claim payments to be higher than the amounts providers actually billed -- for example, ClaimInformatics asserted that when one hospital billed $38,786 for a claim, BCBSMA then priced that claim at $120,614. ClaimInformatics also purportedly discovered instances in which BCBSMA erroneously priced two hospital stays as separate admissions in contravention of BCBSMA's inpatient readmission policy, which provided that if a patient was readmitted to a hospital for a related diagnosis within a week of discharge, the cost of readmission would be included in the price of the initial admission. Similarly, although BCBSMA's observation room billing policy was to charge a one-day rate for observation room stays up to twenty-four hours and a two-day rate for all longer stays, ClaimInformatics allegedly identified cases where BCBSMA incorrectly charged the two-day rate for stays shorter than twenty-four hours when those stays spanned two calendar days. Further, with regard to the degree of patient

---

are relevant to the question of whether BCBSMA was a fiduciary. We thus decline to consider this aspect of the parties' dispute in our analysis.

illness -- for which hospitals use numeric codes to classify severity, ranging from 1 (minor) to 4 (extreme) -- ClaimInformatics purportedly found that BCBSMA accepted a "statistically improbable number of claims" with level 4 severity, leading to excessively high payments to hospitals.  Finally, as alleged by the Fund, ClaimInformatics noted various other idiosyncratic errors; for example, BCBSMA accepted a hospital's designation of a procedure as a "foot amputation" despite the doctor's billing it as a "toe amputation," and BCBSMA processed a claim without inquiry where a provider charged three hours for a procedure known to take no more than five minutes.

Second, the Fund's complaint alleged that BCBSMA's recovery operations entailed self-dealing by BCBSMA at the expense of the Fund.  The Fund principally contended that BCBSMA collected wrongful and excessive recovery fees.  For example, the Fund claimed that there were "numerous instances of BCBSMA causing an error itself, catching it, fixing it, and collecting a recovery fee," such that BCBSMA retained a recovery fee even when overpayments stemmed from its own errors.  According to the Fund, BCBSMA also once retained a recovery fee despite not recovering any overpayment (rather, a hospital had adjusted a claim amount prior to payment), and once retained an inflated recovery fee by applying the recovery fee percentage to the original claim amount instead of the recovered amount.  The complaint further alleged

that BCBSMA, without authorization, increased the recovery fee
percentage from 20% to 30% for all recoveries and began charging
a 19% "Coding Advisor Program Fee" on savings to the Fund from
BCBSMA's post-payment audits of out-of-network claims. Finally,
in relation to the alleged observation room billing errors, the
Fund claimed that BCBSMA pursued provider settlements (rather than
full recoveries via reprocessing claims) even when it was
"administratively practical [and] reasonable" to reprocess the
claims. These settlements would, allegedly, "grossly
undercompensate" the Fund.

     BCBSMA moved to dismiss the Fund's complaint under
Federal Rule of Civil Procedure 12(b)(6), and in a carefully
reasoned opinion issued on March 30, 2022, the district court
granted the motion. Mass. Laborers' Health & Welfare Fund, 2022
WL 952247, at *1. The district court noted that the Fund's ERISA
claims were premised on BCBSMA's being a "fiduciary" under the
statute.[9] Id. at *7, *16. After rejecting the Fund's argument
that BCBSMA was named as a fiduciary in the SPD (an argument that

---

[9]     The court noted that although nonfiduciaries can incur
liability under § 1132(a)(3) if they "participate[] in a fiduciary
breach" by another person, the Fund had not alleged that BCBSMA
participated in any breach by other fiduciaries, so Count Three,
like Counts One and Two, was based on the proposition that BCBSMA
was itself a fiduciary. Mass. Laborers' Health & Welfare Fund,
2022 WL 952247, at *16. On appeal, the Fund does not challenge
the district court's approach as to Count Three; rather, it
continues to argue that BCBSMA was, in fact, a fiduciary.

the Fund does not pursue on appeal), id. at *7-8, the district court turned to the question of whether BCBSMA was a "functional fiduciary" under ERISA, id. at *8.  The court held that BCBSMA was not a functional fiduciary.  Id. at *15.  First, the court held that because BCBSMA was required to apply its negotiated rates, its alleged failure to do so did not reflect an exercise of "discretion" such as would make BCBSMA a fiduciary due to discretionary control over the management of the Plan.  Id. at *9; see id. at *9-12.  Second, the court found that the working capital amount was not an asset of the Plan and thus rejected the Fund's contention that BCBSMA was a fiduciary due to its authority over the management or disposition of Plan assets.  See id. at *12-15.  The court also held that even if the working capital amount was a Plan asset, BCBSMA had not exercised sufficient "authority or control" over the working capital amount to render BCBSMA a fiduciary.  Id. at *15.  The district court dismissed the Fund's ERISA claims and declined to exercise supplemental jurisdiction over the Fund's state-law claims.  See id. at *16.

The Fund timely appealed.

## II.  Analysis

We review de novo the district court's dismissal of the complaint on the basis that BCBSMA lacked fiduciary status.  See In re Fid. ERISA Fee Litig., 990 F.3d 50, 55 (1st Cir. 2021).  In conducting this inquiry, we evaluate whether the complaint

"state[s] a claim to relief that is plausible on its face." In re Fid. ERISA Float Litig., 829 F.3d 55, 59 (1st Cir. 2016) (quoting Saldivar v. Racine, 818 F.3d 14, 18 (1st Cir. 2016)). We first "distinguish the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)," and then "determine whether the factual allegations are sufficient to support the reasonable inference that the defendant is liable." Id. (quoting Saldivar, 818 F.3d at 18). "[W]e need not credit the complaint's statement that [the working capital amount] [was] a '[P]lan asset,' for that label represents a legal conclusion, not a factual assertion." Id. Likewise, the complaint's assertion that BCBSMA exercised control respecting the management or disposition of the working capital amount, and the complaint's statement that BCBSMA exercised discretionary control respecting Plan management, are legal assertions that we need not credit. See In re Fid. ERISA Fee Litig., 990 F.3d at 56-57.

