No. 22-1317

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

MASSACHUSETTS LABORERS' HEALTH
AND WELFARE FUND; TRUSTEES OF THE
MASSACHUSETTS LABORERS' HEALTH
AND WELFARE FUND, as Fiduciaries,

Plaintiffs-Appellants,

v.

BLUE CROSS BLUE SHIELD OF
MASSACHUSETTS,

Defendant-Appellee.

On Appeal from the United States District Court for the
District of Massachusetts
Case No. 1:21-cv-10523-FDS

## BRIEF OF THE SECRETARY OF LABOR, AS
## AMICUS CURIAE IN SUPPORT OF
## APPELLANTS AND REQUESTING REVERSAL

SEEMA NANDA
*Solicitor of Labor*

G. WILLIAM SCOTT
*Associate Solicitor*
*for Plan Benefits Security*

JEFFREY M. HAHN
*Counsel for Appellate and Special Litigation*

ROBIN SPRINGBERG PARRY
*Senior Regulatory Attorney*

SARAH M. KARCHUNAS
*Attorney*

U.S. Department of Labor
Office of the Solicitor
Plan Benefits Security Division
200 Constitution Ave. NW, N4611
Washington, D.C. 20210
(202)-693-5611
Karchunas.Sarah.M@dol.gov

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES...................................................................... ii

STATEMENT OF IDENTITY, INTEREST, AND AUTHORITY TO FILE ......... 1

STATEMENT OF THE ISSUES ............................................................. 2

STATEMENT OF THE CASE ................................................................ 3

    I.    <u>Background</u> ................................................................................. 3

    II.    <u>Procedural History</u> ................................................................... 7

SUMMARY OF THE ARGUMENT ......................................................... 9

ARGUMENT ..................................................................................... 11

    I.    THE FUND PLAUSIBLY ALLEGED THAT BLUE CROSS ACTED
        AS A FIDUCIARY BY EXERCISING CONTROL OR AUTHORITY
        OVER PLAN ASSETS................................................................ 11

        A.   The Fund Plausibly Alleged that the Working Capital Amounts the
             Fund Regularly Sent to Blue Cross for the Payment of Benefits Were
             Plan Assets ...................................................................... 11

        B.   The Fund Plausibly Alleged that Blue Cross Exercised Control or
             Authority over Plan Assets................................................. 17

    II.   THE FUND PLAUSIBLY ALLEGED THAT BLUE CROSS ACTED AS
        A FIDUCIARY BY EXERCISING DISCRETIONARY AUTHORITY OR
        CONTROL OVER PLAN MANAGEMENT ......................................... 20

CONCLUSION ................................................................................... 26

COMBINED CERTIFICATIONS

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases:**

*Acosta v. WH Admins, Inc.*,
  449 F. Supp. 3d 506 (D. Md. 2020) ................................................................. 14 n.4

*Beddall v. State St. Bank and Tr. Co.*,
  137 F.3d 12 (1st Cir. 1998) ......................................................... 19

*Briscoe v. Fine*,
  444 F.3d 478 (6th Cir. 2006)................................................... 14 n.4, 19

*Chao v. Day*,
  436 F.3d 234 (D.C. Cir. 2006) ................................................. 17

*Charters v. John Hancock Life Ins. Co.*,
  583 F. Supp. 2d 189 (D. Mass. 2008) ................................. 21 n.8

*David P. Coldesina, D.D.S. v. Estate of Simper*,
  407 F.3d 1126 (10th Cir. 2005)................................................... 13

*Depot Inc. v. Caring for Montanans*,
  915 F.3d 643 (9th Cir. 2019)................................................... 16, 17

*Donovan v. Cunningham*,
  716 F.2d 1455 (5th Cir. 1983)................................................... 1

*Ed Miniat, Inc. v. Globe Life Ins. Grp., Inc.*,
  805 F.2d 732 (7th Cir. 1986)................................................... 21

*Faber v. Metropolitan Life Ins. Co.*,
  648 F.3d 98 (2d Cir. 2011) ................................................... 12

*Gobeille v. Liberty Mut. Ins. Co.*,
  136 S. Ct. 936 (2016) ................................................... 1

**Page(s)**

## Federal Cases-(continued)

*Gordon v. CIGNA Corp.*,
   890 F.3d 463 (4th Cir. 2018).................................................................. 14 n.4, 16, 17

*Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Mich.*,
   751 F.3d 740 (6th Cir. 2014).................................................................. passim

*ILWU-PMA Welfare Plan Bd. of Trs. v. Conn. Gen. Life Ins. Co.*,
   2015 WL 9300519 (N.D. Cal. 2015).......................................................... 24

*In re Halpin*,
   566 F.3d 286 (2d Cir. 2009)...................................................................... 11, 12

*IT Corp. v. Gen. Am. Life Ins. Co.*,
   107 F.3d 1415 (9th Cir. 1997).................................................................. 14 n.4

*Kalda v. Sioux Valley Physician Partners, Inc.*,
   481 F.3d 639 (8th Cir. 2007)...................................................................... 12

*Merrimon v. Unum Life Ins. Co. of Am.*,
   758 F.3d 46 (1st Cir. 2014) ........................................................................ 11

*Mertens v. Hewitt Assocs.*,
   508 U.S. 248 (1993) ...................................................................................... 9

*Monterey Peninsula Horticulture, Inc. v. Emp. Benefit Mgmt. Servs, Inc.*,
   2020 WL 2747846 (N.D. Cal. May 27, 2020) .......................................... 18

*N.R. v. Raytheon*,
   24 F.4th 740 (1st Cir. 2022) ................................................................ 23 n.9

