No. 22-1317

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

MASSACHUSETTS LABORERS' HEALTH AND WELFARE FUND;
TRUSTEES OF THE MASSACHUSETTS LABORERS' HEALTH AND
WELFARE FUND, as Fiduciaries,

*Plaintiffs - Appellants*,

v.

BLUE CROSS BLUE SHIELD OF MASSACHUSETTS,

*Defendant - Appellee.*

On Appeal from the United States District Court
for the District of Massachusetts, Boston
No. 1:21-cv-10523-FDS

## BRIEF OF *AMICI CURIAE*
## PATIENTRIGHTSADVOCATE.ORG, INC. AND FAMILIES USA
## IN SUPPORT OF APPELLANTS AND REVERSAL

Jeffrey M. Harris
Steven C. Begakis
Consovoy McCarthy PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
jeff@consovoymccarthy.com

*Counsel for Amici Curiae*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

*Amici Curiae*, PatientRightsAdvocate.org, Inc. and Families USA, are nonprofit corporations. Neither party has a parent corporation, and no publicly held corporation owns 10% or more of the stock of either.

## TABLE OF CONTENTS

RULE 26.1 CORPORATE DISCLOSURE STATEMENT .............................................. i

TABLE OF AUTHORITIES ..................................................................... iii

IDENTITY AND INTEREST OF *AMICI CURIAE* .................................................. 1

INTRODUCTION AND SUMMARY OF THE ARGUMENT .................................. 2

ARGUMENT ................................................................................... 4

    I.    BCBS was an ERISA fiduciary over the Massachusetts Laborers' Fund's insurance plan assets, and it cannot escape those essential fiduciary duties by contracting around them. ......................................... 4

        A.    BCBS is wrong to assert that it was not a fiduciary under the contract. ................................................................. 4

        B.    ERISA overrides any contract that would disclaim fiduciary duties from a party that is exercising fiduciary functions. ................ 7

    II.    ERISA's fiduciary protections are needed to police insurance contracts that hide healthcare prices from beneficiaries and obstruct beneficiaries from finding high-quality, cost-efficient care. ................................ 10

        A.    Gag clauses ............................................................. 11

        B.    Anti-steering and anti-tiering clauses. ................................. 14

        C.    All-or-nothing clauses ................................................. 17

CONCLUSION .............................................................................. 18

CERTIFICATE OF COMPLIANCE ........................................................... 20

CERTIFICATE OF SERVICE ................................................................ 21

# TABLE OF AUTHORITIES

## Cases

*Am. Hosp. Ass'n v. Azar,*
   468 F. Supp. 3d 372 (D.D.C. 2020) ................................................................. 2

*Am. Hosp. Ass'n v. Azar,*
   983 F.3d 528 (D.C. Cir. 2020) ...................................................................... 2

*Boggs v. Boggs,*
   520 U.S. 833 (1997) ..................................................................................... 8

*Borroughs Corp. v. Blue Cross Blue Shield of Mich.,*
   2012 WL 3887438 (E.D. Mich.) ............................................................... 7, 8

*Brown v. J.B. Hunt Transp. Servs., Inc.,*
   586 F.3d 1079 (8th Cir. 2009) ...................................................................... 8

*Chami v. Provident Life & Accident Ins. Co.,*
   188 F. Supp. 2d 1084 (N.D. Ind. 2002) ......................................................... 9

*Chao v. Hall Holding Co., Inc.,*
   285 F.3d 415 (6th Cir. 2002) ........................................................................ 9

*Fort Halifax Packing Co., Inc. v. Coyne,*
   482 U.S. 1 (1987) ......................................................................................... 8

*Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Mich.,*
   751 F.3d 740 (6th Cir. 2014) ............................................................. 3, 5, 7, 8

*In re Fid. Erisa Fee Litig.,*
   990 F.3d 50 (1st Cir. 2021) ........................................................................... 7

*In re FirstPay, Inc.,*
   773 F.3d 583 (4th Cir. 2014) ....................................................................... 6

*Ingersoll-Rand Co. v. McClendon,*
   498 U.S. 133 (1990) ..................................................................................... 8

*Peters v. Aetna Inc.,*
   2 F.4th 199 (4th Cir. 2021) ...................................................................... 2, 3

*Pipefitters Loc. 636 Ins. Fund v. Blue Cross & Blue Shield of Mich.*,
   722 F.3d 861 (6th Cir. 2013) ................................................................. 3

*Shaw v. Delta Air Lines, Inc.*,
   463 U.S. 85 (1983) ................................................................................. 8

