# United States Court of Appeals
# For the First Circuit

---

No. 22-1317

MASSACHUSETTS LABORERS' HEALTH AND WELFARE FUND;
TRUSTEES OF THE MASSACHUSETTS LABORERS' HEALTH AND
WELFARE FUND, as Fiduciaries,

Plaintiffs-Appellants,

v.

BLUE CROSS BLUE SHIELD OF MASSACHUSETTS,

Defendant-Appellee.

---

On Appeal from the United States District Court for the District of Massachusetts,
Civil Action No. 1:21-cv-10523-FDS

---

## APPELLANTS' OPENING BRIEF

---

D. Brian Hufford
Jason S. Cowart
Leila Bijan
ZUCKERMAN SPAEDER LLP
485 Madison Avenue, 10th Floor
New York, NY 10022
Tel: 212.704.9600
Fax: 212.704.4256
dbhufford@zuckerman.com
jcowart@zuckerman.com
lbijan@zuckerman.com

Peter K. Stris
John Stokes
STRIS & MAHER LLP
777 S. Figueroa Street, Suite 3850
Los Angeles, CA 90017
Tel: 213.995.6800
Fax: 213.261.0299
pstris@stris.com
jstokes@stris.com

*Counsel for Plaintiffs-Appellants*

## RULE 26.1 DISCLOSURE STATEMENT

Appellants Massachusetts Laborers' Health and Welfare Fund and Trustees of the Massachusetts Laborers' Health and Welfare Fund have no parent corporation, and no publicly held corporation owns 10% or more of their stock.

# TABLE OF CONTENTS

**Page**

RULE 26.1 DISCLOSURE STATEMENT ............................................................i

TABLE OF AUTHORITIES.............................................................................iv

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD ......................... vii

INTRODUCTION .............................................................................................1

JURISDICTIONAL STATEMENT ....................................................................4

STATEMENT OF THE ISSUES ........................................................................4

STATEMENT OF THE CASE............................................................................5

I.      Statutory Background .............................................................................5

II.     Factual Background ...............................................................................10

        A.      The Fund hired Blue Cross as third-party administrator....................10

        B.      The Administrative Services Agreement and relevant Plan terms......11

                1.      The ASA expressly contemplated that the Fund's assets
                        would be used to pay benefits...................................................12

                2.      Under the ASA, Blue Cross applied judgment and
                        discretion to determine the amount of benefits the
                        Fund paid...............................................................................13

                3.      The ASA expressly incorporated Plan terms. ...........................18

        C.      Blue Cross overpaid providers and then blocked the Fund from
                seeking recovery. .....................................................................19

III.    Procedural History ................................................................................20

STANDARD OF REVIEW ..............................................................................22

SUMMARY OF ARGUMENT.........................................................................23

ARGUMENT ..................................................................................................27

I.      The district court erred in dismissing the Fund's fiduciary breach
        claims.....................................................................................................27

        A.      Blue Cross was a fiduciary because it exercised authority over
                the disposition of plan assets.................................................................28

                1.      Blue Cross paid providers using plan assets.............................29

2.    Blue Cross was not a mere conduit; it exercised significant judgment in determining how much should be paid for covered care. .............................................................38

3.    Blue Cross exercised control over plan assets recovered from providers. ..........................................................41

B.    Blue Cross was a fiduciary because it exercised discretionary authority over the plan's management. ...............................................42

1.    Where a contract grants the service provider ongoing discretion, the service provider is a fiduciary. .........................42

2.    The ASA gave Blue Cross ongoing discretion over the amount the Fund paid for covered care. ...................................45

II.    Because the Court should reinstate the federal claims, it should vacate the district court's decision to decline jurisdiction over the state claims....................................................................................................50

CONCLUSION ............................................................................................51

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS ......................................................................................52

CERTIFICATE OF SERVICE ................................................................53

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Beddall v. State St. Bank & Tr. Co.*,
  137 F.3d 12 (1st Cir. 1998)..................................................................*passim*

*Blackstone Realty LLC v. F.D.I.C.*,
  244 F.3d 193 (1st Cir. 2001).......................................................22, 23

*Chao v. Day*,
  436 F.3d 234 (D.C. Cir. 2006)..................................................8, 37, 40

*Charters v. John Hancock Life Ins. Co.*,
  583 F. Supp. 2d 189 (D. Mass. 2008)..........................................43, 47

*Cottrill v. Sparrow, Johnson & Ursillo, Inc.*,
  74 F.3d 20 (1st Cir. 1996)..............................................................8, 40

*Depot, Inc. v. Caring for Montanans, Inc.*,
  915 F.3d 643 (9th Cir. 2019) .......................................................35, 36

*Ed Miniat, Inc. v. Globe Life Ins. Grp., Inc.*,
  805 F.2d 732 (7th Cir. 1986) .........................................................7, 44

*In re Express Scripts/Anthem ERISA Litig.*,
  285 F. Supp. 3d 655 (S.D.N.Y. 2018) ..............................................49

*Fernandez-Salicrup v. Figueroa-Sancha*,
  790 F.3d 312 (1st Cir. 2015)..............................................................50

*Fifth Third Bancorp v. Dudenhoeffer*,
  573 U.S. 409 (2014)............................................................................5

*Golden Star, Inc. v. Mass Mut. Life Ins. Co.*,
  22 F. Supp. 3d 72 (D. Mass. 2014).........................................8, 43, 47

*Gordon v. CIGNA Corp.*,
  890 F.3d 463 (4th Cir. 2018) .............................................................36

*Hi-Lex Controls Inc. v. Blue Cross Blue Shield of Michigan*,
  751 F.3d 740 (6th Cir. 2014) ....................................................*passim*

*Leimkuehler v. Am. United Life Ins. Co.*,
   713 F.3d 905 (7th Cir. 2013) ...................................................7, 23, 27

*Livick v. The Gillette Co.*,
   524 F.3d 24 (1st Cir. 2008)..........................................................48, 49

*Merrimon v. Unum Life Ins. Co. of Am.*,
   758 F.3d 46 (1st Cir. 2014)..........................................................*passim*

*O'Toole v. Arlington Tr. Co.*,
   681 F.2d 94 (1st Cir. 1982)......................................................8, 39, 40

*Pegram v. Herdrich*,
   530 U.S. 211 (2000)............................................................................5

*Peters v. Aetna Inc.*,
   2 F.4th 199 (4th Cir. 2021) .........................................................*passim*

*Pipefitters Loc. 636 Ins. Fund v. Blue Cross & Blue
   Shield of Michigan*,
   722 F.3d 861 (6th Cir. 2013) ......................................................*passim*

*Rozo v. Principal Life Ins. Co.*,
   949 F.3d 1071 (8th Cir. 2020) .........................................7, 43, 44, 47

*Santana v. Deluxe Corp.*,
   920 F. Supp. 249 (D. Mass. 1996)......................................................50

*W.E. Aubuchon Co. v. BeneFirst, LLC*,
   661 F. Supp. 2d 37 (D. Mass. 2009)..................................................39

**Statutes**

28 U.S.C. § 1291 ...................................................................................4

28 U.S.C. § 1331 ...................................................................................4

28 U.S.C. § 1367 ...................................................................................4

29 U.S.C. § 1001(b) ..............................................................................5

29 U.S.C. § 1002(21)(A)................................................................*passim*

29 U.S.C. § 1102(a) ..............................................................................6

v

29 U.S.C. § 1104 ............................................................................5, 6, 20

29 U.S.C. § 1106(b) ...........................................................................6, 21

29 U.S.C. § 1132(e) ...............................................................................4

**Other Authorities**

Br. of Sec'y of Labor, *Hi-Lex Controls, Inc. v. Blue Cross
   Blue Shield of Mich.*, Nos. 13-1773, 13-1859,
   2013 WL 6705224 (6th Cir. Dec. 10, 2013) ......................................9, 30, 32, 33

Department of Labor Advisory Opinion No. 93-14A, 1993 WL
   188473 (May 5, 1993) ...................................................................*passim*

Fed. R. Civ. P. 8 ...................................................................................23

Fed. R. Civ. P. 12(b)(6)......................................................................22, 23

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

This appeal presents important questions under the Employee Retirement Income Security Act of 1974 ("ERISA"). It also involves significant stakes for the more than 20,000 individuals who receive health coverage through Appellants' ERISA-governed health benefits plan. Although Appellants believe the case is governed by well-established principles regarding the circumstances under which a third-party service provider acts as an ERISA fiduciary, this Court has not squarely addressed certain issues implicated by the case. Appellants thus believe that oral argument would assist the Court in resolving the issues presented.

# INTRODUCTION

Appellant Massachusetts Laborers' Health and Welfare Fund (the "Fund") provides a health benefits plan to more than 20,000 members of the Massachusetts & Northern New England Laborers' Union and their families. The plan is self-funded, meaning the Fund bears the full financial risk of paying for its members' health care. That money comes through members' contributions from hours worked pouring concrete, digging tunnels, removing asbestos, working on busy highways, and the many other difficult and hazardous jobs that laborers in the construction industry do to earn a living. Through this hard work and collective action, union members have been able to obtain valuable health coverage for themselves and their families.

To help deliver these benefits, the Fund hired Blue Cross and Blue Shield of Massachusetts to act as its "third-party administrator" (a relationship it has now terminated). In this role, Blue Cross (1) held money from the Fund to cover estimated benefits payments, (2) determined how much healthcare providers would be paid for members' care, and then (3) in fact paid providers on the Fund's behalf. The Fund was bound by Blue Cross's decisions about how much providers should be paid. And if Blue Cross later determined it overpaid a provider, it had the unilateral right to pursue a settlement with the provider and then charge fees to the Fund for doing so.

1

The point of this arrangement is that Blue Cross maintains a network of providers with whom it has negotiated favorable payment rates. And under the contract between the Fund and Blue Cross, the Fund was entitled to those favorable rates as well. But Blue Cross used its broad discretion to manage relationships with healthcare providers to systematically overpay them, costing the Fund many millions of dollars in overpaid benefits. And to make matters worse, in many cases Blue Cross then negotiated settlements with overpaid providers—and charged fees to the Fund for mistakes of Blue Cross's own making.

Blue Cross's actions violate the Employee Income Retirement Security Act of 1974 ("ERISA"). That landmark statute imposes strict fiduciary duties of prudence and loyalty on those who, like Blue Cross, hold plan assets or exercise discretion over plan management. And here, Blue Cross violated those duties through its systematic overpayments and wrongful imposition of fees. Indeed, multiple circuits have held third-party administrators liable (including another Blue Cross Blue Shield company) under directly analogous circumstances. *Hi-Lex Controls Inc. v. Blue Cross Blue Shield of Michigan*, 751 F.3d 740, 747 (6th Cir. 2014); *Pipefitters Loc. 636 Ins. Fund v. Blue Cross & Blue Shield of Michigan*, 722 F.3d 861, 867 (6th Cir. 2013); *Peters v. Aetna Inc.*, 2 F.4th 199, 231 (4th Cir. 2021).

In this case, however, the district court dismissed the Fund's ERISA claims on the ground that Blue Cross was not a fiduciary in the first place (and thus was not

subject to ERISA's exacting fiduciary standards). The district court acknowledged that its holding contravened the law of other circuits. Its holding also contravened the Department of Labor's conclusion, based on longstanding guidance that this Court has previously adopted, that a different Blue Cross Blue Shield company acted as a fiduciary under circumstances identical to this case.

This Court should vacate the district court's decision and remand for this case to be litigated on the merits. Under ERISA, an entity is a fiduciary if it (1) "exercises any discretionary authority . . . respecting management of [an ERISA] plan" or (2) "exercises any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A). Here, the parties' contract gave Blue Cross complete authority over how much the plan paid for covered care. Blue Cross then paid providers on behalf of the plan, but did not itself "provide funds for covered services." A47. It paid providers, rather, from a pool of money collected in advance from the plan to cover estimated claim payments. Blue Cross then had the unilateral right—which it repeatedly exercised in this case—to negotiate post-payment settlements and impose fees on the plan for doing so.

Under the law of every circuit to address comparable scenarios, these actions made Blue Cross a fiduciary. The district court's contrary conclusion was error. The Court should accordingly vacate and remand.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over the federal claims under 28 U.S.C. § 1331 because those claims arise under ERISA, 29 U.S.C. § 1132(e). The court had supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367.

The district court entered final judgment for Blue Cross on all claims on March 30, 2022. A4. Appellants timely filed a notice of appeal on April 26, 2022. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

Under ERISA, an entity is a fiduciary if it (1) "exercises any discretionary authority . . . respecting management of [an ERISA] plan" or (2) "exercises any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A). Here, the parties' contract gave Blue Cross authority to determine— based on its internal policies and procedures—how much the plan paid for members' health benefits. Blue Cross did not "provide funds for covered services." A47. It paid providers, rather, from a pool of money collected in advance from the plan to cover estimated claim payments.

The questions presented are:

1. Did the district court err in dismissing Appellants' ERISA claims, where the sole ground for dismissal was that Blue Cross did not act as a fiduciary?

4

2. If this Court vacates the district court's dismissal of the federal claims, should the Court also reinstate the state-law claims over which the district court declined supplemental jurisdiction?

## STATEMENT OF THE CASE

### I.     Statutory Background

This case is governed by largely settled law concerning who is an ERISA fiduciary and what obligations fiduciaries have.

***Fiduciary duties.*** Congress enacted ERISA "to protect . . . the interests of participants in employee benefit plans and their beneficiaries." 29 U.S.C. § 1001(b). It does so, among other ways, "by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts." *Id.*

To that end, the statute imposes strict fiduciary duties on ERISA plan fiduciaries. 29 U.S.C. § 1104. Grounded in the common law of trusts, those duties require fiduciaries to act "'solely in the interest of the participants and beneficiaries.'" *Pegram v. Herdrich*, 530 U.S. 211, 223 (2000) (quoting 29 U.S.C. § 1104(a)(1)). Fiduciaries thus bear strict duties of loyalty and prudence to the plan and its participants. *Id.*; *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 419 (2014); 29 U.S.C. § 1104.

In addition to the general fiduciary duties set forth in § 1104, ERISA *categorically* bars fiduciaries from engaging in certain kinds of "prohibited transactions." 29 U.S.C. § 1106(b). Relevant here, this includes prohibiting a fiduciary from "deal[ing] with the assets of the plan in his own interest or for his own account." *Id.* § 1106(b)(1).

***Fiduciary status.*** Central to this case is the question of what makes someone a fiduciary in the first place. In ERISA parlance, there are two types of fiduciaries: "named fiduciaries" and "functional fiduciaries." *Beddall v. State St. Bank & Tr. Co.*, 137 F.3d 12, 18 (1st Cir. 1998). Named and functional fiduciaries bear identical duties; the difference is in what makes them a fiduciary. *See id*. A named fiduciary is someone "named in the plan instrument" who has "authority to control and manage the operation and administration of the plan." 29 U.S.C. § 1102(a). Functional fiduciaries, by contrast, are not named in the plan, but incur fiduciary duties "to the extent" they (1) "exercise[] any discretionary authority or discretionary control respecting management of such plan" or (2) "exercise[] any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A).

**1.** Under the first prong of the functional fiduciary standard (sometimes called the "discretion" prong), what matters is, unsurprisingly, discretion over the plan's management. For third-party service providers who have contracted with the plan,

courts have long agreed on the following test for whether the service provider exercises fiduciary discretion:

> [I]f a specific term (not a grant of power to change terms) is bargained for at arm's length, adherence to that term is not a breach of fiduciary duty. No discretion is exercised when an insurer merely adheres to a specific contract term. When a contract, however, grants an insurer discretionary authority, even though the contract itself is the product of an arm's length bargain, the insurer may be a fiduciary.

*Ed Miniat, Inc. v. Globe Life Ins. Grp., Inc.*, 805 F.2d 732, 737 (7th Cir. 1986). Thus, as the Eighth Circuit recently summarized, a "service provider may be a fiduciary when it exercises discretionary authority, even if the contract authorizes it to take the discretionary act." *Rozo v. Principal Life Ins. Co.*, 949 F.3d 1071, 1074 (8th Cir. 2020) (citing *Ed Miniat*, 805 F.2d at 737).

