No.  22-1317
_____

UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT
_____

MASSACHUSETTS LABORERS' HEALTH AND WELFARE FUND;
TRUSTEES OF THE MASSACHUSETTS LABORERS' HEALTH AND
WELFARE FUND, as Fiduciaries,

*Plaintiffs-Appellants*,

v.

BLUE CROSS BLUE SHIELD OF MASSACHUSETTS,

*Defendant-Appellee.*
_____

On Appeal from the U.S. District Court for the District of Massachusetts
No. 21-cv-10523-FDS
Chief Judge F. Dennis Saylor IV
_____

**RESPONSE BRIEF OF DEFENDANT-APPELLEE
BLUE CROSS BLUE SHIELD OF MASSACHUSETTS, INC.**
_____

Evan Miller
David T. Raimer
Joseph P. Falvey
JONES DAY
51 Louisiana Avenue, NW
Washington, D.C. 20001
(202) 879-3939
emiller@jonesday.com
dtraimer@jonesday.com
jfalvey@jonesday.com

*Counsel for Defendant-Appellee*
*Blue Cross Blue Shield of Massachusetts, Inc.*

**RULE 26.1 DISCLOSURE STATEMENT**

Appellee Blue Cross Blue Shield of Massachusetts, Inc. ("BCBSMA") has no parent corporation and it does not issue stock, so no other entity owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

RULE 26.1 DISCLOSURE STATEMENT ................................................................... i

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD ........................... viii

INTRODUCTION .................................................................................................... 1

JURISDICTIONAL STATEMENT ......................................................................... 5

STATEMENT OF THE ISSUES .............................................................................. 5

STATEMENT OF THE CASE ................................................................................. 5

    A.   The Fund Hires BCBSMA as a Third-Party Administrator ......................... 5

    B.   The Fund Complains of Supposed Billing Discrepancies........................... 10

    C.   Chief Judge Saylor Dismisses the Fund's Amended Complaint ................. 12

SUMMARY OF ARGUMENT .............................................................................. 14

STANDARD OF REVIEW .................................................................................... 16

ARGUMENT ......................................................................................................... 16

I.   BCBSMA DID NOT EXERCISE DISCRETIONARY AUTHORITY OVER THE MANAGEMENT OR ADMINISTRATION OF THE PLAN ............................................. 17

    A.   Fiduciary Status Requires the Exercise of Discretionary Authority with Respect to the Management or Administration of the Plan ............... 18

    B.   BCBSMA Did Not Exercise Discretionary Authority Over the Plan ......... 20

        1.   BCBSMA did not exercise discretionary authority over management and administration of the Plan when repricing claims.......................... 20

        2.   BCBSMA did not exercise discretionary authority over management and administration of the Plan when pursuing settlements or collecting fees and costs ................................................. 30

II.   BCBSMA DID NOT CONTROL THE DISPOSITION OF PLAN ASSETS ................... 33

    A.   BCBSMA Did Not "Control" the Disposition of Plan Assets ................... 34

    B.   The Working Capital and Settlement Amounts Were Not "Plan Assets." ....................................................................................................... 39

III.  THE FUND'S POSITION WOULD HARM ERISA PLANS AND THEIR PARTICIPANTS.................................................................................................. 48

CONCLUSION ....................................................................................................... 50

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Acosta v. WH Administrators, Inc.,*
   449 F. Supp. 3d 506 (D. Md. 2020) ............................................................ 47

*Aetna Health Inc. v. Davila,*
   542 U.S. 200 (2004) ................................................................................... 19

*Am.'s Health Ins. Plans v. Hudgens,*
   742 F.3d 1319 (11th Cir. 2014) .................................................................. 44

*Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.,*
   821 F.3d 352 (2d Cir. 2016)........................................................................ 18

*Am. Psychiatric Ass'n v. Anthem Health Plans,*
   50 F. Supp. 3d 157 (D. Conn. 2014) ...................................................21, 38

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ................................................................................... 16

*Baker v. Big Star Div. of the Grand Union Co.,*
   893 F.2d 288 (11th Cir. 1989) ..........................................................20, 23, 24

*Beddall v. State St. Bank & Tr. Co.,*
   137 F.3d 12 (1st Cir. 1998) ....................................................................*passim*

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ................................................................................... 16

*Charters v. John Hancock Life Ins. Co.,*
   583 F. Supp. 2d 189 (D. Mass. 2008) ...................................................28, 33

*CIGNA Corp. v. Amara,*
   563 U.S. 421 (2011) ................................................................................... 22

*Conkright v. Frommert,*
   559 U.S. 506 (2010) ..................................................................................... 4

*Cottrill v. Sparrow, Johnson & Ursillo, Inc.,*
   74 F.3d 20 (1st Cir. 1996) ...............................................................34, 35, 39

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*DeLuca v. Blue Cross Blue Shield of Mich.,*
628 F.3d 743 (6th Cir. 2010) ................................................*passim*

*Doe 1 v. Express Scripts, Inc.,*
837 F. App'x 44 (2d Cir. 2020) (unpublished) ........................... 38

*Doe v. United Health Grp. Inc.,*
No. 17-cv-4160, 2018 WL 3998022 (E.D.N.Y. Aug. 20, 2018) ............................... 18

*Fin. Insts. Ret. Fund v. Off. of Thrift Supervision,*
766 F. Supp. 1302 (S.D.N.Y. 1991) ............................................. 38

*Flacche v. Sun Life Assur. Co. of Canada,*
958 F.2d 730 (6th Cir. 1992) ..................................................... 23

*Golden Star, Inc. v. Mass Mut. Life Ins. Co.,*
22 F. Supp. 3d 72 (D. Mass. 2014) ....................................... 28, 33

*Hecker v. Deere & Co.,*
556 F.3d 575 (7th Cir. 2009) .................................................... 24

*Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Mich.,*
751 F.3d 740 (6th Cir. 2014) ................................................*passim*

*Humana Health Plan, Inc. v. Nguyen,*
785 F.3d 1023 (5th Cir. 2015) ............................................. 31, 50

*ILWU-PMA Welfare Plan Bd. of Tr. v. Conn. Gen. Life Ins. Co.*
No. C-15-2965, 2015 WL 9300519 (N.D. Cal. Dec. 22, 2015) ............................... 28

*In re Express Scripts/Anthem ERISA Litig.,*
285 F. Supp. 3d 655 (S.D.N.Y. 2018) ........................................ 21

*In re Fid. ERISA Float Litig.,*
829 F.3d 55 (1st Cir. 2016) ..................................................*passim*

*In re Luna,*
406 F.3d 1192 (10th Cir. 2005) ........................................... 36, 40

*In re New England Life Ins. Co. Sales Pracs. Litig.,*
346 F.3d 218 (1st Cir. 2003) ..................................................... 16

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*IT Corp. v. Gen. Am. Life Ins. Co.*,
   107 F.3d 1415 (9th Cir. 1997) ....................................................................2, 25, 26, 47

*Kyle Railways, Inc. v. Pac. Admin. Servs., Inc.*,
   990 F.2d 513 (9th Cir. 1993) ......................................................................23, 24, 25

*Lebahn v. Nat'l Farmers Union Unif. Pension Plan*,
   828 F.3d 1180 (10th Cir. 2016) ................................................................18, 23, 25

*Livick v. The Gillette Co.*,
   524 F.3d 24 (1st Cir. 2008) ................................................................ 16, 19, 20, 38

*McCoy v. Mass. Inst. of Tech.*,
   950 F.2d 13 (1st Cir. 1991) ............................................................................... 48

*Monterey Peninsula Horticulture, Inc. v. Employee Benefit Mgmt. Servs., Inc.*,
   No. 5:21-cv-1660, 2020 WL 2747846 (N.D. Cal. May 27, 2020) ............................ 37

*Morales-Cruz v. Univ. of Puerto Rico*,
   676 F.3d 220 (1st Cir. 2012) ..........................................................................27, 31

*Navarro-Ayala v. Hernandez-Colon*,
   951 F.2d 1325 (1st Cir. 1991) ........................................................................... 44

*O'Toole v. Arlington Tr. Co.*,
   681 F.2d 94 (1st Cir. 1982) ...........................................................................34, 35, 36

*Pegram v. Herdrich*,
   530 U.S. 211 (2000) ................................................................... 15, 16, 21, 48

*Peters v. Aetna Inc.*,
   2 F.4th 199 (4th Cir. 2021) ..........................................................................28, 33

*Pharm. Care Mgmt. Ass'n v. Rowe*,
   429 F.3d 294 (1st Cir. 2005) ............................................................................. 4

*Pipefitters Loc. 636 Ins. Fund v. Blue Cross & Blue Shield of Mich.*,
   722 F.3d 861 (6th Cir. 2013) ..........................................................................28, 33

*Rozo v. Principal Life Ins. Co.*,
   949 F.3d 1071 (8th Cir. 2020) ......................................................................... 28

# TABLE OF AUTHORITIES

(continued)

**Page(s)**

*Santana v. Deluxe Corp.*,
    920 F. Supp. 249 (D. Mass. 1996) ........................................................ 3, 20, 24

*Shields v. United of Omaha Life Ins. Co.*,
    50 F.4th 236 (1st Cir. 2022) ................................................................... 19

*Stephanie C. v. Blue Cross Blue Shield of Massachusetts HMO Blue, Inc.*,
    813 F.3d 420 (1st Cir. 2016) ................................................................. 27

*Technibilt Grp. Ins. Plan v. Blue Cross & Blue Shield of N.C.*,
    438 F. Supp. 3d 599, 604 (W.D.N.C. 2020) ........................................ 47

*Technibilt Grp. Ins. Plan v. Blue Cross & Blue Shield of N.C.*,
    No. 19-cv-0079, 2021 WL 1147168 (W.D.N.C. Mar. 25, 2021) ............. 29

*Teets v. Great-W. Life & Annuity Ins. Co.*,
    921 F.3d 1200 (10th Cir. 2019) ............................................................ 49

*Terry v. Bayer Corp.*,
    145 F.3d 28 (1st Cir. 1998) ................................................................... 24

*Tetreault v. Reliance Standard Life Ins. Co.*,
    769 F.3d 49 (1st Cir. 2014) ................................................................... 22

*Toomey v. Jones*,
    855 F. Supp. 19 (D. Mass. 1994) .......................................................... 20

*Varity Corp. v. Howe*,
    516 U.S. 489 (1996) .............................................................................. 21

*Wayne Surgical Ctr., LLC v. Concentra Preferred Sys., Inc.*,
    No. 06-cv-0928, 2008 WL 11510367 (D.N.J. May 9, 2008) ................... 29

*W.E. Aubuchon Co. v. BeneFirst, LLC*,
    661 F. Supp. 2d 37 (D. Mass. 2009) ........................................ 24, 31, 35, 36

*Yacubian v. United States*,
    750 F.3d 100 (1st Cir. 2014) ................................................................. 16

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

STATUTES

29 U.S.C. § 1002 ................................................................................*passim*

29 U.S.C. § 1102 ............................................................................... 49

29 U.S.C. § 1104 ................................................................................*passim*

29 U.S.C. § 1106 ............................................................................... 49

29 U.S.C. § 1109 ............................................................................... 12

OTHER AUTHORITIES

29 C.F.R. § 2509.75-8(D-2) ..............................................................*passim*

Black's Law Dictionary (11th ed. 2019) ......................................... 45

Bogert's The Law of Trusts and Trustees § 17 ............................... 41

Ctrs. for Medicare & Medicaid Servs., MS-DRG Classifications and
   Software ......................................................................................... 11

3 HR Series: Policies and Practices § 190.14 (Sept. 2022 update) ............................. 6, 49

Restatement (Third) of Trusts § 5 ............................................... 40, 46

1 Scott & Ascher on Trusts § 2.3.8.1 ........................................... 40

U.S. Dep't of Labor, Advisory Op. No. 13-03A, 2013 WL 3546834
   (July 3, 2013) ................................................................................. 42

U.S. Dep't of Labor, Advisory Op. No. 92-24A, 1992 WL 337539
   (Nov. 6, 1992) ............................................................................... 42

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

BCBSMA agrees with Appellants that oral argument is appropriate in this case, as it involves important questions under the Employee Retirement Income Security Act of 1974, as amended ("ERISA").

