No. 22-1317

———————————

UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

———————————

MASSACHUSETTS LABORERS' HEALTH AND WELFARE FUND;
TRUSTEES OF THE MASSACHUSETTS LABORERS' HEALTH AND
WELFARE FUND, As Fiduciaries,

*Plaintiffs - Appellants,*

v.

BLUE CROSS BLUE SHIELD OF MASSACHUSETTS,

*Defendant - Appellee.*

———————————

On Appeal from the U.S. District Court for the District of Massachusetts
No. 21-cv-10523
Chief Judge F. Dennis Saylor, IV

———————————

**BRIEF OF AMICI CURIAE ERISA AND TRUST LAW PROFESSORS
IN SUPPORT OF DEFENDANT-APPELLEE AND IN SUPPORT OF
AFFIRMANCE**

———————————

Allison S. Egan
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
T. 215.963.5033

Deborah S. Davidson
MORGAN, LEWIS & BOCKIUS LLP
110 North Wacker Drive
Chicago, IL 60606
T. 312.324.1159

Michael E. Kenneally
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
T. 202.739.5893

Charles L. Solomont
Henry M. Marley
MORGAN, LEWIS & BOCKIUS LLP
One Federal Street
Boston, MA 02110
T. 617.951.8996

*Counsel for ERISA and Trust Law Professors*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................. ii

STATEMENT OF INTEREST ......................................................................... 1

SUMMARY OF ARGUMENT ......................................................................... 2

ARGUMENT ..................................................................................................... 6

    I.    Common Law Principles Appropriately Guide This Court in Determining Whether the Working Capital Amounts Constitute Plan Assets Under ERISA ............................................................. 6

    II.   Common Law Principles Dictate That The Working Capital Amounts Are Not Plan Assets. .................................................... 7

        A.    The Agreement Between the Fund and BCBSMA Shows That the Fund Lacked a Property Interest in the Working Capital Amounts. ................................................ 7

        B.    The "Reasonable Expectations of the Beneficiaries" Do Not Determine Whether the Working Capital Amounts Are Plan Assets ................................................... 15

CONCLUSION ................................................................................................ 17

CERTIFICATE OF COMPLIANCE ............................................................ 19

CERTIFICATE OF SERVICE ...................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Christiansen v. Nat'l Sav. & Tr. Co.*,
  683 F.2d 520 (D.C. Cir. 1982) .................................................................... 10

*Firestone Tire & Rubber Co. v. Bruch*,
  489 U.S. 101 (1989) ............................................................................... 2, 6

*Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*,
  530 U.S. 238 (2000) .................................................................................. 6

*Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Mich.*,
  751 F.3d 740 (6th Cir. 2014) ............................................................... 15, 16

*Hughes Aircraft Co. v. Jacobson*,
  525 U.S. 432 (1999) .................................................................................. 6

*In re Fid. ERISA Float Litig.*,
  829 F.3d 55 (1st Cir. 2016) ............................................................ 13, 14, 15

*In re Halpin*,
  566 F.3d 286 (2d Cir. 2009) ............................................................... 5, 6, 7

*Merrimon v. Unum Life Ins. Co. of Am.*,
  758 F.3d 46 (1st Cir. 2014) .............................................................. 2, 6, 15

*Nachman Corp. v. Pension Benefit Guar. Corp.*,
  446 U.S. 359 (1980) .............................................................................. 2, 6

*Neverett v. Towne*,
  179 A.2d 583 (Vt. 1962) ........................................................................... 10

## STATUTES

29 U.S.C.
  § 1002(21)(A) ........................................................................................... 3
  § 1110 ....................................................................................................... 9

Employee Retirement Income Security Act of 1974 ................................. *passim*

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

## RULES

Fed. R. App. P. 29(c)(5) ............................................................................ 1

## OTHER AUTHORITIES

Bogert's The Law of Trusts and Trustees § 17 (2022) ...............................*passim*

H.R.Rep. No. 93-533 (1973), U.S. Code Cong. & Admin. News 1974 ........................... 6

Restatement (Second) of Trusts (1959)
    § 2 ............................................................................................... **4, 8**
    § 14 cmt. 4 & illus. 1 ................................................................ **14**
    § 14 cmt. a ................................................................................ **8, 17**
    § 74 .............................................................................................. **8**
    § 179 ........................................................................................ **10, 12**