A person[10] can be a fiduciary under ERISA in two ways. See id. at 55. First, a person is a "named fiduciary" if identified as such in a plan instrument or pursuant to a procedure specified

---

[10] ERISA defines the term "person" to include individuals and various business entities. See 29 U.S.C. § 1002(9).

in the plan.  29 U.S.C. § 1102(a).  The Fund does not contend that

BCBSMA was a named fiduciary.[11]

Second, a person can become a "functional fiduciary" by

"performing at least one of several enumerated functions with

respect to a plan." Beddall v. State St. Bank & Tr. Co., 137 F.3d

12, 18 (1st Cir. 1998); see 29 U.S.C. § 1002(21)(A).  A person is

a functional fiduciary

> with respect to a plan to the extent (i) he
> exercises any discretionary authority or
> discretionary control respecting management
> of such plan or exercises any authority or
> control respecting management or disposition
> of its assets, (ii) he renders investment
> advice for a fee or other compensation, direct
> or indirect, with respect to any moneys or
> other property of such plan, or has any
> authority or responsibility to do so, or (iii)
> he has any discretionary authority or
> discretionary responsibility in the
> administration of such plan.

29 U.S.C. § 1002(21)(A) (emphasis added).

The statutory language establishes that "functional

fiduciary status is not an all-or-nothing designation." In re

Fid. ERISA Fee Litig., 990 F.3d at 55.  Rather, a person can be a

fiduciary "for some purposes and not for others." Id.  "In every

case charging breach of ERISA fiduciary duty, then, the threshold

question is . . . whether [a] person was acting as a fiduciary

---

[11]    The Fund made this argument to the district court, but
the district court rejected it, see Mass. Laborers' Health &
Welfare Fund, 2022 WL 952247, at *7-8, and the Fund does not renew
it on appeal.

(that is, was performing a fiduciary function) when taking the action subject to complaint." Pegram v. Herdrich, 530 U.S. 211, 226 (2000); see also Beddall, 137 F.3d at 18 ("[F]iduciary liability arises in specific increments correlated to the vesting or performance of particular fiduciary functions in service of the plan, not in broad, general terms."). Accordingly, we must analyze separately whether BCBSMA was a fiduciary when taking the two distinct actions subject to the Fund's complaint: first, when pricing claims and allegedly overpaying providers, and second, when pursuing recoveries of overpaid amounts and retaining associated fees before reimbursing the Fund.

In arguing that BCBSMA was a fiduciary, the Fund cites only subsection (i) of ERISA's definition of functional fiduciary. The Fund argues both that BCBSMA exercised "discretionary authority or discretionary control respecting management of [the] [P]lan"[12] and that BCBSMA exercised "authority or control respecting management or disposition of [the Plan's] assets." 29 U.S.C. § 1002(21)(A)(i). We address these two arguments in turn.

---

[12] The Fund does not contend that BCBSMA had "discretionary authority or discretionary responsibility in the administration" of the Plan under subsection (iii) of the definition, 29 U.S.C. § 1002(21)(A)(iii), so we need not decide the extent to which this portion of the definition differs from subsection (i).

### A.  Discretionary Authority or Discretionary Control Respecting Plan Management

The Fund first contends that BCBSMA was a fiduciary to the extent that it exercised discretionary authority over the Plan's management.  The Fund does not argue that BCBSMA's management of its PPO network and negotiation of rates with providers made it a fiduciary with respect to the Plan.  Nor does the Fund challenge the ASA's provision that BCBSMA "reserved the right to make changes to its provider network at any time" and to "negotiate different claim payment rates and arrangements with its providers."  Rather, the Fund maintains that BCBSMA exercised discretion in <u>applying</u> already negotiated rates to claims submitted on behalf of the Plan's participants.  It further contends that BCBSMA's control over recovery and settlement operations amounted to discretionary authority over Plan management.

The Department of Labor has issued an interpretive bulletin concerning ERISA fiduciary status, which has been published in the Federal Register.[13]  <u>See</u> 29 C.F.R. § 2509.75-8. The interpretive bulletin provides that a person who has "no power to make any decisions as to plan policy, interpretations, practices

---

[13]    As part of its analysis and interpretation of an agency's applicable federal statute, a court may consider, along with other relevant legal sources, the agency's interpretive bulletins on the matter.  <u>See, e.g.,</u> <u>Reich</u> v. <u>Newspapers of New Eng., Inc.</u>, 44 F.3d 1060, 1071-73 (1st Cir. 1995).

or procedures, but who perform[s] [various] administrative functions for an employee benefit plan, within a framework of policies, interpretations, rules, practices and procedures made by other persons" is not a fiduciary because that person is performing "purely ministerial functions."  Id. § 2509.75-8(D-2); see also Pharm. Care Mgmt. Ass'n v. Rowe, 429 F.3d 294, 301 (1st Cir. 2005) (noting that "purely ministerial" duties are "not sufficient" to render an individual a fiduciary); Beddall, 137 F.3d at 18 ("[T]he mere . . . performance of mechanical administrative tasks generally is insufficient to confer fiduciary status."). These nondiscretionary administrative functions include, inter alia, the "[a]pplication of rules determining eligibility for participation or benefits," the "[c]alculation of benefits," and the "[p]rocessing of claims." 29 C.F.R. § 2509.75-8(D-2); see also Livick v. Gillette Co., 524 F.3d 24, 29 (1st Cir. 2008) (holding that providing estimate of future benefits did not involve discretion); Baxter v. C.A. Muer Corp., 941 F.2d 451, 455 (6th Cir. 1991) (per curiam) ("[A] person without the power to make plan policies or interpretations but who performs purely ministerial functions such as processing claims, applying plan eligibility rules, communicating with employees, and calculating benefits, is not a fiduciary under ERISA."); Schmidt v. Sheet Metal Workers' Nat'l Pension Fund, 128 F.3d 541, 544 n.1, 547 (7th Cir.

1997) (declining to attribute fiduciary status to an individual who "determin[ed] benefit amounts due under the plan").

An entity is a fiduciary when it exercises discretionary authority or control over plan management, even if pursuant to the terms of a contract. See Ed Miniat, Inc. v. Globe Life Ins. Grp., Inc., 805 F.2d 732, 737 (7th Cir. 1986) ("[I]f a specific term (not a grant of power to change terms) is bargained for at arm's length, adherence to that term is not a breach of fiduciary duty. No discretion is exercised when an insurer merely adheres to a specific contract term.  When a contract, however, grants an insurer discretionary authority, even though the contract itself is the product of an arm's length bargain, the insurer may be a fiduciary."); Rozo v. Principal Life Ins. Co., 949 F.3d 1071, 1074 (8th Cir. 2020) ("A service provider may be a fiduciary when it exercises discretionary authority, even if the contract authorizes it to take the discretionary act."); Seaway Food Town, Inc. v. Med. Mut. of Ohio, 347 F.3d 610, 619 (6th Cir. 2003) ("[W]here parties enter into a contract term at arm's length and where the term confers on one party the unilateral right to retain funds as compensation for services rendered with respect to an ERISA plan, that party's adherence to the term does not give rise to ERISA fiduciary status unless the term authorizes the party to exercise discretion with respect to that right.").