*Pegram v. Herdrich*,
   530 U.S. 211 (2000) .............................................................................. 18, 19

*Rozo v. Principal Life Ins. Co.*,
   949 F.3d 1071 (8th Cir. 2020).................................................................... 21

iv

**Page(s)**

**Federal Cases-(continued)**

*Rush Prudential HMO, Inc. v. Moran,*
 536 U.S. 355 (2002) ...................................................................................... 1

*Santana v. Deluxe Corp.,*
 920 F. Supp. 249 (D. Mass. 1996) ............................................................... 23

*Sec'y of Labor v. Doyle,*
 675 F.3d 187 (3d Cir. 2012) ........................................................................ 12

*Sixty-Five Sec. Plan v. Blue Cross & Blue Shield*,
 583 F. Supp. 380 (S.D.N.Y. 1984) ........................................................ 21 n.8

*Technibilt Grp. Ins. Plan v. Blue Cross and Blue Shield of North Carolina*,
 438 F. Supp. 3d 599 (W.D.N.C. 2020) ................................................... 14 n.4

*Technibilt Grp. Ins. Plan v. Blue Cross and Blue Shield of North Carolina*,
 2021 WL 1147168 (W.D.N.C. Mar. 25, 2021) ............................................ 23

*W.E. Aubuchon v. BeneFirst, LLC.*,
 661 F. Supp. 2d 37 (D. Mass. 2009) ...................................................... 16, 19

*Wayne Surgical Ctr. v. Concentra Preferred Sys. Inc.*,
 2008 WL 11510367 (D.N.J. 2008) ............................................................... 24

*Zenon v. Guzman,*
 924 F.3d 611 (1st Cir. 2019) ....................................................................... 20

**Federal Statutes:**

Employee Retirement Income Security Act of 1974, (Title I)
 as amended, 29 U.S.C. § 1001 et. seq.,

 Section 3(21)(A), 29 U.S.C. § 1002(21)(A) .......................................................... 9|

 Section 3(21)(A((i), 29 U.S.C. § 1002(21)(A)(iii)............................. 1, 2, 17 n.6, 20

**Page(s)**

**Federal Statutes-(continued):**

    Section 404, 29 U.S.C. § 1104 ................................................................. 7

    Section 504, 29 U.S.C. § 1134 ................................................................. 1

    Section 505, 29 U.S.C. § 1135 ................................................................. 1

**Miscellaneous:**

Fed. R. App. P. 29(a)(2) ................................................................. 2

29 C.F.R. § 2509.75-8 ................................................................. 22

U. S. Dep't of Labor, Advisory Op. No. 92-24,
    1992 WL 337539 (Nov. 6, 1992) ................................................. 12, 15

U. S. Dep't of Labor, Advisory Op. No. 93-14A,
    1993 WL 188473 (May 5, 1993) ................................................. 11

## STATEMENT OF IDENTITY, INTEREST, AND
## AUTHORITY TO FILE

The Secretary of Labor ("Secretary") has primary regulatory and enforcement authority for Title I of ERISA, 29 U.S.C. §§ 1134, 1135, which includes the statute's stringent fiduciary standards. Under ERISA, and as relevant here, a person is a fiduciary with respect to a plan to the extent they "exercise[] any discretionary authority or discretionary control respecting management of such plan or exercise[] any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A)(i). The district court dismissed Appellants' ERISA claims on the ground that they did not plausibly plead that Appellee Blue Cross and Blue Shield of Massachusetts ("Blue Cross") acted as a fiduciary with respect to Appellants' self-funded ERISA plan. The Secretary has a strong interest in ensuring that those who exercise discretionary authority or control respecting plan management, or exercise any control over plan assets, are subject to ERISA's fiduciary obligations. *See Donovan v. Cunningham*, 716 F.2d 1455, 1462–63 (5th Cir. 1983).

The Secretary also has an interest in ensuring the uniform application of ERISA. *See Gobeille v. Liberty Mut. Ins. Co*., 136 S. Ct. 936, 943–44 (2016); *Rush Prudential HMO, Inc. v. Moran,* 536 U.S. 355, 385 (2002). Here, one basis for Blue Cross's alleged fiduciary status is that it exercised authority over plan assets in the form of funds it received from Appellants' ERISA plan specifically for the payment

1

of benefits. In concluding that these funds were not plan assets, the district court explicitly disagreed with a Sixth Circuit decision holding, on similar facts, that funds remitted to Blue Cross by an employer-sponsor of a self-funded plan and earmarked for plan benefits were plan assets. *Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Michigan*, 751 F.3d 740 (6th Cir. 2014). The Secretary has an interest in ensuring that the First Circuit follows the Sixth Circuit's correct plan-asset analysis. The Secretary files this amicus brief pursuant to Federal Rule of Appellate Procedure 29(a)(2).

## STATEMENT OF THE ISSUES

ERISA defines a fiduciary to include any person who "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A)(i). Appellants alleged that Blue Cross, as third-party administrator of Appellants' self-funded ERISA health benefit plan, exercised authority or control over plan assets, and discretionary authority or control over plan management, by pricing the claims payable by the plan and then paying them out with plan assets. Appellants alleged that Blue Cross breached its fiduciary duties by systematically overpricing those claims, and thereby overpaying providers, in violation of plan terms. The district court dismissed Appellants' ERISA claims on the ground that the First Amended Complaint ("Complaint") did not plausibly allege that

2

Blue Cross acted as a fiduciary under ERISA when taking the challenged actions. The questions presented are:

1.    Whether the district court erred in dismissing Appellants' ERISA claims on the ground that Blue Cross did not act as a fiduciary by exercising authority or control over plan assets.