*Tony & Susan Alamo Found. v. Sec'y of Lab.*,
   471 U.S. 290 (1985) ............................................................................... 8

**Statutes**

29 U.S.C. §1001 ....................................................................................... 2, 8

29 U.S.C. §1001b ......................................................................................... 8

29 U.S.C. §1002 ....................................................................................... 2, 5

29 U.S.C. §1024 ......................................................................................... 12

29 U.S.C. §1104 ............................................................................. 10, 16, 17

29 U.S.C. §1185m ...................................................................................... 12

**Other Authorities**

1978 Message of Pres. Carter .................................................................... 9

Amy Y. Gu, *[Case Brief] Atrium Health Settlement Encourages Enforcement of Anti-tiering/Anti-steering Clauses in Healthcare Contracts* (Nov. 16, 2020),
   bit.ly/3cDfA3U .................................................................... 15, 16, 17

Brian Blase, Ph.D., *Transparent Prices Will Help Consumers and Employers Reduce Health Spending*, Galen Inst. & Tex. Pub. Pol'y Found. (Sept. 27, 2019),
   bit.ly/2H3viC9 ........................................................................ 13, 14

Cal. Dep't of Justice, *Attorney General Bonta Announces Final Approval of $575 Million Settlement With Sutter Health Resolving Allegations of Anti-Competitive Practices* (Aug. 27, 2021), bit.ly/3U0Ps3V ........................................ 18

Devon M. Herrick, Pol'y Rep. No. 349, *The Market for Medical Care Should Work Like Cosmetic Surgery*, Nat'l Ctr. for Pol'y Analysis (May 2013),
   bit.ly/2S6Lmcw ............................................................................. 14

Katherine L. Gudiksen *et al.*, *Preventing Anticompetitive Contracting Practices in Healthcare Markets* (Sept. 8, 2020), bit.ly/3TyiAiP.....................................................*passim*

Michelle Yost Hale *et al.*, *Anti-Steering Provisions in Healthcare Contracts: Anticompetitive or Acceptable?*, Am. Bar Ass'n (Jul. 18, 2022), bit.ly/3RqBzud ...........................................................................................15

Nat'l Acad. for State Health Pol'y, *NASHP Model Act to Address Anticompetitive Terms in Health Insurance Contracts* (Apr. 12, 2021), bit.ly/3RsdfHL ....................................................................................... 10, 11

S. Rep. No. 93-127 (Apr. 18, 1973) ............................................................ 7, 8, 9

U.S. Dep't of Labor, *ERISA*, bit.ly/3ADwuHP..................................................9

U.S. Dep'ts. of HHS, Treasury, & Labor, *Reforming America's Healthcare System Through Choice and Competition* (Dec. 3, 2018), bit.ly/3bl9obg.................. 13, 14

## IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

**PatientRightsAdvocate.org, Inc. (PRA)** is a 501(c)(3) nonprofit, non-partisan organization that provides a voice for consumers—patients, employees, employers, and taxpayers—to have competition, transparency, and meaningful choices in healthcare. PRA advocates for patients to have easy, real-time access to complete health information and real price transparency. Price transparency will usher in price, quality, and outcome differentiation and allow for competition and innovation. Empowered with such information, patients and employers will shop for the best quality of care at the lowest possible price. Consumers will then be in control through choice to reduce their costs of care and coverage. With price certainty, patients can protect their health and wealth for themselves, their families, and the generations to come.

PRA embraces free market principles. We believe that price transparency will foster a competitive, functional marketplace and restore trust and accountability to the healthcare system. Our website, PatientRightsAdvocate.org, shines a light on both the problem and the free-market solution, and features patients and innovative employers who are already saving substantially by using price transparent providers.

PRA submits this brief on behalf of consumers and patients to ensure that their voices are heard and their interests represented in this critically important case. PRA

---

[1] No party's counsel authored this brief in whole or in part. No person, party, or party's counsel other than *amici curiae*, their members, or their counsel contributed money intended to fund preparing or submitting this brief. All parties have consented to the filing of this brief.

has extensive experience with healthcare-related issues and has participated in prior litigation germane to its interests. *See, e.g.*, *Am. Hosp. Ass'n v. Azar*, 983 F.3d 528 (D.C. Cir. 2020); *Am. Hosp. Ass'n v. Azar*, 468 F. Supp. 3d 372 (D.D.C. 2020).