**2.** The second prong of ERISA's functional fiduciary definition (sometimes called the "plan assets" prong) works differently. Every circuit to address the issue has noted that while the discretion prong requires "*discretionary*" authority, the plan assets prong imposes fiduciary duties on "*any*" exercise of authority over the management or disposition of plan assets. 29 U.S.C. § 1002(21)(A) (emphasis added); *see, e.g.*, *Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905, 913 (7th Cir. 2013) (agreeing with the Second, Third, Sixth, Eighth, Ninth, Tenth, Eleventh, and D.C. Circuits, which have "concluded that discretionary control is not required with regard to the management or disposition of plan assets").

This issue remains open in the First Circuit. Although this Court has broadly "use[d] 'discretion' as the touchstone for qualification as a functional fiduciary," the Court has not squarely "address[ed] arguments highlighting differences between the wording of the two prongs of the subsection." *See Golden Star, Inc. v. Mass Mut. Life Ins. Co.*, 22 F. Supp. 3d 72, 78 (D. Mass. 2014); *Beddall v. State St. Bank & Tr. Co.*, 137 F.3d 12, 18 (1st Cir. 1998) ("The key determinant of whether a person qualifies as a functional fiduciary is whether that person exercises discretionary authority in respect to, or meaningful control over, an ERISA plan, its administration, or its assets (such as by rendering investment advice)."); *Cottrill v. Sparrow, Johnson & Ursillo, Inc.*, 74 F.3d 20, 22 (1st Cir. 1996) (no fiduciary status where defendant "simply perform[ed] a transfer specified by the trustee—a purely administrative act"); *O'Toole v. Arlington Tr. Co.*, 681 F.2d 94, 96 (1st Cir. 1982) (bank's "responsibilities as the depository for the funds do not include the discretionary, advisory activities described by the statute").

As discussed in the Argument section *infra*, despite the imprecise language employed in some cases, the First Circuit's rule appears consonant with that of other circuits, which likewise hold that mere possession of plan assets, without anything more, does not give rise to fiduciary status. The person must exercise at least *some* degree of judgment or control over the disposition of the assets as well. *Compare, e.g.*, *Chao v. Day*, 436 F.3d 234, 237 (D.C. Cir. 2006) ("Our interpretation of the

disposition clause does not . . . extend fiduciary status to every person who exercises 'mere possession, or custody' over the plans' assets."), *with Beddall*, 137 F.3d at 20 ("Without more, mechanical administrative responsibilities (such as retaining the assets and keeping a record of their value) are insufficient to ground a claim of fiduciary status.").

*Plan assets.* The final bit of relevant ERISA background is what makes something a "plan asset." As this Court has observed, "ERISA nowhere contains a comprehensive definition of what constitutes 'plan assets.'" *Merrimon v. Unum Life Ins. Co. of Am.*, 758 F.3d 46, 56 (1st Cir. 2014). In the absence of a statutory definition, the First Circuit has, like "[s]everal of [its] sister circuits," adopted the Department of Labor's longstanding view, as expressed in Advisory Opinion No. 93-14A, 1993 WL 188473 (May 5, 1993) ("Advisory Opinion"). *Merrimon*, 758 F.3d at 56 (citing Advisory Opinion).

The Advisory Opinion explains that "the assets of a plan generally are to be identified on the basis of ordinary notions of property rights under non-ERISA law." 1993 WL 188473, at *4. That includes "any property . . . in which the plan has a beneficial ownership interest." *Id.* In its subsequent explanations of this guidance, the Department has emphasized that a "beneficial ownership interest" does not require the plan to hold formal title to the property; nor must assets "be in the form of a formal trust." Br. of Sec'y of Labor, *Hi-Lex Controls, Inc. v. Blue Cross Blue*

*Shield of Mich.*, Nos. 13-1773, 13-1859, 2013 WL 6705224, at *25 (6th Cir. Dec. 10, 2013) (interpreting Advisory Opinion). What matters is whether the money was "earmarked for the payment of plan benefits." *Id.* (noting "the plan's beneficial interest in the funds" held by third-party administrator where funds were "earmarked for plan benefits and plan expenses").

## II.    Factual Background

### A.    The Fund hired Blue Cross as third-party administrator.

The Massachusetts Laborers' Benefit Funds ("Mass Laborers") provides benefits to members of various Local Unions within the jurisdiction of the Massachusetts and Northern New England Laborers' District Council. A8. Plaintiff Massachusetts Laborers' Health and Welfare Fund (the "Fund") operates independently within Mass Laborers to provide health benefits to more than 20,000 union members and their families. A8; *see* 2020 Massachusetts' Laborers Health and Welfare Fund Form 5500, EIN 04-2214296 (filed Oct. 14, 2021) (available at https://www.efast.dol.gov/5500search/).

The Fund is a "self-funded" ERISA plan, meaning that Mass Laborers directly assumes the financial risk of funding all healthcare benefits for participants. A9; A47 (administrative services agreement stating that Blue Cross "does not undertake to provide insurance or to provide funds for covered services"); A50 ("the Fund retains the ultimate financial responsibility and liability for all covered claims"). The money

10

used to pay those benefits comes from employer contributions—contributions funded at least in part through deductions from members' paychecks. A9.

To administer the health benefits offered by the Fund, the Trustees hired Blue Cross Blue Shield of Massachusetts. A12. In this role, Blue Cross was known as the "third-party administrator" for the Fund. The basic division of labor was this: the Fund determined whether a given health service was covered by the plan, while Blue Cross determined how much the healthcare provider would be paid and remitted payment on the Fund's behalf, using money provided to it by the Fund. A12; A48-49. The idea behind the arrangement was that Blue Cross maintained a network of providers with whom it had negotiated favorable payment rates, and by hiring Blue Cross as third-party administrator (and paying it a monthly administrative fee), the Fund could take advantage of those favorable rates.

### B.    The Administrative Services Agreement and relevant Plan terms

The details of the parties' relationship were memorialized in an Administrative Services Agreement (known as the "ASA"). Broadly speaking, there are three key takeaways from the ASA.[1]

---

[1] The ASA was amended after it was originally executed in 2006. For purposes of this appeal, the relevant terms are reflected in the Appendix, A45-79.

**1.     The ASA expressly contemplated that the Fund's assets would be used to pay benefits.**

The ASA expressly stated that the Fund's assets would be used to pay for members' benefits. It said that Blue Cross "does *not* undertake to . . . provide funds for covered services." A47 (emphasis added). And it emphasized that "the Fund retains the ultimate financial responsibility and liability for all covered claims." A50. The ASA thus required that the Fund's money, not Blue Cross's, be used to pay for members' health expenses. A47; A50; *see also* A54 ("Collecting Participant Charges and Employer Contributions. The Fund will be solely responsible for collecting any charges that the Fund assesses for its Participants, and for collecting contributions from employers.").

Under the ASA, the Fund adjudicated whether claims were covered (and thus must be paid). Blue Cross, however, determined *how much* would be paid to providers for covered care. A48-49. As explained below, Blue Cross made this determination based on a range of factors and criteria. The Fund had no input into this determination. Because, however, Blue Cross paid providers without first billing the Fund, it estimated how much the Fund would owe for benefits each month, and the Fund then passed that sum to Blue Cross. A60. This was known as the "working

capital amount," and it effectuated the ASA's provision that Blue Cross would not itself provide the funds to pay claims. A60.[2]

Although not held in a segregated account, the "working capital amount" was specifically earmarked "for estimated Claim Payments" (A60)—*i.e.*, to pay "for Participants' health care benefits." A55 ("'Claim Payments' means the amounts Blue Cross and Blue Shield pays on behalf of the Fund *for Participants' health care benefits* when billed by the provider") (emphasis added). Blue Cross then kept track of the benefits actually paid, and if there was leftover from one month, Blue Cross credited that amount to the next payment (or, in certain circumstances, actually was required to refund the money). A61 (discussing "Monthly Settlement Provisions" and the "Settlement Amount Due to the Fund"). Likewise, if the working capital amount fell short of claim payments, the Fund had to make up the difference. A60.

### 2. Under the ASA, Blue Cross applied judgment and discretion to determine the amount of benefits the Fund paid.

Blue Cross's primary role under the ASA was to determine the amount the Fund would pay for covered care and then in fact pay claims on behalf of the Fund and its members. To do so, it maintained a network of providers with whom it had

---

[2] The ASA's full description of the working capital amount is as follows: "Because Blue Cross and Blue Shield will pay providers of services before being able to bill the Fund, the Fund has agreed to pay a working capital amount to Blue Cross and Blue Shield for estimated Claim Payments. This working capital amount will be based on Blue Cross Blue Shield's estimate of the amount needed to pay claims on a current basis, subject to review and approval by the Fund." A60.

negotiated payment rates, which it then, in theory, passed on to the Fund. A51 (discussing "Negotiated Claim Payment Rates" to which "[the Fund] is entitled"); A49 (Blue Cross will price claims in accordance with reimbursement arrangements). The ASA reserved for Blue Cross ongoing discretion to change its provider network and negotiated payment rates at any time, without any input or approval from the Fund. A51 ("[Blue Cross] reserves the right to make changes to its provider network . . . at any time.").

These negotiated rates were important to Blue Cross's determination of the payment amount. But that process was not as simple as looking at what treatment the patient received and noting the agreed amount with the provider. To determine the proper amount for any given health care claim, Blue Cross employed its internal policies, procedures, and guidelines to evaluate things like medical necessity, whether the treatment required preauthorization, and more:

- Blue Cross "will conduct a medical necessity and utilization review of inpatient urgent, nonurgent, and concurrent care claims using the Blue Cross and Blue Shield medical policy, medical technology assessment guidelines and utilization review policies and procedures as set forth in the Benefit Description as incorporated into this Agreement as Attachment A." A48.

- Blue Cross "will provide all aspects of utilization review, including preadmission review and concurrent care review and catastrophic case management." A51.

- Blue Cross "(i) appl[ied] medical necessity criteria, (ii) appl[ied] medical policy criteria and (iii) pric[ed] the claims." A52.

Applying these policies and criteria to the complex facts of specific claims is not a rote exercise. Consider, for example, a patient who was readmitted to a hospital for further treatment after discharge. When that happened, Blue Cross had to determine—under its internally developed, subject-to-change "medical policy criteria," A52—whether the readmission was based on what's called a "related diagnosis." *E.g.*, A22. If so, the readmission fell under the same claim as the original admission, and the Fund ended up paying significantly less in benefits. The difference to the Fund could be tens of thousands of dollars for a single patient. Blue Cross, in its discretion, assessed the similarity of the two hospital admissions and made this determination.

Blue Cross's assessment of the severity of illness likewise involved discretion and judgment. When a patient goes to a hospital emergency room, the severity of the patient's condition determines the level of care the patient receives. This is usually expressed by a coding system, where a sprained ankle might be a Code 1 and a gunshot wound might be a Code 4. The higher the code, the greater the severity, and

the more the hospital gets paid for providing care. *E.g.*, A25. In deciding the amount the hospital gets paid, Blue Cross itself reviewed the patient's medical records and applied its "medical necessity criteria" and "medical policy criteria," A52, to determine what code level was warranted. That decision, again, could mean tens of thousands of dollars to the Fund for any given patient. And, again, that determination fell within Blue Cross's discretion.

In its filings before the district court, Blue Cross insisted that it "does no more than replace the provider's standard price with the *negotiated* price," ECF 20 at 7, as if it had a chart that listed a set price for every possible benefits claim. But that is obviously not true, and not what the Fund alleged. Blue Cross's claim determinations involved myriad policies and criteria and subjective assessments of patient condition and diagnoses. And to make these determinations, Blue Cross applied its own guidelines and policies, which it had discretion to change over time. A49 (Blue Cross makes decisions based on "Blue Cross and Blue Shield's standard procedures and practices *as in effect from time to time*" (emphasis added)).

Blue Cross, in short, employed significant discretion and judgment to determine the payment amount. And once Blue Cross made its determination, the Fund had no contractual right to determine a different payment amount. A48 (the Fund's "claim adjudication [was] based on Blue Cross and Blue Shield's pricing of claims").

Blue Cross also exercised judgment and discretion *after* it remitted payment on the Fund's behalf. The ASA (and its subsequent amendments) gave it the ongoing and unilateral right to adjust the amounts it previously paid. The ASA noted, for example, that Claim Payments "reflect the rate of payment in effect at the time the claim is paid, but do not include either positive or negative effects of any later contractual settlements with the providers." A55. When Blue Cross entered such a settlement, it "estimate[d]" how much should be credited to the Fund, but it was entitled to pursue "settlements that may exceed the estimates," and the Fund had no "interest in the settlement amounts." A55.

Subsequent amendments gave Blue Cross even greater ongoing discretion. They explained that Blue Cross "may identify claims for which the amount paid by Blue Cross . . . was too high or too low due to reasons such as the use of incorrect claim payment rates, Medicare secondary payer issues, disagreements on provider payment policies, or other similar situations." A79; A73. When that happened, Blue Cross had the discretion to decide either simply to "reprocess impacted paid claims . . . using the normal process," or to go out and "negotiate a settlement with the provider." A79; A73. The Fund had no say in the negotiation or settlement process, even though any overpayment was of *the Fund's* money, not Blue Cross's, which had originally been collected from the Fund's members for the purpose of covering

medical expenses and related administrative fees. Nevertheless, Blue Cross had full authority to determine *whether* to pursue a settlement and *how much* to settle for.

When Blue Cross obtained a settlement to recover an overpayment of the Fund's money, it charged the Fund for "fees paid to outside counsel, fees paid to outside analysts and consultants, and any other outside support costs incurred in obtaining that recovery." A73.

### 3. The ASA expressly incorporated Plan terms.

Finally, under the ASA, Blue Cross agreed that ERISA governs its obligations to the Plan. In describing the parties' "Duties and Obligations Under ERISA," the ASA states:

> The Trustees are the "administrator" and "named fiduciary" of the Fund as that term is defined in Section 3(16)(A) and 402(a), respectively, of ERISA. Blue Cross and Blue Shield is engaged as an independent contractor to perform the specific duties and responsibilities which the Trustees delegate to it. It is understood and agreed that Blue Cross and Blue Shield exercises its duties within the framework of the Plan of Benefits established by the Trustees. Blue Cross and Blue Shield and the Trustees of the Fund accept that the definitions of a fiduciary are contained in ERISA Section 3(21)(A).

A45.

To that end, Blue Cross agreed to "perform its services under th[e] Agreement in a reasonable and prudent fashion and in accordance with the benefits provisions

of the Plan." A48. Thus, the ASA incorporated, and Blue Cross was bound by, the terms of the Fund's ERISA plan.

Those terms make clear that determining the amount that should be paid for covered care was part of managing the Fund's plan, including through what has been called the "Negotiated Rate Mandate." As relevant here, the Negotiated Rate Mandate required that "[t]he billed charges that will be considered covered expenses will never be more than the negotiated rate." A102. In other words, the benefits that union workers and their families received flowed directly from the amount that Blue Cross determined should be paid to providers. *See* A99 (chart explaining benefit amounts, typically as a percentage of the amount determined by Blue Cross).