**INTRODUCTION**

This appeal is the latest chapter in the ongoing efforts of the Massachusetts Laborers' Health and Welfare Fund and its Trustees (collectively, the "Fund") to transform a (meritless) contract dispute into the proverbial federal case.

For many years, the Fund and Blue Cross Blue Shield of Massachusetts, Inc. ("BCBSMA") enjoyed a fruitful working relationship, with BCBSMA serving as a third-party administrator for the multiemployer health benefits plan offered by the Fund. In that capacity, BCBSMA gave the Fund access to its network of healthcare providers and its claims-processing department, which repriced medical claims incurred by Fund beneficiaries in accordance with specially negotiated rates and internal payment polices in effect across BCBSMA's book of business. The Fund then took these repriced claims and adjudicated them, determining whether they were covered by its promised plan of benefits and how costs were to be allocated between the Fund and the beneficiary (e.g., application of deductibles and co-payments). Once the Fund decided whether and how much of a claim to pay, it forwarded final approval or denial to BCBSMA, which only then remitted payment to the appropriate provider. This arrangement offered the Fund the best of both worlds: it benefitted from BCBSMA's discounted rates and extensive provider network while retaining ultimate control of the management and administration of its plan.

Over the past several years, however, the Fund came to believe that BCBSMA's claims-processing systems were rife with error. Relying on information it knew to be

incomplete—and simply mistaken analysis—the Fund faulted BCBSMA for an ever-shifting series of supposed slipups. But every time the Fund brought these "errors" to BCBSMA's attention, proper analysis showed that, with de minimis exceptions, BCBSMA's claims-processing systems had worked as intended.

After almost two years of back-and-forth, the Fund filed suit. But rather than merely seek relief under the parties' contract, the Fund further alleged that BCBSMA was acting as an ERISA fiduciary. According to the Fund, BCBSMA acquired that status because it exercised "discretionary authority" over the Fund's plan and "control" over plan assets. 29 U.S.C. § 1002(21)(A). Distilled to its essence, the Fund's complaint is that BCBSMA made *mistakes* in repricing claims, and that *those mistakes* resulted in overpayments to providers that depleted "plan assets." Even accepting these allegations as true, they do not describe the conduct of an ERISA fiduciary.

*First*, as the district court rightly held, the Fund's argument—that BCBSMA "somehow became a functional fiduciary" "because it made mistakes [in repricing claims], or refused to fix those mistakes, or otherwise overcharged the Plan"—is "surely incorrect." AD19-20. To transform a third-party administrator into an ERISA fiduciary, mere allegations of mistakes (which litter the Fund's complaint) do not suffice. AD20. "The power to err … is not the kind of discretionary authority which turns an administrator into a fiduciary." *IT Corp. v. Gen. Am. Life Ins. Co.*, 107 F.3d 1415, 1421 (9th Cir. 1997). And try as it might, the Fund cannot point to conduct that actually involved the exercise of "discretionary authority" over the "management" or

"administration" of the benefits promised to plan participants. 29 U.S.C. § 1002(21)(A). Instead, it has identified routine third-party administrator activities, which "courts have universally" deemed to be non-fiduciary, *Santana v. Deluxe Corp.*, 920 F. Supp. 249, 254 (D. Mass. 1996), or actions divorced from the plan at issue, which are likewise non-fiduciary, *e.g.*, *DeLuca v. Blue Cross Blue Shield of Mich.*, 628 F.3d 743, 746 (6th Cir. 2010).

*Second*, the argument that BCBSMA "controlled" plan assets fares no better. In essence, the Fund contends that any time BCBSMA erred in repricing claims, that error was fiduciary because it ultimately "diminish[ed] Plan assets." A33. But no court has ever held that such conduct constitutes "control" over plan assets—particularly where, as here, no funds are released absent express approval of the plan sponsor (i.e., the Fund's trustees). AD28. And for good reason. Were it otherwise, every service provider could be said to have "control" over the assets of an ERISA-regulated plan. Indeed, on the Fund's theory, a plumber's decision to use (cheaper) PVC over (more expensive) copper pipe at Fund-owned real estate would implicate ERISA's fiduciary requirements. And if that plumber mistakenly overcharged the Fund, that would be a breach of those standards. That is not—nor should it be—the law.

Tellingly, the Fund's "control" theory applies with equal force regardless of who holds the "plan assets" at issue. The Fund's newfound focus on its purported "beneficial ownership interest" in working capital amounts transferred to BCBSMA is thus ultimately beside the point. At any rate, that argument fails on its own terms. To comply with its contractual obligations, BCBSMA had to pay providers before it could

bill the Fund for reimbursement; the working capital amounts were advances made to ensure BCBSMA need not tie up other funds for that purpose. And basic principles of property law dictate that a party retains no beneficial ownership in monies it advances to another with the understanding that an equivalent sum will be paid to a third party.

At bottom, adoption of either of these theories of liability would have "significant" and "potentially far-reaching consequences." AD21, 27. What the Fund depicts as routine application of "largely settled law" is, in reality, an attempt to apply ERISA to conduct well beyond that statute's intended scope. "Congress enacted ERISA to ensure that employees would receive the benefits they had earned." *Conkright v. Frommert*, 559 U.S. 506, 516 (2010). It "is not designed to regulate or afford remedies against entities that provide services to plans." *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 305 (1st Cir. 2005). Yet the novel and sweeping standards the Fund espouses would do exactly that, subjecting virtually any entity that contracts with an ERISA-regulated plan to exacting fiduciary requirements, and forcing third-party administrators to fundamentally alter the way they do business, AD21, 27. The end result of this dramatic expansion of fiduciary liability would be "substantially" increased costs "that inevitably will be borne largely, if not entirely, by [plan] participants." AD21.

To be clear, BCBSMA does not contend the Fund is without legal recourse. If BCBSMA violated the terms of its agreement it "may be contractually liable" to the Fund. AD20. But that contract dispute should play out in state, rather than federal, court. Here, the sole question is whether BCBSMA is an ERISA fiduciary for purposes of the

Fund's claims. And particularly given the availability of a state-law remedy, this Court need not stretch ERISA well past its breaking point to provide a forum for the Fund.

## JURISDICTIONAL STATEMENT

BCBSMA does not dispute the Fund's jurisdictional statement, apart from its assertion that the district court had supplemental jurisdiction over the state-law claims. *Infra* pp. 51 n.5.

## STATEMENT OF THE ISSUES

1.      Whether, with respect to the challenged conduct, the district court correctly concluded that BCBSMA did not exercise discretionary authority over the management or administration of the plan at issue.

2.      Whether, with respect to the challenged conduct, the district court correctly concluded that BCBSMA did not exercise authority or control over the disposition of plan assets.

3.      Whether the district court correctly declined supplemental jurisdiction over the Fund's state-law claims.

## STATEMENT OF THE CASE

### A.      The Fund Hires BCBSMA as a Third-Party Administrator.

The Fund provides an ERISA-regulated health plan (the "Plan") to a multiemployer group of union laborers. A8; 29 U.S.C. § 1002(1), (40)(A). The Plan is "self-insured," A9, so the Fund "retains the ultimate financial responsibility and liability for all covered claims," A50, which it pays via employer contributions, A9. The Fund

is operated and managed by its Board of Trustees, which serves as the sole "administrator" and "named fiduciary" of the Plan. A13, 45.

Like many plan sponsors "without the administrative expertise or support staff to administer their self-insurance plans," the Fund contracted with a "[t]hird-party administrator"—BCBSMA—to help process claims. 3 HR Series: Policies and Practices § 190.14 (Sept. 2022 update); A12, 45. BCBSMA's obligations to the Fund were governed by an Administrative Services Account Agreement (the "Agreement"). A30. The Agreement provided that BCBSMA would operate "as an independent contractor to perform the specific duties and responsibilities which the Trustees delegate[d] to it." A45. Those duties included the following:[1]

*1. Network access:* First and foremost, BCBSMA agreed to give Plan participants access to "medical services at discounted rates" through its provider network. A50-51, 100. This commitment reserved BCBSMA's right to negotiate provider payment rates and to set payment policies on a network-wide basis. For example, the Agreement stated that BCBSMA may "negotiate different claim payment rates" from those "that may be otherwise assessed by providers" and "may reflect various negotiated discounts" and "other pricing concessions … based on all or a subset of [BCBSMA's] book of business." A51. It further provided that the Fund was entitled "only to those claim

---

[1] This Court may consider the Agreement, relevant amendments, and Summary Plan Description ("SPD") because they are integral to or explicitly relied upon in the complaint. AD3 n.1; Fund Br. 12-19 (relying on these documents ).

payment rates" BCBSMA "offer[ed] to self-insured plans." A51. The Agreement thus promised the Fund equal (but not special) access to discounted, network-wide rates. *Id.*

*2. Claims processing*: After a Plan participant received medical services and a claim was submitted, BCBSMA entered that claim into its "claims processing system(s)" for "repric[ing]" in accordance with its network-wide "provider arrangement[s]" and payment policies, "consistent with the terms of th[e] Agreement." A49, 52.[2] As part of this "initial review," BCBSMA also performed "medical necessity and utilization review[s]" of certain claims pursuant to its "medical policy, medical technology assessment guidelines and utilization review policies and procedures." A48. The repriced claim was then submitted to the Fund. A48.

Upon receipt, the Fund "adjudicat[ed]" the repriced claim. A48-49. In doing so, it determined whether a member was "eligibl[e]" for coverage of the incurred service (e.g., knee replacement), and what portion of the claim was to be borne by the Fund or by the member (e.g., application of copayments, deductibles, etc.). A17, 49. In other words, the Fund had complete discretionary authority to determine whether the participant was eligible to receive benefits, whether to grant the participant's claim, and what portion of the repriced claim the Fund would pay. A48-49.

---

[2] BCBSMA "reprice[d]" claims because providers typically bill at their standard rates, as opposed to BCBSMA's negotiated network rates. A49, 51.

"Following the Fund's adjudication," "final approval or denial" was "forwarded" to BCBSMA. A49. Absent this authorization, BCBSMA could not "remit" any "claim payment" to a provider. A49. Moreover, if "an adjudicated claim [was] appealed by a Covered Participant, the Fund [was] responsible [for] process[ing] and mak[ing] a decision regarding such appeal." A54. The Agreement thus ensured the Fund had final authority over every payment made on behalf of the Plan.