Restatement (Third) of Trusts (2003)
    § 5 cmt. k ............................................................................ **5, 11, 12**
    § 5 cmt. i ................................................................................ **11, 12**
    § 84 cmt. d ............................................................................ **10, 12**
    § 99 ........................................................................................ **9, 14**

Scott & Ascher on Trusts (6th ed. 2022)
    § 17.11.1 ................................................................................ **11**
    § 17.13 .................................................................................... **13**

U.S. Dep't of Labor, Advisory Op. No. 93-14A, 1993 WL 188473 (May 5, 1993) ....... 6

U.S. Dep't of Labor, Advisory Op. No. 94-31A, 1994 WL 501646 (Sept. 9, 1994) .... 16

iii

## STATEMENT OF INTEREST[1]

Amici curiae are legal scholars who write and teach about the Employee Retirement Income Security Act of 1974 (ERISA).

- Colleen E. Medill, Nebraska College of Law

- Maria O'Brien, Boston University School of Law

As legal scholars, amici have a strong interest in the sound development of the law in their fields and an outside perspective on the issues in this case. This case implicates basic principles of trust law, and its application to ERISA, with which amici have substantial experience. Properly applying those principles is important, in amici's view, because the outcome of this case could affect the relationships between the plan sponsors of millions of health plans in this country and the companies that provide administrative services to those plans.

Here, the Massachusetts Laborers' Health and Welfare Fund (the "Fund") urges an untenably overbroad definition of "plan assets" that violates basic principles of trust law and conflicts with ERISA. The Fund contends that Blue Cross and Blue Shield of Massachusetts, Inc. ("BCBSMA") took custody of "plan assets," and thus assumed fiduciary duties under ERISA, when the Fund paid BCBSMA as an incident of the

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than the amici curiae or their counsel contributed money that was intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(c)(5). All parties consented to the filing of this brief.

1

administrative services that BCBSMA provided under their Administrative Services Account Agreement ("Agreement"). Imposing fiduciary obligations in these circumstances would vastly alter the legal landscape for providing and funding healthcare in this country.

Amici believe that common-law principles of trust and property law do not support imposing ERISA fiduciary obligations on service providers that have contractual arrangements similar to the agreement between BCBSMA and the Fund. Consistent application of well-understood trust and property principles to the relationships between health plan sponsors and service providers will ensure predictability in structuring those relationships. This predictability in turn will benefit plan participants by enabling plan sponsors to negotiate access to the medical provider networks of entities such as BCBSMA in a cost-effective manner.

## SUMMARY OF ARGUMENT

ERISA is a "comprehensive and reticulated statute." *Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 361 (1980). But when its text does not answer a question regarding its interpretation, common law principles, including the law of trusts, fill its gaps. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 110 (1989). Relevant here, ERISA does not provide an express definition of "plan assets." Courts therefore identify plan assets "on the basis of ordinary notions of property rights." *Merrimon v. Unum Life Ins. Co. of Am.*, 758 F.3d 46, 56 (1st Cir. 2014). Identifying plan assets is a critical portion of the inquiry into whether an entity qualifies as an ERISA fiduciary—

and is thus saddled with ERISA's fiduciary obligations—because ERISA fiduciaries are those who, among other things, exercise "authority or control respecting management or disposition" of a plan's "assets." 29 U.S.C. § 1002(21)(A).

This case involves a contractual relationship between the Fund, which sponsors an ERISA-regulated multiemployer health plan, and BCBSMA. The health plan is a self-insured plan, which means the Fund bears "ultimate financial responsibility and liability for all covered claims." A50. As is typical for the sponsors of self-insured health plans, which generally do not have the administrative infrastructure or staffing to process claims themselves, the Fund contracted with BCBSMA to serve as a "third-party administrator" to help process claims.

The Agreement sets forth the services BCBSMA agreed to provide. Specifically, BCBSMA agreed to give Plan participants access to "medical services at discounted rates" through its provider network. A50-51. BCBSMA also provided additional administrative services, including claims payment and processing. A49, 52. In exchange for the services, the Fund agreed to pay BCBSMA a monthly "administrative charge." A60. Moreover, because BCBSMA "pa[id] providers … before being able to bill the Fund," the Fund paid it a "working capital amount." *Id.* The working capital amount essentially functioned as a front-end reimbursement, in that it was based on BCBSMA's monthly "estimate of the amount needed to pay [current] claims," subject to the Fund's "review and approval." *Id.* If BCBSMA overestimated how much it would need to pay monthly claims, it credited the Fund's next payment; if it underestimated, it debited. *Id.*