Case law, including from other circuits, demonstrates that this type of "discretion" often arises when contractual terms allow a party to select from a range of options in performing its obligations.[14]  See, e.g., David P. Coldesina, D.D.S, P.C., Emp. Profit Sharing Plan & Tr. v. Est. of Simper, 407 F.3d 1126, 1132 (10th Cir. 2005) ("Discretion exists where a party has the 'power of free decision' or 'individual choice.'  On the other hand, non-discretionary or ministerial functions are those that do not require individual decisionmaking." (citations omitted) (quoting Webster's Ninth New Collegiate Dictionary 362 (1991))).  For example, courts have found discretion to exist when a contract allows a party to unilaterally change the value of a fee or rate.  See, e.g., Rozo, 949 F.3d at 1073, 1075 (provider of a 401(k) plan had the contractual right to "unilaterally calculate[]" a rate of return every six months); Ed Miniat, 805 F.2d at 734, 738 (insurer had the "unilateral right to reduce the rate of return that [the insurer] was to pay on account to [the plan sponsor] to a scheduled

---

[14]    Courts also sometimes find discretion to exist unmoored from contractual obligations or even contrary to them.  See, e.g., Peters v. Aetna Inc., 2 F.4th 199, 231 (4th Cir. 2021) (finding that a hidden fee may have been "imposed upon [a plan participant] and the [p]lan at [the TPA]'s discretion, but without authority under the [p]lan and in direct violation of the [contract]").  But that is not our case.  Rather, the Fund's central premise is that the ASA and SPD granted BCBSMA significant discretion, and that BCBSMA breached fiduciary duties when operating within that discretion.  We thus analyze the Fund's allegations through that framework.

minimum . . . and to increase significantly the annual premium rates to a scheduled maximum"); Golden Star, Inc. v. Mass. Mut. Life Ins. Co., 22 F. Supp. 3d 72, 80-82 (D. Mass. 2014) (service provider to 401(k) plans was contractually authorized to "determine[] where in the range of 0.0 to 1.0% the fee percentage rate [would] be set"); Glass Dimensions, Inc. ex rel. Glass Dimensions, Inc. Profit Sharing Plan & Tr. v. State St. Bank & Tr. Co., 931 F. Supp. 2d 296, 304 (D. Mass. 2013) (bank was given "discretion to set its [lending] fee anywhere from 0% to 50%"). Similarly, courts have found discretion to exist if a contract contains broad language that affords a party flexibility in determining its course of action. See, e.g., Pipefitters Loc. 636 Ins. Fund. v. Blue Cross & Blue Shield of Mich., 722 F.3d 861, 867 (6th Cir. 2013) (contract had "opaque language" stating that fees would be "reflected" in the amounts billed by a TPA, but "[n]owhere . . . set forth the dollar amount . . . or even a method by which the . . . fee [was] to be calculated," and thus "in no way cabin[ed] [the TPA]'s discretion to charge or set" the fees); Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Mich., 751 F.3d 740, 744, 748 (6th Cir. 2014) (similar); Six Clinics Holding Corp., II v. Cafcomp Sys., Inc., 119 F.3d 393, 402 (6th Cir. 1997) (contract allowed a TPA to unilaterally amend the plan and to conduct certain activities "as [the TPA] deem[ed] necessary" and "as required in the judgment of [the TPA]" (emphases omitted)); IT

Corp. v. Gen. Am. Life Ins. Co., 107 F.3d 1415, 1417-18, 1420 (9th Cir. 1997) (contract allowed a TPA to decide which claims were "contested or doubtful" such that they should be referred to the plan sponsor for adjudication, thus giving the TPA discretion in "interpret[ing] the plan to determine whether a benefits claim ought to be referred back").

In contrast, courts typically find discretion to be lacking when a contract merely requires "adhere[nce] to a specific contract term," Ed Miniat, 805 F.2d at 737, even when adhering to that term requires expertise in complex subject matter. See, e.g., Briscoe v. Fine, 444 F.3d 478, 489 (6th Cir. 2006) (finding, where a TPA "operated pursuant to an administrative services agreement that conferred upon it the responsibility for determining eligibility for benefits, processing claims, and assisting the plan administrator in producing reports required by federal and state law," that such duties were "insufficient to convert [the TPA] into an ERISA fiduciary"); Seaway, 347 F.3d at 616, 619 (finding that a TPA did not exercise discretion when retaining discounts and various fees, because the contract stated that those "amounts [were] for the sole benefit of [the TPA], and [the TPA] [would] retain any payments resulting therefrom" (emphasis added)); cf. Rowe, 429 F.3d at 301 (finding that entities lacked discretion when disclosing "conflicts of interests and payments from drug manufacturers" as specifically required by statute).

Another relevant factor in cases involving TPAs is whether the plan sponsor retains the final authority to determine whether claimants are entitled to benefits. See, e.g., Briscoe, 444 F.3d at 489 (discussing various cases that found that a TPA lacked discretion where the plan sponsor reserved the right to review the TPA's eligibility decisions and/or retained control over claims appeals processes); cf. Varity Corp. v. Howe, 516 U.S. 489, 511 (1996) ("[A] plan administrator engages in a fiduciary act when making a discretionary determination about whether a claimant is entitled to benefits under the terms of the plan documents.").

A review of the ASA, the SPD, and the Fund's complaint demonstrates that the present lawsuit falls firmly into the latter category of cases. BCBSMA lacked discretion when taking the actions subject to the Fund's complaint, and so although BCBSMA's actions may have constituted a breach of contract, they were not the actions of a fiduciary under ERISA.