2.    Whether the district court erred in dismissing Appellants' ERISA claims on the ground that Blue Cross did not act as a fiduciary by exercising discretionary authority or discretionary control over plan management.

## STATEMENT OF THE CASE

### I.    Background

This case involves allegations made by the Massachusetts Laborers' Health and Welfare Fund (the "Fund") and its Trustees that Blue Cross violated the fiduciary provisions of ERISA while acting as a third-party administrator ("TPA") for the Fund's self-funded ERISA plan (the "Plan"). In contrast to a fully insured plan—where the plan sponsor pays premiums to an insurance company, which in turn assumes the risk of paying claims—in a self-funded plan, the plan itself bears that risk by setting aside its own funds to pay claims. Self-funded plans often retain TPAs to process those claims, among other tasks.

Prior to the parties terminating their relationship, Blue Cross had been the Plan's TPA since at least 2006, when Blue Cross and the Fund entered into an

Administrative Services Agreement ("ASA"). A12.[1] Under the ASA, Blue Cross contracted with network providers, who agreed to accept discounted rates for covered services rendered to members of the Plan. A7. Pursuant to its summary plan description ("SPD"), the Plan pays network providers for "covered charges," also known as "covered expenses," which, for network providers, "shall never be more than the negotiated rate." A10–11, A102. Blue Cross agreed that it would perform the services described in the ASA consistent with the Plan's terms. A45.

The ASA assigned certain claims-processing and payment duties to Blue Cross and certain others to the Fund. *See* A48–49 (ASA detailing "Joint Duties and Responsibilities Regarding Payment and Processing of Claims"). Under the ASA's "Shared Processing Arrangement," Blue Cross was solely responsible for pricing the claims it received from providers. A48–49; *see* A17 (alleging that the amount of covered charges is "a decision made exclusively by [Blue Cross], based on the contracts and internal policies that are solely in its possession and control."). The ASA made clear that Blue Cross "will receive and reprice all covered claims submitted by network and out-of-network providers to [Blue Cross] in accordance with [Blue Cross's] provider reimbursement arrangements. . . ." A14–15, A49. To price claims, Blue Cross applied a "framework of pricing policies" that included Blue Cross's "billing rates and rules, pricing policies, and provider contracts." A16–17,

---

[1] "A" refers to Appendix, followed by the page number.

A49. The Fund contends that these "rates, rules, policies, and contracts [Blue Cross] has negotiated with its network providers determine the covered, or eligible, charges" payable by the Plan. A16. But the Fund alleged that it was blind to Blue Cross's pricing process and that Blue Cross refused to share it with the Fund. A17. Blue Cross was also responsible under the ASA for conducting a "medical necessity and utilization review of inpatient urgent, nonurgent, and concurrent care claims using the [Blue Cross] medical policy, medical technology assessment guidelines, and utilization review policies and procedures . . . ." A48.

The claims pricing and payment process was also set out in the ASA. First, Blue Cross received claims from providers. A49. "After (i) applying medical necessity criteria, (ii) applying medical policy criteria and (iii) pricing the claim," Blue Cross sent the claim to the Fund for entry into its claims processing system. A15, A48–49, A52. The Fund then calculated the copayment, deductible, and coinsurance obligations for the Plan member, and sent this information to Blue Cross, which remitted the resulting claim payment directly to the provider. A14–15, A17, A48–49. The ASA expressly required the Fund's calculations to be "based on [Blue Cross's] pricing of claims." A48. Indeed, the Fund alleged that Blue Cross "has a stated policy against reviewing [claim prices] for error until the money has been paid to the provider." A26. While the Fund thus played a role in the claims process, nothing in the ASA purported to give the Fund the option of altering Blue Cross's

pricing determinations.

The ASA also set up a process by which Blue Cross received money from the Fund to pay plan benefits. Specifically, the Fund was required to pay Blue Cross a weekly "working capital amount" that represented Blue Cross's "estimate of the amount needed to pay claims on a current basis" plus its estimated administrative fee for that month. A16, A60. Blue Cross made benefit payments to providers from this working capital amount. A60. Once a month, Blue Cross performed a settlement calculation to determine whether the Fund's working capital payments for that month exceeded the amount Blue Cross paid out in covered benefits and took in fees, in which case Blue Cross was required to apply a credit to the Fund's next weekly working capital payment. Conversely, if the Fund's working capital payments were less than the benefits and fees paid that month, Blue Cross could add an additional charge to the Fund's next working capital payment. A20–21, A61.

In 2018, the Fund hired ClaimInformatics, LLC, a corporation that "provides healthcare claim payment review services," to identify potentially improper payments that the Fund may have been making based on Blue Cross's pricing determinations. A21. The Fund alleged that ClaimInformatics identified 5,574 claims involving overpayments of approximately $1.4 million. A22. Among other things, the Fund contended that Blue Cross overpaid providers by pricing claims in violation of Blue Cross's own internal policies. One such example is Blue Cross's "readmission

policy," which provides that the cost of a second hospital stay will be included in the price of an earlier admission if the readmission occurs within 7 days of discharge and is for a related diagnosis. A22. The Complaint identified two instances in which Blue Cross improperly priced a readmission separately from an earlier, related admission. A23. When ClaimInformatics attempted to recover certain of these overpayments from providers on behalf of the Fund, Blue Cross demanded that the Fund stand down and instructed its network providers to ignore the Fund's attempts to recoup overpayments. A28–29.