**Families USA (FUSA)** is a leading national, non-partisan voice for health care consumers, dedicated to achieving high-quality, affordable health care and improved health for all. FUSA works to shape policies nationwide that improve health care value, health equity, the quality of health insurance coverage, and the financial security of families as they seek optimal health. FUSA believes that health care consumers' experiences and needs should drive policy making.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

The Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §1001 *et seq.*, imposes fiduciary status on any person or entity that "exercises any discretionary authority … respecting [the] management of" an employee benefit plan "or exercise[] any authority or control" over the assets of such a plan. *Id.* §1002(21)(A). For example, a health insurance company[2] may be deemed a fiduciary under ERISA if it determines how much the plan will pay for covered care, or if it holds assets in trust to pay insurance claims and negotiate post-payment settlements. *See, e.g.*, *Peters v. Aetna*

---

[2] In this case, the Fund was a self-funded plan that paid all claims for healthcare but contracted with Blue Cross Blue Shield of Massachusetts to provide administrative services to the Fund and obtain access to its network of providers. *See* AD002-03. This is typically described as an "administrative services only" arrangement, but for simplicity we will refer to BCBS and similar companies as "health insurers" or "health insurance companies."

*Inc.*, 2 F.4th 199, 229-32 (4th Cir. 2021); *Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Mich.*, 751 F.3d 740, 744-47 (6th Cir. 2014); *Pipefitters Loc. 636 Ins. Fund v. Blue Cross & Blue Shield of Mich.*, 722 F.3d 861, 866-67 (6th Cir. 2013).

The district court, however, ruled that once an insurer receives health insurance plan assets to pay covered claims and make settlements (pursuant to the insurer's own contracts with providers), then *nobody*—neither the insurer who receives the plan assets nor the plan administrator who transfers the assets—has any further fiduciary duty under ERISA to protect those assets and ensure they are used solely for the employee's benefit.

That is not the law, and such a ruling would enable insurers—as Blue Cross Blue Shield (BCBS) did in this case—to egregiously mismanage self-funded insurance plan assets knowing that there is no accountability under ERISA. This Court should reverse the decision below and reaffirm BCBS's fiduciary obligations to the Fund. ERISA accountability for conduct like what BCBS engaged in here is badly needed to protect workers, prevent waste, and reform our broken healthcare system.

Indeed, insurers are notorious for wasting health plan assets on overpriced and overcharged claims from their network healthcare providers; keeping secret the prices charged for healthcare under the plan; and not taking basic steps to ensure that beneficiaries can identify which providers in the network offer the highest quality and most cost-efficient care. Without ERISA's fiduciary protections for plan participants,

such abuses and inefficiencies will continue to plague our insurance system, betraying ERISA's promise to workers and their families. The decision below should be reversed.

## ARGUMENT

**I.   BCBS was an ERISA fiduciary over the Massachusetts Laborers' Fund's insurance plan assets, and it cannot escape those essential fiduciary duties by contracting around them.**

The district court found that BCBS is not a fiduciary when it managed the health insurance plan assets of the Massachusetts Laborers' Fund because its contract with the Fund absolved them of ERISA fiduciary status. *See* AD022-28. That is wrong on several levels and, if upheld, it would eviscerate an important federal safeguard against the types of abuses alleged in this case.

### A.   BCBS is wrong to assert that it was not a fiduciary under the contract.

Under its contract with the Fund, BCBS had two primary responsibilities. First, BCBS was required to "maintain[] a network of preferred providers through its own contractual arrangements," and use those contracts to negotiate "favorable rates … with [the] providers." *Id.* at 5. Second, BCBS would hold the Fund's health plan assets in trust to pay the claims for those services incurred by participants. *See id.* at 4-7.

The Fund would send a weekly "'working capital amount' to Blue Cross 'for estimated Claim Payments' … based on Blue Cross's 'estimate of the amount needed to pay claims on a current basis, subject to review and approval by the Fund.'" *Id.* at 4. "From that amount, Blue Cross pa[id] claims to hospitals, physicians, and other health-care providers." *Id.* "If, at the end of the month, the actual … claim totals exceed[ed] the Fund's payment for that month, the Fund pa[id] Blue Cross the difference in the

next weekly payment." *Id.* BCBS also recoups plan assets that it pays in error, either "directly" by requesting refunds from the provider "or through 'appropriate recovery operations,' which include subrogation and provider claim-payment audits." *Id.* at 6. After recovering those overpayments, BCBS "credits the Fund the recovered payment, less a 20% fee." *Id.* at 6-7. Alternatively, BCBS has authority to negotiate a settlement with the overcharging provider and "credit … the Fund based on the settlement." *Id.* at 7.