### C.  Blue Cross overpaid providers and then blocked the Fund from seeking recovery.

After years of what appeared to be a fruitful working relationship, the Fund and its Trustees learned that Blue Cross was frequently overpaying providers, to the tune of millions of dollars. A21-27, 30-31. In the district court, Blue Cross suggested that in reaching this conclusion, the Fund had been "led astray" by its third-party claims reviewer (ClaimInformatics LLC). ECF 16-1 at 6 (ECF pagination). But many of Blue Cross's overpayments cannot seriously be disputed: the Fund found instances where Blue Cross paid multiple times even what the provider *billed*. A22-24, 27. It is difficult to imagine this being anything other than an overpayment. The Fund also identified blatant and costly misapplications of Blue Cross's own medical

19

necessity and medical policy guidelines, as well as numerous instances where Blue Cross collected recovery fees for errors *it itself* caused. *Id.* Altogether, just these most obvious overpayments amounted to many millions of dollars. *See id.*

When the Fund and its Trustees brought this information to Blue Cross, its response was to stonewall. A21, 30-32. Blue Cross insisted its payments were correct, and it refused to provide either its underlying provider contracts or its internal payment rules or policies. *Id.*

After Blue Cross refused to act, the Fund itself sent notices of overpayment to providers. A28. Many providers promptly recognized the overpayments and repaid the Fund more than $200,000 in total. A28. But once Blue Cross caught wind of this, it "demanded that the Fund cease its recovery efforts" and forbade its providers from responding to Plaintiffs' requests. A28-29. Thus, even when the Fund discovered that Blue Cross's decisions had caused the Fund to overpay providers who were now willing to repay the Fund, Blue Cross intervened and prevented Mass Laborers from acting to protect how its own plan assets were spent. The Fund has since terminated its relationship with Blue Cross, and this lawsuit followed.

## III.    Procedural History

The amended complaint asserts three claims arising under ERISA. Count 1 alleges that Blue Cross breached its fiduciary duties under 29 U.S.C. § 1104 by, among other things, consistently using its claim pricing authority to overpay

20

providers in its network. A32-33. Count 2 alleges that Blue Cross violated ERISA's prohibited transaction rules under 29 U.S.C. § 1106(b)(1) by collecting unauthorized fees and entering settlement agreements with network providers that resulted in a benefit to Blue Cross. A33-34. And Count 3 seeks injunctive and other appropriate equitable relief for Blue Cross's violations. A34. The complaint also asserts state-law claims for accounting, breach of contract, breach of the covenant of good faith and fair dealing, and unfair and deceptive business practices. A34-38.

Blue Cross moved to dismiss, arguing that the ERISA claims failed on the threshold question of whether it acted as a fiduciary. *See* Blue Cross Mot. Dis., ECF 16-1 at 15-30. Blue Cross also asked the Court to decline jurisdiction over the state-law claims should it dismiss the federal claims. *Id.* at 30.

The district court granted Blue Cross's motion. Addressing fiduciary status, the court held that Blue Cross did not meet either prong of ERISA's functional fiduciary standard. On the "discretion" prong, the court did not ask whether the parties' contract gave Blue Cross ongoing discretion over some aspect of plan management. The court believed, rather, that for Blue Cross to be a fiduciary, "there must be something in the structure of the relationship, either formally or *de facto*, that takes it outside of the normal plan-administrator relationship." AD20. In other words, the court apparently believed that "normal" administrators simply are not

21

fiduciaries under ERISA. And because the court did not find "[t]hat 'something extra'" here (AD20), it concluded Blue Cross was not a fiduciary.[3]

On the "plan assets" prong, the court concluded that Blue Cross did not hold and pay claims using assets of the plan. The court acknowledged that claims "must ultimately be paid out of the resources of the plan." AD27. It also recognized that under the Sixth Circuit's decision in *Hi-Lex Controls Inc. v. Blue Cross Blue Shield of Michigan*, 751 F.3d 740 (6th Cir. 2014), Blue Cross would be a fiduciary. AD23-24. Yet the court disagreed with the Sixth Circuit and Department of Labor's analysis in *Hi-Lex*, believing that doing so would impose fiduciary liability more broadly than Congress intended. AD27. The district court also thought that, despite Blue Cross's unilateral control over the determination of how much benefits should be paid, it acted more like a "depository bank or a custodian" than a fiduciary. AD28.

Because the court dismissed all three of the Fund's ERISA claims on the threshold issue of fiduciary status, the court declined to exercise jurisdiction over the state-law claims. AD29-30.

## STANDARD OF REVIEW

This Court reviews a district court's grant of a motion to dismiss *de novo*. *Blackstone Realty LLC v. F.D.I.C.*, 244 F.3d 193, 197 (1st Cir. 2001). In evaluating Blue Cross's challenge under Rule 12(b)(6), this Court may consider the parties'

---

[3] Citations to the Addendum take the form "AD__."

contract and the plan documents it incorporates, but otherwise accepts the complaint's allegations as true. *Id.* For purposes of this appeal, the question is whether plaintiffs have plausibly alleged facts, under Federal Rule of Civil Procedure 8, that render Blue Cross a fiduciary. In resolving that question, the Court draws all inferences in favor of plaintiffs. *Blackstone Realty*, 244 F.3d at 197.

## SUMMARY OF ARGUMENT

The district court erred in holding that Blue Cross was not a fiduciary. ERISA imposes fiduciary status on anyone who either (1) exercises "*any* authority" over the disposition of plan assets, or (2) exercises "*discretionary* authority" over the management of the plan. 29 U.S.C. § 1002(21)(A) (emphasis added); *see Beddall*, 137 F.3d at 18; *Leimkuehler*, 713 F.3d at 913. Under either test, Blue Cross was a fiduciary here.

**A.** First, Blue Cross unquestionably exercised "*any* authority" over the disposition of the Fund's assets. The Sixth Circuit and Department of Labor's analysis in *Hi-Lex*, 751 F.3d at 746, explains why: Blue Cross took the Fund's money, held it earmarked for the payment of benefits, and then in fact used it to pay benefits. Indeed, the parties' contract expressly stated that Blue Cross did "*not* undertake to . . . provide funds for covered services." A47 (emphasis added). It emphasized that "the Fund retains the ultimate financial responsibility and liability

23

for all covered claims." A50. And it established that Blue Cross held the working capital amount to pay "for Participants' health care benefits." A55, A60.

It accordingly does not matter that Blue Cross held legal title to the assets. Because the parties contemplated that Blue Cross would hold the working capital amount for the purpose of paying benefits, the Fund had a "beneficial ownership interest" in those assets. Advisory Opinion, 1993 WL 188473, at *4; *Merrimon v. Unum Life Ins. Co. of Am.*, 758 F.3d 46, 56 (1st Cir. 2014) (approving reliance on Advisory Opinion in evaluating plan asset question); *Hi-Lex*, 751 F.3d at 746. If Blue Cross did "not . . . provide funds for covered services," A47, who else besides the Fund could do so?

Nor did Blue Cross act as a mere conduit, mechanically following the Fund's instructions for determining how much to pay for covered care. On the contrary, that decision fell entirely within Blue Cross's purview, and it required Blue Cross to exercise significant judgment and discretion when processing each individual health care claim. Blue Cross evaluated whether medical diagnoses were related, what level of care was warranted, and much more, based on its fully discretionary internal policies and procedures. *See supra* 13-16. That is nothing like the "depository bank" cases to which the district court analogized.

Blue Cross held and disposed of plan assets; it was therefore a fiduciary.

**B.** Blue Cross was also a fiduciary based on its discretionary authority over the management of the plan. As noted, Blue Cross had discretion over the amount the plan paid for covered care. And it exercised this discretion (1) by applying its (discretionary) internal procedures for determining how much the Fund would pay in benefits, (2) through its (discretionary) authority to negotiate overpayment settlements with providers, and (3) by imposing (discretionary) "recovery fees" on the plan. Blue Cross made all of these decisions without consulting the Fund, and the Fund was bound by whatever Blue Cross decided.

The parties have largely focused on Blue Cross's authority to determine how much the Fund paid for covered care. And for good reason—to determine the payment amount, Blue Cross did not just look at a pricing chart and write down the number; it had to *apply* its negotiated rates to the claim at issue, evaluating things like the relationship between medical diagnoses or the level of care warranted in a given emergency. *See, e.g.*, A17, 25. And it made those determinations for each individual claim it evaluated using internally developed and discretionary "medical necessity criteria" and "medical policy criteria," over which the Fund had no say. A52. That is more than enough to establish Blue Cross's discretionary authority under the ASA.

But Blue Cross's settlement authority is perhaps even more remarkable. If Blue Cross realized it caused the Fund to overpay a provider (*i.e.*, exactly the

25

problem the Fund is suing over), it was *Blue Cross's decision* whether to pursue a settlement, how to go about doing that, and what amount to accept. A73. Blue Cross could decide—for any reason it wished, including to preserve its own relationships with providers—to just let the overpayment stand. It could decide to reprocess the payment pursuant to a routinized process. Or it could negotiate whatever settlement amount it pleased with the provider. And because Blue Cross controlled recovery of overpayments, it decided whether to charge the Fund the "recovery fee" owed for third-party errors, or to accept responsibility for its own mistakes. A26-27, A73.

These are paradigmatic fiduciary acts. It is thus unsurprising that every circuit court to address analogous facts has concluded that the third-party administrator was a fiduciary. *E.g.*, *Hi-Lex*, 751 F.3d at 744-45 (although Blue Cross could "collect fees per the terms of its contract," it was a fiduciary because such fees were "discretionarily imposed"); *Pipefitters Loc. 636 Ins. Fund v. Blue Cross & Blue Shield of Michigan*, 722 F.3d 861, 867 (6th Cir. 2013) (Blue Cross was a fiduciary because "the state did not fix the rate that Defendant charged each customer, and crucially, neither did the ASC between Plaintiff and Defendant"); *Peters v. Aetna Inc.*, 2 F.4th 199, 231 (4th Cir. 2021) (third-party administrator was a fiduciary because "administrative fee was . . . imposed . . . at Aetna's discretion"). This Court should reach the same conclusion.

The Court should vacate the judgment of the district court (including as to the state-law claims over which the district court declined jurisdiction) and remand for this case to proceed on the merits.

## ARGUMENT

## I.    The district court erred in dismissing the Fund's fiduciary breach claims.

The district court's sole basis for dismissing Appellants' ERISA claims was its conclusion that Blue Cross did not act as a fiduciary. AD13, 28. That conclusion was incorrect. Under ERISA, someone becomes a functional fiduciary by (1) exercising "*any* authority" over the disposition of plan assets, or (2) exercising "*discretionary* authority" over the management of the plan. 29 U.S.C. § 1002(21)(A) (emphasis added); *see Beddall*, 137 F.3d at 18; *Leimkuehler*, 713 F.3d at 913. Satisfying either prong is sufficient to demonstrate fiduciary status under ERISA, and here, Blue Cross readily met both.

Blue Cross decided how much the plan would pay providers for its members' health care and whether to impose certain fees on the plan. It did so not only by applying its (discretionary) internal procedures for determining how much would be paid for covered care, but also through its (discretionary) authority to negotiate overpayment settlements with providers, and by imposing (discretionary) "recovery fees" on the plan. Blue Cross made these decisions without consulting the Fund, and the Fund was bound by whatever Blue Cross decided. And Blue Cross paid providers

using, as the ASA required, the Fund's money. These are paradigmatic fiduciary acts. Which is why, as the district court recognized, the Sixth Circuit and Department of Labor concluded that a different Blue Cross company faced fiduciary status under materially identical circumstances. Particularly given the obligation at this stage to draw inferences in favor of Plaintiffs, this Court should do the same.

The Court should vacate the district court's dismissal of the ERISA claims and remand for this case to be litigated on the merits.

### A.    Blue Cross was a fiduciary because it exercised authority over the disposition of plan assets.

On the "plan assets" prong, to put it simply, the Court should follow *Hi-Lex*. There, the Sixth Circuit and Department of Labor concluded, under circumstances identical to this case, that Blue Cross of Michigan exercised authority over the disposition of plan assets and was thus a fiduciary. The district court agreed that this case is on all fours: under *Hi-Lex*, Blue Cross would be a fiduciary because it took the Fund's money, earmarked it for the payment of benefits, and then in fact used it to pay benefits. AD23-24. The district court, however, thought the Sixth Circuit and Department of Labor (interpreting the very Advisory Opinion on plan assets that this Court has adopted) got it wrong. *Id.* They did not. Blue Cross held and disposed of plan assets; it was therefore a fiduciary.

### 1.     Blue Cross paid providers using plan assets.

The district court first erred in concluding that Blue Cross did not hold any plan assets. On the contrary, the funds held by Blue Cross to pay benefits for plan members—what the ASA called the "working capital amount"—were plan assets.

*a.* As noted *supra*, "ERISA nowhere contains a comprehensive definition of what constitutes 'plan assets.'" *Merrimon*, 758 F.3d at 56. Like several other circuits, this Court has therefore followed the Department of Labor's decades-old guidance on the meaning of that term. *Id.* (citing Advisory Opinion, 1993 WL 188473, at *4).

Plan assets "generally are to be identified on the basis of ordinary notions of property rights under non-ERISA law." Advisory Opinion, 1993 WL 188473, at *4. That includes "any property . . . in which the plan has a beneficial ownership interest." *Id.* As examples of what might give rise to such an interest, the Advisory Opinion included "representation[s] to any participant or beneficiary that the assets . . . will be used only to pay [policy] premiums" or "advis[ing] participants that they should . . . look to the assets . . . as a source of funding for their benefits under the Plan." *Id.*

In *Hi-Lex*, the Department put more meat on the bones of this guidance. The arrangement there was essentially identical to the one here: a self-funded plan hired Blue Cross of Michigan as its third-party plan administrator to price (and then pay) claims; Blue Cross of Michigan periodically estimated how much the plan would

29

owe in benefits payments, and the plan then passed that amount to Blue Cross of Michigan, "earmarked for plan benefits and plan expenses"; Blue Cross of Michigan then "kept detailed records of the funds Hi-Lex wired and accounted for them, . . . and any surplus from the previous quarter [was] rolled over for the next quarter's claims and expenses." Br. of Sec'y of Labor, *Hi-Lex*, 2013 WL 6705224, at *25.

The Department of Labor explained that this arrangement gave rise to "multiple indicia of the plan's beneficial interest in the funds." *Id.* It did not matter that the plan gave up formal title to the funds, or that they were not held in a formal trust. *See id.* What mattered, at bottom, was that the funds "were earmarked for plan benefits and plan expenses." *Id.*

The Sixth Circuit agreed. The funds were plan assets in light of the parties' "understanding that BCBSM in its role as TPA would be holding funds to pay the healthcare expenses of Plan beneficiaries." *Hi-Lex*, 751 F.3d at 746. "Indeed," the court noted, "the quarterly statements received by Hi-Lex show that the funds it sent to BCBSM were, predictably, spent covering the health expenses and administrative costs of plan beneficiaries." *Id.*

The court likewise rejected Blue Cross's argument that plan assets must be held in "a separate bank account set aside exclusively for the funds intended to pay enrollee health expenses." *Id.* Looking instead to the non-ERISA principles of beneficial ownership that guide the plan assets analysis, the court observed:

30

> When one person transfers funds to another, it depends on the manifested intention of the parties whether the relationship created is that of trust or debt. If the intention is that the money shall be kept or used as a separate fund for the benefit of the payor or *one or more third persons*, a trust is created.

*Id.* at 747 (quoting Restatement (Third) of Trusts § 5 cmt. k (2003)) (emphasis in *Hi-Lex*). Thus, because Blue Cross of Michigan held the funds "for the purpose of paying plan beneficiaries' health claims and administrative costs," they were plan assets. *Id.*

*b.* The same analysis applies here. The manifest intent of the parties was for Blue Cross to hold the Fund's money to pay for members' health benefits. The ASA is explicit on this point: Blue Cross "does *not* undertake to provide insurance or *to provide funds for covered services*." A47 (emphasis added). And "the Fund retains the ultimate financial responsibility and liability for all covered claims." A50. If Blue Cross was neither providing the funds nor otherwise financially responsible for paying benefits, who was? The Fund.

That was the entire point of the financial arrangement under the ASA. Blue Cross estimated how much the Fund would owe for benefits each month, and the Fund paid that as the "working capital amount." A60. The express purpose of the working capital amount was "for estimated Claim Payments." *Id*. And the ASA defined "Claim Payments" as "the amounts Blue Cross and Blue Shield pays on behalf of the Fund *for Participants' health care benefits* when billed by the provider."