*3. Provider recovery and settlements*: The Agreement required BCBSMA to take certain steps to recover erroneous payments. If the Fund discovered a claim payment error, BCBSMA had to make "reasonable efforts" to "stop" the payment's release or to attempt recovery from the provider. A50. If BCBSMA caused the error, it would "reimburse the Fund the amount of any such incorrect payment." *Id.*

The Agreement also authorized BCBSMA to initiate network-wide efforts to recover payments resulting from "fraud or abuse." A73. In that case, the Fund was entitled to its pro rata share of any recovery, less a fee equal to a fixed percentage "of the recovery amount." A73. Alternatively, if "the recovery activities include[d] costs" paid to outside counsel or analysts, BCBSMA debited the recovery amount for the "outside support costs" in lieu of any "recovery fee." *Id.* No charges were imposed, however, for recoveries attributable to errors made by BCBSMA. *Id.* The Fund "agree[d]" that its pro rata share of any recovery, "less the applicable recovery fee or costs, [wa]s the full and final amount" to which it was entitled, and expressly disclaimed "any legal or beneficial ownership interest" in funds retained by BCBSMA. *Id.*

The Agreement further permitted BCBSMA to address certain over- or underpayments via settlements with providers on behalf of its book of business. A79. In the ordinary case, BCBSMA would "reprocess [those] claims and bill or credit the [Fund] using [its] normal process for claims adjustments." *Id.* But in the rare case where it was "not administratively practical or reasonable" to do so, BCBSMA could "instead negotiate a settlement with the provider." *Id.* BCBSMA would then "credit or bill the [Fund] based on its pro rata share of the settlement." *Id.* Presumably recognizing such settlements avoided the higher costs associated with reprocessing individual claims, the Fund "agree[d]" that this pro rata share was the "full and final amount" it would receive related to settled claims. *Id.*

*4. Payments to BCBSMA*: The Agreement entitled BCBSMA to monthly "administrative charge[s]" in payment for its services. A60. In addition, because BCBSMA "pa[id] providers … before being able to bill the Fund," the Fund paid it a "working capital amount for estimated Claim Payments." *Id.* This working capital amount was "based on [BCBSMA's] estimate of the amount needed to pay claims on a current basis, subject to review and approval by the Fund." *Id.* Thus, the Fund remitted a single "fixed" payment to BCBSMA that included the "working capital amount" plus BCBSMA's monthly fee. *Id.* Although estimated on a "monthly" basis, this aggregate sum was paid weekly in "pre-determined amounts approved by both parties." A60-61. The Agreement did not require BCBSMA to segregate the working capital amount from its administrative fee, much less to hold the former in a separate account. A60-61. Nor

9

did it prohibit BCBSMA from retaining any interest earned on prior payments. A60-61.
Once transmitted to BCBSMA, the Fund had no way to access the working capital
amounts. A60-61.

Each month, BCBSMA performed "settlement calculations," which compared
the "weekly payment amounts for the preceding month [with] the expenses due." *Id.*
Upon completing those calculations, BCBSMA either credited or debited the Fund's
next payment. *Id.* Neither the Fund nor BCBSMA was entitled to interest on any
debited or credited amount. *Id.* However, if the Fund's weekly payments were late,
BCBSMA could "assess a finance charge on the amount … past due." *Id.* And if "the
Fund fail[ed] to make timely payments," BCBSMA had "the right of setoff" against the
"working capital amount[s]." *Id.*

5. *Audit rights*: The Agreement allowed the Fund to employ "a mutually
acceptable CPA firm or nationally recognized consulting firm" to audit BCBSMA's
"Claim Payment records to ensure" compliance with the Agreement. A59. Despite its
allegations of repricing errors and related efforts to "conceal" relevant information,
A33, the Fund never exercised these audit rights.

### B.     The Fund Complains of Supposed Billing Discrepancies.

In July 2018, the Fund retained ClaimInformatics, a company that purports to
provide "healthcare claim payment review services," to analyze BCBSMA's claim
processing and payment functions. A21. The Fund contends that review identified
instances in which BCBSMA "paid claims in violation of the Plan's written terms." *Id.*

These purported errors included calculating and remitting payments that exceeded providers' initial billings, *id.*; incorrectly applying the Agreement's "readmission policy," A22; paying the wrong rate for observation room stays, A23-24; processing internally inconsistent claims, A25; and charging unauthorized fees, A26-27. The Fund separately alleges that BCBSMA improperly settled claims with certain hospitals. A24-25.

Notably, the Fund admits these allegations are based on incomplete information. A22, 32. Due to confidentiality provisions in the Agreement, A53, 60, the Fund did not have "access to BCBSMA's private provider contracts," A19, which set the rates BCBSMA will pay particular providers, A7. Nor could it review "various internal policies" that, inter alia, governed BCBSMA's "interpretation and application" of those contracts. A7, 17, 19-21. These contracts and policies were not Fund-specific—they were negotiated and applied across BCBSMA's entire book of business—and were designed to take advantage of "markdowns, rebates, volume and other pricing concessions." A27, 51. That explains why the repriced amounts the Fund saw might not always seem correct. A32. For instance, BCBSMA might negotiate a standard rate for a certain service that, overall, saves money, but in an individual claim might result in a payment lower or higher than the billed price. A32.[3]

_____

[3] This reality belies the assertion that payment of "multiple times … what the provider billed" necessarily constitutes an overpayment. Fund Br. 19. The Fund is surely familiar with, for example, industry-standard, diagnosis-related group ("DRG") payment methodologies, whereby providers receive a fixed rate for all charges associated with an inpatient stay, irrespective of a specific billed charge or actual costs incurred. *E.g.*, Ctrs. for Medicare & Medicaid Servs., MS-DRG Classifications and

BCBSMA explained all this to the Fund, steadfastly maintaining that the challenged claims had processed correctly. A30-32. Yet notwithstanding its fragmentary knowledge (and apparently unwilling to invoke its audit rights to gain a more complete understanding), the Fund directed ClaimInformatics to demand refunds from various providers. A28. Because such efforts were not authorized by the Agreement (and interfered with the operation of BCBSMA's provider network), A50, BCBSMA told the Fund to halt its recovery efforts, which it eventually did, A28-29.

### C. Chief Judge Saylor Dismisses the Fund's Amended Complaint.

Dissatisfied with BCBSMA's explanations, the Fund ultimately filed suit. A39. In addition to state-law claims, A34-38, the operative amended complaint includes three federal claims—all predicated on the same conduct as the state-law claims and all premised on the theory that BCBSMA is an ERISA fiduciary, 29 U.S.C. §§ 1106(b)(1), 1109(a). Count I alleged that BCBSMA breached "duties of loyalty, care, prudence, and candor" by "using plan assets to overpay benefits," "taking excessive fees," "concealing relevant information," and "advanc[ing] interests other than those of the plan or its members." A32-33. Count II maintained that BCBSMA engaged in "[p]rohibited transactions" by "deal[ing] with Plan assets in its own interest," collecting "unauthorized fees," and entering "settlement agreements with network providers." A33-34. And Count III repeated the prior allegations, but sought equitable relief. A33.

---

Software, https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/Acute InpatientPPS/MS-DRG-Classifications-and-Software.

BCBSMA moved to dismiss on the grounds that it was not an ERISA fiduciary with respect to the challenged conduct. Dist. Ct. Dkt. ("Dkt.") 12-1, at 10-20. In response, the Fund's arguments centered on BCBSMA's purported misapplication of its negotiated rates, claiming that such repricing errors demonstrated both discretionary authority over the Plan and control over plan assets. Dkt. 17, at 9-23. BCBSMA's settlement authority was not discussed. And to the extent the Fund advanced plan-assets arguments, it focused on "control": there was no mention of "beneficial ownership."

Chief Judge Saylor sided with BCBSMA. In doing so, he first held that BCBSMA did not exercise the requisite "discretionary authority" by "[f]ailing to apply the correct rate" or otherwise "ma[king] mistakes." AD20. He then applied "'ordinary notions of property rights'" to conclude that the Fund lacked a beneficial ownership interest in the working capital amounts conveyed to BCBSMA. AD22 (citation omitted). And even assuming these amounts constituted "plan assets," he held that BCBSMA did not "control" them, because it "pa[id] claims according to the [Plan's] instructions … and subject to [the Fund's] approval." AD28.

Having dismissed the ERISA claims, Chief Judge Saylor declined to exercise jurisdiction over the state-law claims. AD29-30. This dispute, he explained, "concern[s] contractual obligations arising under state law," which are best-suited to resolution in state court. AD30.

## SUMMARY OF ARGUMENT

Chief Judge Saylor was right. BCBSMA did not act as an ERISA fiduciary with respect to the challenged conduct. The ERISA claims therefore fail, and the state-law claims should be dismissed.

**I.** BCBSMA did not exercise "discretionary authority" over the "management" or "administration" of the Plan by repricing claims and pursuing settlements. 29 U.S.C. § 1002(21)(A). Rather than exercising any such discretion when repricing claims, BCBSMA merely executed its express contractual obligations to apply network-wide rates and policies. The Fund not only concedes that the *adoption* of these measures was non-fiduciary, but it also fails to allege that their *application* involved any discretion. Indeed, the Fund's complaint—which repeatedly charges BCBSMA with "errors" and "violations"—assumes that BCBSMA *lacked* discretion to depart from the specific dictates of its network-wide rates and policies. And even if BCBSMA exercised some degree of discretion while repricing claims, it still lacked authority over plan management, because the Fund—not BCBSMA—made the final decision over whether and how much to pay on each and every claim.

Nor did BCBSMA wield discretionary authority over the Plan when it pursued settlements. Because BCBSMA exercised that authority on behalf of its book of business, its conduct was not fiduciary. And while the Fund now argues that BCBSMA had discretion over the retention of fees and costs in connection with settlements, the complaint does not challenge—and the Agreement does not authorize—the collection

of any such fees. In any event, even if such fees were authorized and challenged, their allocation was dictated by the Agreement.

**II**. BCBSMA likewise did not "control" the disposition of "plan assets." *Id.* Although BCBSMA held the working capital amounts, it did not "control" their disposition within the meaning of ERISA because no claims were paid without the express approval of the Fund. Nor did BCBSMA "control" the disposition of the settlement amounts. On the contrary, the Agreement—not BCBSMA—expressly determined how those amounts were distributed.

Moreover, even if BCBSMA controlled these funds, they were not "plan assets." The Fund retained no beneficial ownership interest in the working capital amounts transferred to BCBSMA because BCBSMA was free to use those monies as its own, subject only to its contractual obligation to pay equivalent sums to providers. And the Fund forfeited—and fails to justify—any argument that it had a beneficial ownership interest in the settlement amounts.

**III.** Any "doubt that Congress intended the category of fiduciary … functions to encompass the [conduct] at issue here [should] harden[] into conviction" upon consideration of "the consequences that would follow from [the Fund's] contrary view." *Pegram v. Herdrich*, 530 U.S. 211, 232 (2000). By the Fund's lights, virtually every entity that contracts with an ERISA-regulated plan is a fiduciary because its activities "affect" plan assets. Were this Court to adopt that approach, third-party

15

administrators—and service providers more generally—would have to fundamentally alter their operations, resulting in increased costs for plans, providers, and participants.