The Fund paid both the administrative charge and the working capital amount via a single payment, made on a weekly basis. A60-61. Once the payments were in BCBSMA's hands, the Agreement did not restrict BCBSMA's use of the funds. It did not require BCBSMA to separate the administrative charge from the working capital amount. *Id.* Nor did it require BCBSMA to hold the working capital in a separate account. *Id.* It did not specify that BCBSMA pay claims using the specific funds transferred as working capital. *Id.* It did not prevent BCBSMA from investing the working capital and retaining any interest earned. *Id.* If the Fund was late on its payments, BCBSMA retained the right to impose a "finance charge on the amount past due," but it could not suspend paying claims as they were due. A62. If the working capital amounts were lost or stolen, BCBSMA was liable to the Fund. AD23.

The Fund's interpretation of the working capital amounts as "plan assets" violates ordinary notions of property rights and is inconsistent with basic tenets of trust law. The Agreement is replete with terms that are incompatible with the Fund having an equitable property interest in the working capital amounts. Under classic hornbook trust law, trust beneficiaries have equitable ownership interests in *separately maintained* trust property. Restatement (Second) of Trusts § 2 (1959). But the Fund commingled the working capital with BCBSMA's compensation for services, and did not require BCBSMA to place the working capital in a separate account. Nor did the Agreement restrict BCBSMA's use of the working capital. It did not require BCBSMA to use the specific working capital monies to pay claims, and it did not prohibit BCBSMA from

investing the working capital and retaining any interest earned.  When a person receives money with "unrestricted use" but is "liable to pay a similar amount to … a third person," "a debt is created," not a trust relationship.  Restatement (Third) of Trusts § 5 cmt. k (2003).  In addition, BCBSMA would be liable to the Fund if the working capital were lost or stolen, AD23, which is also contrary to a trust relationship:  a trustee is not liable if the trust *res* is lost through no fault of its own because his duties only extend to the specific property in which the beneficiary has an equitable interest.  Bogert's The Law of Trusts and Trustees § 17 (2022).  In short, no trust was created when the Fund transferred the working capital to BCBSMA, and the Fund retained no equitable interest in the working capital once paid to BCBSMA.

The Fund's last-ditch attempt to identify plan assets based on the "reasonable expectations of the beneficiaries" is inconsistent with the law of this circuit and common law principles.  Finally, and critically, ERISA does not endorse modifying or expanding settled common law principles in the name of filling gaps in the statutory text.  *See, e.g., In re Halpin*, 566 F.3d 286, 292 (2d Cir. 2009) (terms such as "assets" in ERISA should be interpreted consistent with "commonly understood definitions" found in the common law).  If this Court were to endorse the Fund's interpretation of the working capital amounts, it would turn the meaning of "plan assets" on its head and deprive health plan sponsors and service providers of critical "predictability and coherence" when structuring their relationships to such plans.  *Id.*

5

## ARGUMENT

I. **Common Law Principles Appropriately Guide This Court in Determining Whether the Working Capital Amounts Constitute Plan Assets Under ERISA.**

ERISA is a "comprehensive and reticulated statute," *Nachman Corp.*, 446 U.S. at 361, but it "nowhere contains a comprehensive definition of what constitutes 'plan assets.'" *Merrimon*, 758 F.3d at 56. Thus, courts are to identify plan assets "on the basis of ordinary notions of property rights." *Id.* (quoting U.S. Dep't of Labor, Advisory Op. No. 93-14A, 1993 WL 188473, at *4 (May 5, 1993)).

Additionally, "ERISA abounds with the language and terminology of trust law," particularly when dealing with questions interpreting "the Act's fiduciary responsibility provisions," which "codif[y] and mak[e] applicable to [ERISA] fiduciaries certain principles developed in the evolution of the law of trusts." *Firestone Tire*, 489 U.S. at 110 (quoting H.R.Rep. No. 93–533, p. 11 (1973), U.S. Code Cong. & Admin. News 1974, pp. 4639, 4649) (quotations omitted). The common law of trusts thus offers a "starting point for analysis [of ERISA]" and serves as a critical guide in considering the common law determinants of property characteristics in an ERISA context. *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 250 (2000) (quoting *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 447 (1999) (internal quotation marks omitted)).