First, as for BCBSMA's pricing of claims, the ASA and SPD required BCBSMA to apply payment rates according to schedules that had already been negotiated with providers. Under the ASA, BCBSMA was required to "receive and reprice all covered claims . . . in accordance with [the] provider reimbursement arrangements" it had previously negotiated. And the SPD informed Plan participants that if they chose in-network providers, then the "billed charges that [would] be considered covered expenses

[would] never be more than the negotiated rate."  The documents thus clearly contemplated that there were "negotiated rate[s]" to which BCBSMA was required to conform when pricing claims; BCBSMA was afforded no discretion to deviate from those rates.  Further, the Fund retained full authority over eligibility determinations: once BCBSMA had "repriced" the claims, the ASA required BCBSMA to transmit those claims to the Fund, which would enter the claims into its own "claims processing system" to "determine member eligibility, the availability of benefits and claims adjudication."  After calculating deductibles and copayments, the Fund would forward the "final approval or denial" to BCBSMA, authorizing BCBSMA's payment to providers.  And for all claims that were disputed by participants, the Fund -- not BCBSMA -- was solely "responsible to process and make a decision regarding such [an] appeal."  See Briscoe, 444 F.3d at 489 (declining to attribute fiduciary status to a TPA where the plan sponsor "retained the final authority to determine whether a claim should be paid and was the entity to which dissatisfied employees were instructed to direct their appeal of a claim denial").

Indeed, the Fund's complaint is fundamentally premised on the notion that there were "correct" rates to be applied to each submitted claim, but that BCBSMA failed to apply them.[15]

---

[15]    As we previously noted, the Fund does not take issue with BCBSMA's negotiation of rates with providers or the fact that

Pointing to the SPD's provision that "billed charges that w[ould] be considered covered expenses w[ould] never be more than the negotiated rate," the complaint alleges that BCBSMA "paid claims in violation of the Plan's written terms, which require adherence to negotiated rates and prohibit billed charges that exceed negotiated rates." With respect to hospital readmission pricing errors, the complaint alleges that "BCBSMA incorrectly priced such events as two separate hospital admissions in direct violation of BCBSMA's policy" (emphasis added), and with respect to observation room pricing errors, the complaint states that BCBSMA's "payments exceeded the amount permitted and owed under the Plan, in which the benefits are limited to the rates negotiated by BCBSMA." Similar language abounds throughout the complaint. These allegations may buttress a claim that BCBSMA breached its contractual obligation under the ASA and SPD to price claims according to its negotiated schedules, but they do not support an inference that BCBSMA had discretion on whether to do so.

The Fund argues that BCBSMA's exercise of medical judgment in repricing claims was an exercise of discretion sufficient to confer fiduciary status. It points out that under the ASA, BCBSMA was required to "conduct a medical necessity and

---

BCBSMA reserved the right to renegotiate those rates. Rather, the Fund focuses only on BCBSMA's application of those rates to participants' claims.

utilization review" of participants' claims using the "medical policy, medical technology assessment guidelines and utilization review policies" that were developed by BCBSMA and attached to the ASA.

Most of the factual allegations presented by the Fund in its complaint, however, do not reflect an exercise of significant medical judgment by BCBSMA. On the contrary, many of them describe clerical errors. For example, the complaint alleges that ClaimInformatics identified a "pattern of BCBSMA calculating covered charges in amounts higher than the amounts healthcare providers actually billed," including one instance of pricing a claim at $120,614 despite the hospital's billing only $38,786. Similarly, the complaint alleges that BCBSMA repeatedly priced hospital readmissions as separate admissions in contravention of its policy that certain readmissions would be included in the initial admission price, and that BCBSMA regularly and erroneously charged a two-day rate for observation room stays under twenty-four hours when those stays spanned two calendar days. In one instance, BCBSMA purportedly failed to inquire about a discrepancy in which a hospital billed a procedure as a "foot amputation" despite the doctor's billing it as a "toe amputation." These alleged errors concern instances where BCBSMA allegedly failed to follow straightforward contractual obligations.

We focus more specifically on two allegations in the complaint. First, the complaint alleges that BCBSMA accepted a "statistically improbable number of claims" in which a hospital had classified patient illness to be of "level 4" severity. Second, the complaint alleges that in one instance, BCBSMA failed to inquire why a provider charged three hours for a procedure known to take no more than five minutes. These two allegations have to do with knowledge of specific medical statistics (i.e., the average number of hospital patients with severe illness and the average length of a certain procedure, respectively). We need not decide what level of medical judgment might rise to the level of "discretion" under ERISA, because we are satisfied that neither of these alleged actions do so. Cf. Pegram, 530 U.S. at 231-32 (finding that HMOs are not fiduciaries "to the extent that [they] make[] mixed eligibility [and treatment] decisions acting through [their] physicians," partly because "[a]t common law, fiduciary duties characteristically attach to decisions about managing assets and distributing property to beneficiaries"). And in any event, there is an additional reason to reject the Fund's argument: the Fund confuses the complexity of the medical issues involved with the question of whether BCBSMA had discretion. The complaint alleges throughout that BCBSMA failed to reach the "correct" outcome when pricing claims, not that it had the discretion to reach different conclusions.

- 31 -

Next, the Fund argues that BCBSMA was a fiduciary when taking the recovery and settlement actions alleged in the Fund's complaint. The complaint's allegations concern actions alleged to violate BCBSMA's contractual obligations, but as to which BCBSMA had no discretion. The complaint alleges, for example, that BCBSMA would at times retain a recovery fee even when the overpayments necessitating recovery had been caused by BCBSMA's own errors. The ASA did not grant BCBSMA discretion to take such an action, however; rather, the ASA clearly provided that BCBSMA was authorized to retain a recovery fee only if the need for recovery was "attributable to a third party and not attributable to an error made by [BCBSMA]." Similarly, the complaint's allegations that BCBSMA once retained a recovery fee despite not recovering any overpayment, and once miscalculated a recovery fee by applying the recovery fee percentage to the original claim amount instead of the recovered amount, both amount to claims that BCBSMA breached the plain terms of the ASA, which allowed BCBSMA to retain a recovery fee only when it pursued and obtained a recovery, and provided that the recovery fee percentage would be applied to the "recovery amount." The complaint further alleges that BCBSMA wrongfully increased the recovery fee percentage from 20% to 30% for all recoveries and began charging a 19% "Coding Advisor Program Fee" on savings to the Fund from BCBSMA's post-payment audits of out-of-network claims. Again, these acts are alleged to be in

violation of the ASA, which provides for a 20% recovery fee. Indeed, BCBSMA's explanation for charging these fees was that it believed the Fund had signed separate amendments allowing the fees to be exacted; neither party argues that BCBSMA had the discretion under the ASA to charge these fees.