## II. Procedural History

The Fund and the Trustees sued Blue Cross for breaching its fiduciary duties under ERISA, 29 U.S.C. § 1104, by violating Plan terms and using Plan assets to overpay benefits and take excessive fees.[2] A32–33. Specifically, the Fund alleged that the Plan's terms require Blue Cross to pay for "covered services" by reference to "the rates, rules, policies, and contracts BCBSMA has negotiated with its network providers," A16, and that by systematically pricing claims contrary to those standards, Blue Cross violated plan terms, *see, e.g.,* A21, A33. The Fund sought injunctive relief to redress Blue Cross's violations. A34.

The district court granted Blue Cross's motion to dismiss the Complaint's ERISA claims for failure to plausibly plead Blue Cross's fiduciary status. It first held

---

[2] The Secretary does not take a position on Count 2 of the Complaint.

that Blue Cross was not a fiduciary by dint of exercising authority or control over plan assets because there is no reason to believe, under "ordinary notions of property rights," that the amounts the Fund paid to Blue Cross as working capital were plan assets. AD22–23. In so holding the court explicitly disagreed with the Sixth Circuit's plan asset analysis in an analogous case, *Hi-Lex Controls Inc. v. Blue Cross Blue Shield of Michigan.* 751 F.3d 740 (6th Cir. 2014); AD23–27. The court further held that even if the working capital amounts were plan assets, Blue Cross did not exercise sufficient authority or control over those assets to render it a functional fiduciary because it acted more as a "depository bank or custodian" performing "purely administrative act[s]." AD27–28.

Second, the district court held that Blue Cross was not a fiduciary by exercising discretionary authority over plan management because it found that Blue Cross's pricing decisions implicate contractual rather than fiduciary duties. AD19–20.[3] The court also concluded that Blue Cross's pricing determinations "are non-discretionary, ministerial acts that are insufficient to create a functional fiduciary status." AD20.

---

[3] "AD" refers to the Addendum, followed by the page number.

## SUMMARY OF THE ARGUMENT

A person is a fiduciary under ERISA to the extent they, among other things, "exercise[] any discretionary authority or discretionary control respecting management of such plan or exercise[] any authority or control respecting management or disposition of [the plan's] assets." 29 U.S.C. § 1002(21)(A). ERISA thus defines fiduciary status "not in terms of formal trusteeship, but in functional terms of control and authority." *Mertens v. Hewitt Assocs.,* 508 U.S. 248, 260–62 (1993). Here, the Fund plausibly alleged two independent bases for Blue Cross's fiduciary status: (1) that Blue Cross exercised authority or control over plan assets by pricing and paying benefit claims with funds the Plan forwarded for that very purpose (*i.e.*, the Fund's working capital payments), and (2) that Blue Cross exercised discretionary authority over plan management by unilaterally pricing claims covered by the Plan.

In holding otherwise, the district court first determined that the Fund's working capital payments were not plan assets, expressly disagreeing with the Sixth Circuit's determination that funds held by a Blue Cross entity in analogous circumstances were plan assets. *Hi-Lex,* 751 F.3d at 745. But in doing so, the court placed undue emphasis on formalistic hallmarks of plan asset status (such as the absence of a formal trust and whether the funds were segregated), and failed to recognize that, under the governing contract (the ASA), (a) the working capital

9

amounts were specifically earmarked "for estimated Claim Payments," and (b) any amounts left over in a given month were credited to *the Fund* against its working capital obligation for the next month. A60–61. Under "ordinary notions of property rights"—the standard adopted by this Court and the Secretary of Labor for determining plan assets—the working capital amounts were plan assets. This Court should align itself with the Sixth Circuit and reverse the district court on the plan asset question.

The district court also erred in concluding that even if the working capital payments were plan assets, Blue Cross did not exercise sufficient control or authority over them to render it a fiduciary because it acted "more in the nature of a depository bank." That far understates Blue Cross's role here. As the Complaint alleged and the ASA underscores, Blue Cross was hardly akin to a depository bank mechanically receiving and crediting deposits, but rather *exclusively* determined the prices of claims and ultimately paid those claims to providers out of plan assets.

Separately, in finding that the Complaint did not plausibly allege that Blue Cross exercised discretionary authority or discretionary control over plan management, the district court erroneously determined that Blue Cross's claim-pricing determinations were "ministerial functions" constrained by contract. To the contrary, the Complaint plausibly alleged that the ASA vested Blue Cross with broad discretion to price claims pursuant to its own policies and procedures, through a

process that entailed substantial discretion and over which the Fund had no oversight or input.

## ARGUMENT

## I. THE FUND PLAUSIBLY ALLEGED THAT BLUE CROSS ACTED AS A FIDUCIARY BY EXERCISING CONTROL OR AUTHORITY OVER PLAN ASSETS

The Fund alleged—and the ASA reinforces—that the working capital payments it regularly remitted to Blue Cross were for the express purpose of paying plan benefits, and that it was entitled to a credit for any amounts left over in a given month after all claims were paid. The district court nevertheless held that the working capital amounts were not the Plan's assets, and that Blue Cross thus did not act as a fiduciary with respect to those amounts, largely because they were not held in a segregated account or trust. AD 22. And even if they were Plan assets, the district court further held that Blue Cross did not exercise sufficient authority or control over them to render it a fiduciary because it was "more in the nature of a depository bank or a custodian." AD 28. Both conclusions were in error.