Thus, by holding plan assets, applying its negotiated rates to claims pursuant to its own internal policies and procedures, and settling post-payment disputes, BCBS unquestionably "exercise[d] … discretionary authority or … control respecting management of [the] plan … [and] authority or control respecting management or disposition of its assets." 29 U.S.C. §1002(21)(A); *see, e.g.*, *Hi-Lex*, 751 F.3d at 747 ("BCBSM was holding the funds wired by Hi-Lex 'in trust' for the purpose of paying plan beneficiaries' health claims … and, in doing so, functioned as an ERISA fiduciary."). The Fund, the labor unions that paid into it, and their employee beneficiaries "all understood that BCBSM would be holding ERISA-regulated funds to pay the health expenses and administrative costs of enrollees in the [Fund's] Health Plan." *Hi-Lex Controls*, 751 F.3d at 746; *see* AD009 ("[T]he [Summary Plan Description] states that … '[t]he people who operate your plan, called 'fiduciaries' of the plan, have a duty to do so prudently and in the interest of you and other Plan participants and beneficiaries.'").

The district court seriously erred in concluding otherwise. According to BCBS, "once the Fund pa[id] the monthly working capital amount [to cover the cost of employee claims], it relinquishe[d] any ownership interest in those funds," and thus neither BCBS nor the Fund "control[ed] any Plan assets" and BCBS could mismanage those assets without any federal liability. AD022. The district court accepted this argument. It held that under "'ordinary notions of property rights under non-ERISA law,'" the assets of the plan—once transferred to BCBS for claims payment and settlement—were no longer ERISA plan assets for three reasons: (1) the assets were not kept in a separate account "in the name of [the] Fund" that is "segregated from other financial assets of Blue Cross"; (2) the Fund "[had no] access to those funds" and could not "demand their return"; and (3) BCBS bore the "risk of … loss" due to theft or malinvestment. AD022-23.

This is wrong both factually and legally. The Fund transferred the working capital amount to BCBS for the sole purpose of paying claims and thus for the exclusive benefit of plan participants. AD004. Such an arrangement creates a trust as a matter of property law, even though the funds were not segregated in a separate trust account. *See, e.g.*, *In re FirstPay, Inc.*, 773 F.3d 583, 595 (4th Cir. 2014) ("[A] court may presume that funds received, held, and conveyed by a trustee in accordance with the purpose and for the benefit of a trust, although commingled with funds not subject to that trust, are indeed funds subject to the trust."); *Hi-Lex Controls*, 751 F.3d at 746 ("BCBSM cannot … cite any case law requiring [a segregated account] for the existence of ERISA plan assets. …

[T]rust law … favors [the opposite] position."). BCBS was unquestionably an ERISA fiduciary.

**B.    ERISA overrides any contract that would disclaim fiduciary duties from a party that is exercising fiduciary functions.**

Even if BCBS's interpretation of the *contract* was correct, ERISA's protections would override it. If BCBS and the Fund had taken self-funded plan assets and agreed to treat them as nothing more than a payment for services that BCBS could mismanage and squander at will, then the Fund's health plan—and any other similar self-funded health plan—would not be a "promise" of benefits but an "illusion." S. Rep. No. 93-127, p.15 (Apr. 18, 1973), bit.ly/3d9WDpO. Under BCBS's view, once the health plan administrator (here, the Fund) transferred the plan assets to the insurer (here, BCBS) to pay its employees' claims, *nobody* would be a fiduciary anymore, because the assets belong to the insurer and neither the insurer nor the plan administrator "'perform[s] a fiduciary function'" over them. *In re Fid. Erisa Fee Litig.*, 990 F.3d 50, 55 (1st Cir. 2021). This would effectively allow a plan and its administrative services provider to contract away ERISA's fiduciary duties, absolving *anyone* of the duty to safeguard plan assets for the benefit of the employee beneficiaries.

Congress prohibited such arrangements that would "contract around the requirements of ERISA." *E.g.*, *Borroughs Corp. v. Blue Cross Blue Shield of Mich.*, 2012 WL 3887438, at *4 (E.D. Mich.). ERISA was "'landmark reform legislation,'" *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 137 (1990) (quoting S. Rep. No. 93-127, p.36), enacted

to address "malfeasance and maladministration in [employer] plans" and ensure such plans would "become a reality rather than an illusion," S. Rep. No. 93-127, p.15. Congress thus designed ERISA as "a comprehensive statute" to "promote the interests of employees and their beneficiaries." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983). It sets "uniform standards, including rules concerning … fiduciary responsibility," *id.* at 91, with the "principal object" of protecting plan beneficiaries—not the economic interests of employers or insurance companies, *Boggs v. Boggs*, 520 U.S. 833, 845 (1997); *see* 29 U.S.C. §§1001(c), 1001b(c). ERISA is "remedial legislation," so it is "liberally construed to effectuate Congress's intent to protect plan participants." *Brown v. J.B. Hunt Transp. Servs., Inc.*, 586 F.3d 1079, 1086 (8th Cir. 2009).