31

A55 (emphasis added). From there, as in *Hi-Lex*, Blue Cross kept track of the claims actually paid, and if there was leftover from one month, credited that amount to the next month's payment (or, in some circumstances, was required to actually pay the money back to the Fund). A61. And if claim payments exceeded the working capital amount, the Fund was obligated to make up the difference. *Id.*

It could not be clearer that, as in *Hi-Lex*, the parties intended for Blue Cross to hold the Fund's money to pay for participants' health benefits. In the Department of Labor's words, the funds "were earmarked for" that purpose. Br. of Sec'y of Labor, *Hi-Lex*, 2013 WL 6705224, at *25. The Fund and its participants thus had a beneficial ownership interest in the money, making those funds plan assets under the Advisory Opinion that guides this Court's plan assets analysis. *Merrimon*, 758 F.3d at 56 (citing Advisory Opinion, 1993 WL 188473, at *4).

*c.* The district court thought the Sixth Circuit and Department of Labor's analysis in *Hi-Lex* was incorrect. AD24-27. But the court's reasoning was unpersuasive. It rested on (1) an unduly restrictive view of the legal standard (as explained by the Department of Labor in interpreting the very Advisory Opinion that guides this Court's plan assets analysis); (2) misapprehensions about the facts of this case (directly contradicted by the ASA); and (3) policy arguments (that have been rejected by both Congress and the expert agency tasked with implementing and enforcing ERISA).

32

*i.* First, the district court took an improperly narrow view of the "ordinary property principles," and the concept of "beneficial ownership," that govern the plan assets question. The court observed that "title to the fund passes to Blue Cross when the Fund makes its periodic payments," that the Fund cannot "demand their return," that Blue Cross "bears the risk of any investment loss," and that the "funds are not held in the name of the Fund." AD22-23. In light of this, the court thought there was "no reason to believe, under 'ordinary notions of property rights,' that the funds paid to Blue Cross" were plan assets. AD22.

Setting aside, for now, that many of these premises are factually incorrect, the district court's focus on *legal* ownership (holding legal title) gave short shrift to the controlling concept of *beneficial* ownership interests. As the Advisory Opinion this Court endorsed in *Merrimon* explained, the plan's "beneficial" interest in the funds is what really matters. Advisory Opinion, 1993 WL 188473, at *4; *see Merrimon*, 758 F.3d at 56 (citing Advisory Opinion). Interpreting that guidance, the Department of Labor clarified in *Hi-Lex* that *beneficial* ownership interests do not require a "formal trust" relationship. Br. of Sec'y of Labor, *Hi-Lex*, 2013 WL 6705224, at *25. And it was entirely irrelevant that Blue Cross held legal title to the funds, because the "payments that Hi-Lex forwarded to Blue Cross were earmarked for plan benefits and plan expenses." *Id.* That was enough to show "the plan's beneficial interest in the funds." *Id.*

33

The Sixth Circuit's trust law comparison demonstrates why the Department's view is correct, and the district court's overly restrictive. As in trust law, the key is not who holds title to the assets, but whether "the intention is that the money shall be kept or used . . . for the benefit of . . . *one or more third persons*." *Hi-Lex*, 751 F.3d at 747 (citing Restatement (Third) of Trusts § 5 cmt. k (2003)) (emphasis in *Hi-Lex*). Thus, the fact that Blue Cross held funds "for the purpose of paying plan beneficiaries' health claims" meant that the funds were plan assets. *Id.* The same is true here.

*ii.* The district court's analysis also rested on key factual errors. The court believed that the "typical attributes of property rights, such as the actual contractual arrangements of the parties and the allocation of risk" should be dispositive. AD27. But it erred in evaluating those matters here, particularly given its obligation to draw inferences in favor of plaintiffs at this stage of proceedings.

For example, the district court incorrectly stated that the Fund had no ongoing interest in or right to the working capital amount once it was paid to Blue Cross, and that the working capital was not held for the benefit of the Fund. AD22-23 ("There is no reason to believe that the Fund can have access to those funds, or demand their return, at any time or for any reason."; "[T]here is nothing in the ASA that states or suggests that they are held in trust for the Fund, or for the benefit of the Fund or its participants."). The ASA says otherwise. As in *Hi-Lex*, the ASA required Blue Cross

to keep track of "[t]otal paid claims" out of the working capital amount for a given month, and if there was leftover, "Blue Cross and Blue Shield will apply (credit) such amount . . . to the Fund's next scheduled . . . payment." A61. If "required by law," Blue Cross would even "refund the difference" to the Fund. A61. The Fund thus very much held an interest in and rights to the money once paid to Blue Cross.

The district court also incorrectly analogized the working capital amount to the premiums paid by a fully insured plan. AD23 (citing *Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 658-59 (9th Cir. 2019)). In that kind of arrangement, the plan pays a fixed amount for insurance coverage, and the insurer then has to pay all claims from its own pocket—even if they exceed the amount of premium payments. *Depot*, 915 F.3d at 659 ("Under a 'fully insured' plan, the insurance company acts as a direct insurer; it guarantees a fixed monthly premium for 12 months and bears the financial risk of paying claims. Premiums paid under a fully insured plan are not held in trust; rather, they are fixed fees paid in exchange for the insurance company assuming the financial risk of providing the benefits promised.") (cleaned up) (citations omitted).

But *Depot* itself, the very case the district court relied on, explained the critical "distinction between a self-funded plan and a fully insured plan." *Depot*, 915 F.3d at 658. "Under a 'self-funded' plan"—like the ones at issue here and in *Hi-Lex*—"the insurance company acts only as a third-party administrator; the employer is

responsible for paying claims out of the employees' contributions and bearing the financial risk." *Id.* (cleaned up) (citations omitted). These assets, unlike the premiums paid by a fully insured plan, "are therefore contributions from employees earmarked and held in trust by the employer for the employees' later benefit" and are accordingly "assets of the plan." *Id.* (citing *Hi-Lex*, 751 F.3d at 747).

Here, we are operating in the self-funded context, not the fully insured context. The district court's failure to distinguish between the two was error. *Id.*; *see also Gordon v. CIGNA Corp.*, 890 F.3d 463, 472 (4th Cir. 2018) ("Because Hi-Lex had a self-funded plan, Blue Cross Blue Shield was responsible for a certain sum of earmarked money that, even if comingled with other assets, was still for the specific use of Hi-Lex. Here, however, the situation is significantly different. UCG had an insurance contract with the CIGNA Defendants. LINA collected premiums, comingled them with other assets, and if a covered employee died, paid a set benefit, regardless of the amount of premiums collected.").

Given the actual contractual arrangement, the funds here were plan assets even under the district court's narrow view of "beneficial ownership interests."

*iii.* Finally, the court rested its plan assets decision on policy grounds, fearing the "potentially far-reaching consequences" of following *Hi-Lex*. AD27. Here was the court's concern:

> Obviously, claims must be paid somehow, and they must ultimately be paid out of the resources of the plan, directly

36

or indirectly. Presumably, self-funded plans do not have the necessary administrative capability and expertise to pay a multitude of claims on a daily basis, which is why they engage third-party administrators. Under *Hi-Lex*, however, third-party administrators who handle claim-payment functions will have difficulty avoiding becoming functional fiduciaries—unless, perhaps, they pay claims in advance out of their own funds. But if the TPA pays the claims out of its own funds, and bills the plan after the fact, it is in effect playing the role of an unsecured lender to the plan. The ERISA statute surely does not mandate such a result.

AD27. In short, the district court worried that because claims "must ultimately be paid out of the resources of the plan,"—itself an admission that plan assets are being used—third-party administrators in Blue Cross's situation will almost always be dealing with plan assets.

This kind of policy concern cannot override the statute's plain language. Congress judged that *anyone*, third-party administrator or not, who exercises *any* authority over the management or disposition of a plan's assets incurs fiduciary duties. *See* 29 U.S.C. § 1002(21)(A). The Department of Labor—the expert agency tasked with implementing and enforcing ERISA—took the same view under identical circumstances in *Hi-Lex*. The district court was not entitled to disregard that judgment.[4]

---

[4] Other circuits have likewise rejected the policy concerns voiced by the district court. *Chao v. Day*, 436 F.3d 234, 237 (D.C. Cir. 2006) ("Our interpretation of the disposition clause does not—as [defendant] fears—extend fiduciary status to every person who exercises 'mere possession, or custody' over the plans' assets.").

And in any event, there is no basis for the district court's policy concern. Courts, like the *Hi-Lex* court, have frequently held third-party administrators of self-funded plans to be ERISA fiduciaries due to the role they play in administering the plans. That has certainly not stopped companies like Blue Cross from continuing to serve as third-party administrators. There is no reason to believe that this will change merely by applying ERISA in a proper manner to impose fiduciary status on third-party administrators who are given discretionary authority over how a plan is administered or who control plan assets in paying benefits.

\*     \*     \*

The parties' agreement expressly contemplated that the Fund's money, not Blue Cross's, would be used to pay benefits, and the working capital amount was specifically earmarked for that purpose. Those funds were accordingly plan assets.

### 2. Blue Cross was not a mere conduit; it exercised significant judgment in determining how much should be paid for covered care.

There also can be little question that Blue Cross exercised "*any* authority or control" over the "disposition" of the plan assets it held. 29 U.S.C. § 1002(21)(A) (emphasis added); *see Hi-Lex*, 751 F.3d at 744-47. The district court's contrary conclusion, in a single cursory paragraph that improperly drew inferences in *Blue Cross's* favor (AD27-28), was incorrect.

The court properly noted that "ERISA does not 'extend fiduciary status to every person who exercises "mere possession, or custody" over the plan's assets.' Instead, the statute requires that the putative functional fiduciary exercise 'authority or control' as to the management or disposition of a plan's assets." AD27-28 (quoting *W.E. Auburn Co. v. BeneFirst, LLC*, 661 F. Supp. 2d 37, 54 (D. Mass. 2009)). The court erred, however, when it held that "Blue Cross is acting more in the nature of a depository bank or a custodian than a manager with discretionary authority over assets." AD28 (citing *Beddall*, 137 F.3d at 20; *O'Toole*, 681 F.2d at 95-96).

Blue Cross was far more than a mere conduit, mechanically following the instructions of the Fund. As the ASA amply demonstrates, Blue Cross's process for determining how much benefits should be paid required significant discretion and judgment of the type that characterizes a fiduciary. *See supra* 13-16. There are, essentially, two aspects of the claims process: whether the service is covered, and how much should be paid in benefits. A49. The Fund had authority over the first question; Blue Cross the second. And Blue Cross exercised that authority by applying internally developed policies and procedures that it could change at any time; it in fact paid providers using the Fund's money, without first billing the Fund; and it then had full discretion to renegotiate payment amounts with providers after the fact. *See supra* 13-18.

In effect, Blue Cross took in the Fund's bills, made binding decisions over whether and how much to pay, and then transmitted payment. That is nothing like the "depository bank" situation addressed in *Beddall* and similar cases. Those cases involved "mechanical administrative responsibilities (such as retaining the assets and keeping a record of their value)," *Beddall*, 137 F.3d at 20, or merely "exercis[ing] physical control [by] forward[ing] the $130,000 to First Security," *Cottrill*, 74 F.3d at 22. And in *O'Toole*, the plaintiff sought to impose fiduciary status literally on the basis that the bank was the "depository for the funds," despite the bank holding no other role whatsoever. 681 F.2d at 96.[5]

Imagine asking a bank to do what Blue Cross did for the Fund—take in bills, evaluate whether they meet various payment criteria, negotiate the payment amount, and then remit payment. Of course no bank does that. The situation here is entirely

---

[5] Blue Cross argued before the district court that it was not a fiduciary because it paid providers only after the Fund "approve[d] a claim." ECF 16-1 at 23. As the Fund explained in its complaint, the Fund adjudicated claims—that is, decided whether the claims were covered, and applied deductibles and copayments—only after Blue Cross determined how much a provider should be paid. A17. But the Fund played no role in determining that amount—that was solely Blue Cross's role. *See id.* (Blue Cross had "total control" over the setting the amount of "covered charges"). Thus, the Fund did not "approve" the amount of covered charges. Blue Cross made that determination, and after the Fund's adjudication of *other* coverage issues, Blue Cross paid providers out of plan assets. Blue Cross exercised control over assets of the Fund because the amount that Blue Cross paid out was based directly on Blue Cross's discretionary benefits determination.

different from the "depository bank" scenario, and Blue Cross unquestionably exercised "any" authority over the disposition of the plan assets it held.

Because Blue Cross exercised control over assets of the Fund, the district court erred in concluding that Blue Cross was not a fiduciary. This Court should accordingly vacate and remand.

### 3. Blue Cross exercised control over plan assets recovered from providers.

In addition to the working capital amount, Blue Cross exercised control over Fund assets recovered from provider overpayments. Blue Cross obtained these monies from providers to resolve or settle overpayment disputes. Blue Cross then decided how much to retain for itself as a "recovery fee:" sometimes 20%, sometimes 30%, sometimes a pro rata share of the cost of recovery, and sometimes nothing if Blue Cross decided that the overpayment resulted from its own mistake. A13-14, A21, A23-24, A73. Because Blue Cross decided how much to keep for itself, and deducted that fee before crediting the overpayment back to the Fund, it exercised control over the "management or disposition" of plan assets. *See Hi-Lex*, 751 F.3d at 744 (explaining that, despite supposed "standard" fee policy, record showed that imposition of fees was not "universal" and in fact was discretionary).

**B.    Blue Cross was a fiduciary because it exercised discretionary authority over the plan's management.**

Blue Cross's authority over the disposition of plan assets is enough for fiduciary status. But Blue Cross was also a fiduciary under the other prong of ERISA's functional fiduciary definition: it exercised discretionary authority over the management of the plan. 29 U.S.C. § 1002(21)(A). Blue Cross had discretion over determining how much the Fund paid for covered care. That included the discretionary right to seek post-payment settlements with providers—and then charge fees to the Fund for doing so. In Circuit cases involving a third-party administrator with discretion like Blue Cross's here, including the right to impose fees, other courts have found fiduciary status. This Court should do the same.

**1.    Where a contract grants the service provider ongoing discretion, the service provider is a fiduciary.**

In the district court, Blue Cross suggested that it was unheard of to impose fiduciary status on a third-party administrator under the "discretion" prong. ECF 16-1 at 7. That is patently untrue. Courts routinely impose fiduciary status on third-party administrators and others who contract to provide services to ERISA plans—when those contracts give the service provider ongoing discretion over an aspect of plan management. *See, e.g.*, *Hi-Lex*, 751 F.3d at 744-45 (although Blue Cross could "collect fees per the terms of its contract," it was a fiduciary because such fees were "discretionarily imposed"); *Pipefitters*, 722 F.3d at 867 (Blue Cross was a fiduciary

42

because "the state did not fix the rate that Defendant charged each customer, and crucially, neither did the ASC between Plaintiff and Defendant"); *Peters*, 2 F.4th at 231 (third-party administrator was a fiduciary because "administrative fee was . . . imposed . . . at Aetna's discretion"); *Rozo*, 949 F.3d at 1074 (third-party insurer was fiduciary because "[e]very six months, Principal sets the CCR with no specific contract terms controlling the rate"); *Golden Star, Inc. v. Massachusetts Mut. Life Ins. Co.*, 22 F. Supp. 3d 72, 81-82 (D. Mass. 2014) (holding that third-party administrator of employer-sponsored 401(k) plan was functional fiduciary because it had discretion to set management fee rates); *Charters v. John Hancock Life Ins. Co.*, 583 F. Supp. 2d 189, 197-99 (D. Mass. 2008) (holding that third-party administrator of employer-sponsored 401(k) plan was a functional fiduciary because it exercised discretion with respect to its own compensation and investment options made available to participants).

That includes, in particular, cases where third-party administrators had contractual discretion to impose fees on the plan. *Hi-Lex*, 751 F.3d at 744-45; *Pipefitters*, 722 F.3d at 867; *Peters*, 2 F.4th at 231. Blue Cross accordingly starts from a false premise; nothing about ERISA precludes a third-party administrator from being a functional fiduciary.