## STANDARD OF REVIEW

This Court reviews *de novo* an order granting a motion to dismiss. *In re New England Life Ins. Co. Sales Pracs. Litig.*, 346 F.3d 218, 221 (1st Cir. 2003). To survive such a motion, a plaintiff must allege facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The plaintiff must show "more than a sheer possibility that a defendant has acted unlawfully"; "[t]hreadbare recitals" "supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When a "written instrument" that may be considered in ruling on the motion "contradicts allegations in the complaint," the instrument "trumps the allegations." *Yacubian v. United States*, 750 F.3d 100, 107-08 (1st Cir. 2014).

## ARGUMENT

To qualify as an ERISA fiduciary, an entity must exercise either (1) "discretionary authority" over a plan's "management" or "administration," or (2)"authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A). Significantly, the fact that an entity is a fiduciary for some purposes does not make it a fiduciary for all purposes; an entity may wear both fiduciary and non-fiduciary "hats." *Pegram*, 530 U.S. at 225. Thus, "in cases alleging breach of ERISA fiduciary duty," the "threshold question" is whether the entity was acting as a fiduciary "when taking the action subject to complaint." *Livick v. The Gillette Co.*, 524 F.3d 24, 29 (1st Cir. 2008).

16

The Fund's ERISA claims fail at this threshold. *First*, BCBSMA did not have discretionary authority over management or administration of the Plan. It was the Fund that adjudicated benefit claims, interpreting and applying the Plan's terms to decide whether and how much to pay. By contrast, BCBSMA's limited duties were those of a typical third-party administrator—devoid of discretion, governed by a services contract, and indistinguishable from those in numerous cases that rejected similar complaints. *Second*, BCBSMA did not have authority or control over plan assets. The Fund does not—and cannot—contend BCBSMA dispensed a single dollar without Fund approval. Instead, it maintains that BCBSMA's ostensible billing errors indirectly *affected* plan assets. But that extravagant theory of "control" would transform every contract dispute involving an ERISA plan into a fiduciary matter, contrary to the statute, caselaw, and common sense.

## I.    BCBSMA Did Not Exercise Discretionary Authority over the Management or Administration of the Plan.

The Fund contends that BCBSMA exercised "discretionary authority" over plan "management" by repricing claims and pursuing provider settlements. Fund Br. 42-50; DOL Br. 20-24. As noted below, courts have construed this basis for fiduciary liability "narrowly," AD16; *Beddall v. State St. Bank & Tr. Co.*, 137 F.3d 12, 21 (1st Cir. 1998), and it does not encompass BCBSMA's actions here.

A.    **Fiduciary Status Requires the Exercise of Discretionary Authority with Respect to the Management or Administration of the Plan.**

As Chief Judge Saylor explained, the quintessential characteristic of an ERISA fiduciary is "discretionary authority." AD20. But not just any kind of discretionary authority: To be relevant, that "discretionary authority" must relate to *the* "*plan*" at issue. 29 U.S.C. § 1002(21)(A) (emphasis added). And it must do more than merely affect that plan: it must involve the plan's "management" or "administration." *Id.*; AD20.

At the outset, this means that even if discretionary, conduct "not directly associated with a [particular] benefits plan" is not fiduciary. *DeLuca*, 628 F.3d at 746-47. Accordingly, as the Fund acknowledges, Fund Br. 46 n.7, a third-party administrator is "not subject to fiduciary standards" when it makes "business decision[s]" "generally applicable" across its book of business. *DeLuca*, 628 F.3d at 746-47. Though such decisions necessarily have an "effect" on an ERISA plan, they do not involve its management or administration. *Id.*; *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 357 n.2 (2d Cir. 2016); *Doe v. United Health Grp. Inc.*, No. 17-cv-4160, 2018 WL 3998022, at *4 (E.D.N.Y. Aug. 20, 2018).

More fundamentally, the Labor Department has explained that where an entity has "no power to make any decisions as to plan policy," to "interpret[]" the plan document, or otherwise to determine plan "practices or procedures," it is not a fiduciary. 29 C.F.R. § 2509.75-8(D-2). This remains true even if it performs a host of activities that *affect* a benefits plan, including the "[a]pplication of rules determining

18

eligibility for participation or benefits," "[c]alculation of benefits," "[c]ollection of contributions and application of contributions as provided in the plan," and "[p]rocessing of claims." *Id.* These services—typically performed by third-party administrators—may be "important," AD17, but they do not involve the exercise of "discretionary authority" with respect to the "management" or "administration" of a benefits "plan," 29 U.S.C. § 1002(21)(A). Instead, they involve the performance of "purely ministerial functions" "within a framework of policies, interpretations, rules, practices and procedures made by other persons." *Livick*, 524 F.3d at 29 (citation omitted); AD17. And when an entity "execute[s] its obligations under [a] contract," it does not exercise fiduciary discretion. AD20; *see Livick*, 524 F.3d at 29.

By contrast, courts have extended fiduciary status where a contractual provision grants a third-party administrator discretionary authority over plan operation, such as the power to interpret a plan document or to adjudicate plan participants' claims via discretionary "benefit" or "eligibility determinations." *DeLuca*, 628 F.3d at 746; *Aetna Health Inc. v. Davila*, 542 U.S. 200, 218-19 (2004); *accord* Fund Br. 7; *see also Shields v. United of Omaha Life Ins. Co.*, 50 F.4th 236, 252-53 (1st Cir. 2022). Such duties call for the exercise of independent judgment over the meaning of plan terms rather than the mere implementation of "rules" required by the plan sponsor. *Livick*, 524 F.3d at 29. Even then, however, courts have "universally" held that a third-party administrator is not a fiduciary if the plan sponsor *retains ultimate authority* to overrule the benefits decision.

*E.g.*, *Baker v. Big Star Div. of the Grand Union Co.*, 893 F.2d 288, 290 (11th Cir. 1989); *Santana*, 920 F. Supp. at 254.

### B.    BCBSMA Did Not Exercise Discretionary Authority Over the Plan.

These principles demonstrate that BCBSMA did not exercise discretionary authority when taking the "action[s] subject to complaint." *Livick*, 524 F.3d at 29. Importantly, the Fund does not—and cannot—complain that BCBSMA acted as a fiduciary in establishing its provider network, negotiating network-wide payments rates, or instituting provider payment policies applicable across its book of business. Fund Br. 46 n.7; A7; *supra* Section I.A. Nor does the Fund contend that BCBSMA adjudicates claims or makes benefits determinations: those duties are reserved to the Fund. *Supra* pp. 7-8. Instead, the Fund maintains that BCBSMA exercised discretionary authority by (1) applying negotiated network provider reimbursement rates and internal policies while repricing claims, Fund Br. 45-46 & n.7, and (2) pursuing settlements and allegedly associated fees and costs, *id.* at 46. Neither claim has merit.

#### 1.    BCBSMA did not exercise discretionary authority over management and administration of the Plan when repricing claims.

According to the Fund, BCBSMA's repricing efforts required discretionary "judgment calls" regarding the management or administration of the Plan. Fund Br. 45-46 & n.7. Not so. Like the "unquestionably non-fiduciary" claims "processing" activities of which it is a subset, *Toomey v. Jones*, 855 F. Supp. 19, 24 (D. Mass. 1994); 29 C.F.R. § 2509.75-8(D-2), repricing is not fiduciary conduct.

**a.** As an initial matter, the repricing of claims—the substitution of rates negotiated by BCBSMA for rates ordinarily billed by providers—does not involve "management" or "administration" of *the Plan*. 29 U.S.C. § 1002(21)(A). A third-party administer "engages in a fiduciary act when making a discretionary determination about whether a claimant is entitled to benefits under the terms of the plan documents." *Varity Corp. v. Howe*, 516 U.S. 489, 511 (1996). Repricing, however, does not require "interpretation[]" of the plan document or the SPD. 29 C.F.R. § 2509.75-8(D-2). Nor does it involve the scope of available coverage under the Plan's program of benefits or what portion of a participant's claim will be paid by the Fund—much less whether any particular claim will be granted or denied.[4] Instead, it involves the price the Fund will pay for a particular service, a topic that has nothing to do with a participant's entitlement to benefits. In that sense, repricing is wholly divorced from conduct Congress "concentrated on" when it "took up the subject of fiduciary responsibility under ERISA." *Pegram*, 530 U.S. at 232. Thus, even if repricing involved discretionary authority, it is not the kind of discretionary authority ERISA was designed to regulate.[5]

---

[4] *E.g.*, *Am. Psychiatric Ass'n v. Anthem Health Plans*, 50 F. Supp. 3d 157, 169 (D. Conn. 2014) (dismissing claim where plaintiffs did not challenge insurers' "'assess[ment of] a participant's entitlement to benefits' under" the plan, but only the "setting of reimbursement rates and policies regarding the extent of coverage, which are [non-fiduciary] business decisions"); *In re Express Scripts/Anthem ERISA Litig.*, 285 F. Supp. 3d 655, 682 (S.D.N.Y. 2018) (similar, where plaintiffs made no allegation that defendant "misconstrued or interpreted their health plans").

[5] The Fund argued below that application of BCBSMA's negotiated rates required "interpret[ion]" of plan documents, AD18-22, a dubious proposition for the

In any event, the challenged conduct is simply not discretionary. When repricing claims, BCBSMA—like a typical third-party administrator—executed its express contractual obligation to apply its network-wide negotiated rates and policies. A49. BCBSMA "did not have the discretion to set or apply some other rates." AD20. Nor did BCBSMA have "ongoing discretion" to apply those rates and policies however it wished. Fund Br. 44-45. Instead, the Agreement specifically required BCBSMA to adhere to network-wide rates and policies in repricing each claim, without any allowance for discretion in doing so. A49.

The Fund's own complaint confirms as much. Its entire case is premised on the notion that BCBSMA "violated" the Agreement and the SPD, A6-8, which "*require[d]* adherence to negotiated rates and *prohibit[ed]* billed charges that exceed negotiated rates," A21 (emphasis added). Far from suggesting that application of these rates and policies involved the exercise of discretion, the complaint maintains they specifically "determine[d]" the covered charges. A16-17. In other words, there was a right answer and a wrong answer, and BCBSMA allegedly got it wrong. *E.g.*, A17-19, 21, 33 (alleging "[e]rrors" and "violations" of contractual obligations); AD19 ("'What this lawsuit is about is [BCBSMA's] demonstrated failure to apply its own negotiated rates and its

---

reasons expressed by the district court—and given the Supreme Court's reluctance to allow plan terms to be set by anyone other than the plan sponsor. *Cf. CIGNA Corp. v. Amara*, 563 U.S. 421, 438 (2011); *Tetreault v. Reliance Standard Life Ins. Co.*, 769 F.3d 49, 56 (1st Cir. 2014). It has not pressed that argument on appeal.

consequent violation of the [the Agreement and the SPD].'" (quoting Dkt. 17, 20-21)). Although these allegation are false, they confirm that the Fund is challenging whether BCBSMA complied with specific contractual requirements—and that, in turn, is fatal to the Fund's ERISA claims. As Chief Judge Saylor explained, if BCBSMA "violated its contractual obligations" by misapplying network-wide rates and policies, it "may be contractually liable to the Plan." AD19-20. But it is not liable as an ERISA fiduciary because it had no "discretionary authority" to depart from its obligations under the Agreement. *Id.*[6]

On top of all that, BCBSMA lacked discretionary authority because the Fund retained "ultimate decision-making authority over all claims." AD20. Once BCBSMA submitted the repriced claims, the Fund—not BCBSMA—interpreted and applied Plan terms to adjudicate the claim, decide coverage eligibility, and issue a "final approval or denial." A48-49; Fund Br. 48 (conceding this). And if a Fund-adjudicated claim was appealed by a participant, the Fund—not BCBSMA—processed and resolved the appeal. A54. So even if BCBSMA exercised some degree of discretion in repricing claims (and it did not), BCBSMA did not exercise discretionary "authority" over plan

---

[6] *E.g.*, *Lebahn v. Nat'l Farmers Union Unif. Pension Plan*, 828 F.3d 1180, 1186-87 (10th Cir. 2016) (no discretionary authority where third-party administrator applied "complicated" rules); *Kyle Railways, Inc. v. Pac. Admin. Servs., Inc.*, 990 F.2d 513, 516 (9th Cir. 1993) (same, where contractually "obligated to follow the [p]lan"); *Flacche v. Sun Life Assur. Co. of Canada*, 958 F.2d 730, 734 (6th Cir. 1992) (same, for application of "formulas"); *Baker*, 893 F.2d at 290 (same, where plan sponsor "rent[ed]" a "claims processing department" to determine amounts payable "in accordance with" the plan).