The term "assets," moreover, has "a reasonably well understood meaning that is imbedded in the common law of contracts, property and trusts." *In re Halpin*, 566 F.3d at 292. When using trust and property law to interpret ERISA, courts must strive to

maintain a "commonly understood definition of 'assets'" because doing so "ensures that plans and related parties can look to an established body of rules and principles to structure relationships," particularly fiduciary ones. *Id.* Ascribing a different meaning to "assets" risks "depriv[ing] these relationships of an essential source of predictability and coherence." *Id.*

## II. COMMON LAW PRINCIPLES DICTATE THAT THE WORKING CAPITAL AMOUNTS ARE NOT PLAN ASSETS.

The Fund argues that it maintained a beneficial ownership interest in the working capital amounts it transferred to BCBSMA, effectively creating a trust relationship between the Fund and BCBSMA. Although the Fund and U.S. Department of Labor ("DOL") purport to draw from "ordinary notions of property rights under non-ERISA law," Fund Br. 29; *see* DOL Br. 10, their position in fact marks a significant departure from well-settled common law principles.

### A. The Agreement Between the Fund and BCBSMA Shows That the Fund Lacked a Property Interest in the Working Capital Amounts.

Under classic hornbook trust law, trust beneficiaries have equitable ownership interests in separately maintained trust property, not the trustee's general assets. No trust relationship was formed when the Fund and BCBSMA entered their contract. The Agreement has many terms that are incompatible with an equitable property interest by the Fund in the working capital amounts.

**1.** A defining feature of a trust is the trust property or trust *res*. The basic definition of a trust is "a fiduciary relationship with respect to property, subjecting the

person by whom the title to the property is held to equitable duties to deal with the property for the benefit of another person." Restatement (Second) of Trusts § 2. Accordingly, "[a] trust cannot be created unless there is trust property." *Id.* § 74.

Traditionally, the trust property is subject to divided ownership between the trustee and the beneficiary. This division of ownership helps distinguish trust relationships from ordinary contract relationships like a creditor-debtor relationship or a contractual obligation to a third-party beneficiary. *See* Bogert's The Law of Trusts and Trustees § 17 ("One of the major distinguishing characteristics of a trust is divided ownership of property, the trustee usually having legal title and the beneficiary having equitable title."). "In contract, on the other hand, this element of division of property interest is entirely lacking." *Id.* The distinction has important practical implications.

Specifically, the trust law beneficiary's rights and the trustee's obligations are often tied to the trust property specifically. *See* Restatement (Second) of Trusts § 14 cmt. a ("The beneficiary of a trust has the beneficial interest in the trust property.") The promisee or third-party beneficiary of a contract, on the other hand, has merely a "personal claim against the promisor" and no property interest in the promisor's assets. *Id.* So, for example, trust beneficiaries and contract promises have very different remedies if the trustee or promisor becomes insolvent:

> If a trustee becomes insolvent, a beneficiary may take all the identifiable trust property from the assets of the insolvent trustee and need not come in as a general creditor, except as to trust assets that the beneficiary cannot trace. A general creditor, on the other hand, having no property interest in the assets owned by the debtor, must accept merely a dividend.

Bogert's The Law of Trusts and Trustees § 17.  Moreover, "[a]bsent a breach of trust, a trustee is not liable for a loss or depreciation in the value of trust property[.]" Restatement (Third) of Trusts § 99.  This excusal from liability differs from a contractual relationship:

> Because a trustee's duties apply to specific assets in which a beneficiary has an equitable interest, a trustee may be excused from all liability if the trust res is lost through no fault of the trustee.  This is because none of the trustee's other assets are affected by trust duties. … The loss or destruction of any particular property of a debtor, on the other hand, even though wholly without the debtor's fault, will not discharge a debt.  The debt is due from any of the property of the debtor.  The contract duty of the debtor to pay is not affected by misfortune affecting any part of the debtor's property.

Bogert's The Law of Trusts and Trustees § 17.[2]  And the trust beneficiary's property interest also ordinarily entitles the beneficiary to the income that the trust property produces:

> Because a beneficiary has equitable ownership in the ordinary case, the beneficiary receives the net income of the trust property rather than any fixed rate of income or return on the value of that property.  The creditor, however, is not the owner of the money or other property which he has transferred to his debtor, and has no rights to the actual income which it produces in the absence of special contract.