With respect to recovery and settlement operations, only one allegation in the complaint entails any exercise of judgment by BCBSMA. The complaint alleges, in relation to BCBSMA's erroneously charging a two-day rate for observation room stays that spanned two calendar days but were shorter than twenty-four hours, that BCBSMA obtained partial recoveries via provider settlements even though it was "administratively practical [and] reasonable" to reprocess the claims instead for full recoveries. The settlements, according to the complaint, "grossly undercompensate[d]" the Fund.

It is true that the ASA granted BCBSMA the ability to exercise some measure of judgment in determining whether reprocessing a claim would be "not administratively practical or reasonable" such that BCBSMA could instead pursue a settlement with the provider. But even if this provision grants BCBSMA "discretion" under ERISA, the Fund has failed to plausibly allege that this discretion involves Plan management. See 29 U.S.C. § 1002(21)(A)(i) (designating as fiduciaries persons who exercise "discretionary authority or discretionary control respecting

management of [the] plan" (emphasis added)).  On the contrary, the
ASA contemplated that BCBSMA typically would undertake such
settlements on behalf of all or a subset of its book of business,
with each client (including the Fund) receiving "its pro rata share
of the settlement."  The Fund fails to plausibly allege that such
settlements constituted <u>management</u> of the Plan, as opposed to
broader business decisions that simply <u>affected</u> the Plan and its
participants.  <u>See</u> <u>Pegram</u>, 530 U.S. at 226 ("[T]he threshold
question is not whether the actions of some person employed to
provide services under a plan adversely <u>affected</u> a plan
beneficiary's interest, but whether that person was acting as a
fiduciary (that is, was performing a fiduciary function) when
taking the action subject to complaint." (emphasis added));
<u>Merrimon</u> v. <u>Unum Life Ins. Co. of Am.</u>, 758 F.3d 46, 60 (1st Cir.
2014) ("Discretionary acts trigger fiduciary duties under ERISA
only when and to the extent that they relate to plan management or
plan assets."); <u>DeLuca</u> v. <u>Blue Cross Blue Shield of Mich.</u>, 628
F.3d 743, 747 (6th Cir. 2010) (holding that a TPA was not a
fiduciary when negotiating rates with providers, "principally
because those business dealings were not directly associated with
the benefits plan at issue . . . but were generally applicable to
a broad range of health-care consumers"); <u>id.</u> ("[I]n determining
liability for an alleged breach of fiduciary duty in an ERISA case,
the courts 'must examine the conduct at issue to determine whether

it constitutes management or administration of the plan, giving rise to fiduciary concerns, or merely a business decision that has an effect on an ERISA plan not subject to fiduciary standards.'" (internal quotation marks omitted) (quoting Hunter v. Caliber Sys., Inc., 220 F.3d 702, 718 (6th Cir. 2000))).  The Fund has not alleged that any observation room error settlements were specific to the Plan, let alone shown that such Plan-specific settlements would have involved "management" of the Plan.  Cf. Merrimon, 758 F.3d at 60 (finding that an insurer's discretion in setting interest rates on retained asset accounts used to pay life insurance benefits "did not relate to plan management but, rather, related to the management of the [retained asset accounts]").

As the Department of Labor's interpretive bulletin notes, a "person who performs purely ministerial functions . . . within a framework of policies, interpretations, rules, practices and procedures made by other persons is not a fiduciary." Livick, 524 F.3d at 29 (omission in original) (quoting 29 C.F.R. § 2509.75-8(D-2)).  The Fund tries to turn this interpretive bulletin on its head by arguing that it was BCBSMA, not "other persons," that set up the relevant "framework."  The Fund contends that this is so because BCBSMA negotiated rates with providers and used its own procedures to pursue recoveries.  This argument fails.  It is accurate that BCBSMA itself negotiated its PPO provider rates, but this negotiation was not the action that was the subject of the

Fund's complaint.    Rather, the relevant "framework" was the framework for <u>applying</u> the negotiated PPO rates.  The ASA specified that BCBSMA must apply its already negotiated PPO rates, and then provided in-depth instructions on how and when BCBSMA was authorized to pursue recoveries and provider settlements.  It was the Fund which, in the ASA, created this "framework."

The Fund has failed to plausibly allege that BCBSMA exercised discretionary authority or control over management of the Plan when taking the actions subject to the Fund's complaint.

### B.  Authority or Control Respecting Management or Disposition of Plan Assets

The Fund next turns to the issue of "plan assets," arguing that BCBSMA was a fiduciary to the extent that it "exercise[d] any authority or control respecting management or disposition of [the Plan's] assets."  29 U.S.C. § 1002(21)(A)(i). The Fund contends that the working capital amount was a Plan asset and that BCBSMA exercised "authority or control respecting management or disposition" of the working capital amount.[16]

---

[16]    In a single paragraph of its brief, the Fund also posits that recovered amounts from overpaid providers constituted Plan assets over which BCBSMA exercised the requisite control.  But the Fund never raised this theory before the district court, so the Fund forfeited the argument.  <u>See</u> <u>Massó-Torrellas</u> v. <u>Municipality of Toa Alta</u>, 845 F.3d 461, 466 (1st Cir. 2017) ("Appellants cannot raise an argument on appeal that was not squarely and timely raised in the trial court.    [L]itigants must spell out their legal theories face-up and squarely in the trial court . . . . [Otherwise,] that claim ordinarily is deemed unpreserved for purposes of appellate review." (alterations and omission in

As previously described, the working capital amount was an amount paid by the Fund to BCBSMA "for estimated [c]laim [p]ayments." It was paid in weekly installments as part of a fixed monthly sum that consisted of both the working capital amount and estimated administrative charges. Each month, BCBSMA would determine whether actual claim payments and incurred administrative fees that month had been lower than or higher than the combined weekly payments. If the combined payments had overestimated actual claims and fees, BCBSMA would apply a credit to the Fund's next weekly payment; if the combined payments were too low, the Fund would increase its next payment accordingly. The parties agreed to this arrangement in the ASA.