### A. The Fund Plausibly Alleged that the Working Capital Amounts the Fund Regularly Sent to Blue Cross for the Payment of Benefits Were Plan Assets

"The assets of [an employee benefit] plan generally are to be identified on the basis of ordinary notions of property rights." *Merrimon v. Unum Life Ins. Co. of Am.*, 758 F.3d 46, 56 (1st Cir. 2014) (quoting U.S. Dep't of Labor, Advisory Op. No. 93-14A, 1993 WL 188473, at *4 (May 5, 1993)); *In re Halpin*, 566 F.3d 286, 289 (2d

11

Cir. 2009). As the Department has previously explained, "the assets of a welfare plan generally include any property, tangible or intangible, in which the plan has a beneficial ownership interest." U.S. Dep't of Labor, Advisory Op. No. 92-24A, 1992 WL 337539, at *2 (Nov. 6, 1992). Assessing whether a plan has a beneficial ownership interest "requires consideration of any contract or other legal instrument involving the plan, as well as the actions and representations of the parties involved." U.S. Dep't. of Labor, Advisory Op. No. 94–31A, 1994 WL 501646, at *2 (Sept. 9, 1994); *see Faber v. Metropolitan Life Ins. Co*., 648 F.3d 98, 105–06 (2d Cir. 2011); *Sec'y of Labor v. Doyle*, 675 F.3d 187, 204 (3d Cir. 2012) ("[T]he first step in identifying the property of an ERISA plan is to consult the documents establishing and governing the plan," as well as "contracts to which the plan is a party"). Also relevant is "whether the plan sponsor . . . has acted or made representations sufficient to lead participants and beneficiaries of the plan to reasonably believe that such funds separately secure the promised benefits or are otherwise plan assets." AO 94–31A, 1994 WL 501646, at *2 (Sept. 9, 1994); *Kalda v. Sioux Valley Physician Partners, Inc*., 481 F.3d 639, 647 (8th Cir. 2007).

Here, the Complaint, as reinforced by the ASA it incorporates, plausibly alleged that the amounts the Fund remitted to Blue Cross as working capital were plan assets because they were specifically earmarked to "secure the promised [Plan] benefits." AO 94–31A, 1994 WL 501646, at *2 (Sept. 9, 1994). The ASA makes

explicitly clear that the "working capital amount" is for "estimated Claim Payments."
A60. And it also makes clear that "[Blue Cross] does not undertake . . . to provide
funds for covered services." A47. If the working capital amounts were to pay claims,
and if Blue Cross did not pay claims with its own funds, it logically follows that the
working capital amounts were the Plan's funds. *See also* A79 ("Blue Cross and Blue
Shield may identify claims for which the amount paid by Blue Cross and Blue Shield
to the provider *on behalf of the [Fund]* was too high or too low…." (emphasis
added)). That the Fund is responsible for funding benefits and not Blue Cross is also
reflected in the SPD distributed to participants, which informs them that the Plan is a
"[f]ully funded, self-insured Fund," and that all payments made to the Fund "are used
exclusively for providing benefits to eligible participants and their dependents, and
the paying of all expenses incurred with respect to the operation of the Plan." A134.

Numerous courts have held that the act of setting aside or earmarking funds
that are specifically meant to pay out plan benefits renders such funds plan assets. For
example, in *Hi-Lex*, the court found that contributions sent by a self-funded plan to
Blue Cross for the payment of health benefits remained plan assets after they were
transferred to Blue Cross. 751 F.3d at 745. The Sixth Circuit concluded that the SPD
and Administrative Services Contract established that the contributions would be held
by Blue Cross for the specific purpose of paying out benefits. *Id*. at 745–46. And in
*David P. Coldesina, D.D.S. v. Estate of Simper*, the Tenth Circuit found that a dental

office's employee benefits plan administrator had control over plan assets where he received plan contributions, deposited them into his own business account, and then wrote checks on behalf of the plan for the amount of the contribution. 407 F.3d 1126, 1133–34 (10th Cir. 2005). Other cases on similar facts abound.[4]

Further underscoring the plan-asset status of the earmarked funds is that the Fund retained a reversionary interest in its working capital payments. Specifically, if the working capital payments ended up exceeding the amount Blue Cross paid in claims and takes in fees for a given month, the excess was credited to the *Fund* towards its working capital obligation the next month. A61. That provision would make no sense if in fact the working capital were Blue Cross's money with which it was free to do as it pleases. In short, the Complaint plausibly alleged that the working capital amounts sent by the Fund to Blue Cross were held for the benefit of the Plan and its participants—and thus were plan assets—because, under the ASA, (1) they

---

[4] *See e.g., Gordon v. CIGNA Corp.,* 890 F.3d 463, 472 (4th Cir. 2018) (where a third-party administrator "was responsible for a certain sum of earmarked money that, even if comingled with other assets, was still for the specific use of [the employer]," the third-party administrator was effectively "holding the funds 'in-trust'"); *IT Corp. v. Gen. Am. Life Ins. Co*., 107 F.3d 1415, 1422 (9th Cir. 1997) (bank account funded by employer from which administrator drew funds to pay claims constituted plan assets); *Briscoe v. Fine*, 444 F.3d 478, 489–495 (6th Cir. 2006) (contributions deposited into an account in the name of both the company and the TPA to pay health service providers were plan assets); *see also Technibilt Grp. Ins. Plan v. Blue Cross and Blue Shield of North Carolina*, 438 F. Supp. 3d 599, 605 (W.D.N.C. 2020) (denying motion to dismiss where claims were paid out of Blue Cross's general claims account which was funded by the employer); *Acosta v. WH Admins, Inc*., 449 F. Supp. 3d 506, 510, 513, 519 (D. Md. 2020) (employer and employee contributions distributed to the administrators' account to fund welfare benefit plan were plan assets).

were specifically earmarked to pay benefit claims, and (2) any excess amounts not used to pay claims inure to the Fund's benefit.