It is axiomatic that remedial legislation cannot be contracted away but must "be applied even to those who would decline its protections." *Tony & Susan Alamo Found. v. Sec'y of Lab.*, 471 U.S. 290, 302 (1985). Congress designed ERISA so that plan fiduciaries could not "evad[e] ERISA's regulatory scope, thereby depriving employees of the protections of that statute." *Fort Halifax Packing Co., Inc. v. Coyne*, 482 U.S. 1, 16 (1987); *see, e.g., Borroughs*, 2012 WL 3887438, at *4. In other words, neither plan sponsors nor insurance companies that provide administrative services to a plan can get around ERISA fiduciary status simply by "characteriz[ing] [their] arrangement … as a service agreement between two companies." *Hi-Lex*, 751 F.3d at 746.

For good reason. ERISA "sets *minimum standards* for most … health plans in private industry to provide protection for individuals in these plans." U.S. Dep't of

Labor, *ERISA*, bit.ly/3ADwuHP (emphasis added). Putting bare minimum standards in law "'was an essential step in the protection of worker [plans].'" *Chami v. Provident Life & Accident Ins. Co.*, 188 F. Supp. 2d 1084, 1088 (N.D. Ind. 2002) (quoting 1978 Message of Pres. Carter). Those standards "assure American workers that they may look forward with anticipation" to the benefits of their health plan "without fear that … [they] will be lacking in the necessities to sustain them as human beings within our society." S. Rep. No. 93-127, p.13.

ERISA's standards also "increase stability within the framework of our nation's economy," and they "restore credibility and faith in the … plans designed for American working men and women," which "encourage[s] rather than diminish[es] efforts by management and industry to expand pension plan coverage and to improve benefits for workers." *Id.* Accomplishing those lofty goals required sweeping legislation by Congress that imposed fiduciary duties on those who hold and manage plan assets—duties that are "'the highest known to the law.'" *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 426 (6th Cir. 2002). The district court's ruling effectively makes these duties optional and subject to being contracted away, thereby directly thwarting Congress's express objectives in ERISA.

The dangers of such a ruling are readily apparent in this case. BCBS overcharged the Fund's employee beneficiaries for health insurance claims by millions of dollars and actively concealed its inflated rates and overcharges from plan participants. Appellant's Opening Br. 19-20; AD009-12; A021-32. Such behavior flagrantly violates BCBS's duty

9

to act "solely" in the interest of plan beneficiaries. 29 U.S.C. §1104(a)(1). But there would be limited ability to police such misconduct if the district court's extraordinary narrowing of fiduciary status—allowing BCBS to contract around its fiduciary duties under ERISA—is allowed to stand. According to BCBS, the Fund was not a fiduciary because it had no control over the plan assets, and BCBS was not a fiduciary because it had absolute control over them. *See* AD022-23 ("Blue Cross … contends that it does not control any Plan assets, because once the Fund pays the monthly working capital amount, it relinquishes any ownership interest in those funds."). This Court should not interpret ERISA to bless this behavior, which would eviscerate the broad statutory protections that Congress promised to participants in employee benefit plans and immunize from ERISA liability even egregious misuse of plan assets.

## II.  ERISA's fiduciary protections are needed to police insurance contracts that hide healthcare prices from beneficiaries and obstruct beneficiaries from finding high-quality, cost-efficient care.

It is imperative for this Court to reverse the district court's decision to ensure that plan participants and their representatives have the tools needed to fight wasteful and anticompetitive practices and ensure much-needed legal accountability in the healthcare market. Insurance companies such as BCBS are notorious for undermining patients' interests by entering into contracts with healthcare providers in their network that "impede competition and increase prices" for services. Nat'l Acad. for State Health Pol'y, *NASHP Model Act to Address Anticompetitive Terms in Health Insurance Contracts* (Apr. 12, 2021), bit.ly/3RsdfHL. Those insurer-provider contracts often include harmful

clauses such as "anti-steering clauses, anti-tiering clauses, all-or-nothing clauses, and gag clauses," making it harder for beneficiaries to compare healthcare prices and find lower-cost, better-quality care. *Id.* If the insurer can evade fiduciary status, however, many of those anticompetitive and anti-consumer practices will remain in place.