The relevant distinction for a service provider's fiduciary status, rather, is this: where the contract definitively determines every aspect of the administrator's duties,

there is no fiduciary status; but where the contract gives the administrator *ongoing*

*discretion* over an aspect of plan management, the service provider *is* a fiduciary.

Courts have long followed the Seventh Circuit's formulation:

> [I]f a specific term (not a grant of power to change terms)
> is bargained for at arm's length, adherence to that term is
> not a breach of fiduciary duty. No discretion is exercised
> when an insurer merely adheres to a specific contract term.
> When a contract, however, grants an insurer discretionary
> authority, even though the contract itself is the product of
> an arm's length bargain, the insurer may be a fiduciary.

*Ed Miniat*, 805 F.2d at 737; *see Hi-Lex*, 751 F.3d at 744 ("while simple adherence to

a contract's term giving a party the unilateral right to retain funds as compensation

does not give rise to fiduciary status, a term that authorizes a party to exercise

discretion with respect to that right does") (quotation marks and brackets omitted).

Or as the Eighth Circuit recently summarized: a "service provider may be a fiduciary

when it exercises discretionary authority, even if the contract authorizes it to take the

discretionary act." *Rozo*, 949 F.3d at 1074 (citing *Ed Miniat*, 805 F.2d at 737).[6]

---

[6] Notably, each of these cases involved a contractual relationship between the service
provider and the plan. The contract's grant of discretionary authority is indeed what
gave rise to fiduciary status. Blue Cross's assertion that this is really a breach of
contract case, not an ERISA fiduciary breach case, is thus a red herring. *E.g.*, ECF
16-1 at 7. It is true that Blue Cross breached its contract, but because the contract
*also* gave Blue Cross discretionary authority over the plan's management, Blue
Cross must face the Fund's fiduciary breach claims as well. *See, e.g.*, *Peters*, 2 F.4th
at 231 (requiring third-party administrator to face fiduciary breach claims because
"administrative fee was . . . imposed upon Peters and the Plan at Aetna's discretion,
but without authority under the Plan and in direct violation of the MSA"—*i.e.*, in

Those principles are dispositive here.

### 2. The ASA gave Blue Cross ongoing discretion over the amount the Fund paid for covered care.

*a.* Here, Blue Cross's responsibilities fell squarely on the "ongoing discretion" side of the line. Part of managing the Fund's ERISA plan, it goes without saying, is determining how much providers will be paid for members' health benefits. *E.g.*, A98-99 (describing "covered charges" and "negotiated rate[s]"); A99 (chart explaining benefit coverage amounts, typically as a percentage of the cost determined by Blue Cross); A102 ("billed charges that will be considered covered expenses will never be more than the negotiated rate"). The amount Blue Cross decided should be paid to providers in turn determined how much members paid for their care. A99. And under the ASA, Blue Cross had unilateral, ongoing, and binding control over that important decision:

At the outset, to determine the proper payment amount for a given claim, Blue Cross "(i) appl[ied] medical necessity criteria, (ii) appl[ied] medical policy criteria and (iii) pric[ed] the claims." A52. This required Blue Cross to employ internally developed guidelines and procedures, which Blue Cross could change at any time, to make judgment calls about things like the appropriate level of care to pay for, the relationship between different medical diagnoses, and much more. *See supra* 13-16;

---

violation of the contract); *see id.* at 235 ("A reasonable factfinder could thus determine that [Aetna] violated § 20(B) of the MSA . . . .").

A49 (Blue Cross made decisions based on "Blue Cross and Blue Shield's standard procedures and practices *as in effect from time to time*") (emphasis added). And once Blue Cross made its decision, the Fund was bound by it. A48 (the Fund's "claim adjudication [was] based on Blue Cross and Blue Shield's pricing of claims").

Once initial payment had been made, Blue Cross had ongoing discretion to make "later contractual settlements with the providers" and then impose fees on the Fund. A55; A73. When it identified a potential overpayment—like all of the errors at issue in this case—Blue Cross could decide either to "reprocess impacted paid claims . . . using the normal process," or to go out and "negotiate a settlement with the provider." A79. The Fund had no say in the negotiation or settlement process; Blue Cross had full authority to determine whether to settle and how much to settle for. A79. And when it obtained a settlement, Blue Cross could charge the Fund a "recovery fee" or its costs for "fees paid to outside counsel, fees paid to outside analysts and consultants, and any other outside support costs incurred in obtaining that recovery." A73.[7]

---

[7] To be clear: Appellants do not contend that establishing its provider network and rates made Blue Cross a fiduciary. ECF 17 at 9 (ECF pagination). It was, rather, Blue Cross's discretionary, on-the-ground *application* of those negotiated rates (including its after-the-fact discretion to pursue settlements for overpayments like the ones alleged here) that gave rise to fiduciary status. *E.g.*, *id.* at 16 ("Similarly, BCBSMA is a functional fiduciary because, without any guidance in the ASA or SPD or possible oversight by Plaintiffs, BCBSMA unilaterally and discretionarily sets and applies negotiated rates to determine Plan benefits."); *id.* at 22 ("BCBSMA's challenged conduct—applying 'negotiated rates'—is not based upon or subject to

The cases imposing fiduciary status on third-party service providers in similar circumstances are legion. *See supra* 42-44. In each of these cases, the initial arm's-length negotiation left some kind of ongoing discretion in the service provider's hands. In *Pipefitters*, *Hi-Lex*, and *Peters*, that discretion had to do, as here, with health benefits claim pricing and fees. In *Rozo*, the service provider had discretion over the interest rate that participants received on their retirement investments. *Charters* involved discretion over the 401k investment options available to participants. In *Golden Star*, it was the management fee. What unifies them all is that despite the parties' arm's-length contractual relationship, the administrator exercised some form of ongoing discretion over the plan's management.

This case fits neatly within that line of authority. Most obviously, in *Hi-Lex*, *Pipefitters*, and *Peters*, the third-party administrator was a fiduciary because it could decide whether or not to impose certain fees on its clients. *See Hi-Lex*, 751 F.3d at 744-45 (also discussing *Pipefitters*); *Peters*, 2 F.4th at 231. The same is true here. Blue Cross could decide whether to pursue provider settlements for claims that were overpaid (and also how much to settle for). A73, 79. And when it elected to pursue settlements, it could impose "recovery fees" on the Fund. A26-27; A73. That alone is dispositive, given that the challenged conduct here involves Blue Cross's provider

anyone's control but its own."); *id.* at 15 (arguing that the documents "give BCBSMA discretionary authority and control over the calculation of negotiated rates *and* their application to Plan claims") (emphasis in original).

47

overpayments and subsequent settlements (or lack thereof). *Hi-Lex*, 751 F.3d at 745 (Blue Cross was fiduciary because "the Disputed Fees were discretionarily imposed"); *Peters*, 2 F.4th at 231 (Aetna was fiduciary because "fee was . . . imposed upon Peters and the Plan at Aetna's discretion").

The ASA afforded Blue Cross discretion in determining how much providers were paid—a decision that required the exercise of judgment and the application of Blue Cross's internal policies and procedures—and settling disputes with providers (and imposing fees on the Fund for doing so). That made Blue Cross a fiduciary.

*b.* In reaching the contrary conclusion, Blue Cross and the district court misapplied the legal standard. In the district court, Blue Cross rested heavily on this Court's observation that a "person who performs purely ministerial functions . . . within a framework of policies, interpretations, rules, practices and procedures made by other persons is not a fiduciary." *Livick v. The Gillette Co.*, 524 F.3d 24, 29 (1st Cir. 2008) (citation omitted). That's true enough. But here, Blue Cross's decisions were not based on "procedures made by *other* persons." *Id.* (emphasis added). Every aspect of those procedures, rather, fell under Blue Cross's purview. And though the Fund determined coverage eligibility and made the final claim adjudication, that determination was "based on Blue Cross and Blue Shield's pricing of claims." A48. The Fund, in other words, lacked the contractual right to determine a payment amount different from what Blue Cross decided—that aspect of plan management

was in Blue Cross's hands. This case thus falls on the other side of the line drawn by *Livick*.

The district court went astray for similar reasons. Relying on Blue Cross's assertion that courts just don't impose fiduciary status on third-party administrators, the court asked the wrong question. Rather than asking whether the ASA granted Blue Cross ongoing discretion, the court started from the premise that a "normal plan-administrator relationship" cannot give rise to fiduciary status. AD20. The court thus required "something in the structure of the relationship, either formally or *de facto*, that takes it outside of the normal plan-administrator relationship." AD20. The district court cited nothing for that formulation of the legal standard, and it is not the law. Nothing about being a third-party administrator, standing alone, immunizes an entity from being a fiduciary.

What matters, as court after court has held, is whether a contract fixes all terms (making the administrator's actions "purely mechanical") or whether it grants the administrator ongoing discretion. *See supra* 43-44. Thus, in the cases the district court relied on (AD17), those courts simply found that the administrator was acting "within a framework . . . made by other persons." *Livick*, 524 F.3d at 29 (cited AD17); *In re Express Scripts/Anthem ERISA Litig.*, 285 F. Supp. 3d 655, 679 (S.D.N.Y. 2018) (court found that service provider merely "act[ed] pursuant to the terms of [its] contract" and thus did "not exercise discretionary authority") (cited

AD17); *Beddall*, 137 F.3d at 18 (court found service provider performed only "mechanical administrative tasks") (cited AD17); *Santana v. Deluxe Corp.*, 920 F. Supp. 249, 256 (D. Mass. 1996) ("John Hancock processed claims pursuant to rules, policies, and procedures established by Deluxe for administration of the Plan.") (cited AD17).

Here, the opposite is true. Blue Cross had discretionary authority to apply its own internal policies to determine the amount the Fund would pay, and then to seek settlements for claim overpayments and impose fees on the Fund. And in cases involving administrators that *do* have ongoing discretionary authority over some aspect of plan management—in particular where that discretion includes the right to impose fees—courts universally find fiduciary status.

Because Blue Cross exercised ongoing discretion in determining how much should be paid for covered care, it acted as a fiduciary. The district court erred in concluding otherwise. This Court should accordingly vacate the district court's dismissal of Appellants' ERISA claims.

## II.    Because the Court should reinstate the federal claims, it should vacate the district court's decision to decline jurisdiction over the state claims.

The district court's only basis for declining jurisdiction over the Fund's state-law claims was its dismissal of the federal claims. AD29-30. Because the federal claims should be reinstated, so too should the state-law claims. *Fernandez-Salicrup v. Figueroa-Sancha*, 790 F.3d 312, 328 (1st Cir. 2015) ("[B]ecause some of

Plaintiffs' federal claims are being reinstated, the state law claims must be resurrected as well.").

## CONCLUSION

The Court should vacate the decision of the district court and remand for this case to proceed on the merits.

Dated:  September 16, 2022                    Respectfully submitted,

                                              s/ Peter K. Stris
                                              Peter K. Stris
                                              John Stokes
                                              STRIS & MAHER LLP
                                              777 S. Figueroa St., Ste. 3850
                                              Los Angeles, CA 90017
                                              Tel: 213.995.6800
                                              Fax: 213.261.0299
                                              pstris@stris.com
                                              jstokes@stris.com

                                              D. Brian Hufford
                                              Jason S. Cowart
                                              Leila Bijan
                                              ZUCKERMAN SPAEDER LLP
                                              485 Madison Avenue, 10th Floor
                                              New York, NY 10022
                                              Tel: 212.704.9600
                                              Fax: 212.704.4256
                                              dbhufford@zuckerman.com
                                              jcowart@zuckerman.com
                                              lbijan@zuckerman.com

                                              *Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1.      This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,273 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14 point Times New Roman.

Dated:  September 16, 2022                s/ Peter K. Stris
                                          Peter K. Stris

**CERTIFICATE OF SERVICE**

I hereby certify that on September 16, 2022 I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that the following parties or their counsel of record are registered as ECF Filers and that they will be served by the CM/ECF system:

David T. Raimer
Jones Day
51 Louisiana Ave NW
Washington, DC 20001-2113
Email: dtraimer@jonesday.com

Evan Miller
Jones Day
51 Louisiana Ave NW
Washington, DC 20001-2113
Email: emiller@jonesday.com

*Counsel for Defendant-Appellee*
*Blue Cross Blue Shield of Massachusetts, Inc.*

Dated:  September 16, 2022                    s/ Peter K. Stris
                                              Peter K. Stris

**ADDENDUM**

# TABLE OF CONTENTS

<u>**Document**</u>                                                                        <u>**Page**</u>

Dkt. # 21 – District Court Decision ......................................................AD1

Dkt. # 22 – District Court Final Order of Dismissal.........................................AD31

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| **MASSACHUSETTS LABORERS' HEALTH AND WELFARE FUND and TRUSTEES OF THE MASSACHUSETTS LABORERS' HEALTH AND WELFARE FUND, as fiduciaries,** ) ) ) ) ) ) |  |
| **Plaintiffs,** ) ) | **Civil Action No. 21-10523-FDS** |
| **v.** ) ) |  |
| **BLUE CROSS BLUE SHIELD OF MASSACHUSETTS,** ) ) ) |  |
| **Defendant.** ) ) |  |

## <u>MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO DISMISS</u>

**SAYLOR, C.J.**

This is a case arising out of the administration of a union health-benefit plan. Plaintiff Massachusetts Laborers' Health and Welfare Fund (the "Fund") operates a self-funded multi-employer health-benefit plan (the "Plan") for its members. The Plan is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*.

The Trustees of the Plan hired defendant Blue Cross and Blue Shield of Massachusetts to be a third-party administrator for the Plan. The Fund has brought suit against Blue Cross alleging breaches of fiduciary duties under ERISA and violations of state law. According to the Fund, Blue Cross violated its fiduciary duties and the terms of the plan by failing to process claims correctly, overpaying benefits, neglecting to recoup overpayments properly, and refusing to provide the information needed by the Fund to verify that claims were priced appropriately.

Blue Cross has moved to dismiss the complaint for failure to state a claim. The central

question, for present purposes, is whether Blue Cross is a fiduciary of the Plan.  Blue Cross
contends that as a third-party administrator, its obligations to the Fund are solely contractual in
nature, not fiduciary, and that accordingly this dispute is not governed by ERISA.  Blue Cross
further asserts that the Court should decline to exercise its supplemental jurisdiction over the
remaining state-law claims.

For the reasons set forth below, the motion to dismiss will be granted.

I.    **Background**

A.    **Factual Background**

The facts are set forth as alleged in the complaint unless otherwise noted.

1.    **The Parties**

The Massachusetts Laborers' Health and Welfare Fund provides a self-funded multi-
employer health-benefit plan to members of the Laborers' Local Union in Massachusetts and
parts of northern New England.  (Am. Compl. ¶ 7).  The Plan is governed by ERISA and is
superintended by the Trustees of the Fund, who are fiduciaries of the Plan.  (*Id.* ¶¶ 8, 10).

Blue Cross Blue Shield of Massachusetts is a licensed health-insurance company
headquartered in Boston, Massachusetts.  (*Id.* ¶ 11).  Among other things, Blue Cross is a
preferred-provider organization ("PPO"), meaning that it has established a network of health-
care providers with which it has negotiated rates for services.  (*Id.* ¶ 18).  Presumably because of
the size and volume of its business, Blue Cross has generally been able to negotiate favorable
rates with those providers.  (*See id.*).  The establishment and maintenance of that PPO, and the
negotiation of those rates, has occurred independently of any relationship between Blue Cross
and the Fund.

2.    **Plan Administration**

In 2006, the Fund hired Blue Cross to provide administrative services to the Plan.  (*Id.*

¶¶ 28, 30).  The agreement between the Fund and Blue Cross is governed by an Administrative Services Account Agreement ("ASA"), which has been renewed annually since its original execution in May 2006.  (*Id.* ¶ 30).