23

"management" because the Fund had the final say as to whether any claim was paid out and how much was paid. 29 U.S.C. § 1002(21)(A). And without the authority to make "ultimate decisions" over the scope of Plan coverage, BCBSMA was not a fiduciary. *Baker*, 893 F.2d at 290; *e.g.*, *Kyle Railways*, 990 F.2d at 516 (holding that a third-party administrator was not a fiduciary in part because it could not make "final decision[s]" regarding payments); *Hecker v. Deere & Co.*, 556 F.3d 575, 583 (7th Cir. 2009) (similar); *Santana*, 920 F. Supp. at 256 (similar); *W.E. Aubuchon Co. v. BeneFirst, LLC*, 661 F. Supp. 2d 37, 51-52 (D. Mass. 2009) (similar); *see also Terry v. Bayer Corp.*, 145 F.3d 28, 35 (1st Cir. 1998) ("[W]hen the plan administrator retains discretion to decide disputes, a third party service provider … is not a fiduciary of the plan.").

**b.** Nothing the Fund or the Labor Department says changes this analysis. The Fund first accuses Chief Judge Saylor of adopting a standard that renders third-party administrators presumptively "immun[e]" from fiduciary liability. Fund Br. 42, 49. But what Chief Judge Saylor actually said—following "the strong weight of authority," *BeneFirst*, 661 F. Supp. 2d at 50 (citing cases)—is that third-party administrators are not ERISA fiduciaries unless "something extra" transforms "the normal plan-administrator relationship." AD20. Crucially, the "something extra" he required was "'discretion[]'"— specifically "'discretionary authority'" over plan management—which is, of course, the standard provided by ERISA. AD20, 18 n.7. Thus, far from misstating the law, *see* Fund Br. 49, Chief Judge Saylor simply recited it.

The Fund's insistence that the "*application*" of network-wide rates and policies involves the exercise of such discretionary authority is (at best) counterintuitive. Fund Br. 46 n.7. The Fund offers no support for the proposition that this involves the "management" and "administration" of the Plan beyond its own ipse dixit. Fund Br. 45; *supra* p. 21. And given that the Fund declines to dispute that BCBSMA's negotiation of these "generally applicable" rates and policies (the part involving discretion, judgment, and authority) is not fiduciary, *supra* p. 20, it is more than a little odd to maintain that their application (the mechanical part) is fiduciary. It is akin to conceding that a financial advisor is not a fiduciary when he selects stocks but is a fiduciary when he types in the corresponding market order.

In any event, the Fund confuses complexity with discretion. Although repricing can be a complex task, it is not a discretionary one. The Agreement specifically required BCBSMA to adhere to network-wide policies that the complaint itself assumes generated specific conclusions. *Supra* pp. 22-23. Indeed, any remand proceedings would hinge on whether BCBSMA violated the Agreement by misapplying these specific policies. Where, as here, a third-party administrator must adhere to specific rules—even "complicated" ones—it does not possess discretionary authority. *Lebahn*, 828 F.3d at 1186-87. In other words (the Labor Department's), a third-party administrator does not exercise discretion when it "err[s] in adhering to [the] framework in place"—yet that is precisely what the Fund alleges here. DOL Br. 24; *e.g.*, *Kyle Railways*, 990 F.2d at 515-16; *IT Corp.*, 107 F.3d at 1421.

The Fund takes issue with this conclusion on the ground that the "framework" here was not "made by other persons." Fund Br. 48; DOL Br. 22. As Chief Judge Saylor noted, the implication of this argument is that a plan could *never* contract with at third-party administrator "to take advantage of its provider network (and lower rates)" without the latter becoming an ERISA fiduciary. AD21. But in any event, the Fund upends its own argument by conceding that the Plan and the Agreement require BCBSMA to reprice claims using its negotiated rates and policies. *Supra* pp. 22-23. Thus, the "framework" was indeed "made by others": the Fund. Any mistake in application of Fund-required rates and policies would be a paradigmatic case of a non-discretionary error, "as when a clerical employee types an erroneous code onto a computer screen." *IT Corp.*, 107 F.3d at 1421.

That the Agreement allowed BCBSMA to change the network-wide policies undergirding these repricing decisions "from time to time" does not alter this conclusion. Fund Br. 45-46. By definition, any such modifications "were not directly associated with the benefits plan at issue." *DeLuca*, 628 F.3d at 747. Changing rates and policies "generally applicable" across BCBSMA's book of business is inherently non-fiduciary. *Id.*; *supra* p. 18. In any event, the Fund does not challenge BCBSMA's decisions *changing* policies; it challenges BCBSMA's decisions *applying* policies—and in making the latter decisions, BCBSMA was undisputedly required to adhere to every policy "in effect" at that time. A49.

Unable to show that BCBSMA's run-of-the-mill repricing efforts were discretionary, the Fund resorts to claiming—for the first time—that the application of certain criteria during "medical necessity" review required BCBSMA to make "judgment calls" concerning the "appropriate level of care" and "the relationship between different medical diagnoses." Fund Br. 45; A48 (describing "medical necessity" review and "medical policy" criteria "us[ed]" in that process). But the Fund "cannot constructively amend [its] complaint with an allegation made for the first time in an appellate brief." *Morales-Cruz v. Univ. of Puerto Rico*, 676 F.3d 220, 225 n.2 (1st Cir. 2012). And to the extent decisions the Fund now describes as involving the application of these criteria were addressed below, Fund Br. 15-16, the allegation was that BCBSMA violated its contractual obligations in applying stated rules—*not* that BCBSMA displayed poor judgment while making discretionary decisions. *E.g.*, A22-23 (alleging BCBSMA "direct[ly] violat[ed]" the Plan and its inpatient readmission policy through pricing "[e]rrors"); A25 (alleging BCBSMA "violat[ed]" its contractual obligations regarding severity-of-illness overpayments); Dkt. 17, at 3 n.2, 10-11 (arguing that application of negotiated rates, but not medical necessity or policy criteria, involved discretion, despite noting the latter in the facts section).

Even if these matters were properly raised, this Court has specifically rejected the assertion that "[t]he power to decide" these kinds of medical necessity issues "necessarily implies the existence of discretion." *Stephanie C. v. Blue Cross Blue Shield of Massachusetts HMO Blue, Inc.*, 813 F.3d 420, 428 (1st Cir. 2016). Nor do they involve

"management" or "administration" of the Plan: as described by the Fund, these criteria affect how much the Fund will pay for a particular service, not whether the service is covered in the first place. *Supra* p. 21. But insofar as these criteria impact the scope of coverage, BCBSMA would not be a fiduciary because it did not have final say on the matter. A148-50; *supra* pp. 23-24.

Finally, the Fund asserts that a "legion" of cases have "impos[ed] fiduciary status on third-party service providers in similar circumstances." Fund Br. 42-44, 47. That notion cannot survive a glance at the cited cases. *None* involved repricing, let alone the imposition of fiduciary status for alleged failure to apply network-wide rates or policies. The cases instead involved third parties with unilateral discretion to impose plan-specific fees, set their own compensation, or establish return rates—actions that do not remotely resemble the conduct challenged here. *See Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Mich.*, 751 F.3d 740, 744-45 (6th Cir. 2014) (discretionary plan-specific fees); *Pipefitters Loc. 636 Ins. Fund v. Blue Cross & Blue Shield of Mich.*, 722 F.3d 861, 866-67 (6th Cir. 2013) (similar); *Peters v. Aetna Inc.*, 2 F.4th 199, 231 (4th Cir. 2021) (similar); *Charters v. John Hancock Life Ins. Co.*, 583 F. Supp. 2d 189, 197-98 (D. Mass. 2008) (similar); *Golden Star, Inc. v. Mass Mut. Life Ins. Co.*, 22 F. Supp. 3d 72, 81-82 (D. Mass. 2014) (discretionary plan-specific fee rates); *Rozo v. Principal Life Ins. Co.*, 949 F.3d 1071, 1074 (8th Cir. 2020) (discretionary plan-specific return rate).[7]

---

[7] The Labor Department's district court cases, though involving repricing, are likewise distinguishable. DOL Br. 23-24. *ILWU-PMA Welfare Plan Bd. of Trustees v.*

In the end, much of the Fund's disquiet appears to arise from the fact that once BCBSMA repriced a claim, the Fund "lacked the contractual right to determine payment amounts different from what [BCBSMA] decided." Fund Br. 48. As the Fund admits, this is not quite accurate: after BCBSMA repriced the claim, it was the Fund that determined final "payment amounts" after adjudicating the claim, determining eligibility, and applying copayment, deductible, coinsurance exclusions, etc. *See id.* To be sure, "the Fund was bound" to base those determinations on BCBSMA's repricing efforts. Fund Br. 46. But this would be true *even if BCBSMA perfectly performed its repricing duties*, given BCBSMA's unchallenged (and unchallengeable) right to negotiate payment rates with providers and to set internal payment policies on behalf of its book of business. *Supra* p. 18. That the Fund was "bound" by BCBSMA's determinations thus cannot make them fiduciary—particularly where the Fund had final signoff on the payment of any claim. *Supra* pp. 23-24.

---

*Connecticut General Life Insurance Co.* involved application of a framework that was not compelled by the parties' agreement. No. C-15-2965, 2015 WL 9300519, at *4-5 (N.D. Cal. Dec. 22, 2015). In *Wayne Surgical Center, LLC v. Concentra Preferred Systems, Inc.*, the third-party service provider held authority not only to "negotiat[e] each claim directly with the provider of services," but also to "adjudicate[e]" "claim disputes." No. 06-cv-0928, 2008 WL 11510367, at *4-5 (D.N.J. May 9, 2008). And in *Technibilt Group Insurance Plan v. Blue Cross & Blue Shield of North Carolina*, the plan sponsor "fully turned over" plan administration to the third-party administrator, including "all aspects of processing and payment"; BCBSMA's role is not nearly so "broad." No. 19-cv-0079, 2021 WL 1147168, at *2 (W.D.N.C. Mar. 25, 2021); *supra* pp. 7-8. Neither of the latter cases grappled with *DeLuca*, so they never explained how *applying* a repricing scheme is fiduciary activity even though *developing* it is not.

Of course, to the extent the Fund questioned the accuracy of BCBSMA's repricing efforts, it could initiate an audit by a "mutually acceptable CPA firm or nationally recognized consulting firm." A60. But that is not what the Fund did. Instead, it hired ClaimInformatics to make *guesses*, and then commenced a federal lawsuit.