*Id.*

---

[2] The nonliability of a trustee who has *not* breached a fiduciary duty differs from an exculpatory provision in an agreement whereby a fiduciary *has* breached but the agreement "purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty[.]"  *See* 29 U.S.C. § 1110.

Given the beneficiary's ownership interests in the trust property specifically, a trustee has a general duty "to keep the trust property separate from his individual property, and, so far as it is reasonable that he should do so, to keep it separate from other property not subject to the trust." Restatement (Second) of Trusts § 179. The duty to keep trust property separate is also known as the duty to earmark trust property. Restatement (Third) of Trusts § 84 cmt. d ("Duty to earmark trust property: It is ordinarily the duty of a trustee to have trust property designated or made externally identifiable as trust property. Thus, deposits of trust money in a bank should be made in a separate account in the name of the trustee as trustee").

Common law courts have recognized, therefore, that "mingling" assets received "with other funds of the [recipient] is inconsistent with the claim of a trust relationship." *Neverett v. Towne*, 179 A.2d 583, 588 (Vt. 1962); *cf. Christiansen v. Nat'l Sav. & Tr. Co.*, 683 F.2d 520, 533 (D.C. Cir. 1982) (discussing, in an ERISA context, the difference between trusts and third-party beneficiaries to a contract and noting the importance of "look[ing] for something quite specific in the statement of a trust relationship, before one reads such relationship into the ordinary rights of [parties under a different arrangement].").

Whether the parties anticipate maintaining a separation between the funds they exchange and the recipient's other assets can often show whether the parties have created a trust relationship or some other relationship, like a contractual relationship with a third-party beneficiary or a debt relationship. For example, "[w]hen a person pays money to another with instructions that the latter is to pay a debt or the debts of

10

the former to one or more third persons" and "the person receiving the money is entitled to use it as his or her own, the transaction merely creates a contract for the benefit of the payor's creditor." Restatement (Third) of Trusts § 5 cmt. i. Similarly, a debt is created when "one person transfers funds to another" and "it is intended … that the person receiving the money shall have the unrestricted use of it, being liable to pay a similar amount to the payor or a third person, whether with or without interest." *Id.* § 5 cmt. k. But "[i]f the intention is that the money shall be kept or used *as a separate fund* for the benefit of the payor or one or more third persons, a trust is created." *Id.* (emphasis added).

In a trust relationship, the duty to separate helps allocate risk between the trustee and beneficiaries. From the trustee's point of view, while "[t]he loss or destruction of any particular property of a debtor … will not discharge a debt," trustees are not liable for funds lost through no fault of their own. Bogert's The Law of Trusts and Trustees § 17. And from the beneficiary's point of view, separating funds ensures that the assets are not subject to risk from the trustee's personal creditors and that the assets can more readily be traced if they are moved. Scott & Ascher on Trusts § 17.11.1 (6th ed. 2022).

**2.** Here, the Agreement and the transfer of the working capital created a contractual relationship, not a trust relationship. First, the Agreement authorized intermingling of the working capital amounts with BCBSMA's general assets. Rather than keep the working capital amounts separate from BCBSMA's fees, the Fund paid both amounts in a single lump sum. A60-61. The Fund concedes that the working

capital amounts were "not held in a segregated account" at any time.  Fund Br. 13.  This contractual arrangement is inconsistent with a trustee's fiduciary duty not to mingle assets.  Restatement (Second) of Trusts § 179.  Furthermore, this arrangement confirms that the mingled assets sent by the Fund, as trustee, to BCBSMA were not earmarked as trust assets.  Restatement (Third) of Trusts § 84 cmt. d ("Duty to earmark trust property: It is ordinarily the duty of a trustee to have trust property designated or made externally identifiable as trust property. Thus, deposits of trust money in a bank should be made in a separate account in the name of the trustee as trustee.")

Second, BCBSMA was entitled to use the working capital amounts as its own more broadly.  Because BCBSMA received amounts into its general fund equal to the amount of *estimated* monthly provider claims, the parties intended that BCBSMA would receive the money "with unrestricted use of it, being liable to pay a *similar amount* to … a third person."  *See* Restatement (Third) of Trusts § 5 cmt. k (describing a debt contract) (emphasis added); *cf. id.* § 5 cmt. i. (creating a contract for the benefit of a third person when "a person pays money to another with instructions that the latter is to pay a debt or the debts of the former to one or more third persons … [and] the person receiving the money is entitled to use it as his or her own.").  Not only that, but when "the Fund fails to make timely payments" of BCBSMA's compensation, the contract gave BCBSMA "the right of setoff against the Fund's working capital amount," further showing that the parties agreed for the working capital to be for BCBSMA's use and benefit.  A62.