In their briefing, the parties and their amici vigorously dispute the question of whether the working capital amount remained a Plan asset once paid to BCBSMA.[17] We assume, without deciding, that the working capital amount did remain an asset of the Plan, and that, as the Fund alleges, the working capital amount (as opposed to other funds) was actually used by BCBSMA to pay claims on behalf of the Plan's participants. Even if the working capital amount was a Plan asset, the Fund has failed to plausibly allege that BCBSMA exercised "any authority or control

---

original) (quoting Thomas v. Rhode Island, 542 F.3d 944, 949 (1st Cir. 2008))).

[17]    We thank all amici to this appeal for their briefs.

respecting management or disposition" of the working capital amount. 29 U.S.C. § 1002(21)(A)(i).

Every circuit to have directly addressed the issue has concluded that "discretionary" control or authority is not required with respect to the management or disposition of plan assets. See LoPresti v. Terwilliger, 126 F.3d 34, 40 (2d Cir. 1997); Bd. of Trs. of Bricklayers & Allied Craftsmen Loc. 6 of N.J. Welfare Fund v. Wettlin Assocs., Inc., 237 F.3d 270, 272-74 (3d Cir. 2001); Briscoe v. Fine, 444 F.3d 478, 490-91 (6th Cir. 2006); Leimkuehler v. Am. United Life Ins. Co., 713 F.3d 905, 912-13 (7th Cir. 2013); FirsTier Bank, N.A. v. Zeller, 16 F.3d 907, 911 (8th Cir. 1994); IT Corp. v. Gen. Am. Life Ins. Co., 107 F.3d 1415, 1421 (9th Cir. 1997); David P. Coldesina, D.D.S, P.C., Emp. Profit Sharing Plan & Tr. v. Est. of Simper, 407 F.3d 1126, 1132 & n.2 (10th Cir. 2005); Chao v. Day, 436 F.3d 234, 235-37, 237 n.1 (D.C. Cir. 2006).[18]  Finding otherwise would "do[] violence to the statutory text," Chao, 436 F.3d at 236, which provides that "any" authority or control suffices, 29 U.S.C. § 1002(21)(A)(i) ("[A] person is a fiduciary with respect to a plan to the extent . . . he [(a)] exercises any discretionary authority or discretionary

---

[18]  To our knowledge, the Fourth and Fifth Circuits have not considered the question, and the Eleventh Circuit has declined to decide it, see Carolinas Elec. Workers Ret. Plan v. Zenith Am. Sols., Inc., 658 F. App'x 966, 970 n.3 (11th Cir. 2016) (per curiam) (unpublished decision).

control respecting management of such plan or [(b)] exercises any authority or control respecting management or disposition of its assets . . . ." (emphases added)); see also Wettlin, 237 F.3d at 274 ("That Congress established a lower threshold for fiduciary status where control of assets is at stake is not surprising, given that '[a]t common law, fiduciary duties characteristically attach to decisions about managing assets and distributing property to beneficiaries.'" (alteration in original) (quoting Pegram, 530 U.S. at 231)).  We join our sister circuits in concluding that even nondiscretionary control or authority over plan assets suffices to render a person a fiduciary.

Nevertheless, the statute imparts fiduciary status only to persons who "exercise[] . . . authority or control" with respect to the "management or disposition" of plan assets.  29 U.S.C. § 1002(21)(A)(i).  This court has thus noted that "the mere exercise of physical control or the performance of mechanical administrative tasks generally is insufficient to confer fiduciary status." Beddall, 137 F.3d at 18.  Rather, a degree of "meaningful control" is required.  Id.; see also Cottrill v. Sparrow, Johnson & Ursillo, Inc., 74 F.3d 20, 22 (1st Cir. 1996) (finding the "simpl[e] perform[ance]" of "a purely administrative act" insufficient to render a person a fiduciary), abrogated on other grounds by Hardt v. Reliance Standard Life Ins. Co., 560 U.S. 242 (2010); 29 C.F.R. § 2509.75-8(D-2) (noting that "administrative

functions" do not constitute control over the management or disposition of plan assets). This conclusion is consistent with case law from other circuits. See, e.g., Chao, 436 F.3d at 237 (declining to "extend fiduciary status to every person who exercises 'mere possession, or custody' over [plan] assets"); Briscoe, 444 F.3d at 494 (same); Wettlin, 237 F.3d at 275 ("ERISA does not consider as a fiduciary an entity such as a bank when it does no more than receive deposits from a benefit fund on which the fund can draw checks."); IT Corp., 107 F.3d at 1422 ("Authority over a plan's money is not the same thing as being a depository of the money. If the plan's money is deposited in a bank, that does not ipso facto make the bank a fiduciary.").

The Fund develops no argument with respect to the "management" of the working capital amount,[19] so our analysis is limited to determining whether BCBSMA exercised authority or control respecting the "disposition" of the working capital amount. Cf. Cottrill, 74 F.3d at 21-22 (analyzing the terms "management" and "disposition" separately). Further, because ERISA confers fiduciary status only "to the extent" that the

_____

[19] The Fund's brief makes cursory reference to the phrase "management or disposition," but the relevant section of its brief develops only an argument that BCBSMA "was a fiduciary because it exercised authority over the disposition of [P]lan assets." (Emphasis added). Any argument about the "management" of the working capital amount is thus waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

requisite control is exercised, 29 U.S.C. § 1002(21)(A), our analysis is confined to resolving whether BCBSMA "act[ed] as a fiduciary . . . when taking the action subject to complaint," Pegram, 530 U.S. at 226. Here, that action was BCBSMA's allegedly erroneous pricing of claims. We thus must decide only whether the Fund has plausibly alleged that BCBSMA's repricing of claims constituted "authority or control respecting . . . disposition" of the working capital amount.[20] 29 U.S.C. § 1002(21)(A)(i). It has not, for several reasons.

First, the act of repricing claims was not itself an exercise of authority over the "disposition" of the working capital amount. The Fund cites no authority supporting the notion that determining the amount of plan assets to be paid is equivalent to controlling the actual payment -- i.e., the disposition -- of those assets. See Webster's Third New International Dictionary 654 (1971) (defining "disposition" as "a placing elsewhere, a giving over to the care or possession of another, or a relinquishing"). On the contrary, the pricing process was separate from and antecedent to the act of payment. Cf. Leimkuehler, 713 F.3d at

---

[20]   The Fund does not argue that BCBSMA's recovery and settlement operations constituted control over the working capital amount. And as we previously noted, see supra note 16, the Fund forfeited its argument that the amounts recovered from overpaid providers constituted Plan assets. We thus analyze only BCBSMA's pricing activities, not its actions pertaining to recovery and settlement.