In dismissing the Complaint, the district court held that the Fund's working capital payments were not Plan assets on the basis of the following factors: (1) that "[t]he funds are not held in the name of [the] Fund," (2) that the funds "are not segregated from other financial assets of Blue Cross, and there is nothing in the ASA that requires them to be," (3) [t]here is no reason to believe that the Fund can have access to those funds, or demand their return, at any time or for any reason," and (4) Blue Cross "bears the risk of any investment loss, [embezzlement, or theft]." AD22–23.

But formalities like a trust or segregated account are not required to show that funds are set aside for the benefit of participants or beneficiaries. In *Hi-Lex,* Blue Cross likewise made "much of the fact that neither it nor [the plan sponsor] had a separate bank account set aside exclusively for the funds intended to pay enrollee health expenses." 751 F.3d at 746. The Sixth Circuit explained that Blue Cross "cannot, however, cite any case law requiring such an arrangement for the existence of ERISA plan assets." *Id.* Rather, as discussed, the primary sources for determining whether a plan has a beneficial interest in particular funds under "ordinary notions of property rights" are the "contract[s] or other legal instrument[s] involving the plan, as well as the actions and representations of the parties involved." *Id.* at 745 (quoting

AO 92-24A at *2). The Sixth Circuit thus concluded that "plan assets can exist when a company directly funds an ERISA plan from its corporate assets and the contracted TPA holds those funds in a general account." *Id.* at 746–47 (citation omitted).[5]

The cases the district court relies on do not say otherwise. *See* AD23 (*citing W.E. Aubuchon v. BeneFirst, LLC.*, 661 F. Supp. 2d 37, 54 (D. Mass. 2009) and *Depot Inc. v. Caring for Montanans*, 915 F.3d 643, 658–59 (9th Cir. 2019)). On the contrary, the court in *BeneFirst* assumed that the funds the plan remitted to the TPA for the payment of benefits were plan assets. *See BeneFirst*, 661 F.2d at 54 ("BeneFirst exercised control over the Plan assets in at least three different respects."). The problem was that the TPA, in the court's view, did not exercise *sufficient control* over those assets merely by writing checks. *Id*. Similarly misplaced is the court's reliance on *Depot*, which involved premiums paid to a health insurer, not contributions remitted by a self-funded plan to a TPA to pay benefits. 915 F.3d at 658–59. In the fully-insured scenario, premiums are essentially the insurer's fee for assuming the risk of paying benefits, which it must pay with its own funds irrespective of the amount of premiums collected; as such, the plan has no property

---

[5] The district court took issue with the decision in *Hi-Lex* because "[t]here was little discussion of the terms of the contract, other than to note in general terms that BCBSM was required to pay claims out of the amounts transferred." AD26. But that fact is a central one under the Department's guidance and the prevailing case law. In any case, and as discussed, the Fund's property interest in the working capital amounts is reflected not only in the fact that those amounts are used to pay claims, but also in the Fund's reversionary interest (in the form of a credit) in any leftover amounts after all claims and fees are paid in a given month.

interest in the premiums once remitted. *See id.* at 658; *Gordon v. CIGNA Corp.*, 890

F.3d 463, 472 (4th Cir. 2018) (finding that the "critical distinction" with *Hi-Lex* is

that it "involved a self-funded plan" whereas this case concerned "an insurance

contract" that "paid a set benefit, regardless of the amount of premiums collected.").

In contrast, self-funded plans (or their sponsors)—not the TPA—are "responsible for

paying claims . . . and bearing the financial risk." *Depot*, 915 F.3d at 658. Because

TPAs are responsible for processing claims with funds provided by the plan, those

funds generally retain their plan-asset status even after being remitted to a TPA. *Id.*

### B.    The Fund Plausibly Alleged that Blue Cross Exercised Control or Authority over Plan Assets.

The district court concluded that even if the funds remitted to Blue Cross were

plan assets, Blue Cross did not exercise sufficient control over them to make it a

fiduciary. Rather, the court reasoned that Blue Cross acted "more in the nature of a

depository bank or a custodian than a manager with discretionary authority over

assets." AD27–28.[6] The court's characterization of Blue Cross's role is contrary to

the allegations in the Complaint, as supported by the ASA.

---

[6] To the extent the district court was suggesting that Blue Cross was required to exercise *discretionary* control over plan assets in order to qualify as a fiduciary, that is contrary to the statute. Although discretionary control over *plan management* is required, it is not required that a functional fiduciary have discretionary authority or control over plan *assets*; any control or authority over plan assets will suffice. 29 U.S.C. § 1002(21)(A)(i); *see, e.g., Chao v. Day,* 436 F.3d 234, 237 (D.C. Cir. 2006) ("Because the disposition clause contains no 'discretion' requirement, it is irrelevant whether Day exercised 'discretion' in his thievery. '[A]ny authority or control' is enough.").

For starters, the Complaint alleged that it was Blue Cross, not the Fund, that exclusively determined the amounts of the covered charges to be paid out of the Fund's working capital, "based on the contracts and internal policies that are solely in [Blue Cross's] possession and control," and that Blue Cross controlled plan assets by paying benefits in accordance with Blue Cross's interpretation of its "pricing rates, rules, policies, and contracts." AD17. Indeed, the Fund alleged that "regardless of how implausible any claim data appears, once [Blue Cross] has priced the claim, it has a stated policy against reviewing it for error until the money has been paid to the provider." A17, A26. And the ASA itself makes clear that the Fund adjudicated claims "based on [Blue Cross's] pricing of claims." A48. These allegations are sufficient to survive a motion to dismiss. *See e.g., Monterey Peninsula Horticulture, Inc. v. Emp. Benefit Mgmt. Servs, Inc.,* 2020 WL 2747846, at *3 (N.D. Cal. May 27, 2020) (finding allegation that TPA "had authority and control over Plan assets by determining the amount and recipient of benefit payments" enough to survive a motion to dismiss).