## A.    Gag clauses

Insurers routinely enter contracts with providers that include "gag clauses, or price secrecy contract provisions, [that] prohibit a contractual party from disclosing price or other information." Katherine L. Gudiksen *et al.*, *Preventing Anticompetitive Contracting Practices in Healthcare Markets* 47 (Sept. 8, 2020), bit.ly/3TyiAiP. Based on the "erroneous assumption that provider payment rates are trade secrets," these clauses "prevent patients, competing providers, and employers from knowing the negotiated provider payment rates." *Id.* By cloaking the negotiated rates in a "shroud of secrecy," gag clauses make it impossible for health plan administrators to "assess the relative value of healthcare services from competing providers," and "hinder [them] from effectively using outside firms to analyze their claims for waste or low-value care." *Id.* at 47-48. Gag clauses also "amplify" the harm of other clauses—for example, by "conceal[ing] the magnitude of variation in provider rates so that the effects of an anti-steering clause remain hidden." *Id.* at 48.

Notably, ERISA itself expressly prohibits such gag clauses. ERISA specifically requires plan fiduciaries to provide employees, upon request, "a copy of the latest updated summary[] plan description, and the latest annual report, any terminal report,

11

the bargaining agreement, trust agreement, *contract, or other instruments under which the plan is established or operated.*" 29 U.S.C. §1024(b)(4) (emphasis added). This language plainly includes information about contracts between insurers and network providers, including the negotiated rates that plan participants are charged for care under the plan.

Moreover, the Consolidated Appropriations Act of 2021 amended ERISA to expressly provide that any "group health plan or health insurance issuer … may not enter into an agreement with a health care provider, network[,] or association of providers" that would restrict the insurer from "providing provider-specific cost or quality of care information or data" to the plan sponsor or beneficiaries. 29 U.S.C. §1185m(a)(1). Insurers and health plans must also submit annual disclosures to the HHS Secretary attesting their compliance with this requirement. *Id.* In short, all participants in employer-sponsored health plans have a federal-law right under ERISA to know the price of their care upfront, and there is no basis for employers, insurers, or providers to claim that this critical information must be kept secret.

Unfortunately, however—as this case demonstrates—gag clauses and price secrecy remain pervasive, thereby allowing providers to charge grossly inflated prices for care and opening the door to waste, fraud, and abuse. In a properly functioning market, both patients and plan administrators would "need to compare price and quality measures among providers for many of their efforts to control the cost of … healthcare services." Gudiksen, *supra* at 47-48. Gag clauses, however, prevent patients and employers from "us[ing] pricing information to make more informed decisions when

choosing which providers to use for both health care and network inclusion." *Id.* at 52. This lack of price transparency deprives patients of potential cost savings that would improve their overall plan benefits and allow them to shop for high-quality, cost-effective care. *See id.* This case starkly illustrates the problems resulting from a lack of transparency, as BCBS actively concealed providers' inflated rates and overcharges, resulting in a multimillion-dollar loss for the Fund. *See* Appellant's Opening Br. 19-20; AD009-12; A021-32.

Price concealment is a concern that goes far beyond this case. There can be no meaningful reform of America's healthcare system without price transparency. Price transparency lowers prices, empowering consumers to choose the best quality care at the lowest price. It also rewards those providers who serve their patients most efficiently, thereby putting downward pressure on prices of high-cost providers, and spurring innovation. *See generally* Brian Blase, Ph.D., *Transparent Prices Will Help Consumers and Employers Reduce Health Spending*, Galen Inst. & Tex. Pub. Pol'y Found. (Sept. 27, 2019), bit.ly/2H3viC9; U.S. Dep'ts. of HHS, Treasury, & Labor, *Reforming America's Healthcare System Through Choice and Competition* (Dec. 3, 2018), bit.ly/3bl9obg.

Indeed, for the handful of healthcare services that consumers typically purchase out of pocket, those services are characterized by robust competition, falling prices, and increasing quality. For example, LASIK eye surgery is rarely covered by insurance, so prices are advertised prominently, and surgeons must compete for patients and consumer dollars. Due to this price transparency, inflation-adjusted prices of LASIK

surgery fell by about 25% between 1999 and 2011 even as quality significantly improved. *See* Devon M. Herrick, Pol'y Rep. No. 349, *The Market for Medical Care Should Work Like Cosmetic Surgery* 8-9, Nat'l Ctr. for Pol'y Analysis (May 2013), bit.ly/2S6Lmcw.