The ASA governs how Blue Cross processes claims, recoups or settles erroneously paid benefits, provides Fund members access to its network of providers and negotiated rates, and assesses fees charged to the Fund.  (ASA at 1, ECF No. 16-2). [1]

### a.        Administrative Services Account Agreement

The ASA provides that Blue Cross is obligated to perform "certain administrative services in connection with the Fund's self-insured group health plan."  (*Id.* at 1).  The ASA outlines its duties and responsibilities as follows:

> Blue Cross and Blue Shield has been designated by the fund to provide certain administrative services for its group health plan, including arranging for a network of health care providers whose services are covered by the group health plan, providing services to network providers, claims processing, individual case management, medical necessity review, utilization review, quality assurance programs and disease monitoring and management services.

(*Id.* at 6).

In addition, the ASA describes the roles of the parties under ERISA:

> The Trustees are the "administrator" and "named fiduciary" of the Fund as that term is defined in Section 3(16)(A) and 402(a), respectively, of ERISA.  Blue Cross and Blue Shield is engaged as an independent contractor to perform the specific duties and responsibilities which the Trustees delegate to it.  It is understood and agreed that Blue Cross and Blue Shield exercises its duties within the framework of the Plan of Benefits established by the Trustees.  Blue Cross and Blue Shield and the Trustees of the Fund accept that the definitions of a fiduciary are contained in ERISA Section 3(21)(A).

---

[1] Excerpts of the ASA and SPD, although not attached to the complaint, were submitted with Blue Cross's motion to dismiss.  Because the Fund has not challenged their authenticity, they are properly before the Court. *Beddall v. State St. Bank & Tr. Co.*, 137 F. 3d 12, 17 (1st Cir. 1998) ("When, as now, a complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6).").

3

(*Id.* at 1).

### a.     <u>Administrative Fee and Working Capital Amount</u>

In exchange for the services of Blue Cross, the Fund pays an administrative fee. (*Id.* at 16). In addition, "[b]ecause [Blue Cross] will pay providers of services before being able to bill the Fund," the Fund pays a "working capital amount" to Blue Cross "for estimated Claim Payments." (*Id.*). The working capital amount is based on Blue Cross's "estimate of the amount needed to pay claims on a current basis, subject to review and approval by the Fund." (*Id.*). From that amount, Blue Cross pays claims to hospitals, physicians, and other health-care providers.

Although both the administrative fee and working capital amount are determined monthly, the Fund pays those charges in weekly installments "in the pre-determined amounts approved by both parties." (*Id.* at 16-17). At the end of each month, Blue Cross performs a "settlement calculation" where it calculates the actual administrative fees incurred that month and the total amount paid in claims. (*Id.* at 17). If, at the end of the month, the actual administrative charges and claim totals exceed the Fund's payment for that month, the Fund pays Blue Cross the difference in the next weekly payment. (*Id.*). If the Fund has overpaid, Blue Cross credits the difference to the Fund's next payment. (*Id.*).

Blue Cross sends the Fund various statements of paid claims and administrative charges on a monthly basis, as well as periodic reports of adjustments and interest payments (incurred if the Fund is untimely with its return of claim approvals) and a monthly settlement summary invoice. (*Id.*).

In the event the Fund disputes a monthly charge, it must notify Blue Cross of the disputed amount. (*Id.*). The Fund is still obligated, however, to pay the amount Blue Cross charges. (*Id.*). If Blue Cross confirms that the disputed amount was not the Fund's responsibility, then

Blue Cross credits that amount to the Fund's next payment.  (*Id.* at 17-18).

### b.    Maintenance of Provider Network and Negotiation of Rates

The ASA specifically acknowledges that Blue Cross maintains a network of preferred

providers through its own contractual arrangements.  (*Id.* at 6).  Blue Cross is required by the

ASA to make that network—and by extension, the favorable rates that it has negotiated with

providers—available to Plan participants:

> Blue Cross and Blue Shield will make its PPO network of preferred health care
> providers available to Participants in the Plan as provided in this Agreement.  The
> Fund will have no responsibility for maintaining or administering the network on
> behalf of Participants . . . Blue Cross and Blue Shield will use commercially
> reasonable efforts to maintain the network as a competitive and cost effective
> network of providers.

(*Id.* at 7).

The ASA expressly permits Blue Cross to exercise discretion when negotiating rates with

health-care providers for services:

> Blue Cross and Blue Shield may negotiate different claim payment rates and
> arrangements with its providers and/or vendors . . . These claim payment rates and
> arrangements may vary based upon the type of health benefit plan, account-
> specific enrollment . . . and/ or product funding arrangement . . . from rates that
> may be otherwise assessed by providers and/or vendors and may reflect various
> negotiated discounts and factors (including but not limited to initial markdowns,
> rebates, volume, and other pricing concessions which may be based on all or a
> subset of Blue Cross and Blue Shield's book of business).

(*Id.*).  According to the ASA, the Fund agrees that those negotiated rates determine the claim-

payment rates paid by the Fund:  "The Fund acknowledges and agrees that it is entitled only to

those claim payment rates and provider/vendor arrangements that Blue Cross and Blue Shield

offers to self-insured plans and that it approves the use of such rates and arrangements applied on

behalf of its self-insured health benefit plans."  (*Id.*).

### c.    Processing of Claims

Blue Cross is responsible for processing claims on behalf of the Fund.  (*Id.* at 4-5).  When

a beneficiary submits a claim, Blue Cross reprices the claim according to its provider arrangements.  (*Id.* at 5).  It then transmits the claim to the Fund to determine "member eligibility, the availability of benefits and claims adjudication."  (*Id.* at 4).  After the Fund makes its determination, it transmits the adjudicated claim information back to Blue Cross for payment and reporting.  (*Id.* at 5).

Blue Cross evaluates a claim by conducting "a medical necessity and utilization review of inpatient urgent, nonurgent, and concurrent care claims using the Blue Cross and Blue Shield medical policy, medical technology assessment guidelines and utilization review policies and procedures as set forth in the Benefit Description . . . ."  (*Id.* at 4).  However, final approval for a claim lies with the Fund.  (*Id.* at 5).  In the event a participant disputes the evaluation or adjudication of a claim, the Fund is responsible for processing and deciding claim appeals.  (*Id.* at 10).

### d.    Recovery of Erroneous Payments

According to the ASA, if the Fund identifies an error after authorizing the claim, the Fund can notify Blue Cross to halt payment.  (*Id.* at 6).  However, if payment has already been disbursed, Blue Cross must seek to recover the payment according to the claim-adjudication process it has established with the provider.  (*Id.*).  If the erroneous payment resulted from an error by the Fund in authorizing and adjudicating the claim, the Fund bears responsibility for the incorrect payment.  (*Id.*).  Conversely, if the erroneous payment resulted from an error made by Blue Cross, then Blue Cross bears responsibility.  (*Id.*).

The ASA also provides avenues for recovery when the error is attributable to a third party.  When claims are paid as a result of third-party fraud or abuse, Blue Cross may seek recovery directly or through "appropriate recovery operations," which include subrogation and provider claim-payment audits.  (ASA 2010 Amendment at 1).  If Blue Cross recovers any

6

portion of the payments, it credits the Fund the recovered payment, less a 20% fee. (*Id.*).

According to the ASA, Blue Cross may, in the course of its ongoing operations, identify claims for which Blue Cross, on behalf of the Fund, paid the incorrect amount. (ASA 2015 Amendment at 6). Such errors may be attributable to "the use of incorrect claim payment rates, Medicare secondary payer issues, disagreements on provider payment policies, or other similar situations." (*Id.*). When Blue Cross identifies such errors, the ASA states that it should reprocess the impacted claim and credit or bill the Fund accordingly. (*Id.*). However, if reprocessing the claim is "not administratively practical or reasonable," Blue Cross may "instead negotiate a settlement with the provider." (*Id.*). Blue Cross will then credit or bill the Fund based on the settlement. (*Id.*).

### e.   Audits

According to the ASA, the Fund has the right to request an audit of Blue Cross's records to ensure that it conducts its administrative responsibilities in accordance with the ASA. (ASA at 15). The Fund may initiate an audit by notifying Blue Cross through a written letter that outlines the purpose and objectives of the audit, its scope, the sampling methodology of the auditors, a description of the data requirements, and a proposed timetable. (*Id.*). The Fund or its designated auditor coordinates the audit with Blue Cross's Audit and Controls division, and the audit must be conducted in accordance with the ASA and any applicable Blue Cross policies. (*Id.*).

### f.   Confidentiality

As noted, Blue Cross has created, and maintains, a PPO network that exists and operates independently of its relationship with the Fund. While the ASA permits Fund participants to take advantage of the PPO network, it does not give the Fund complete access to the business dealings of Blue Cross. Accordingly, the ASA states the following:

7

AD007

Each party will retain ownership and control over their respective systems, trade secrets, provider reimbursement arrangements, procedures, methodologies, and practices used in connection with the performance of its responsibilities under this Agreement ("Proprietary Information").  All claim history, utilization data and individually identifiable health information pertaining to these claims developed by each party hereto during the term of this Agreement ("Personal Information") will be the sole and exclusive property of such party.

(ASA at 14).

### g.    Summary Plan Description

The Plan's written terms are summarized in a Summary Plan Description ("SPD"), which provides participants with information regarding Plan benefits.  (Am. Compl. ¶ 17).

The SPD explains to Plan participants that the Fund entered into an agreement with a PPO that contracts with healthcare providers to provide medical services at discounted rates. (SPD at 13, ECF No. 16-2).  It states that the Fund's PPO for "most medical expenses" is Blue Cross.  (*Id.*).

The SPD sets forth the extent of the Plan's medical coverage.  It informs participants that the "billed charges that will be considered covered expenses will never be more than the negotiated rate (if you use a PPO provider) or the reasonable and customary charges." (*Id.* at 15).[2]  Participants bear the cost of their share of covered expenses, as set forth under the Plan terms, and any amount that exceeds the covered expenses.  (*Id.*).  The SPD informs participants that when they seek care from an in-network provider, that provider is paid directly by Blue Cross.  (*Id.* at 23).

The SPD also describes the duties of various parties to the Plan.  It states that the Trustees of the Fund have discretionary authority to delegate responsibility and that those designees may

---

[2] The Fund refers to this term as the "Negotiated Rate Mandate."  As discussed below, it contends that this term in the SPD requires Blue Cross to apply the rates it negotiates with providers to the Fund's claims.

have discretionary authority to interpret Plan terms:

> In carrying out their respective responsibilities under the Plan, the Board of
> Trustees, the Fund Administrator and other individuals with delegated
> responsibility for the administration of the Plan will have discretionary authority
> to interpret the terms of the Plan and to determine eligibility and entitlement to
> Plan benefits in accordance with the terms of the Plan.  Any interpretation or
> determination will be given full force and effect, unless it can be shown that the
> interpretation or determination was arbitrary and capricious.

(*Id.* at 47).

In addition, the SPD states that ERISA imposes legal responsibilities upon Plan

fiduciaries:

> In addition to creating rights for Plan participants, ERISA imposes duties upon
> the people who are responsible for the operation of employee benefit plans.  The
> people who operate your plan, called "fiduciaries" of the plan, have a duty to do
> so prudently and in the interest of you and other Plan participants and
> beneficiaries.

(*Id.* at 49).  The SPD further states if that duty is breached, a beneficiary may file suit:  "If it

should happen that Plan fiduciaries misuse the Plan's money, or if you are discriminated against

for asserting your rights, you may seek assistance from the U.S. Department of Labor or you

may file suit in Federal court."  (*Id.* at 50).

### 3.     Alleged Violation of Plan Terms

#### a.     Alleged Concealment of Information

According to the complaint, Blue Cross has consistently refused to provide the Fund with

access to its internal policies and procedures that relate to the negotiation of prices with the

providers in the PPO.  (Am. Compl. ¶ 53).  It further alleges that Blue Cross also refused to grant

the Fund access to information concerning provider contracts and that Blue Cross actively

conceals its methodology for determining "covered charges" under the Plan.  (*Id.* ¶¶ 55-56).  The

withholding of that information, the complaint alleges, makes it impossible for the Fund to verify

that Blue Cross does not overpay for claims.  (*See id.* ¶¶ 55, 58).

#### b.     Alleged Claim Errors

In July 2018, the Fund hired ClaimInformatics, LLC, a company that provides healthcare claim payment review services, to audit claims that were priced, processed, and paid by Blue Cross on behalf of the Fund between 2016 and 2018. (*Id*. ¶¶ 62-63).

According to the complaint, ClaimInformatics identified 5574 erroneous claims that had resulted in the Fund paying $1,402,687.57 in excess benefits. (*Id*. ¶ 64).[3]  Those alleged claim errors also resulted in Plan participants and beneficiaries paying $32,810.74 in unnecessary charges through mistakenly paid deductibles or claims made against coinsurers. (*Id.*).  The complaint provides various examples of specific alleged violations of the Plan and errors in claims processing.

The complaint further alleges that Blue Cross has a policy of paying inflated claims up-front and auditing them only after the fact. (*Id.* ¶ 80).  For example, in May 2021 the Fund allegedly challenged Blue Cross's decision to process a claim when a provider billed three hours of services for a minor procedure typically completed in minutes. (*Id.*).  When the Fund questioned Blue Cross about the claim, it responded that its policy was to audit such claims on a "post pay basis." (*Id.*).

The complaint alleges that Blue Cross paid itself unauthorized recovery fees. (*Id.* ¶ 81).  For example, according to the complaint, Blue Cross wrongly collected a recovery fee when a hospital, on its own accord, revised a billing statement and no recovery of overpayment was necessary. (*Id.*).  It also allegedly raised the recovery fee from 20% to 30% without first obtaining approval from the Fund and often paid itself recovery fees for overpayments that

---

[3] Blue Cross contends that all of the allegedly erroneous claims were in fact properly paid, with the exception of some *de minimis* errors, which it has offered to refund. (BCBS Mem. at 1).

resulted from its own error.  (*Id.* ¶¶ 52, 81).  According to the complaint, Blue Cross often calculates recovery fees incorrectly by basing the fee amount on the price of the entire claim rather than the amount of the overpaid funds.  (*Id.* ¶ 81).

The complaint alleges that Blue Cross charged the Fund unauthorized commission fees. (*Id.* ¶ 82).  According to the complaint, in March 2021, the Fund discovered that Blue Cross had charged quarterly commission fees on savings the Fund accrued from audits of out-of-network claims.  (*Id.*).  According to the complaint, the Fund never consented to such fees, and Blue Cross continues to bill those fees to the Fund.

The complaint alleges in general terms that the efforts of Blue Cross to recover overpayments are insufficient.  It alleges that Blue Cross does not conduct recovery operations on an ongoing basis and that it only does so insofar as those recovery efforts benefit its own interests.  (*Id.* ¶ 84).

### c.    <u>Alleged Blocking of Independent Recovery of Overpayment</u>

According to the complaint, based on the alleged failure of Blue Cross to recover overpayments, the Fund authorized ClaimInformatics to recover $1.4 million in overpayments that had been identified in its review.  (*Id.* ¶ 85).  ClaimInformatics began sending letters to providers and collecting refunds.  (*Id.* ¶¶ 87-88).  In response, Blue Cross requested that the Fund cease its recovery efforts, contending that ClaimInformatics's communications with providers on behalf of the Fund violated the ASA, and contacted providers and instructed them to ignore notices of overpayment from the Fund.  (*Id.* ¶¶ 87-90).

### d.    <u>Alleged Refusal to Provide Supporting Documentation for Audit</u>

After the Fund ceased attempts to recover alleged overpayments independently, ClaimInformatics submitted to Blue Cross for review a sample of claims where benefits were

allegedly overpaid.  (*Id.* ¶ 94).  According to the complaint, Blue Cross asserted that it had audited the claims and that they had been billed correctly.  (*Id.* ¶ 96).  However, Blue Cross allegedly refused to provide corroborating records, leaving the Fund unable to verify those findings.  (*Id.* ¶¶ 96, 100).  Throughout its discussions with the Fund concerning the overpayment of claims, BlueCross maintained that ClaimInformatics's findings were incorrect and refused to provide information concerning Blue Cross's contracts with providers.  (*Id.* ¶ 101).  According to the complaint, Blue Cross asserted that it had audited claims and that the claims had been processed without error.  (*Id.* ¶ 102).  However, Blue Cross allegedly refused to show the Fund the relevant records.  (*Id.*).