> ## 2. BCBSMA did not exercise discretionary authority over management and administration of the Plan when pursuing settlements or collecting fees and costs.

The Fund also argues that BCBSMA exercised discretionary authority when pursuing settlements with providers and collecting allegedly associated fees and costs. Fund Br. 46. Neither argument has merit.

**a.** The Fund's claims regarding BCBSMA's settlement authority ignore the dispositive fact that BCBSMA entered into the challenged settlements *on behalf of its applicable book of business*. *See* A79 (requiring BCBSMA to distribute "pro rata shares" to affected plans). For example, the Fund complains that BCBSMA "reached private settlements with [certain] hospitals" regarding alleged overpayments related to observation room stays. A23-25. Notably, these alleged errors were not unique to the Fund; they purportedly arose from "erro[neous]" "appl[ication]" of an internal BCBSMA "payment policy." *Id.*

Again, as the Fund elsewhere acknowledges, these sorts of network-wide actions are not fiduciary in nature. Fund Br. 46 n.7; A7. Like the negotiation of provider rates or the setting of internal payment policies, while such "business decisions" have an

"effect" on the Plan, they do not involve its "management" or "administration." *DeLuca*, 628 F.3d at 746-47; *supra* p. 18.[8]

Even if these settlements were plan-specific, as Chief Judge Saylor explained, such decisions do not involve "the level of discretion required to transform a third-party administrator into a functional fiduciary." AD21. Courts have held that even "broad[er]" recovery responsibilities generally do not render a third-party service provider a fiduciary. *E.g.*, *Humana Health Plan, Inc. v. Nguyen*, 785 F.3d 1023, 1025, 1029 (5th Cir. 2015); *BeneFirst*, 661 F. Supp. 2d at 53 (explaining that the "determination of whether and how aggressively to pursue an overpayment" does not confer fiduciary status). The contrary view, moreover, would extend fiduciary status to the "many law firms and collections agencies" that commonly exercise recovery powers. *Humana*, 785 F.3d at 1029. ERISA provides "no basis for expanding the meaning of fiduciary in this fashion." *Id.* at 1029 n.10; *Beddall*, 137 F.3d at 21.

The Fund's arguments regarding the purported collection of post-settlement fees are even further off the mark. Fund Br. 46-47. To begin, the Fund's complaint is devoid of any allegations regarding fees imposed in the wake of settlements and thus any claim in this regard is forfeited. *Morales-Cruz*, 676 F.3d at 225 n.2. In fairness, there is a good

---

[8] The Fund does not appear to challenge BCBSMA's general recovery efforts, Fund Br. 46, but insofar as it does, those efforts are likewise network-wide, A73 (crediting amounts "attributable to services for Covered Members" and imposing a "pro rata" share of costs).

reason for this absence: the Agreement does not authorize post-settlement fees. To reach a contrary conclusion, the Fund mashes together two separate provisions, Fund Br. 46, one dealing with network-wide *recovery* efforts, A73, and another addressing BCBSMA's *settlement* authority, A79. Only the former authorizes fees and costs. *See id.*

Even assuming they had been challenged, there was nothing "discretionary" about these fees. If BCBSMA obtained a qualifying recovery without incurring outside support costs, it charged the Fund a recovery fee equal to "20% of the recovery amount." A73. Alternatively, if BCBSMA obtained a qualifying recovery while incurring outside support costs, it retained an amount equal to those costs and did "not charge … the recovery fee." A73. These "specific" contractual terms undisputedly eliminated discretion. Fund Br. 44. Multiplying "20%" by the recovery amount or adding up "outside support costs" requires only a calculator, not any discretionary judgment. A73; *cf.* 29 C.F.R. § 2509.75-8(D-2) ("[c]alculation of services" is not fiduciary activity).[9]

**b.** The Fund's brief attempt to argue the contrary falls short. In the Fund's view, BCBSMA possessed discretion because it had "full authority to determine whether to settle and how much to settle for." Fund Br. 46. But the Fund likewise had "no say,"

---

[9] To be sure, the Fund alleges BCBSMA once assessed a 30% (rather than 20%) recovery fee, in reliance on a purportedly unsigned amendment. A18-19, 27. Assuming that to be true, the Fund has identified a failure to follow explicit contractual terms— an error, not the exercise of discretion. Likewise, the Fund repeatedly claims BCBSMA "charged fees to the Fund for mistakes of BCBSMA's own making." Fund Br. 3, 20, 41; A27. Again, if true, that would involve a violation of the Agreement. *Supra* p. 8.

*id.*, in the negotiation of BCBSMA's provider rates or any of the host of other decisions BCBSMA makes on behalf of its book of business, *supra* p. 18. And like those decisions, the execution of network-wide settlements is "not subject to fiduciary standards." *DeLuca*, 628 F.3d at 747.

Shifting gears, the Fund again falls back on the supposed "legion" of supporting cases, Fund Br. 47, but this sally is no more successful than the first. None of the cases involved settlement powers, let alone imposed fiduciary status on a third-party administrator that pursued settlements or recoveries on behalf of its book of business. And although some involved fees, the resemblance ends there. As the Fund admits, the fees in the cited cases were "discretionarily imposed," whereas here the fees and costs were fixed by the Agreement. Fund Br. 42-43 (quoting *Hi-Lex*, 751 F.3d at 744-45); *Pipefitters, Loc. 636 Ins. Fund*, 722 F.3d at 866-67 (fees not "fix[ed]" by contract); *Charters*, 583 F. Supp. 2d at 197-98 (similar) *Peters*, 2 F.4th at 231 (fees imposed "at [third-party administrator's] discretion"); *Golden Star*, 22 F. Supp. 3d at 81-82 (similar).

## II. BCBSMA DID NOT CONTROL THE DISPOSITION OF PLAN ASSETS.

The Fund also contends BCBSMA is a fiduciary because it exercised "control" over the disposition of "plan assets": specifically, the working capital amounts and settlement recoveries. Fund Br. 28-41; DOL Br. 11-20. But there is a reason the Fund did not rely heavily on the argument that these funds were "plan assets" below. It lacks merit. As Chief Judge Saylor held, BCBSMA did not "control" the disposition of these funds and, in any event, they were not "plan assets." AD27-28.

### A.    BCBSMA Did Not "Control" the Disposition of Plan Assets.

Even if the working capital and settlement amounts were plan assets (and they were not, *see infra* Section II.B), BCBSMA did not "control" their disposition within the meaning of ERISA.[10]

**1.**    The Fund concedes that "ERISA does not extend fiduciary status to every person who exercises mere possession, or custody over the plan's assets." Fund Br. 39. "[P]hysical control" does not suffice. *Cottrill v. Sparrow, Johnson & Ursillo, Inc.*, 74 F.3d 20, 22 (1st Cir. 1996). Rather, an entity must exercise "control respecting management or disposition of [a plan's] assets." 29 U.S.C. § 1002(21)(A). At times, this Court has suggested this means "the fiduciary [must] exercise … discretion and judgment[] over the disposition [of assets]." *Cottrill*, 74 F.3d at 22; *O'Toole v. Arlington Tr. Co.*, 681 F.2d 94, 96 (1st Cir. 1982) (pointing to some degree of "discretionary control or authority," i.e., "responsibilit[y]" for "discretionary, advisory activities"). But at a minimum, it is not enough to "simply perform … a purely administrative act," *Cottrill*, 74 F.3d at 22; some level of "meaningful control" is required, *Beddall*, 137 F.3d at 18; Fund Br 8 (describing this Court's rule as mandating "*some* degree of judgment or control over the disposition of the assets").

---

[10] The Fund does not contend, on appeal or in its complaint, that BCBSMA controlled the "management" of plan assets, 29 U.S.C. § 1002(21)(A), such as by failing to prudently invest the working capital, Fund Br. 28-41.

Under any of these formulations, fiduciary status does not arise where a third party holds and disposes of plan assets as "specified" by the plan sponsor. *Cottrill*, 74 F.3d at 22; AD28. For instance, "[i]f a [plan] tells a bookkeeping service to send a check for $950 to Mercy Hospital, the bookkeeping service does not thereby become a fiduciary." *BeneFirst*, 661 F. Supp. 2d at 54. Nor does a bank become a fiduciary by holding plan assets for disbursement at the plan's command. *O'Toole*, 681 F.2d at 96; *Beddall*, 137 F.3d at 20. Although these entities exercise physical control over plan assets, they ultimately do not control their disposition.

These principles confirm BCBSMA was not a fiduciary here. Even assuming the working capital amounts were plan assets, BCBSMA could remit payments from those amounts only with Fund approval. A49. In fact, there is no allegation that BCBSMA paid any claim without the Fund's consent; the Fund admits that it "made the final claim adjudication[s]." Fund Br. 48. This is thus *not* a case where a third-party administrator "has both the funds and the discretion to pay claims." *Hi-Lex*, 751 F.3d at 746. The Fund—not BCBSMA—controlled the disposition of the working capital amounts. Nor did BCBSMA exercise control over settlement amounts. The Agreement expressly required BCBSMA to credit these settlements to affected plans on a "pro rata basis." A79. Even (wrongly) assuming that fees and costs could be deducted from those amounts, the Agreement fixed their calculation. A73; *supra* Section I.B.2. Because the Agreement "specified" the allocation of settlement proceeds, BCBSMA was not a fiduciary when distributing them. *Cottrill*, 74 F.3d at 22.

If anything, BCBSMA functioned "more in the nature of a depository bank or a custodian": it paid providers only with Fund approval and distributed settlement recoveries only according to the Agreement. AD28. Thus, BCBSMA—like a depository bank—merely wrote checks "to execute the claims payment [and settlement distribution] function" at the behest of the Fund—which is insufficient to establish "control" over plan assets. *BeneFirst*, 661 F. Supp. 2d at 54; *see O'Toole*, 681 F.2d at 95-96; *Beddall*, 137 F.3d at 20. Any contrary ruling would make *every financial depository* a fiduciary, which would not only be wrong but also redound to ERISA plans' detriment by increasing their costs of interacting with third parties. *Cf. In re Luna*, 406 F.3d 1192, 1208 (10th Cir. 2005) ("[I]magine … a business that rents space in an investment property owned by a pension fund. Under the [Fund's] logic, the tenant's failure to pay its rent obligation might create a de facto fiduciary relationship.").

**2.** In its notably cursory discussion of the issue, the Fund fails to demonstrate that BCBSMA controlled the disposition of the working capital amounts. Fund Br. 39-41. Despite admitting that it alone decided whether to approve claim payments, *id.* at 48, the Fund argues (in a footnote) that its exclusive approval authority does not matter because BCBSMA's repricing efforts (indirectly) "determined how much a provider should be paid," *id.* at 40 n.5. Or, in the Labor Department's words, "it is enough that BCBSMA exercise[d] control over the pricing of claims to be paid out with plan assets." DOL Br. 19; Fund Br. 39-40.