Third, the contract imposed no duty on BCBSMA to invest the working capital amounts for the Fund's benefit. The Fund was not even entitled to interest in months where it overpaid the working capital amounts. A60-61. Moreover, no language in the contract prohibited BCBSMA from investing the working capital amounts and keeping the earned income for itself. If the parties had established a trust, BCBSMA would likely have been obliged to invest the money for the Fund's benefit and pay over the proceeds to the Fund. *See* Scott & Ascher on Trusts § 17.13 ("Ordinarily, a trustee has a duty to use reasonable care and skill to make the trust property productive."); Bogert's The Law of Trusts and Trustees § 17 ("Because a beneficiary has equitable ownership in the ordinary case, the beneficiary receives the net income of the trust property[.]").

In contrast, this Court has held that when an ERISA plan transfers money to an intermediary, the plan has no ownership interest in the income from investment of that money if it does not qualify as plan assets. *In re Fid. ERISA Float Litig*, 829 F.3d 55, 59-60 (1st Cir. 2016). By the same token, when the parties do not intend for the plan to have any right to the investment income, it follows that the plan does not have an ownership interest in the *principal* of the investment—the transferred money. As shown already, that reasoning comports with ordinary trust and property law, which guided the Court's analysis. *See In re Fid.* 829 F.3d at 60.

Fourth, like a party to an ordinary contract but unlike a trustee, BCBSMA would have been personally liable to the Fund if the working capital amount were lost or stolen, showing that the Fund's interest was not specifically tied to the putative trust

property.  *See* AD23; *see supra* p. 9; Restatement (Third) of Trusts § 99 ("Absent a breach of trust, a trustee is not liable for a loss or depreciation in the value of trust property[.]").

Had the Fund intended to retain a beneficial ownership interest in the transferred cash, it could have contracted for segregation of the working capital amounts; made clear that BCBSMA could not use the working capital amount as its own; bargained for a beneficial interest in the income from investments; and indemnified or held harmless BCBSMA for any loss or theft.  The substance of such an arrangement would have tended to establish the Fund's beneficial ownership interest in the working capital amount by creating the incidents of a trust relationship.  *See In re Fid.* 829 F.3d at 58 (reasoning that a fund could have contracted for an arrangement (removal of intermediary payee) that would have ensured the fund maintained an ownership interest).

But the contract did not give the Fund equitable ownership interests in the working capital amount.  It gave them an ordinary contractual right to have BCBSMA pay providers the agreed-upon amounts, which the working capital amount was simply meant to estimate on a periodic basis.  Even if BCBSMA had assumed personal liability for the Fund's obligations to the providers, that still would be a classic example of a contractual arrangement that does not amount to a trust relationship under common law principles.  *See, e.g.*, Restatement (Second) of Trusts § 14 cmt. 4 & illus. 1 ("If property is transferred by one person to another who agrees in consideration thereof to assume a personal liability to a third person, a contract for the benefit of the third

person and not a trust is created. … A pays $1000 to B who agrees to pay the money

to C.  B is trustee of the money for C.  *If it is agreed that B may use the $1000 as his own but*

*that he will pay a similar amount to C, B is not trustee of the money.*" (emphasis added)).

### B.     The "Reasonable Expectations of the Beneficiaries" Do Not Determine Whether the Working Capital Amounts Are Plan Assets

The Fund and the Department of Labor rely extensively on *Hi-Lex Controls, Inc.*

*v. Blue Cross Blue Shield of Michigan*, 751 F.3d 740 (6th Cir. 2014).  *See* Fund. Br. 29-32;

DOL Br. 12-13.  But the Court should not follow its analysis of the "reasonable

expectation" of plan beneficiaries, *Hi-Lex*, 751 F.3d at 746, or the DOL's related inquiry

into whether beneficiaries "reasonably believe" that working capital amounts "secure

the promised benefits or are otherwise plan assets," DOL Br. 12.  That analysis has no

place in the law of this circuit.[3]  Identifying plan assets turns on common-law trust and

property principles, not the "reasonable expectations" of ERISA plan beneficiaries.