913-14 (declining to attribute fiduciary status to an insurance
company based on actions it took "well before" it invested plan
assets); Carolinas Elec. Workers Ret. Plan v. Zenith Am. Sols.,
Inc., 658 F. App'x 966, 971 (11th Cir. 2016) (per curiam)
(unpublished decision) (concluding that a TPA was not a fiduciary
when the allegations against it "all relate[d] to [its] role in
accounting for the plan's assets" but not to whether it "exercised
authority or control over the assets"); 29 C.F.R. § 2509.75-8(D-
2) (noting that the "[c]alculation of benefits," "[c]ollection of
contributions and application of contributions as provided in the
plan," and "[p]rocessing of claims" do not constitute control over
the management or disposition of plan assets).  Even if BCBSMA's
pricing of claims affected the disposition of the working capital
amount, it did not amount to "meaningful control" over such
disposition.  Beddall, 137 F.3d at 18; cf. Livick, 524 F.3d at 29
(noting that whether a service provider's actions "adversely
affected a plan beneficiary's interest" does not determine whether
that entity was acting as an ERISA fiduciary (quoting Pegram, 530
U.S. at 226)).

        We turn, then, to the actual "disposition" of the working
capital amount.  The Fund does not argue that BCBSMA used the
working capital amount for its own benefit, see, e.g., Guyan Int'l,
Inc. v. Pro. Benefits Adm'rs, Inc., 689 F.3d 793, 796, 798 (6th
Cir. 2012) (attributing fiduciary status to a TPA that "commingled

and misappropriated . . . [p]lan funds for its own purposes");
Chao, 436 F.3d at 235, 238 (holding that an insurance company
president was a fiduciary when he promised to use plan funds to
purchase insurance policies but instead "pilfered" the funds and
provided fake policies), or billed the Fund for other fees, see,
e.g., Hi-Lex, 751 F.3d at 743, 747 (concluding that a TPA that
"retain[ed] additional revenue by adding certain mark-ups to
hospital claims paid by its . . . clients" was a fiduciary);
Pipefitters, 722 F.3d at 864-65, 867 (similar). Nor does the Fund
contend that BCBSMA paid any portions of the working capital amount
to anyone other than providers pursuant to adjudicated claims.
See, e.g., Srein v. Frankford Tr. Co., 323 F.3d 214, 221-22 (3d
Cir. 2003) (finding that a company that distributed plan funds to
a different plan was a fiduciary); LoPresti, 126 F.3d at 40
(concluding that a company officer who "use[d] . . . plan assets
to pay [c]ompany creditors" was a fiduciary). Rather, the Fund
argues only that BCBSMA overpriced claims, leading to overpayments
to providers who were entitled to a lower amount of compensation.

But as to the actual payment of claims to these
providers, the Fund has failed to plausibly allege that BCBSMA
exercised any authority or control over the payment process beyond
the "mere exercise of physical control or the performance of
mechanical administrative tasks." Beddall, 137 F.3d at 18. On
the contrary, the ASA unambiguously gave the Fund full control

over claims eligibility determinations and thus the authority to approve the transmission of claim payments. After BCBSMA repriced each claim according to its provider network rates, the Fund entered that claim into its own claims processing system to "determine member eligibility." Only once the "final approval or denial" of the claim was "forwarded by the Fund to [BCBSMA]" was BCBSMA entitled to remit portions of the working capital amount to providers. Further, if a Plan participant disputed any adjudicated claim, the Fund -- not BCBSMA -- was solely "responsible to process and make a decision regarding such [an] appeal."

The fact that BCBSMA could make claim payments only with the Fund's authorization, along with the fact that the Fund retained full control over the appeals process, weighs toward finding that BCBSMA lacked authority respecting the disposition of the working capital amount. See, e.g., id. at 20 (holding that a bank was not a fiduciary when investing plan assets according to the binding directions of an investment manager); Cottrill, 74 F.3d at 22 (finding that the "simpl[e] perform[ance] [of] a transfer specified by [a plan] trustee" did not amount to an exercise of control over the disposition of plan assets); cf. Humana Plan, Inc. v. Nguyen, 785 F.3d 1023, 1028 (5th Cir. 2015) (noting that "a requirement that [a] [service provider] submit a recommendation to the plan administrator for approval before the [service provider] takes further action" weighs toward finding

that the service provider is a "ministerial employee," not a
fiduciary).  With respect to the actual payment of the working
capital amount (as opposed to the repricing of claims), BCBSMA
essentially acted as a "conduit, performing a ministerial act
directed by [the Fund]." Cottrill, 74 F.3d at 22.  The parties'
arrangement is distinguishable from instances in which a TPA has
the ability to convey plan funds unilaterally.  Compare, e.g.,
Carolinas, 658 F. App'x at 971 (holding that a TPA was not a
fiduciary where the TPA "was not a signatory on the plan's bank
account and . . . could not dispose of plan assets without the
[plan] trustees' approval"), with, e.g., Wettlin, 237 F.3d at 271,
275 (holding that a TPA was a fiduciary where the TPA "wrote
checks[] and disbursed assets from the fund's bank account" and
"was not required to seek approval from the [plan] [t]rustees in
advance").[21]

Our holding is a limited one.  We do not hold, for
example, that a TPA lacks fiduciary status whenever the plan
sponsor is responsible for claims adjudication.  See Humana, 785

---

[21]    Like Wettlin, various cases attributing fiduciary status
have involved defendants that apparently had relatively
unconstrained check-writing authority over an account containing
plan assets. See, e.g., Guyan, 689 F.3d at 796, 798; Briscoe, 444
F.3d at 483, 494; Coldesina, 407 F.3d at 1133-35; LoPresti, 126
F.3d at 38, 40; IT Corp., 107 F.3d at 1418-21.  BCBSMA neither had
nor attempted to exercise such authority; its ability to convey
the working capital amount was circumscribed by the requirement of
first obtaining the Fund's approval for each claim payment.