The fact that the Fund played some role in the claims process (by calculating the copayment, deductible, and coinsurance obligations) does not alter this conclusion. As the district court correctly stated, "[a]n entity's status as a functional fiduciary…is not an all-or-nothing designation" and "the determinative inquiry is whether that [entity] was acting as a fiduciary (that is, was performing a fiduciary

function) when taking the action subject to complaint." AD16 (citing *Pegram v. Herdrich,* 530 U.S. 211, 226 (2000)). Because fiduciary status attaches "to the extent" a person exercises the requisite control, it is enough that Blue Cross exercises control over the pricing of claims to be paid out with plan assets, as that is the conduct the Fund challenges. *Beddall v. State St. Bank and Tr. Co.,* 137 F.3d 12, 18 (1st Cir. 1998) (explaining that "fiduciary liability arises in specific increments"); *see also Briscoe v. Fine,* 444 F.3d 478, 494–95 (6th Cir. 2006) (holding that TPA "exercised at least partial control over plan assets and, to the extent that it did so, qualifies as a fiduciary"). Therefore, for purposes of pricing claims and paying them out, Blue Cross exercised authority and control over plan assets.

In holding otherwise, the district court cited cases for the proposition that "mere possession, or custody" over plan assets is not enough for fiduciary status. AD27-28 (citing *BeneFirst*, 661 F. Supp. 2d at 54; *O'Toole v. Arlington Tr. Co.,* 681 F.2d 94, 96 (1st Cir. 1982) (concluding that a bank's "responsibilities as the depository for the funds" are not fiduciary activities); *Cottrill v. Sparrow, Johnson & Ursillo, Inc.,* 74 F.3d 20, 22 (1st Cir. 1996) ("simply perform[ing] a transfer specified by the trustee—a purely administrative act" insufficient for fiduciary status); *Beddall,* 137 F.3d at 20 ("Without more, mechanical responsibilities (such as retaining the assets and keeping a record of their value) are insufficient to ground a claim of fiduciary status."). But, as discussed above, the Fund alleged that Blue Cross was far

19

from a bank that passively held plan assets, but rather exclusively determined the price of claims to be paid with those assets.[7] Those allegations are sufficient at this stage to support a plausible inference that Blue Cross exercised authority over plan assets in making pricing determinations. *See Zenon v. Guzman*, 924 F.3d 611, 615 (1st Cir. 2019) (court on a motion to dismiss must "take as true the allegations of the complaint, as well as any inferences [it] can draw from it in the plaintiff's favor.").

## II.    THE FUND PLAUSIBLY ALLEGED THAT BLUE CROSS ACTED AS A FIDUCIARY BY EXERCISING DISCRETIONARY AUTHORITY OR CONTROL OVER PLAN MANAGEMENT

The Fund plausibly alleged another basis for Blue Cross's fiduciary status: that Blue Cross acted as a fiduciary by exercising "discretionary authority or discretionary control respecting [plan] management" in its claim-pricing decisions. 29 U.S.C. § 1002(21)(A)(i). Specifically, the Fund alleged that Blue Cross set the amount of covered charges based on Blue Cross's contracts and internal policies that are solely in its control and which the Fund could not access (A17, A19–20); that the Fund's separate role in determining copayments, deductibles, and coinsurance obligations are "based on" Blue Cross's pricing determinations (A17); and that Blue Cross misapplied its internal framework and the Plan's written terms, causing the Fund to overpay millions of dollars in claims (A21–27).

---

[7] The Secretary is not conceding that holding plan assets is insufficient for fiduciary status. But because Blue Cross did far more than just hold plan assets, the Court does not need to reach that question.

In rejecting the Fund's argument, the district court erred in several respects.

First, the district court characterized the Fund's allegations regarding Blue Cross's

pricing decisions as strictly a failure by Blue Cross to satisfy its contractual

obligations. AD20 ("If Blue Cross [failed to apply the correct rate to some subset of

claims], it of course may be contractually liable to the Plan. That does not, however,

make it a functional fiduciary."). But the fact that Blue Cross operated under a

contract is not dispositive of anything; it is well settled that a contract that confers

discretionary authority or control on a party can support fiduciary status. *See Ed*

*Miniat, Inc. v. Globe Life Ins. Grp., Inc.*, 805 F.2d 732, 737 (7th Cir. 1986) ("When a

contract . . . grants an insurer discretionary authority, even though the contract itself

is the product of an arm's length bargain, the insurer may be a fiduciary."); *Rozo v.*

*Principal Life Ins. Co.*, 949 F.3d 1071, 1074 (8th Cir. 2020) ("A service provider

may be a fiduciary when it exercises discretionary authority, even if the contract

authorizes it to take the discretionary act."); *F.H. Krear & Co. v. Nineteen Named*

*Trs.*, 810 F.2d 1250, 1259 (2d Cir. 1987) (contract may give person such control over

factors that determine the actual amount of its compensation that the person becomes

an ERISA fiduciary).[8] These are the same type of allegations made in the

---

[8] *See also Sixty-Five Sec. Plan v. Blue Cross & Blue Shield*, 583 F. Supp. 380, 387–88
(S.D.N.Y. 1984) (Blue Cross was fiduciary with respect to own compensation when
its fees were based on percentage of claims paid and Blue Cross had complete
discretion and control over what claims would be paid); *Charters v. John Hancock*
*Life Ins. Co.*, 583 F. Supp. 2d 189, 197 (D. Mass. 2008) (when agreement gives

Complaint—that the ASA gave Blue Cross full discretionary authority or control over claim pricing.