Price drops due to price transparency also have "spillover effects" for the entire market, including patients who do not comparison shop. A 2017 study found that when California implemented a reference pricing system and price transparency for state employees, higher-cost facilities began to lower their prices for everyone, even for those who did not comparison shop. *See Reforming America's Healthcare System* 96-97. Similarly, a New Hampshire study revealed that when only 8% of patients used transparent prices to comparison shop, there were spillover effects for all patients because of downward pressure on high-cost providers. *See Transparent Prices Will Help Consumers* 14.

In sum, a lack of price transparency is one of the foundational flaws in the dysfunctional U.S. healthcare system. ERISA contains multiple tools to promote transparency and attack unlawful gag clauses, yet the district court's narrow reading of fiduciary status would significantly hinder efforts to use ERISA to attack these anticompetitive and anti-consumer policies.

### B. Anti-steering and anti-tiering clauses.

Another common anticompetitive provision in insurer-provider contracts is the "anti-steering clause," which "prohibit[s] insurance carriers from giving incentives to patients to utilize cheaper or higher value healthcare facilities." Amy Y. Gu, *[Case Brief] Atrium Health Settlement Encourages Enforcement of Anti-tiering/Anti-steering Clauses in*

*Healthcare Contracts* (Nov. 16, 2020), bit.ly/3cDfA3U. By agreeing not to "steer" plan participants to "lower-cost, higher-value providers" in the network, insurance companies like BCBS remove a "primary mechanism … [to] control costs." Gudiksen, *supra* at 39. Without the ability to "direct patients to higher-value providers or have patients pay a higher co-pay for seeing such providers," employee beneficiaries often end up receiving lower-quality, more expensive care. *Id.* at 41. An anti-steering clause is thus an expressly "'anti-incentive' clause[]" designed to "lessen competition" and increase provider profits at the expense of plan participants and the employers who pay the bills under a self-funded arrangement like the one at issue here. Gu, *supra.* The only entities who ultimately benefit from these clauses are high-cost, low-quality providers. *See, e.g.*, Michelle Yost Hale *et al.*, *Anti-Steering Provisions in Healthcare Contracts: Anticompetitive or Acceptable?*, Am. Bar Ass'n (Jul. 18, 2022), bit.ly/3RqBzud (such clauses "inhibit the development of new insurance programs," "reduce competing providers' investments," and "inhibit insurers' ability to accentuate certain aspects of patient choice, such as prioritizing cost-effectiveness").

A health insurer that adopts anti-steering clauses in its contracts with providers wastes the assets of self-funded plans on needlessly overpriced claims from high-cost providers. Such behavior falls well short of its duty to manage plan assets prudently, to act "solely in the interest of the participants and beneficiaries" for the "exclusive purpose of … providing [them] benefits," and "defraying reasonable expenses of administering the plan." 29 U.S.C. §1104(a)(1).

Insurance companies also routinely make contracts with their network providers that contain "anti-tiering" clauses that harm patients by preventing the insurer from "tiering" the network. Without these clauses, insurers would normally have "a tiered network, [where] the insurer separates providers into distinct tiers based on cost and quality and assigns corresponding co-pay amounts for each tier." Gu, *supra*. "A low-cost and high-quality provider is considered better value that would provide savings for both the insurer and the patient," so that provider would be "assign[ed] … to a higher tier with lower copay to incentivize patients to choose them." *Id.* Another alternative is "a narrow-network plan," which "enables insurers to exclude higher-cost providers from the provider network." *Id.* Both forms of "tiered" plans can help "control costs" for patients. Gudiksen, *supra* at 39. "[T]iering … can have procompetitive effects on both the demand side, as patients choose higher-value providers, and on the supply side, as providers reduce their prices and improve their quality"—all while "preserv[ing] consumer choice." *Id.* at 40.

"Anti-tiering" clauses, however, "inhibit payers from placing a system hospital in anything other than the most favorable cost-sharing tier." Gu, *supra*. In other words, these clauses "prohibit an insurer from placing a health system on a lower-value tier or, in some cases, from even signaling to patients that there are higher-value alternatives." Gudiksen, *supra* at 41. This "insulate[s] providers from market forces by eliminating price signals that encourage patients to choose higher-value care," to the detriment of beneficiaries, with "few procompetitive explanations [to] justify [it]." *Id.* at 46. Like anti-

steering clauses, these anti-tiering clauses violate the insurer's duty of care and loyalty to the plan beneficiaries. *See, e.g.*, 29 U.S.C. §1104(a)(1).