    **B.**    <u>**Procedural Background**</u>

    The amended complaint asserts three claims arising under ERISA:  Count 1 alleges a breach of fiduciary duty in violation of 29 U.S.C. § 1109; Count 2 alleges engagement in prohibited transactions in violation of 29 U.S.C. § 1106(b)(1); and Count 3 seeks injunctive relief for violations of ERISA and Plan terms in accordance with 29 U.S.C. § 1132(a)(3).

    The complaint also asserts four claims arising under state law:  Count 4 seeks an equitable accounting; Count 5 alleges breach of contract; Count 6 alleges breach of the implied covenant of good faith and fair dealing; and Count 7 alleges unfair and deceptive business practices in violation of Mass. Gen. Laws ch. 93A, § 9.

**II.**    <u>**Legal Standard**</u>

    To survive a motion to dismiss, a complaint must state a claim that is plausible on its face*.  See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  For a claim to be plausible, the "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." *Id.* at 555 (internal citations omitted).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). When determining whether a complaint satisfies that standard, a court must assume the truth of all well-pleaded facts and give the plaintiff the benefit of all reasonable inferences. *See Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)). Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

## III. <u>Analysis</u>

Blue Cross has moved to dismiss the federal claims for failure to state a claim upon which relief can be granted. It further contends that if the ERISA claims are dismissed, the court should refrain from exercising supplemental jurisdiction over the related state-law claims.

### A. <u>Whether Blue Cross Is a Fiduciary</u>

Count 1 alleges that Blue Cross breached its fiduciary duty to the Plan in violation of 29 U.S.C. § 1109. Count 2 alleges that Blue Cross, despite being a Plan fiduciary, acted in its own interests when dealing with Plan assets, thereby violating 29 U.S.C. § 1106(b)(1). The threshold issue in assessing the viability of both claims, therefore, is whether Blue Cross owed a fiduciary duty to the Fund.

There are two methods by which fiduciary status may be attributed to an entity under ERISA. First, that entity can be a "named" fiduciary—that is, in accordance with statutory requirements, the entity is named as a fiduciary in the plan documents. Second, that entity can be a "functional" fiduciary—that is, fiduciary status can arise from the exercise of discretion or control with respect to the management or assets of the plan. *See Beddall v. State St. Bank & Tr.,*

13

*Co.*, 137 F.3d 12, 18 (1st Cir. 1998).

### 1.      Named Fiduciary

The Fund first contends that Blue Cross is a named fiduciary of the Plan.  ERISA

provides that "[e]very employee benefit plan . . . shall provide for one or more named fiduciaries

who jointly or severally shall have authority to control and manage the operation and

administration of the plan."  29 U.S.C. § 1102(a)(1).  A named fiduciary must be identified "in a

plan instrument or pursuant to a procedure specified in that instrument."  *In re Fidelity ERISA*

*Fee Litig.*, 990 F.3d 50, 55 (1st Cir. 2021).

The ASA expressly provides that "[t]he Trustees are the . . . 'named fiduciary' of the

Fund as that term is defined in [ERISA]."  (ASA at 1).  The ASA does *not* expressly name Blue

Cross as a fiduciary, and the Fund does not contend otherwise.

Nonetheless, the Fund cites to portions of the SPD that it contends raise a plausible

inference that Blue Cross is a named fiduciary of the Plan.  Specifically, the Fund points to

excerpts from the SPD that refer to plan "fiduciaries," using the plural term.  (*See e.g.*, SPD at

49-50).  For example, in the section of the SPD titled "Your ERISA Rights" is the following

passage:

> In addition to creating rights for Plan participants, ERISA imposes duties upon
> the people who are responsible for the operation of employee benefit plans.  The
> people who operate your plan, called 'fiduciaries' of the plan, have a duty to do so
> prudently and in the interest of you and other Plan participants and beneficiaries.

(SPD at 49).  Because the SPD refers to "fiduciaries" (plural), the Plan contends that Blue Cross

must therefore be a named fiduciary because to hold otherwise would leave the Trustees as the

sole "fiduciary" (singular).[4]

---

[4] The word "Trustees," of course, is itself a plural noun.

That argument is unconvincing, to say the least. It rests completely on the inference that the use of a plural noun necessarily implies the existence of at least one other fiduciary, and that the third-party administrator must be the hidden object of the plural reference. Such an oblique reference in one passage of the SPD is far from sufficient to transform the third-party administrator of an ERISA plan into a named fiduciary.[5]

The Fund also contends that (1) because the SPD defines "individuals with delegated responsibility for the administration of the Plan" as having the discretion to "interpret the terms of the Plan" and determine "eligibility and entitlement to Plan benefits," therefore (2) those designees are fiduciaries of the Plan. (SPD at 47). Blue Cross, according to the Fund, is such a designee. But that is simply an argument that Blue Cross is a functional, rather than a named, fiduciary.[6]

Accordingly, there is no evidence that Blue Cross is a named fiduciary of the Plan. The Court will therefore turn to the question of whether it is a functional fiduciary.

### 2. <u>Functional Fiduciary</u>

Under ERISA, an entity not specifically named as a plan fiduciary may nonetheless be characterized as a "functional" fiduciary, depending on its responsibilities to the plan. The statute provides that that

> a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, . . . or (iii) he has any discretionary authority or discretionary

---

[5] The SPD also informs participants that they, too, might become "fiduciaries" of the Fund if they receive reimbursements to which the Fund has subrogation rights. (SPD at 43). In that context, the plural form of "fiduciary" refers to functional fiduciaries—that is, those participants who find themselves in possession of Fund assets.

[6] The Fund also points to statements that charges billed under the plan "will never be more than the negotiated rate," (SPD at 15), and that Blue Cross is an "organization through which benefits are provided," (SPD at 48). Again, at most, that is an argument that Blue Cross is a functional fiduciary.

15

responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A). Although the statutory language appears to be somewhat expansive, in practice courts have construed that language narrowly. *See, e.g.*, *Beddall*, 137 F.3d at 21 (referring to "ERISA's somewhat narrow fiduciary provisions").

Whether a party is accurately characterized as a "functional fiduciary" depends on whether that entity "undertakes discretionary tasks related to the plan's management and administration." *Livik v. Gillette Co.*, 524 F.3d 24, 29 (1st Cir. 2008); *see also Beddall*, 137 F.3d at 18 (1st Cir. 1998) ("The key determinant of whether a person qualifies as a functional fiduciary is whether that person exercises discretionary authority in respect to, or meaningful control over, an ERISA plan, its administration, or its assets . . . ."). An entity's status as a functional fiduciary, though, "is not an all-or-nothing designation." *In re Fidelity*, 990 F.3d at 55. "A person or entity can be a fiduciary of a plan for some purposes and not for others." *Id.* The determinative inquiry is "whether that [entity] was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000).

The Fund contends that Blue Cross acted as a functional fiduciary because it exercised both discretionary authority and control over the administration and management of the Plan and authority and control respecting the management and disposition of Plan assets. Blue Cross contends that the functions it performs are typical third-party administrator services, effectively indistinguishable from similar arrangements that have been upheld repeatedly by federal courts.

### a. Discretionary Authority over Plan Administration and Management

Blue Cross contends that it performed typical third-party administrator tasks that do not give rise to a fiduciary duty. Specifically, it contends that the activities alleged in the

complaint—such as the processing and pricing of claims and the recovery of erroneous payments—are acts governed by the terms of the ASA and not subject to meaningful discretion on the part of Blue Cross.  To the extent there are disputes, it argues, they are simply contract disputes, not breaches of fiduciary duty.  *See Pharmaceutical Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 305 (1st Cir. 2005) (holding that ERISA "is not designed to regulate or afford remedies against entities that provide services to plans").

In general, a third-party administrator of an ERISA benefit plan is not a functional fiduciary if it performs "purely ministerial functions . . . within a framework of policies, interpretations, rules, practices, and procedures" set forth by the plan sponsor.  *Livik*, 524 F.3d at 29.  A third-party administrator, therefore, may provide important services to a plan—such as processing claims, calculating benefits, applying the benefit-plan rules to determine benefit eligibility, and collecting contributions—without incurring fiduciary responsibilities, as long as the plan sets forth the framework governing those functions.  *See* 29 C.F.R. § 2509.75-8 (D-2); *see also Beddall*, 137 F.3d at 18 ("[T]he mere exercise of physical control or the performance of mechanical administrative tasks generally is insufficient to confer fiduciary status."); *In re Express Scripts/Anthem ERISA Litig.*, 285 F. Supp. 3d 655, 679 (S.D.N.Y. 2018) (stating that when "a service provider . . . acts pursuant to the terms of a contract, it does not exercise discretionary authority"); *Santana v. Deluxe Corp.*, 920 F. Supp. 249, 254 (D. Mass. 1996) (stating that courts have "universally ruled" that when a third-party administrator does not adjudicate claims it is not an ERISA fiduciary); *but see Technibilt Grp. Ins. Plan v. Blue Cross & Blue Shield of N.C.*, 438 F. Supp. 3d 599, 605 (W.D.N.C. 2020) (denying motion to dismiss because allegations that Blue Cross exercised discretion in processing and paying claims were

sufficient to plausibly allege that Blue Cross functioned as plan fiduciary).[7]

It is true that Blue Cross is not simply a third-party administrator; it also independently maintains a network of providers, and negotiates rates with those providers on behalf of its entire book of business according to its own processes and procedures. Under the ASA, Fund participants are allowed to access that PPO network and take advantage of those negotiated rates.

It is doubtful, to say the least, whether Blue Cross's actions in maintaining a network of providers and negotiating payment rates with those providers are sufficient to create a fiduciary status. *See DeLuca v. Blue Cross Blue Shield of Mich.*, 628 F.3d 743, 747 (6th Cir. 2010) (holding that Blue Cross's negotiation of rates with providers, which affected prices paid by ERISA plan, was not a basis for attributing fiduciary status in that case). *But see Peters v. Aetna, Inc.*, 2 F.4th 199, 231 (4th Cir. 2021) (holding that negotiation of rate with subcontractor could give rise to fiduciary status for third-party administrator because administrator had allegedly buried a fee increase within the negotiated rate).

However, that is not the question before the Court. The Fund does *not* contend that Blue Cross's establishment of a provider network and negotiation of rates with those providers made it a functional fiduciary. (Opp'n at 4) ("Plaintiffs do not allege that establishing a network or negotiated rates are fiduciary acts"); (*id.* at 20) ("Plaintiffs' lawsuit is not about the act of negotiating health care service prices."). Rather, the Fund asserts that Blue Cross incurred a fiduciary duty when it "interpreted," and then violated, what it calls the "Negotiated Rate

---

[7] Nonetheless, a third-party administrator may incur fiduciary responsibilities if it exercises other types of discretionary authority. *See, e.g., Golden Star, Inc. v. Massachusetts Mut. Life Ins. Co.*, 22 F. Supp. 3d 72, 81-82 (D. Mass. 2014) (holding that third-party administrator of employer-sponsored 401(k) plan was functional fiduciary because it had discretion to set management fee rates); *Charters v. John Hancock Life Ins. Co.*, 583 F. Supp. 2d 189, 197-99 (D. Mass. 2008) (holding that third-party administrator of employer-sponsored 401(k) plan was a functional fiduciary because it exercised discretion with respect to its own compensation and investment opportunities made available to participants).

Mandate." (*See id.* at 2, 10, 20).

     The Plan documents submitted to the Court do not use the term the "Negotiated Rate Mandate." Insofar as the Fund identifies a specific passage as the "Mandate," it points to a single sentence in the SPD—not the Plan, and not the ASA—that informs participants that "[t]he billed charges that will be considered covered expenses will never be more than the negotiated rate." (SPD at 15). The Fund then contends that because the specific rate for each provider is not listed in the SPD, Blue Cross necessarily has authority to "interpret" that sentence by determining what those negotiated rates would be. (Opp'n at 5). It further contends that the complaint is not concerned with the negotiation of rates, but the failure to apply those negotiated rates to claims. (*See* Opp'n at 20) ("What this lawsuit is about is [Blue Cross's] demonstrated failure to apply its own negotiated rates and its consequent violation of the Negotiated Rate Mandate. This has nothing to do with the actual act of negotiation.").

     The Fund's argument can thus be summarized as follows. The ASA provides that Blue Cross will serve as a third-party administrator and handle the day-to-day activities of handling claims. Blue Cross did *not* become a functional fiduciary because it handled those functions. The ASA also contemplates that Blue Cross will maintain a preferred provider network and negotiate rates with providers. Blue Cross did *not* become a functional fiduciary because it handled those functions, either. Instead, Blue Cross allegedly became a fiduciary when it "made benefit determinations that exceeded negotiated rates" (Opp'n at 6)—or, to use the language of the complaint, when it violated the "Negotiated Rate Mandate"—thereby causing the Plan to pay excessive amounts for certain claims.

     The Plan thus seems to argue that when Blue Cross violated its contractual obligations— because it made mistakes, or refused to fix those mistakes, or otherwise overcharged the Plan—it

19

AD019

stopped acting as a mere third-party administrator, and somehow became a functional fiduciary.

That interpretation is surely incorrect. For a party to become a functional fiduciary, there must be something in the structure of the relationship, either formally or *de facto*, that takes it outside of the normal plan-administrator relationship. That "something extra," by statute, means exercising meaningful "discretionary authority or discretionary control respecting the management" of the Plan, or having "discretionary authority or discretionary responsibility in the administration" of the Plan. 29 U.S.C. § 1002(21)(A). Failing to apply the correct rate to some subset of claims is none of those things. If Blue Cross did so, it of course may be contractually liable to the Plan. That does not, however, make it a functional fiduciary.

Put another way, even if the Court were to construe the SPD as imposing a "Negotiated Rate Mandate," Blue Cross did not have the authority to "interpret" that language. Again, the Fund acknowledges that Blue Cross had the right to maintain its provider network, and negotiate rates, without becoming a functional fiduciary. Nonetheless, the Fund characterizes the *application* of those rates as an *interpretation* of the SPD. But Blue Cross was required to apply those rates to the claims of Fund participants; it did not have the discretion to set or apply some other rates. And when it did so, did not "interpret" the SPD—it executed its obligations under the contract. Those are non-discretionary, ministerial acts that are insufficient to create a functional fiduciary status. Indeed, the ASA provides that the Fund has ultimate decision-making authority over all claims. (ASA at 10) ("In the event an adjudicated claim is appealed . . . the Fund will be responsible to process and make a decision regarding such appeal."); *see Santana*, 920 F. Supp. at 256 (holding that third-party administrator was not fiduciary of ERISA health plan partly because plan sponsor retained ultimate decision-making authority over claims).

The Fund further alleges that Blue Cross's insufficient effort to recover overpayments was both detrimental to the Fund and involved the exercise of discretion.  Of course, Blue Cross exercised some minor degree of discretion under the terms of the ASA with respect to the recovery of erroneously paid specific claims, in the sense that it has the contractual obligation to determine whether mistakenly paid claims should be rectified through normal claim adjustment processes or through settlement agreements with providers.  But that is a far cry from the level of discretion required to transform a third-party administrator into a functional fiduciary.  *See W.E. Aubuchon v. BeneFirst, LLC*, 661 F. Supp. 2d 37, 53 (D. Mass. 2009) (concluding that the "determination of whether and how aggressively to pursue an overpayment to a medical provider" does not involve the exercise of discretion sufficient to confer the status of functional fiduciary on the third-party administrator).

Indeed, if third-party administrators engaged in normal service relationships with plans are in fact functional fiduciaries, significant consequences are likely to result.  ERISA fiduciaries are subject to a variety of restrictions, including a duty of loyalty and prohibitions on certain kinds of transactions.  *See* 29 U.S.C. §§ 1104, 1106.  It is difficult to see how a plan could contract, as here, with a third-party administrator to take advantage of its provider network (and lower rates) under such circumstances.  Presumably, too, third-party administrators will raise their fees substantially to cover both the restricted nature of the business and the additional risk incurred.  Congress cannot have intended such a result, which would provide little, if any, marginal benefit to participants, while imposing substantial additional expenses on plans— expenses that inevitably will be borne largely, if not entirely, by participants through increased fees or reduced benefits.