36

The Fund cites no authority for this—breathtaking—proposition. Under the Fund's theory, advances need not be paid to a third-party service provider for it to exercise control over the disposition of plan assets. Mere pricing of claims would suffice, regardless of who holds the plan assets at issue. But no court has ever held that informing an ERISA-regulated plan of the price to be paid for a particular service constitutes "control" over plan assets. A simple hypothetical shows why: Assume the Fund directly paid providers, at their standard rates, and a hospital billed the Fund $10,000 for a surgery that should have been priced at $5,000. The Fund could choose to cover the claim or not; to pay some or all of the bill. But the hospital does not become a fiduciary simply because it *relays an erroneous price to the Fund*. Yet according to the Labor Department and the Fund, that mistake would constitute impermissible self-dealing. Indeed, the hospital would be a fiduciary even if it billed the Fund correctly; by initially setting the rate and invoicing the Fund, it would be deciding "how much should be paid" out of plan assets. Fund Br. 39. That is not, and cannot be, the law. To hold otherwise would transform any entity that bills a benefits plan into a fiduciary. *Infra* pp. 48-50.[11]

---

[11] The Labor Department's sole case on this issue is distinguishable. DOL Br. 18. Not only did *Monterey Peninsula Horticulture, Inc. v. Employee Benefit Management Services, Inc.*, have nothing to do with repricing, but the third-party administrator had the authority to make benefits determinations and write checks without plan sponsor approval. No. 5:21-cv-1660, 2020 WL 2747846, at *1, *3 (N.D. Cal. May 27, 2020).

To be sure, BCBSMA's repricing efforts *affected* disposition of the working capital amounts, Fund Br. 40 n.5, but the test is not whether BCBSMA's actions "adversely affected" the plan, it is whether BCBSMA *controlled* the disposition of plan assets. *Livick*, 524 F.3d at 29; *Fin. Insts. Ret. Fund v. Off. of Thrift Supervision*, 766 F. Supp. 1302, 1309 (S.D.N.Y. 1991) (similar). And setting the price for a particular service does not demonstrate control over plan assets. *See Doe 1 v. Express Scripts, Inc.*, 837 F. App'x 44, 49 (2d Cir. 2020) (unpublished) ("Anthem did not act as an ERISA fiduciary when it entered into the … Agreements, even though its decisions may ultimately affect how much plan participants pay for drug prices."); *Am. Psychiatric Ass'n*, 50 F. Supp. 3d at 169 (similar).

Again, *DeLuca* provides a helpful analogue. In that case, a group of plan participants sued their third-party administrator, arguing it had negotiated price increases with medical providers that adversely affected the plan. 628 F.3d 743. The Sixth Circuit rejected these claims. Although there was no doubt the negotiated rates had "an effect on" plan assets—the plan ended up paying more because its prices were higher—that was insufficient to establish fiduciary status, because "the challenged rate negotiations were not an exercise of … authority or control" over "plan assets." *Id.* at 747-48. Likewise here, the Fund asserts that BCBSMA's purported errors led to higher payments—but this does not show that BCBSMA had any more "control" over plan assets than any contractor that mistakenly bills a plan, particularly given that the Fund ultimately decided whether to approve each payment.

**3.** As to settlement amounts, the Fund's one-paragraph argument is meritless, Fund Br. 41. As explained above, BCBSMA did not have discretion to "decide[] how much [of these funds] to keep for itself." *Id.* Rather, the Agreement—not BCBSMA—"specified" how much BCBSMA kept, by fixing the pro rata distribution of settlement amounts and, in the case of recovery efforts, BCBSMA's collection of fees or costs. *Cottrill*, 74 F.3d at 22; *supra* Section I.B.2.

The Fund nonetheless argues BCBSMA's alleged failure to follow these specifications demonstrates "control over" plan assets. Fund Br. 41. *But see supra* p. 32 n.9. The Fund points to *Hi-Lex*, where the court "apparently concluded" the third-party administrator had "control" over plan assets because it was "occasionally willing to waive [certain fees] for the benefit of the plan." AD24 n.8 (citing 751 F.3d at 744-45). As Chief Judge Saylor observed, the notion that failure to follow explicit contractual terms amounts to "control" over plan assets is, to put it mildly, "counterintuitive." *Id.* Moreover, such a conclusion would again extend fiduciary liability to any entity that mistakenly overbills (or underbills) the Fund. ERISA cannot compel that result.

## B. The Working Capital and Settlement Amounts Were Not "Plan Assets."

Regardless, any funds over which BCBSMA ostensibly exercised "control" were not "plan assets." In the First Circuit, plan assets must be "identified on the basis of ordinary notions of property rights." *In re Fid. ERISA Float Litig.*, 829 F.3d 55, 60 (1st Cir. 2016) (Souter, J.); AD25 n.9. Purporting to apply this standard, the Fund argues it

had a "beneficial ownership" interest in the working capital amounts and the amounts recovered from network-wide settlements. Chief Judge Saylor correctly rejected this argument. AD23-27.

**1.** The Fund first fails to show a beneficial ownership interest in the working capital amounts. The common law of trusts provides that no such interest arises when one person transfers funds to another who (i) may use the funds as his own but (ii) agrees to pay the same amount to a third party. That transfer instead creates either a debt relationship or a contract for the benefit of the third party. Restatement (Third) of Trusts § 5 cmt. k (explaining that a "debt is created" where "the person receiving the [transferred] money shall have the unrestricted use of it, [despite] being liable to pay a similar amount to the payor or a third person"); *id.* cmt. i (similar); 1 Scott & Ascher on Trusts § 2.3.8.1 (explaining that a debt exists where the parties "intend for the recipient to have the use of the money as the recipient's own and to be under merely a personal liability to repay the money to … a third person."); *Luna*, 406 F.3d at 1204 (noting that a "contract to convey property does not," without more, "give rise to a fiduciary relationship"); AD26 (discussing these principles).

Here, the Agreement made clear that BCBSMA could use the working capital amounts as its own. For one, the Agreement described the amounts as a "number of dollars equal to the cost … for covered services," A54, belying any claim that the specific monies provided by the Fund were set apart for a particular use. Perhaps not surprisingly, therefore, the Agreement did not require—and the working capital

amounts were "not held in"—a "segregated account" (as the Fund concedes). Fund Br. 13. Indeed, the Agreement dictated that BCBSMA would receive the amounts together with its own projected fees in weekly installments, intermingling "working capital" with compensation BCBSMA could clearly use for any purpose. A61. Nor did the Agreement prohibit BCBSMA from investing these amounts and retaining the earned income. *Id.* What is more, the Agreement distinguished BCBSMA's duty to pay covered claims from its entitlement to the working capital amounts, thus making clear that BCBSMA could use the latter as its own. *See* A62 (permitting BCBSMA to collect a "finance charge on the amount that is past due" but not to pause claim payments).

The Agreement's allocation of risk further supports BCBSMA's unrestricted use of the funds. Although the Fund retained "ultimate financial responsibility" to its beneficiaries, A50, BCBSMA would have remained liable *to the Fund* if the working capital amounts were lost or stolen, *see* AD23. Retaining that liability was consistent with BCBSMA having a purely contractual duty to pay covered claims. Bogert's The Law of Trusts and Trustees § 17 ("The contract duty of the debtor to pay is not affected by misfortune affecting any part of the debtor's property."). It is inconsistent, however, with the fiduciary relationship that the Fund imagines. *Id.* ("[A] trustee may be excused from all liability if the trust res is lost through no fault of the trustee."); *cf. In re Fid.*, 829 F.3d at 60 (funds not plan assets where "no indication" that "the plan bears the risk if the cash is lost").

The conclusion that the working capital amounts were not plan assets is also consistent with the Labor Department's own guidance. The Labor Department previously advised (but now ignores) that even the "segregation" of an employer or third-party administrator's funds is insufficient to "create a beneficial interest in those assets on behalf of the plan." U.S. Dep't of Labor, Advisory Op. No. 92-24A, 1992 WL 337539 at *3 (Nov. 6, 1992). Instead, the Labor Department advised that a plan generally has "a beneficial interest in particular assets if [1] the employer establishes a trust on behalf of the plan, [2] sets up a separate account with a bank or other third party in the name of the plan, or [3] specifically indicates in the plan documents or instruments that separately maintained funds belong to the plan." *Id.*; *accord* U.S. Dep't of Labor, Advisory Op. No. 13-03A, 2013 WL 3546834 at *2 (July 3, 2013). The Fund does not argue that any of those conditions are satisfied here, nor could it.

This is particularly true given that this Court has itself rejected the notion that plan payments to participants are "plan assets" while passing through an intermediary. *In re Fidelity* concerned the payment of funds from a mutual fund to a third-party administrator, then from that administrator to a retirement plan's beneficiaries. 829 F.3d at 57-58. In such circumstances, this Court concluded the funds were not plan assets: the administrator was not a fiduciary with respect to those funds, but simply "an agent charged with transferring" cash to plan beneficiaries. *Id.* at 60. Similarly here, nothing about the transfer of provider payments through BCBSMA "suggests the

[Fund] is meant to exercise, or receive a benefit under, ordinary property rights in the traveling cash." *Id.* at 61.

Indeed, a contrary conclusion would elevate form over substance. No one would argue BCBSMA held "plan assets" if it had paid covered claims from its own account and billed the Fund for reimbursement. But that is essentially what the Agreement prescribed, except that it directed the Fund to reimburse BCBSMA on the front-end (based on mutually-acceptable estimates) rather than the back-end (based on actual costs). A60. While this "commonplace feature of self-funded benefit plans" makes the Agreement more cost-effective for all parties (i.e., by ensuring BCBSMA need not set aside capital from other sources to pay claims), AD23, 27, it is irrelevant to fiduciary status, *see In re Fid.*, 829 F.3d at 60 (rejecting contention that "cash becomes a plan asset simply because it moves, not directly from the fund to the participant, but from the fund through [a third-party administrator] on its way to the participant").

**2.**   The Fund's contrary arguments do not persuade. To start, the Agreement did not require BCBSMA to "hold the Fund's money to pay for members' health benefits." Fund Br. 31; DOL Br. 12; PatientRightsAdvocate.org Br. 6. In support of this claim, the Fund first notes that the Agreement required payment of "working capital amount[s] … for estimated Claim Payments." A60. But read in context and without any other mechanisms to segregate the funds, that statement merely reflects a contract for the benefit of a third party. *Supra* pp. 40-42. Second, the Fund states that the Agreement gave it the "ultimate financial responsibility … for all covered claims." A50. But as the

operator of a self-insured plan, the Fund has that responsibility on any view of the Agreement, *Am.'s Health Ins. Plans v. Hudgens*, 742 F.3d 1319, 1324 (11th Cir. 2014); it says nothing about whether the working capital amounts were plan assets. Third, the Fund quotes the disclaimer that BCBSMA did "not undertake to provide insurance or to provide funds for covered services." A47. But the Fund neglects the relevant section header, A47 ("Benefits Are Self-Insured; Agreement Is Not an Insurance Contract"), which made clear that the disclaimer concerned providing funds *beyond those that the Fund will cover* (i.e., BCBSMA was not an insurer). *Navarro-Ayala v. Hernandez-Colon*, 951 F.2d 1325, 1343 (1st Cir. 1991) (finding that a section heading "indicate[d]" what "the drafter was concerned with"). Fourth, as for the Fund's supposed "reversionary interest" in working capital overpayments, DOL Br. 14; Fund Br. 34-35, three features of the Agreement—BCBSMA's ability to use the amounts as its own, the absence of interest due, and the reciprocal debits applied to any underpayments—show the monthly reconciliation calculations were a mere bookkeeping device to allow BCBSMA to "pay claims on a current basis." A60-61. Finally, the Fund relies on the SPD's statement that contributions to the Fund were to be "used exclusively for providing benefits." A134. But that condition is plainly satisfied on BCBSMA's view of the Agreement, as the Fund paid the working capital amounts (and the administrative charges) in exchange for BCBSMA's services, including the payment of covered benefits.