When identifying plan assets, this Court has focused exclusively on "ordinary

notions of property rights" and the application of common-law principles, including

contract, property, and trust law.  *See, e.g., Merrimon*, 758 F.3d at 56; *In re Fid.* 829 F.3d

at 60.  This circuit has never relied on or adopted the portion of the DOL advisory

opinion that notes that "representations … to participants and beneficiaries" sufficient

---

[3] The Fund appears to concede this point.  Although it relies on *Hi-Lex*, it does not raise an argument based on beneficiaries' expectations.  *See* Fund Br. 29-32.

to lead them to "reasonably believe that such funds … secure [] benefits or are otherwise plan assets" can guide whether funds are plan assets.

It is for good reason that this circuit has not adopted this sort of position. A beneficiary-expectations standard adds nothing to the analysis other than unpredictability and subjectivity. As a general rule, beneficiaries' expectations vary and are largely indiscernible. To the extent a court might discover them, moreover, it would need to rely on the plan documents and related instruments. Indeed, by the DOL's own standards, beneficiary expectations in this context arise by virtue of the plan sponsor's manifested intention "to grant such a beneficial interest" or by making "representations" to participants and plan beneficiaries. U.S. Dep't of Labor, Advisory Op. No. 94-31A, 1994 WL 501646 (Sept. 9, 1994). In this case, that would require reviewing the Agreement and perhaps the SPD (although the latter is released by the Fund, not BCBSMA). But the Court already considers those documents to determine whether the Fund has a beneficial ownership under ordinary trust and property principles. It is wrong then, to treat beneficiary expectations as an independent factor in the analysis.

Indeed, as Chief Judge Saylor noted, a focus on beneficiary expectations improperly takes the analysis *away* from ordinary principles of property rights. AD 26. In declining to adopt *Hi-Lex*, Chief Judge Saylor reasoned that the *Hi-Lex* court, in relying too heavily on the beneficiaries' expectations, "did not directly consider whether, as a matter of 'ordinary [principles] of property rights,' title to the funds had transferred

16

to BSBSM once the plan had made its monthly payment." *Id.* There was "little discussion of the terms of the contract," "no discussion of who bore the risk of loss after transfer," or explanation as to "how, as a matter of property law, the reasonable expectation of the beneficiaries (who were not parties to the contract, and presumably never read it) appeared to be given substantial weight over the actual terms of the contract." *Id.*

Moreover, beneficiary expectations are not a proper consideration under common-law trust principles. A beneficiary may not know a trust has been created in his or her benefit, Restatement (Third) of Trusts § 14 cmt. a, but the trustee still maintains fiduciary duties to that beneficiary notwithstanding the beneficiary's ignorance. Besides, an easy-going or even incapacitated beneficiary may not expect anything; but the trustee's duties do not change. Trust law rights rise above subjective expectations, and the substantive terms of the parties' arrangement show that there are no trust-law rights in the working capital amounts here.

## CONCLUSION

Because the working capital amounts are not plan assets, this Court should affirm the decision below.

Dated: December 7, 2022

Respectfully submitted,

*s/ Deborah S. Davidson*

Allison S. Egan
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
T.  215.963.5033

Deborah S. Davidson
MORGAN, LEWIS & BOCKIUS LLP
110 North Wacker Drive
Chicago, IL 60606
T.  312.324.1159

Michael E. Kenneally
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
T.  202.739.5893

Charles L. Solomont
Henry M. Marley
MORGAN, LEWIS & BOCKIUS LLP
One Federal Street
Boston, MA 02110
T.  617.951.8996

*Counsel for ERISA and Trust Law Professors*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the word limit of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because, excluding the parts of the brief  exempted by Rule 32(f), it contains 4,582 words.

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5), and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared using Microsoft Word in Garamond font, in a size measuring no less than 14 points.


Dated:  December 7, 2022              *s/ Deborah S. Davidson*
                                     Deborah S. Davidson

                                     *Counsel for ERISA and Trust Law Professors*

## CERTIFICATE OF SERVICE

I certify that on December 7, 2022, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit using the CM/ECF system.   Counsel for Plaintiffs-Appellants and Defendant-Appellee are registered CM/ECF users and will be served by the CM/ECF system.


Dated:  December 7, 2022                          *s/ Deborah S. Davidson*
                                                 Deborah S. Davidson

                                                 *Counsel for ERISA and Trust Law Professors*