F.3d at 1030 ("We do not hold . . . that a third-party service provider must have final decision-making authority to be an ERISA fiduciary."). Rather, our holding is fact-specific: it is based on, inter alia, the Fund's failure to develop an argument about the "management" of Plan assets; the fact that BCBSMA's control over the pricing process (which is the sole "action subject to complaint," Pegram, 530 U.S. at 226) does not plausibly constitute authority or control with respect to the "disposition" of the working capital amount; the fact that the Fund has not alleged that BCBSMA used the working capital amount for its own purposes or paid it to unauthorized recipients; and the fact that BCBSMA lacked "meaningful control" over remitting claim payments to Fund-approved providers, Beddall, 137 F.3d at 18.

We conclude that even if the working capital amount was a Plan asset, the Fund has failed to plausibly allege that BCBSMA exercised "any authority or control respecting management or disposition" of that amount. 29 U.S.C. § 1002(21)(A)(i). The Fund's contention that BCBSMA was a fiduciary fails.

### III.  Implications

Because the parties and their amici have dedicated extensive briefing to the practical implications of our ruling, we briefly address those arguments here. Doing so is consistent with Supreme Court and First Circuit case law. See, e.g., Varity Corp., 516 U.S. at 513-15 (discussing the "basic purposes" of ERISA);

Shields v. United of Omaha Life Ins. Co., 50 F.4th 236, 251-52 (1st Cir. 2022) (addressing a debate between two amici regarding the purposes of ERISA); Beddall, 137 F.3d at 21 (examining potential risks and incentives created by the attribution of fiduciary status).

The Supreme Court has recognized that ERISA was enacted primarily "to promote the interests of employees and their beneficiaries in employee benefit plans" and "to protect contractually defined benefits." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 113 (1989) (first quoting Shaw v. Delta Airlines, Inc., 463 U.S. 85, 90 (1983); and then quoting Mass. Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 148 (1985)). But there exists a "tension between the primary [ERISA] goal of benefiting employees and the subsidiary goal of containing . . . costs." Mertens v. Hewitt Assocs., 508 U.S. 248, 262-63 (1993) (alteration in original) (quoting Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 515 (1981)). For example, another aim of ERISA was "to create a system that is [not] so complex that administrative costs, or litigation expenses, unduly discourage employers from offering [ERISA] plans in the first place." Conkright v. Frommert, 559 U.S. 506, 517 (2010) (alterations in original) (quoting Varity Corp., 516 U.S. at 497).

BCBSMA and its amici persuasively argue that attributing fiduciary status to BCBSMA on this case's facts could interfere

with BCBSMA's business model in a manner that could also harm plan participants and beneficiaries.  The Fund contracted with BCBSMA primarily to take advantage of its network of providers, with whom BCBSMA negotiates discounted rates in volume.  Indeed, amici for BCBSMA note that some TPAs offer both TPA services and insurance services and generally make the same network available to both sets of clients, serving the goal of uniformity.  If BCBSMA were required here to adhere to strict fiduciary duties in the interests of individual plans, it arguably would need to restructure its networks and procedures based on the needs of each plan, undermining its ability to act in the overall interest of its book of business.  Cf. DeLuca, 628 F.3d at 747 ("The financial advantage underlying [a TPA]'s rate negotiations arises from the market power that [the TPA] has as a large purchaser of health-care services. . . . If, however, [the TPA] would be required to negotiate solely on a plan-by-plan basis, as a practical matter its economic advantage in the market would be destroyed, damaging its ability to do business on a system-wide basis, ultimately to the [plan] beneficiaries' disadvantage.").

Such restructuring could ultimately come at a steep price to plans and their participants.  Indeed, one current industry practice allows plan sponsors to purchase contract "riders" that require a TPA to act as final claims adjudicator, rendering the TPA a fiduciary.  According to amici for BCBSMA, the

cost of these riders is "not insubstantial," given the expenses and risks associated with being an ERISA fiduciary.  Finding that fiduciary status stems from arrangements like the one here could lead TPAs to increase fees to account for the imposition of fiduciary obligations.[22]  See Beddall, 137 F.3d at 21 (noting the importance of avoiding a "climate in which [entities] would routinely increase their fees to account for the risk that fiduciary liability might attach to nonfiduciary work" (quoting Ariz. State Carpenters Pension Tr. Fund v. Citibank, (Ariz.), 125 F.3d 715, 722 (9th Cir. 1997))).  TPAs might have difficulty avoiding such a result -- for example, under the Fund's view of the "plan assets" inquiry, TPAs for self-funded plans would perhaps need to pay claims in advance and only later be reimbursed by the plans to avoid becoming functional fiduciaries.  As the district court noted, such an arrangement would force the TPA to "play[] the role of an unsecured lender to the plan."  Mass. Laborers' Health & Welfare Fund, 2022 WL 952247, at *15.  That outcome could constitute an unnecessary "upheaval" in the TPA industry.  Pegram, 530 U.S. at 233.

_____

[22]    We do not hold that contract riders are required to render a TPA a fiduciary.  Such a holding would obviate ERISA's provision that entities can be functional fiduciaries even if not named as fiduciaries in plan documents or via plan procedures. See 29 U.S.C. § 1002(21)(A).  We hold only that the arrangement between the Fund and BCBSMA did not confer functional fiduciary status on BCBSMA.

Amici for the Fund contend that finding BCBSMA to be a nonfiduciary on these facts may allow TPAs and insurers to perpetuate various anticompetitive practices, such as the inclusion of "anti-steering clauses," "anti-tiering clauses," "all-or-nothing clauses," and "gag clauses" in their contracts with plans. We do not doubt that such practices can harm plans and their participants; nor do we question that ERISA could potentially offer relief for those harms. Nevertheless, these concerns cannot override the statutory language. See Mertens, 508 U.S. at 263 ("We will not attempt to adjust the balance between those competing goals that the text adopted by Congress has struck."). And our decision still allows plans to structure their contracts with TPAs in various ways that will give rise to functional fiduciary status. Further, plans remain able to purchase contract riders to name TPAs as fiduciaries.

### IV. Disposition

For the foregoing reasons, the judgment of the district court is affirmed.[23]

---

[23] Because we affirm the district court's dismissal of the Fund's ERISA claims, we also affirm the court's dismissal of the Fund's state-law claims upon declining to exercise supplemental jurisdiction. See Mass. Laborers' Health & Welfare Fund, 2022 WL 952247, at *16. The Fund does not argue that the dismissal of its state-law claims was an abuse of discretion.