Second, relying on a DOL interpretive bulletin carving out certain "ministerial functions" from fiduciary actions, 29 C.F.R. § 2509.75-8, D-2, the district court held that Blue Cross's pricing decisions were "non-discretionary, ministerial acts that are insufficient to create a functional fiduciary status." AD20. The district court misapplied the interpretive bulletin. While the bulletin states that a person who performs "purely ministerial functions" is not a fiduciary, that is true *only* to the extent they have "*no power* to make any decisions as to plan policy, interpretations, practices or procedures," and perform their functions "within a framework of policies, interpretations, rules, practices and procedures *made by other persons*." 29 C.F.R. § 2509.75-8, D-2 (emphasis added). In those circumstances, the powerless person performing the ministerial functions subject to another person's rules "is not a fiduciary because such person does not have discretionary authority or discretionary control respecting management of the plan [and] does not exercise any authority or control respecting management and disposition of the assets of the plan." *Id*.

But here, the Fund alleged that Blue Cross priced claims using *its own* "framework of policies, interpretations, rules, practices and procedures," and that it had full discretion to interpret them. Indeed, applying those policies as alleged in the

---

insurance company control of factors that determine amount of its compensation, it becomes ERISA fiduciary with respect to its compensation).

Complaint *inherently* required the exercise of discretion, such as whether a second hospital admission involved a "related" diagnosis to an earlier admission. *See* A22. Such conduct is far afield from the mechanical, ministerial functions described in the Department's interpretive bulletin. As explained by another court considering similar allegations against Blue Cross—and facing similar counter-arguments made by Blue Cross that its duties were merely ministerial—ministerial duties are "those routine tasks in which a person is merely applying standards set by others and thus cannot be held to exercise any discretionary authority," whereas "Blue Cross specifically bargained to be allowed to 'apply its standard practices, policies and procedures' . . . so it was in fact exercising its own discretion with respect to all the 'services described in its agreement.'" *Technibilt Grp. Ins. Plan v. Blue Cross and Blue Shield of North Carolina*, NO. 5:19-CV-00079, 2021 WL 1147168, at *2 (W.D.N.C. Mar. 25, 2021). The same is true here.[9]

Thus, the cases cited by the district court holding that a TPA is not a functional fiduciary when it acts pursuant to policies and procedures set by *the plan* are inapposite. AD21–22 (*citing*, *e.g.*, *Santana v. Deluxe Corp.*, 920 F. Supp. 249, 256

---

[9] To the extent the district court credited Blue Cross's attempts to disclaim any discretionary authority or control and disregarded the Fund's plausible allegations to the contrary, the court overstepped its role on a motion to dismiss. As this Court has explained, it "do[es] not review a motion to dismiss by granting any favor to the defendants' version of the facts," and the "defendants' promise that the Plan does not function as [the plaintiff] alleges … does not change [the Court's] analysis of a motion to dismiss." *N.R. v. Raytheon*, 24 F.4th 740, 746, 748 (1st Cir. 2022).

(D. Mass. 1996) ("All evidence of record in this case points to the fact that John Hancock processed claims pursuant to rules, policies, and procedures established by [the plan sponsor] for administration of the Plan.")). More relevant are decisions denying motions to dismiss where plaintiffs plausibly allege, like the Fund here, that a service provider applied their own frameworks of policies and procedures. *See, e.g., ILWU-PMA Welfare Plan Bd. of Trs. v. Conn. Gen. Life Ins. Co.*, 2015 WL 9300519 at *5 (N.D. Cal. 2015) (premature to hold that defendants lacked discretion, given allegations that they applied own frameworks for administering plan rather than merely erring in adhering to framework in place); *Wayne Surgical Ctr. v. Concentra Preferred Sys. Inc.*, 2008 WL 11510367, *4–5 (D. N.J. 2008) (contract gave service provider active role in determining claim repricing and methodologies and parameters underlying repricing scheme).

Because both the Complaint and ASA make clear that Blue Cross made its pricing decisions in accordance with its own internal policies and procedures over which it exercised substantial discretion, the Complaint properly challenges acts of discretionary plan management by Blue Cross.

## CONCLUSION

For the foregoing reasons, the Secretary respectfully requests that this Court

reverse the district court's decision granting Blue Cross's motion and dismissing

Counts I and III of the Complaint.

DATED:     September 14, 2022

                              Respectfully submitted,

                              SEEMA NANDA
                              Solicitor of Labor

                              G. WILLIAM SCOTT
                              Associate Solicitor for
                              Plan Benefits Security

                              JEFFREY M. HAHN
                              Counsel for Appellate and Special Litigation

                              ROBIN SPRINGBERG PARRY
                              Senior Regulatory Attorney

                              SARAH M. KARCHUNAS
                              Attorney
                              U.S. Department of Labor
                              Plan Benefits Security Division
                              200 Constitution Ave., N.W., Rm. N-4611
                              Washington, D.C. 20210
                              (202) 693-5611

## COMBINED CERTIFICATIONS

I hereby certify that the attached brief complies with Fed R. App. P. 29(a)(4)-(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 6,286 words and has been prepared in proportionately-spaced typeface using Microsoft Word in 14-point Times New Roman.

I further certify that on September 14, 2022, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that the following counsel of record for the parties are registered as ECF Filers and that they will be served by the CM/ECF system:

D. Brian Hufford, Jason S. Cowart, Leila Bijan, Peter K. Stris, John Stokes, Counsel for Plaintiffs-Appellants

David T. Raimer and Evan Miller, Counsel for Defendant-Appellee

Dated: September 14, 2022

/s/ Sarah M. Karchunas
SARAH M. KARCHUNAS