### C.   All-or-nothing clauses

Another way insurance contracts disadvantage patients is through so-called "all-or-nothing clauses, which require a health plan that wants to contract with a particular provider or affiliate in a provider system to contract with all other providers in that system" and to pay "higher … rates for the entire system." Gudiksen, *supra* at 22. This typically happens when there is an outsized provider in a region, such as a large and prominent hospital, that the insurance company "must have within its network to be commercially viable because of geographic proximity, referrals, legal obligations, reputation, specialized services, or a lack of an alternative in a geographic location." *Id.* "As a result of [this] must-have status," the provider "can demand supracompetitive rates for all providers and facilities within [its] system." *Id.* And once providers obtain this "must-have" status, they use "all-or-nothing" clauses to stamp out competition. *See id.* at 23.

These clauses are the product of a market failure, "an extreme form of a concept known as tying, or the practice of a dominant provider utilizing their market power over services in one market (the tying product) to pressure health plans to buy their services in other markets (the tied product)." *Id.* This gives the insurer a powerful incentive to agree to all-or-nothing clauses and makes it unlikely it will reject those clauses without a contrary legal obligation, such an ERISA fiduciary duty to act in the patient's interests.

\* \* \*

In short, today's healthcare marketplace is riddled with anticompetitive practices that result in higher prices, lower quality, and a dysfunctional market that fails to reward low-cost, high-value providers and punish high-cost, low-value providers. Patients and employers have achieved some victories against these practices, including a major settlement with Sutter Health last year that resulted in more price and quality transparency and an elimination of all-or-nothing clauses. *See* Cal. Dep't of Justice, *Attorney General Bonta Announces Final Approval of $575 Million Settlement With Sutter Health Resolving Allegations of Anti-Competitive Practices* (Aug. 27, 2021), bit.ly/3U0Ps3V. But far more remains to be done, and ERISA is one of the most potent tools for reform.

Yet the district court's narrow interpretation of fiduciary status under ERISA would allow many wasteful and anticompetitive provisions in insurer-provider contracts to evade meaningful scrutiny. This Court should reverse the decision below to ensure that ERISA remains available to plan participants to ensure that plan assets are not being wasted and patients are not being harmed by secretive, self-serving, overpriced, and anticompetitive provider contracts.

## CONCLUSION

The decision below should be reversed.

Dated: September 16, 2022    Respectfully submitted,

               _/s/ Jeffrey M. Harris_

               Jeffrey M. Harris
               Steven C. Begakis
               CONSOVOY MCCARTHY PLLC
               1600 Wilson Blvd., Ste. 700
               Arlington, VA 22209
               (703) 243-9423
               jeff@consovoymccarthy.com

               *Counsel for Amici Curiae*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limits of Fed. R. App. P. 29(a)(5) &

32(a)(7)(B), because it has 4,581 words, excluding parts exempted by Fed. R. App. P.

32(f). This brief complies with the typeface and type style requirements of Fed. R. App.

P. 32(a)(5) & (6), because it was prepared in proportionally spaced 14-point Garamond

typeface, using Microsoft Word version 16.64.

Dated: September 16, 2022          */s/ Jeffrey M. Harris*
                                   Jeffrey M. Harris

## CERTIFICATE OF SERVICE

I filed this brief via the Court's CM/ECF system on September 16, 2022, thereby

electronically serving all counsel of record.

*Attorneys for Plaintiff-Appellants*
Leila Bijan
Jason Cowart
D. Brian Hufford
  Zuckerman Spaeder LLP
  485 Madison Ave., 10th Flr.
  New York, NY 10022
James Francis Grosso
  O'Reilly Grosso Gross & Jones PC
  1661 Worcester Rd., Ste. 403
  Framingham, MA 01701-5400
John Randolph Stokes
Peter K. Stris
  Stris & Maher LLP
  777 S Figueroa St., Ste. 3850
  Los Angeles, CA 90017

*Attorneys for Defendant-Appellee*
Amy Harman Burkart
  33 Arch St., 24th Flr.
  Boston, MA 02110-1424
Evan Miller
David T. Raimer
  Jones Day
  51 Louisiana Ave. NW
  Washington, DC 20001-2113


Dated: September 16, 2022     */s/ Jeffrey M. Harris*
         Jeffrey M. Harris