In summary, Blue Cross does not exercise discretionary authority or discretionary control

21

respecting the management of the plan, and does not have discretionary authority or
discretionary responsibility in the administration of the plan.

### b.    Authority and Control over Plan Assets

Fiduciary status can also be attributed to a third-party administrator when it exercises
"any authority or control respecting management or disposition of [plan] assets." 29 U.S.C.
§ 1002(21)(A). The Fund contends that Blue Cross is a functional fiduciary because it exercises
authority or control over the "working capital amount," which it claims is a Fund asset.

Blue Cross first contends that it does not control any Plan assets, because once the Fund
pays the monthly working capital amount, it relinquishes any ownership interest in those funds.
Alternatively, it contends that even if those funds could be characterized as Plan assets, it does
not control or manage them; rather, Blue Cross acts as a depository of the funds and an
intermediary that pays claims. It asserts that holding it as a fiduciary for merely possessing Plan
assets would be akin to attributing fiduciary status to a depository bank.

Because ERISA lacks any comprehensive definition as to what constitutes a "plan asset,"
"the assets of a plan generally are to be identified on the basis of ordinary notions of property
rights under non-ERISA law." *In re Fidelity ERISA Float Litig.*, 829 F.3d 55, 60 (1st Cir. 2016)
(quoting *Merrimon v. Unum Life Ins. Co. of Am.*, 758 F.3d 46, 56 (1st Cir. 2014)).

Here, the ASA provides for the transfer of funds for two principal purposes: to provide
"working capital" for the payment of claims and to pay Blue Cross's administrative fees. There
is no reason to believe, under "ordinary notions of property rights," that the funds paid to Blue
Cross as "working capital amounts" remain the assets of the Fund. The funds are not held in the
name of Fund. They are not segregated from other financial assets of Blue Cross, and there is
nothing in the ASA that requires them to be. There is no reason to believe that the Fund can
have access to those funds, or demand their return, at any time or for any reason. If they were to

22

be embezzled, stolen, or lost, Blue Cross would bear the entire risk.  Blue Cross likewise bears

the risk of any investment loss.  And there is nothing in the ASA that states or suggests that they

are held in trust for the Fund, or for the benefit of the Fund or its participants.  To the contrary,

the ASA indicates that they are paid monthly to Blue Cross "[b]ecause [Blue Cross] will pay

providers of services before being able to bill the Fund"—in other words, to provide Blue Cross

with sufficient capital to pay those bills on a current basis.  (ASA at 16).

The fact that Blue Cross actually pays the claims—in accordance with the requirements

of the contract, and subject to the approval of the Fund—does not mandate a different result.  As

this Court observed in *W.E. Aubuchon v. BeneFirst, LLC*:

> It is fundamentally inconsistent . . . to hold that a third-party administrator does
> not become a fiduciary merely because it processes and pays claims, but that the
> existence of check-writing authority to execute the claims payment function does
> in fact create such a relationship . . . Accordingly, the exercise of authority over
> bank accounts in the circumstances here is not sufficient to confer the status of a
> 'functional fiduciary' on [the third-party administrator].

661 F. Supp. 2d at 54.

In short, the ASA sets forth a contractual arrangement that permits claims to be paid on a

timely and current basis without incurring interest costs.  But the fact remains that title to the

funds passes to Blue Cross when the Fund makes its periodic payments, and there is nothing in

the ASA, or otherwise, to suggest the contrary.  *See Depot Inc. v. Caring for Montanans*, 915

F.3d 643, 658-59 (9th Cir. 2019) (concluding that once premium payments were paid to a health

insurer as part of an ERISA-governed employee benefit plan, the plan lost any "beneficial

ownership interest" in the funds and therefore the premiums were not plan assets; instead, they

were payments "in exchange for a contractual right to receive a particular service").

It is true that the Sixth Circuit reached a different decision under analogous

circumstances in *Hi-Lex Controls Inc. v. Blue Cross Blue Shield of Michigan*, 751 F.3d 740 (6th

23

Cir. 2014). For the reasons set forth below, this Court disagrees with the reasoning of the *Hi-Lex* court.

*Hi-Lex* involved a dispute as to whether Blue Cross Blue Shield of Michigan ("BCBSM"), as third-party administrator, properly charged certain types of fees to the relevant plan. The resolution of that dispute required the court to determine whether BCBSM was a "functional fiduciary" within the meaning of the statute. The central issue appears to have been whether BCBSM exercised "any authority or control respecting management or disposition" of plan assets within the meaning of 29 U.S.C. § 1002(21)(A).[8] If it did, then it was acting as a functional fiduciary.

The parties in *Hi-Lex* had an apparently typical arrangement in which the sponsor of a self-funded plan collected employee contributions for health benefits, to which it added its own (much larger) employer contribution. It then sent the combined amount to BCBSM as third-party administrator on a regular, apparently monthly, basis. From that combined amount, BCBSM paid claims and collected its administrative fees.

The court first noted that the employee contributions—which were collected by the employer from paychecks and segregated from the employer's general assets—were "plan assets" within the meaning of ERISA once the employer had collected them. 751 F.3d at 745. It then went on to say, without analysis, that the employee contributions "sent to BCBSM to pay claims and administrative costs qualify as plan assets." *Id.* It thus assumed away the very

---

[8] The *Hi-Lex* court also addressed whether BCBSM exercised discretion with respect to the disputed fees, apparently in order to ascertain whether it had exercised "discretionary authority or discretionary control respecting management of the plan" or "discretionary authority or discretionary responsibility in the administration of such plan" within the meaning of 29 U.S.C. § 1002(21)(A). 751 F.3d at 744-45. It apparently concluded that BCBSM did so, noting that certain individual underwriters had the "flexibility to determine 'how and when'' certain disputed fees were charged, and because those fees were sometimes waived. That led to the counterintuitive conclusion that because BCBSM was occasionally willing to waive its fees for the benefit of the plan—probably as a matter of customer service—it had thereby become a functional fiduciary. *Id.*

question at the heart of the dispute:  did those plan assets *remain* plan assets once they were transferred to BCBSM?  If so, why?  If not, why not?

The court then addressed the employer contribution portion of those payments.  *Id*. at 745-47.  It began by citing Department of Labor regulations addressing how the assets of an ERISA plan were to be determined:

> [T]he assets of an employee benefit plan generally are to be identified on the basis of ordinary property rights.  Under this analysis, the assets of a welfare plan generally include any property, tangible or intangible, in which the plan has a beneficial ownership interest.   Making the plan assets' determination therefore requires consideration of any contract or other legal instrument involving the plan, as well as the actions and representations of the parties involved.  Furthermore, the drawing [of] benefit checks on a TPA account, as opposed to an employer account, may suggest to participants that there is an independent source of funds securing payment of their benefits under the plan.

*Id.* at 745 (citations and internal quotations omitted).[9]

The court then noted, in substance, that both the SPD and the contract provided that BCBSM, as third-party administrator, would pay claims out of the funds provided to it by Hi-Lex, and that there was "no special fund or trust" from which benefits would be paid.  *Id.* at 745-46.  It noted that Hi-Lex would make the "final claims determination," although enrollees were required to make initial benefits claims with BCBSM.  *Id.* at 746. After addressing some relatively collateral matters,[10] the court concluded:

> Collectively, these 'actions and representations' establish that BCBSM, Hi-Lex and the company's employees all understood that BCBSM would be holding ERISA-regulated funds to pay the health expenses and administrative costs of

---

[9] The First Circuit has adopted the first portion of the DOL definition, stating that the "the assets of a plan generally are to be identified on the basis of ordinary notions of property rights under non-ERISA law."  *Merrimon*, 758 F.3d at 56; *In re Fidelity ERISA Float Litigation*, 829 F.3d at 60.

[10] For example, the court noted that references to ERISA in plan documents and the plan's requirement that the third-party administrator annually submit data necessary for completing ERISA-mandated reports undermined the defendant's argument that the agreement between the parties was simply a service agreement made without consideration of potential ERISA obligations. *Id.* at 746. That does not, however, address the question of whether the funds at issue were assets of the plan under principles of "ordinary property rights."

25

enrollees in the Hi-Lex Plan. As a result, Hi-Lex's Plan beneficiaries had a reasonable expectation of a 'beneficial ownership interest' in the funds held by BCBSM.

*Id.*

The court thus did not directly consider whether, as a matter of "ordinary [principles] of property rights," title to the funds had transferred to BCBSM once the plan had made its monthly payment. There was little discussion of the terms of the contract, other than to note in general terms that BCBSM was required to pay claims out of the amounts transferred. There was no discussion of who bore the risk of loss after that transfer, or whether (if indeed the plan still held title to the funds) the plan could demand their return. It did not explain how, as a matter of property law, the reasonable expectation of the beneficiaries (who were not parties to the contract, and presumably had never even read it) appeared to be given substantial weight over the actual terms of the contract.

BCBSM had argued that the funds were not plan assets because they were commingled with other BCBSM funds, as the contract did not require that they be set aside in a segregated account. *Id.* But the court brushed that argument aside, noting only that a segregated account was not specifically mandated by law, and that it was possible to retain a beneficial interest without such segregation. *Id.* at 746-47. BCSM further argued that the law of trusts provided that "[w]hen one person transfers funds to another, it depends on the manifested intention of the parties whether the relationship created is that of trust or debt." *Id.* at 747. But in response, the court simply observed in conclusory terms that the common law supports the conclusion that the funds were held in trust. *Id.* It did so even though the contract itself appears to have expressly contemplated a debt relationship, not a trust relationship.

In short, while the desire of the *Hi-Lex* court to protect beneficiaries was no doubt laudable, the court did not actually ground its decision in "ordinary [principles] of property

26

rights." Instead, it gave great weight to the fact that BCBSM paid claims out of the funds transferred to it—which is surely a commonplace feature of self-funded benefit plans administered by third-party administrators—and the expectations of the beneficiaries. And it gave little or no attention to the typical attributes of property rights, such as the actual contractual arrangements of the parties and the allocation of risk.

Furthermore, a broader application of the conclusions in *Hi-Lex* as to plan assets could again produce some potentially far-reaching consequences. The decision seems to suggest that a self-funded plan and a third-party administrator are nearly powerless to enter into an arrangement that would treat employer and employee contributions as anything other than plan assets, even when neither party intends such a result. Obviously, claims must be paid somehow, and they must ultimately be paid out of the resources of the plan, directly or indirectly. Presumably, self-funded plans do not have the necessary administrative capability and expertise to pay a multitude of claims on a daily basis, which is why they engage third-party administrators. Under *Hi-Lex*, however, third-party administrators who handle claim-payment functions will have difficulty avoiding becoming functional fiduciaries—unless, perhaps, they pay claims in advance out of their own funds. But if the TPA pays the claims out of its own funds, and bills the plan after the fact, it is in effect playing the role of an unsecured lender to the plan. The ERISA statute surely does not mandate such a result.

Finally, and in any event, even if the Court were to conclude here that the monthly "working capital" amounts paid to Blue Cross are, in fact, assets of the Plan, that is still insufficient to transform Blue Cross into a functional fiduciary. ERISA does not "extend fiduciary status to every person who exercises 'mere possession, or custody' over the plan's assets." *BeneFirst*, 661 F. Supp. 2d at 54 (citation omitted). Instead, the statute requires that the

putative functional fiduciary exercise "authority or control" as to the management or disposition of a plan's assets. 29 U.S.C. § 1002(21)(A). A third-party administrator that pays claims according to the instructions of the plan, and subject to its approval, is not exercising discretion and judgment over assets, but performing "purely administrative act[s]." *Cottrill v. Sparrow, Johnson & Utrillo, Inc.*, 74 F.3d 20, 22 (1st Cir. 1996). If the funds are in fact assets of the Plan, Blue Cross is acting more in the nature of a depository bank or a custodian than a manager with discretionary authority over assets. *See Beddall*, 137 F.3d at 20; *O'Toole v. Arlington Tr. Co.*, 681 F.2d 94, 95-96 (1st Cir. 1998).

In summary, the allegations of the complaint are not sufficient to form a plausible basis to conclude that Blue Cross is either a named fiduciary or a functional fiduciary of the Plan. In particular, Blue Cross is not named as a fiduciary in any Plan document, and is not a functional fiduciary because it does not exercise either discretionary authority and control over the administration and management of the Plan or authority and control respecting the management and disposition of Plan assets. Counts 1 and 2 therefore fail to state a claim upon which relief can be granted.

### B. Injunctive or Equitable Relief

Count 3 states a claim for injunctive relief for violation of the Plan terms. Under ERISA, a claim can be stated

> by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

29 U.S.C. § 1132(a)(3).

The Fund contends that the statute provides for relief against any party that violates any plan terms. Because Blue Cross has violated the "Negotiated Rate Mandate," the Fund reasons,

it has violated plan terms, entitling the Fund to injunctive relief.

The Supreme Court has made clear that both fiduciaries and non-fiduciaries can incur liability under § 1132(a)(3). *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 246-47 (2000). However, under § 1132(a)(3), actions against non-fiduciaries must be based on the non-fiduciary's participation in a breach of fiduciary duty. *See id.* at 248-49 (stating the language of § 1132(a)(5) permitted the Secretary of Labor to bring ERISA actions against non-fiduciaries who knowingly participate in fiduciary breaches and that the "similarly worded" § 1132(a)(3) therefore imposed a similar scope of liability). In other words, a claim under § 1132(a)(3) may be brought against a party that is not a fiduciary, but such a party must have participated in a fiduciary breach (ostensibly in concert with a fiduciary) for a claim under § 1132(a)(3) to stand. *See National Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 91 (3d Cir. 2012) ("As the Court in *Harris Trust* explained, [§ 1132(a)(3)] provides a right of action against a transferee of ill-gotten trust assets who is a knowing participant in an ERISA violation.").

Here, for the reasons set forth above, the Fund has failed to allege any fiduciary breach in which Blue Cross may have participated. Accordingly, Count 3 fails to state a claim, and will be dismissed.

### C.    State-Law Claims

State-law breach-of-contract claims by plans against third-party administrators are not normally preempted by ERISA. *BeneFirst*, 661 F. Supp. 2d at 46-47. However, "when all federal claims have been dismissed, it is an abuse of discretion for a district court to retain jurisdiction over the remaining pendent state law claims unless doing so would serve the interests of fairness, judicial economy, convenience, and comity." *Zell v. Ricci*, 957 F.3d 1, 15 (1st Cir. 2020) (internal quotation marks omitted) (quoting *Wilber v. Curtis*, 872 F.3d 15, 23 (1st Cir. 2017)).

Here, the Court finds no compelling reason to retain jurisdiction over this matter. For the reasons set forth above, this is a dispute concerning contractual obligations arising under state law. No discovery has been undertaken, and no trial date has been set. Under the circumstances, the interests of justice do not favor the assertion of supplemental jurisdiction.

Accordingly, those claims will be dismissed without prejudice to their renewal in state court.

## IV.  <u>Conclusion</u>

For the foregoing reasons, the motion to dismiss of defendant Blue Cross Blue Shield of Massachusetts for failure to state a claim upon which relief can be granted is GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor IV

F. Dennis Saylor IV

Chief Judge, United States District Court

Dated: March 30, 2022

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

Massachusetts Laborers' Health and Welfare Fund et al

                Plaintiff

      V.

                             CIVIL ACTION

                             NO. 21-10523-FDS

Blue Cross Blue Shield of Massachusetts

                Defendant

## <u>ORDER OF DISMISSAL</u>

<u>Saylor, C. J.</u>

      In accordance with the Court's Memorandum and Order dated <u>March 30, 2022,</u> it is hereby ORDERED that the above-entitled action be and hereby is DISMISSED.

                            By the Court,

<u>3/30/2022</u>                     <u>/s/ Christina McDonagh</u>
      Date                        Deputy Clerk