Perhaps sensing the vulnerability of its textual arguments, the Fund argues the working capital amounts were "earmarked" for plan benefits. Fund Br. 10, 32-33. As

an initial matter, the Fund fails to tie "earmarking" to ordinary common law principles, which govern here. *In re Fid.*, 829 F.3d at 60. Instead, the Fund's lead authority for its "earmarking" test is a Labor Department brief. Fund Br. 10, 32-33. That brief not only lacks legal force but also conflicts with the Labor Department's actual guidance, which specifies that even the "segregation" of assets—let alone their earmarking—does not (without more) grant "a beneficial interest." *Supra* pp. 41-42.

In any event, despite the Fund's repeated use of the word, no provision in the Agreement requires BCBSMA to "earmark" (i.e., "[t]o set aside") the working capital amount in *any* respect. *Earmark*, Black's Law Dictionary (11th ed. 2019). Not only is there no requirement that the working capital amounts be segregated, but they are in fact intermingled with BCBSMA's compensation. *Supra* pp. 9-10. Were that not enough, in the event "the Fund fails to make timely payments" (that included BCBSMA's compensation), the Agreement granted BCBSMA "the right of setoff against the Fund's working capital amount." A62. This ability to recoup *compensation* from the working capital amounts cannot be reconciled with the notion that they were somehow to be used exclusively for provider payments. Accordingly, even if ERISA contained an "earmarking" test, the Fund has failed to show its application here.

The Fund further errs in relying on *Hi-Lex*. For one, *Hi-Lex* is distinguishable, as its third-party administrator was required to "pay[] benefits *from* the money [the employer] provide[d]." 751 F.3d at 746 (emphasis added). In that respect, *Hi-Lex* arguably implicated the rule that "a trust is created" if "'the intention is that the

[transferred] money shall be kept or used *as a separate fund* for the benefit of the payor or one or more third persons.'" *Id.* at 747 (quoting Restatement (Third) § 5 cmt. k (emphasis added)).[12] There is no occasion for applying that rule here, as the instant Agreement permits BCBSMA to pay covered claims out of its general fund. *Supra* Section II.B.1.

Moreover, to the extent *Hi-Lex* is not distinguishable, it is mistaken. The Fund cites *Hi-Lex* for the proposition that it had a beneficial ownership interest in the working capital amounts, regardless of whether BCBSMA could have used them as its own. *See* Fund Br. 29-31. But the ordinary common-law principles discussed above squarely reject that view, *supra* Section II.B.1, and *Hi-Lex* did not identify any common-law principles to the contrary. Indeed, as Chief Judge Saylor explained, *Hi-Lex* "gave little or no attention to the typical attributes of property rights, such as the actual contractual arrangements of the parties and the allocation of risk," AD27, and rejected various common-law arguments "in conclusory terms," AD26. The decision instead relied heavily on the "reasonable expectation[s]" of the plan's beneficiaries, 751 F.3d at 746—a necessarily subjective consideration that, under the common law, has no bearing on the disputed "property rights," *In re Fid.*, 829 F.3d at 60; AD25-26 & n.10, and which the Fund has declined to defend in its briefing.

---

[12] The Fund replaces the words "as a separate fund" with ellipses when quoting this statement to support its "earmarking" rule. Fund Br. 34.

The other cases cited by the Fund and its amici are no more compelling. The court's aside in *Gordon v. CIGNA Corp.* distinguishing *Hi-Lex* fails to account for the shortcomings in that decision detailed above, and, if anything, reinforces that the funds in *Hi-Lex* were plan assets only because the third-party administrator had to "us[e] [the] money" to pay claims, not as its own, 890 F.3d 463, 471-72 (4th Cir. 2018). In turn, *Coldesina v. Estate of Simper* focused on whether a plan's administrator exercised "control" over certain funds, without meaningfully addressing whether those funds were "plan assets." 407 F.3d 1126, 1133-35, (10th Cir. 2005). *IT Corp.* relied on the uncontroversial assumption that "money in [a] *plan's* bank account" is a plan asset. 107 F.3d at 1421 (emphasis added), and *Briscoe v. Fine* made that same assumption about assets in an account jointly managed by a plan and its third-party administrator, 444 F.3d 478, 483, 492 (6th Cir. 2006). Lastly, *In re FirstPay, Inc.* did not involve ERISA and, moreover, acknowledged that a non-trust relationship is created where, as here, the recipient of funds "ha[s] the unrestricted use thereof," subject to paying a "similar amount" to a third person. 773 F.3d 583, 592 (4th Cir. 2014) (citation omitted).[13]

**3.** Finally, the Fund briefly attempts to establish a beneficial ownership interest in the settlement amounts. Fund Br. 41. But insofar as the Fund possessed such an

---

[13] The Labor Department's district court cases are also inapposite. *Acosta v. WH Administrators, Inc.*, 449 F. Supp. 3d 506, 511, 516-17 (D. Md. 2020) (funds in a named fiduciary's bank account are "plan assets"); *Technibilt Grp. Ins. Plan v. Blue Cross & Blue Shield of N.C.*, 438 F. Supp. 3d 599, 604 (W.D.N.C. 2020) (no analysis of whether "plan assets" were at issue).

interest beyond its pro-rata share, it expressly renounced it. A79. Regardless, the Fund did not plausibly have an interest in funds (i) held by providers, (ii) transferred to BCBSMA in provider-wide settlements, and (iii) distributed to the Fund on a "pro rata" basis. A79. The Fund's contrary argument assumes *providers themselves* possessed plan assets, a creative proposition for which it provides no authority. Fund Br. 41. Nor did the Fund seek to classify the settlement amounts as "plan assets" before the district court. *See* Dkt. 17, at 12-16. Its argument thus fails both on the merits and under ordinary forfeiture principles. *McCoy v. Mass. Inst. of Tech.*, 950 F.2d 13, 22 (1st Cir. 1991).

## III. THE FUND'S POSITION WOULD HARM ERISA PLANS AND THEIR PARTICIPANTS.

If any further reason is needed, the Court should reject these efforts to extend ERISA's fiduciary rules to "typical" third-party administrator relationships because they threaten serious harm to benefit plans and their participants. AD24. This Court has previously declined to extend fiduciary status in "undesirable" and "counter-intuitive" ways, explaining that "ERISA's somewhat narrow fiduciary provisions are designed to avoid such incremental costs." *Beddall*, 137 F.3d at 21. And here, extending fiduciary status to third-party administrators like BCBSMA would upend ERISA plans' widespread reliance on such entities, inflicting not only "incremental" but debilitating costs. *Id.*; *see also Pegram*, 530 U.S. at 232-37 (declining to extend fiduciary status where it could result in "upheaval" and "difficult[ies]" for the industry).

ERISA imposes fiduciary duties on those actually "responsible" for the plan. *Teets v. Great-W. Life & Annuity Ins. Co.*, 921 F.3d 1200, 1206 (10th Cir. 2019). Here, for instance, as the plan administrator and named fiduciary, the Trustees "have authority to control and manage the operation … of the plan." 29 U.S.C. §§ 1002(16), 1102(a)(1). That is fitting, because the Trustees must have the interests of Plan participants as their sole goal. But those who merely *contract with* ERISA plans are rarely in the same position—their goal is to engage in mutually beneficial commerce. ERISA plans reap significant benefits from this arrangement, because contracting with third-party administrators enables them to gain access to "discounted rates," A100, and "administrative expertise or support staff," 3 HR Series: Policies and Practices § 190.14.

To make these benefits available to ERISA plans, however, service providers must be able to take their own business interests into account and operate their downstream relationships (e.g., with hospitals and medical providers) in support of their entire book of business. *DeLuca*, 628 F.3d at 747. The Fund's position would prevent them from doing so by subjecting virtually all service providers to ERISA's fiduciary standards, including stringent duty of loyalty and prohibited transaction requirements. 29 U.S.C. §§ 1104, 1106. Indeed, the Fund freely admits it seeks to require BCBSMA to look "exclusive[ly]" to the Fund's interests. A27. That would destroy the ability of third-party administrators to fold ERISA plan clients into their existing networks, defeating the purpose of the arrangement.

As Chief Judge Saylor explained, "[i]t is difficult to see how a plan could contract" "with a third-party administrator to take advantage of its provider network (and lower rates) under such circumstances." AD21. At minimum, third-party administrators would likely "raise their fees substantially to cover both the restricted nature of the business and the additional risk incurred." *Id.* "Congress cannot have intended such a result, which would provide little, if any, marginal benefit to participants, while imposing substantial additional expenses on plans—expenses that inevitably will be borne largely, if not entirely, by participants through increased fees or reduced benefits." *Id.*; AD27; *Beddall*, 137 F.3d at 21; *Humana*, 785 F.3d at 1029.[14]

## CONCLUSION

For these reasons, this Court should affirm the decision below.[15]

---

[14] The costs would not only be pecuniary. As the law stands, a third-party administrator may consider both pecuniary and health policy interests when constructing its network and negotiating provider-pricing agreements and guidelines. But on the Fund's view of ERISA, third-party administrators would be saddled with atomized, customer-by-customer decision-making when applying those contracts and guidelines; they would be precluded, for example, from resolving ambiguities in existing payment policies with an eye to achieving healthier outcomes across their entire book of business. It makes no sense to take such health policy objectives off the table based on trivialities of form, especially in the absence of any clear directive in ERISA.

[15] The Fund raises no independent basis for retention of the state-law claims. Fund Br. 50-51. Thus, because the ERISA claims fail, the state-law claims were properly dismissed. AD29-30.

Dated:  November 30, 2022

Respectfully submitted,

*/s/ Evan Miller*
Evan Miller
David T. Raimer
Joseph P. Falvey
JONES DAY
51 Louisiana Avenue, NW
Washington, D.C. 20001
(202) 879-3939
emiller@jonesday.com
dtraimer@jonesday.com
jfalvey@jonesday.com

*Counsel for Defendant-Appellee*
*Blue Cross Blue Shield of Massachusetts,*
*Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with the length limitations of Fed. R. App. P. 32(a)(7). The brief contains 12,997 words, excluding the items exempted by Fed. R. App. P. 32(f).

2.      This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6). It was prepared using Microsoft Office Word 2016 in 14-point, proportionally spaced Garamond font.


Dated:  November 30, 2022                          <u>/s/ Evan Miller</u>
                                                                Evan Miller
                                                                *Counsel for Defendant-Appellee*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on November 30, 2022, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit using the CM/ECF system. I certify that the following Counsel for Plaintiffs-Appellants are registered CM/ECF users and will be served by the CM/ECF system:

Peter K. Stris
John Stokes
STRIS & MAHER LLP
777 S. Figueroa Street, Suite 3850
Los Angeles, CA 90017
pstris@stris.com
jstokes@stris.com

D. Brian Hufford
Jason S. Cowart
Leila Bijan
ZUCKERMAN SPAEDER LLP
485 Madison Avenue, 10th Floor
New York, NY 10022
dbhufford@zuckerman.com
jcowart@zuckerman.com
lbijan@zuckerman.com

Dated:  November 30, 2022                    */s/ Evan Miller*
                                             Evan Miller
                                             *Counsel for Defendant-Appellee*