No. 22-1317

_____

## UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

_____

MASSACHUSETTS LABORERS' HEALTH AND WELFARE FUND;
TRUSTEES OF THE MASSACHUSETTS LABORERS' HEALTH AND
WELFARE FUND, as Fiduciaries,

Plaintiffs-Appellants,

v.

BLUE CROSS BLUE SHIELD OF MASSACHUSETTS,

Defendant-Appellee.

_____

On Appeal from the United States District Court
for the District of Massachusetts (Judge F. Dennis Saylor, IV)

_____

## *AMICUS CURIAE* BRIEF OF BLUE CROSS BLUE SHIELD ASSOCIATION IN SUPPORT OF APPELLEE AND AFFIRMANCE

Anthony F. Shelley
  *Counsel of Record*
Miller & Chevalier Chartered
900 Sixteenth St. NW
Black Lives Matter Plaza
Washington, DC 20006
Telephone:   (202) 626-5800
Facsimile:    (202) 626-5801
Email:  ashelley@milchev.com

*Counsel for Amicus Curiae Blue Cross Blue Shield Association*

December 7, 2022

## <u>FED. R. APP. P. 26.1 DISCLOSURE STATEMENT</u>

In accordance with Fed. R. App. P. 26.1, *amicus* Blue Cross Blue Shield Association states that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

FED. R. APP. P. 26.1 DISCLOSURE STATEMENT ...............................................1

TABLE OF AUTHORITIES ....................................................................... ii

STATEMENT OF THE *AMICUS CURIAE* ...............................................................1

STATEMENT PURSUANT TO FED. R. APP. P. 29(a)(4)(e)................................2

ARGUMENT .......................................................................................2

I.    ADOPTING THE FUND'S POSITION WOULD MAKE TPA
      SERVICES MARKEDLY MORE EXPENSIVE FOR ERISA PLANS
      AND THEIR BENEFICIARIES ......................................................................2

II.   THE FUND'S POSITION, IF ADOPTED, WOULD WREAK
      HAVOC WITHIN THE TPA INDUSTRY AND ULTIMATELY BE
      HARMFUL TO THE HEALTHCARE SYSTEM GENERALLY ................7

III.  THE FUND'S POSITION, IF ADOPTED, WOULD HAVE OTHER
      DELETERIOUS CONSEQUENCES ...........................................................15

Certificate of Compliance with Rule 32(a)...................................................... *Post*

i

# TABLE OF AUTHORITIES

**Page(s)**

## *Cases*

*Am.'s Health Ins. Plans v. Hudgens*,
  742 F.3d 1319 (11th Cir. 2014) ..........................................................................10

*Angel Jet Servs., L.L.C. v. Red Dot Bldg. Sys.' Emp. Benefit Plan*, No.
  CV-09-2123, 2010 U.S. Dist. LEXIS 16345 (D. Ariz. Feb. 8, 2010) ...............13

*Bayada Nurses, Inc. v. Blue Cross Blue Shield of Mich.*,
  No. 08-1241, 2008 U.S. Dist. LEXIS 58218 (E.D. Pa. July 30,
  2008) ....................................................................................................................13

*Choice Healthcare, Inc. v. Kaiser Found. Health Plan of Colo.*,
  615 F.3d 364 (5th Cir. 2010) ..............................................................................13

*CIGNA Corp. v. Amara*,
  563 U.S. 421 (2011)...............................................................................................4

*City of Hope Nat'l Med. Ctr. v. Healthplus, Inc.*,
  156 F.3d 223 (1st Cir. 1998)................................................................................11

*Dana Ltd. v. Aon Consulting, Inc.*,
  984 F. Supp. 2d 755 (N.D. Ohio 2013) .................................................................9

*Depot, Inc. v. Caring for Montanans, Inc.*,
  915 F.3d 643 (9th Cir. 2019) ..............................................................................18

*Ed Miniat, Inc. v. Globe Life Ins. Grp., Inc.*,
  805 F.2d 732 (7th Cir. 1986) ..............................................................................16

*Egelhoff v. Egelhoff*,
  532 U.S. 141 (2001)...............................................................................................7

*Fuller v. SunTrust Banks, Inc.*,
  744 F.3d 685 (11th Cir. 2014) ..............................................................................3

*Great-West Life & Annuity Ins. Co. v. Knudson*,
  534 U.S. 204 (2002)..............................................................................................19

*Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*,
  530 U.S. 238 (2000)..................................................................................3, 15, 18

*Hughes v. Northwestern Univ.*,
    142 S. Ct. 737 (2022) .......................................................................................... 16

*Int'l Air Med. Servs. v. Triple-S Salud, Inc.*,
    No. CV-15-00149, 2015 U.S. Dist. LEXIS 118491 (D. Ariz. Sept.
    3, 2015) ............................................................................................................. 13

*IT Corp. v. Gen. Am. Life Ins. Co.*,
    107 F.3d 1415 (9th Cir. 1997) ............................................................................ 9

*ITPE Pension Fund v. Hall*,
    334 F.3d 1011 (11th Cir. 2003) ........................................................................... 3

*Kyle Rys., Inc. v. Pacific Admin. Servs., Inc.*,
    990 F.2d 513 (9th Cir. 1993) ............................................................................... 9

*Montanile v. Bd. of Trs. of Nat'l Elevator Indus. Health Ben. Plan*,
    577 U.S. 136 (2016) ...................................................................................... 4, 19

*Peterson v. UnitedHealth Grp., Inc.*,
    913 F.3d 769 (8th Cir. 2019) ............................................................................ 12

*Pharm. Care Mgmt. Ass'n v. Rowe*,
    429 F.3d 294 (1st Cir. 2005) ............................................................................... 3

*St. Luke's Episcopal Hosp. v. La. Health Servs. & Indem. Co.*,
    No. 08-1870, 2009 U.S. Dist. LEXIS 388 (S.D. Tex. Jan 6, 2009) ................... 13

*Trs. of Colo. Laborers' Health & Welfare Tr. Fund v. Am. Benefit
Plan Adm'rs, Inc.*,
    No. 04-cv-02630, 2006 WL 2632308 (D. Colo. Sept. 13, 2006) ........................ 9

*In re UnitedHealth Grp. PBM Litig.*,
    Nos. 16-CV-3352, et al., 2017 WL 6512222 (D. Minn. Dec. 19,
    2017) ................................................................................................................... 9

*US Airways, Inc. v. McCutchen*,
    569 U.S. 88 (2013) ........................................................................................ 4, 19

*Varity Corp. v. Howe*,
    516 U.S. 489 (1996) ............................................................................................ 5

## *Statutes*

Employee Retirement Income Security Act of 1974,
    29 U.S.C. §§ 1001 *et seq.* ...................................................................1
    29 U.S.C. § 1002 ...............................................................................2
    29 U.S.C. § 1104 .........................................................................3, 12
    29 U.S.C. § 1106 ...............................................................................3
    29 U.S.C. § 1108 .........................................................................3, 18
    29 U.S.C. § 1109 ...............................................................................4
    29 U.S.C. § 1113 .............................................................................17
    29 U.S.C. § 1132 .......................................................................*passim*

## *Other Authorities*

29 C.F.R. § 2560.503-1 ...........................................................10, 11

Austin Frakt, *Teaching Hospitals Cost More, But Could Save Your
    Life*, *N.Y. Times* (June 5, 2017), https://www.nytimes.com/2017
    /06/05/upshot/teaching-hospitals-cost-more-but-could-save-your-
    life.html .........................................................................................14

## STATEMENT OF THE *AMICUS CURIAE*

The Blue Cross Blue Shield Association ("BCBSA") is a nonprofit trade association that coordinates the national interests of the independent, community-based, and locally operated Blue Cross Blue Shield companies ("BCBSA Member Companies"). Together, the 34 independent, community-based, and locally operated BCBSA Member Companies underwrite or assist in the provision of health benefits, either through insurance or third-party administrative services, to 114 million persons in all 50 states, the District of Columbia, and Puerto Rico. Many of these individuals receive their health benefits through plans governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*

Because BCBSA Member Companies provide, as one of their principal products, third-party administrative services to ERISA plans, they have a substantial interest in court proceedings that affect the legal duties and potential liabilities under ERISA of a third-party administrator ("TPA"). This case, as argued by Appellants Massachusetts Laborers' Health and Welfare Fund and Trustees of the Massachusetts Laborers' Health and Welfare Fund (collectively, "the Fund"), raises the specter of expansion of the ERISA duties and liabilities of TPAs beyond what currently is the law in this Circuit and elsewhere; at a minimum, if the Fund's position were adopted, the Court's decision would create

uncertainty about when TPAs and other service providers will be deemed to be exercising control over ERISA-plan assets or discretion over ERISA-plan administration, so as to trigger application of a host of ERISA fiduciary obligations and remedies.  On this basis, BCBSA has a strong interest in this particular appeal.

Counsel for the *amicus* has contacted counsel for the Fund and for Appellee Blue Cross Blue Shield of Massachusetts, Inc. ("BCBSMA"), respectively, and they indicated that the Fund and BCBSMA consent to the filing of this brief.

## STATEMENT PURSUANT TO FED. R. APP. P. 29(a)(4)(E)

The *amicus* states that:  (1) a party's counsel did not author this brief in whole or in part; (2) a party or party's counsel did not contribute money that was intended to fund preparing or submitting this brief; and (3) no person – other than BCBSA, its members, or its counsel – contributed money that was intended to fund preparing or submitting this brief.

## ARGUMENT

## I. ADOPTING THE FUND'S POSITION WOULD MAKE TPA SERVICES MARKEDLY MORE EXPENSIVE FOR ERISA PLANS AND THEIR BENEFICIARIES

The District Court correctly held that BCBSMA was not acting as an ERISA fiduciary with respect to any of the matters about which the Fund complains. Instead, BCBSMA was simply an ERISA service provider.  More specifically, it was a TPA for an ERISA plan that, in ERISA parlance, constitutes an ERISA "party in interest."  *See* 29 U.S.C. § 1002(14)(B) ("The term 'party in interest'

means, as to an employee benefit plan[,] . . . a person providing services to such plan.").

The fiduciary status the Fund seeks for BCBSMA stems, almost certainly, from the former's desire to subject the latter to greater legal requirements than ERISA otherwise mandates for a party in interest. After all, "ERISA's fiduciary duties are the 'highest known to law.'" *Fuller v. SunTrust Banks, Inc.*, 744 F.3d 685, 695 (11th Cir. 2014) (quoting *ITPE Pension Fund v. Hall*, 334 F.3d 1011, 1013 (11th Cir. 2003)). In that regard, ERISA establishes an intricate set of fiduciary obligations, as well as specifically prohibits certain transactions in which a fiduciary may engage. *See* 29 U.S.C. §§ 1104(a)(1), 1106, 1108. A party in interest, on the other hand, need only ensure that it has not "knowingly participat[ed]" in any ERISA-violating activity of a fiduciary. *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 241, 248-49 (2000) (internal quotation marks and citation omitted). Consequently, fiduciary status for BCBSMA is a boon for the Fund because it expands the bases on which the Fund can assert ERISA violations.

Moreover, fiduciary status would increase markedly the potential relief against BCBSMA under ERISA. The inquiry about whether an entity is an ERISA fiduciary has "high stakes, for classification as a fiduciary or a nonfiduciary renders a defendant liable for different types of damages." *Pharm. Care Mgmt.*

*Ass'n v. Rowe*, 429 F.3d 294, 300 (1st Cir. 2005). A fiduciary must "make good" to an ERISA plan for any losses the fiduciary has instigated, 29 U.S.C. § 1109(a), and the Supreme Court has directed that other forms of monetary compensation – such as disgorgement and surcharge – potentially too are available against an ERISA fiduciary. *See CIGNA Corp. v. Amara*, 563 U.S. 421, 442 (2011); *but cf. Montanile v. Bd. of Trs. of Nat'l Elevator Indus. Health Ben. Plan*, 577 U.S. 136, 148 n.3 (2016) (suggesting *CIGNA* discussion is *dicta*). But no money can be had under ERISA from a party in interest even where it has participated in a fiduciary's ERISA violation, unless (among other requirements) the suing party seeks specific funds contained in a segregated fund. *See Montanile*, 577 U.S. at 148 & n.3; *US Airways, Inc. v. McCutchen*, 569 U.S. 88, 95 (2013); *see also infra* p. 19. Because there are no allegations of the existence of a segregated fund in this case, the Fund potentially will be able, with fiduciary status for BCBSMA, to obtain monetary relief that ERISA forecloses against a party in interest.

Aside from there being no warrant in ERISA for the Fund's legal position on fiduciary status, which BCBSMA in its brief has amply shown, acceptance of the Fund's position would come at a steep price. The terms and pricing for administrative services contracts are keenly negotiated between ERISA plan administrators and prospective TPAs. As with any services contract, the greater and more complicated the services to be provided, the greater the price tag.

Normally, a TPA contract will not postulate fiduciary status for the TPA, and the plan administrator enjoys a concomitant lower price for the overall arrangement. Insofar as the plan administrator may wish for the TPA to become a fiduciary, it customarily purchases what is known as a "rider" at additional expense. The expense is not insubstantial, given that, again, fiduciary status brings with it numerous and intricate ERISA obligations and the prospect of expanded liability.

Riders exist for plan administrators to purchase from TPAs the service of acting as final claims adjudicator. Claims adjudication, of course, involves a fiduciary act, when the adjudicator is the *final* decision-maker (on appeal) with *discretionary* authority. *See Varity Corp. v. Howe*, 516 U.S. 489, 511-12 (1996). A plan administrator might wish to delegate these sensitive fiduciary matters to the TPA, and a TPA might agree – at added price – to perform them, then following all ERISA requirements for proper fiduciary activity.

Were the Fund to succeed with its position, a TPA seemingly would rarely avoid fiduciary status, even when the TPA has contracted for no final claims-adjudication authority. For instance, the Fund's expansive view that the presence of working-capital amounts to cover transactions and operations associated with the TPA could result in every TPA act having a fiduciary dimension if it results in reimbursement to the TPA from working capital. Currently, TPAs perform their functions pursuant to the letter of the contracts they have entered with plan

administrators.  If, now, they must comply with ERISA *fiduciary* requirements when conducting their operations for an ERISA plan, with the attendant possibility of fiduciary liability under ERISA, the costs for TPA services obviously will increase.  And if substantially all of the TPAs' operations may become fiduciary functions because they are tied in some manner to reimbursement from working capital, these cost increases necessarily will be large.[1]

Even ignoring the consequences of the Fund's working-capital argument, the Fund's position appears destined to result in compulsory purchases of additional, expensive riders in order to obtain TPA services.  The Fund has contended that, among other things, the pricing of claims and practices associated with settling provider disputes can trigger fiduciary status for the TPA.  A TPA whose contract with a plan administrator envisions the TPA engaging in these pursuits may in the future demand that the plan administrator purchase additional riders to account for the TPA's additional fiduciary responsibilities, just as rider purchases ensue when an ERISA plan seeks to delegate final, discretionary claims authority to a TPA.

---

[1] The alternative to increasing the cost of its services to compensate for fiduciary status as a result of the existence of working capital would be for the TPA to refuse altogether to agree to working-capital arrangements for use in the payment of claims.  As explained later, that alterative creates a host of separate problems.  *See infra* p. 8.

The Supreme Court has readily commented that increased ERISA-plan costs "are ultimately borne by the beneficiaries." *Egelhoff v. Egelhoff*, 532 U.S. 141, 150 (2001). That is especially true where payroll contributions towards the plan's coverage, along with the employer sponsor's payments, financially support the plan. The Fund's position promises to make health-benefits coverage a more expensive enterprise for ERISA plans and their beneficiaries alike.[2]

## II. THE FUND'S POSITION, IF ADOPTED, WOULD WREAK HAVOC WITHIN THE TPA INDUSTRY AND ULTIMATELY BE HARMFUL TO THE HEALTHCARE SYSTEM GENERALLY

If the Fund prevails, the nature of a TPA's operations will change going forward, and not for the better. At best, TPA services will become less streamlined, potentially leading to delays in claims administration. Even more concerning, TPAs may no longer be able readily to conduct their operations uniformly for a line of business and may need to halt practices that benefit the healthcare system generally.

**A.** A TPA faced with fiduciary status simply because of the establishment of working-capital amounts might, rather than charge a higher price for its claims-

---

[2] Even a holding that fiduciary status *might* result if certain circumstances exist, rather than the Court adopting a blanket rule that a TPA shall be a fiduciary, will result in increased costs for ERISA plans. The current price-point for TPA services cannot be expected to remain the same if the TPA must now account for the added possibility a court may in the future deem it a fiduciary with potential fiduciary liability.

administration services, refuse to set up a working-capital arrangement in the first place. These arrangements, however, make for swift and more seamless claims payment, providing a constantly replenished source of funds to pay providers for services they render to patients (*i.e.*, beneficiaries). The TPA need not worry that its other funds will be at risk through non-payment from the ERISA plan, and therefore need not delay payment to the provider, because the ERISA plan has, in essence, made an up-front payment through the provision of working capital.

No interested party is benefitted from the cessation of working-capital arrangements. For beneficiaries, their providers will be paid later, because the TPA may choose to await the transfer of funds from the ERISA plan to cover the claim in order to avoid the risk that the TPA's own money will be at risk. For the ERISA plan, it will be faced with a more cumbersome process of covering each claim before it is paid. For providers, payments to them will take more time in ERISA situations, as the TPA waits for funds from the plan to reimburse the provider. For the TPAs, they face the nightmare of paying provider claims one by one as monies arrive from specific ERISA plans, rather than paying providers in bulk based on funds already present for ERISA-plan clients. Nonetheless, because of the legal consequences and obligations of being a fiduciary, working-capital arrangements between ERISA plans and TPAs may become a thing of the past.

Another of the Fund's chief theories for fiduciary status – namely, that the TPA exercises discretion and therefore attains fiduciary status whenever it might deviate from the ERISA plan's terms in paying claims (despite having no final authority over claims payments) – also will, if adopted by the Court, negatively affect the claims-administration process. As the District Court noted, this theory amounts to a contention that a TPA becomes a fiduciary whenever it makes a mistake in paying claims, an argument that courts, to this point, have universally rejected.[3] Were it to become the law that an ERISA-plan service provider's alleged mistake in providing contracted-for services triggers fiduciary status, TPA claims administration inevitably will slow. The consequence of making a mistake will be so high that every claims payment will need to be checked thrice over to ensure accuracy, possibly to the point of immobilization in some circumstances. Potentially, a sort of "pre-certification" process will arise whereby the TPA, before paying a provider, will press the ERISA plan having final discretionary authority in

---

[3] *E.g.*, *IT Corp. v. Gen. Am. Life Ins. Co.*, 107 F.3d 1415, 1421 (9th Cir. 1997); *Kyle Rys., Inc. v. Pacific Admin. Servs., Inc.*, 990 F.2d 513, 516 (9th Cir. 1993); *In re UnitedHealth Grp. PBM Litig.*, Nos. 16-CV-3352, et al., 2017 WL 6512222, at *8-10 (D. Minn. Dec. 19, 2017); *Dana Ltd. v. Aon Consulting, Inc.*, 984 F. Supp. 2d 755, 764 (N.D. Ohio 2013); *Trs. of Colo. Laborers' Health & Welfare Tr. Fund v. Am. Benefit Plan Adm'rs, Inc.*, No. 04-cv-02630, 2006 WL 2632308, at *7 (D. Colo. Sept. 13, 2006).

the first instance for a final ruling, in order to avoid the prospect of any allegation of a mistake.

All of that additional processing and procedure will take time, and, in a world where millions upon millions of health-benefits claims are processed on an annual basis, probably cannot workably be accomplished.  The Department of Labor, through its claims regulations, seeks speedy claims resolution, because beneficiaries are disadvantaged when payment is delayed.  29 C.F.R. § 2560.503-1(f)(2).  States too attempt to compel rapid claims processing, at the pain of a TPA paying interest if state-established maximum times are exceeded (though courts have found that ERISA preempts these measures, *see, e.g.*, *Am.'s Health Ins. Plans v. Hudgens*, 742 F.3d 1319, 1331, 1333 n.18 (11th Cir. 2014) (holding that ERISA preempts Georgia prompt-pay law applicable to TPAs of self-funded plans)).  These federal and state timing goals are put in jeopardy, when a TPA reasonably must work and rework a claim in order to avoid the fiduciary status that comes with a normal, expected, and minimal error rate.

This is not to say that TPAs currently are careless in their claims processing, so as to invite mistakes.  Quite the opposite.  There are numerous incentives for them already to get things exactly right:  their business reputation depends on accurate claims processing; plan administrators as fiduciaries should be vigilantly monitoring TPA work for accuracy, *see infra* p. 16; ERISA already supplies

- 10 -

certain causes of action against a party in interest, to be pursued by fiduciaries, beneficiaries, and the Department of Labor, *see infra* p. 16; and beneficiaries (and providers with assignments from them, *see City of Hope Nat'l Med. Ctr. v. Healthplus, Inc*., 156 F.3d 223, 228 (1st Cir. 1998)) can appeal the non-payment or underpayment of a claim that they believe conflicts with an ERISA plan's terms and policies.  *See* 29 U.S.C. § 1132(a)(1)(B); 29 C.F.R. § 2560.503-1(h).  The point is that the odd rule under which a TPA is a fiduciary when making claims-processing mistakes, but seemingly not when it accurately processes claims, is unnecessary to protect ERISA-plan interests.  Current law ensures the right balance between vigilance for accuracy and speedy claims processing.

**B.**  Even more concerning, a rule that TPAs readily are fiduciaries may necessitate a wholesale reordering of TPA operations.  A TPA generally conducts its operations consistently for its entire business, and a company that offers TPA services as well as insurance will make the same network available for both TPA and insurance clients.  For instance, the TPA/insurer may create a network of facilities, doctors, and pharmacies and offer the network to all of its various accounts, including ERISA clients with administrative services contracts; the rates the TPA/insurer pays those in-network providers customarily will, because of each provider's agreement with the TPA/insurer, be uniform for all of the provider's patients whose benefits the TPA/insurer administers or insures; and the

TPA/insurer may settle billing disputes with that provider on a global scale, irrespective of the vagaries of a particular patient's ERISA coverage. This way, there are economies of scale that the TPA/insurer and the provider enjoy, and administration for the TPA/insurer and bookwork by the provider are eased through uniformity.

Things will change if a TPA, in providing these products and services, qualifies as a fiduciary. A plan fiduciary cannot merely act with an eye toward what is good for its client base as a whole, but must tailor its activity to the individualized best interests of the ERISA plan and its participants and beneficiaries. *See* 29 U.S.C. § 1104(a)(1)(A); *Peterson v. UnitedHealth Grp., Inc.*, 913 F.3d 769, 776 (8th Cir. 2019) ("While administrators like United may happen to be fiduciaries of multiple plans, nevertheless each plan is a separate entity and a fiduciary's duties run separately to each plan.") (internal quotation marks and citation omitted). Must a TPA include a greater number of in-network providers in a particular area for an ERISA plan whose participants have special needs in that area? In a similar vein, if a dispute is settled with a provider in a manner that benefits a TPA's clients as a whole, is the TPA at risk of having breached its fiduciary duties by not having focused on an individual plan's interests alone?

In a nutshell, a model in which a TPA is a fiduciary when it conducts its core functions is incompatible with the manner in which TPAs currently operate much

of their business.  Except where the ERISA plan has purchased fiduciary services, the TPA seeks to act on a large scale rather than singly in the interests of individual ERISA-plan clients.  Under the Fund's view of the world, TPAs in the future would have to fragment their negotiations with providers.[4]

**C.**  The Fund's position threatens damage to the healthcare system in general.  Many different considerations may enter into the pricing arrangement between a TPA and the providers in its network.  A TPA might negotiate higher rates with a sector of providers in order to support increased efforts to improve healthcare outcomes; yet, current beneficiaries might not see the fruits of that

---

[4] The problems endemic in the Fund's model would be particularly acute for the Blue Cross Blue Shield system, where a BCBSA Member Company may make use of the provider networks established by its sister BCBSA Member Companies. Under a program known as BlueCard (which is well-described in the case law), a subscriber of one BCBSA Member Company enjoys the discounted rates of a sister BCBSA Member Company's network, if the subscriber needs services in the sister BCBSA Member Company's jurisdiction (such as when traveling or working out-of-state).  *E.g.*, *Choice Healthcare, Inc. v. Kaiser Found. Health Plan of Colo.*, 615 F.3d 364, 371 (5th Cir. 2010); *Int'l Air Med. Servs. v. Triple-S Salud, Inc*., No. CV-15-00149, 2015 U.S. Dist. LEXIS 118491, at \*12 (D. Ariz. Sept. 3, 2015); *Angel Jet Servs., L.L.C. v. Red Dot Bldg. Sys.' Emp. Benefit Plan*, No. CV-09-2123, 2010 U.S. Dist. LEXIS 16345, at \*12 (D. Ariz. Feb. 8, 2010); *St. Luke's Episcopal Hosp. v. La. Health Servs. & Indem. Co*., No. 08-1870, 2009 U.S. Dist. LEXIS 388, at \*19-26 (S.D. Tex. Jan 6, 2009); *Bayada Nurses, Inc. v. Blue Cross Blue Shield of Mich.*, No. 08-1241, 2008 U.S. Dist. LEXIS 58218, at \*14-15 (E.D. Pa. July 30, 2008).  Certainly, the sister BCBSA Member Company's network does not reflect rates and policies singly aimed at the beneficiaries of the client of another BCBSA Member Company.  Yet, the Fund's position appears to necessitate that pricing decisions of the sister BCBSA Member Company must further the interests of the ERISA plan paying for the services.

effort, only future ones.  Has the TPA violated its fiduciary duties by pricing

claims with an element unrelated to the services enjoyed by current beneficiaries

(whose plan contributions might comprise the payment to the provider, in part)?

Likewise, teaching hospitals often charge more, and are paid more, than

non-teaching hospitals.  The same services might be provided by the two, and the

patient outcomes might be similar for the two; but Medicare and commercial

insurers may pay the teaching hospitals more, in order to further the educational

mission of the teaching hospital and eventually prompt a greater number of

healthcare providers and more widely available services to the general public.  *See*

Austin Frakt, *Teaching Hospitals Cost More, But Could Save Your Life*, *N.Y. Times*

(June 5, 2017), https://www.nytimes.com/2017/06/05/upshot/teaching-hospitals-

cost-more-but-could-save-your-life.html.  If the TPA automatically is a fiduciary

when pricing or paying claims, one can envision ERISA-plan beneficiaries and

their ERISA plans bringing suit against the TPA for breach of fiduciary duties

whenever the TPA has adopted a payment structure taking into account any extra-

plan considerations.

Nothing in ERISA suggests Congress meant to negate the advantages to

society that significant players in the healthcare industry can bring to bear through

their pricing policies and practices.  However, if the Fund succeeds, TPAs may

hereafter need to divorce from their pricing any considerations other than what immediately serves the best interests of the particular ERISA plan at issue.

## III. THE FUND'S POSITION, IF ADOPTED, WOULD HAVE OTHER DELETERIOUS CONSEQUENCES

Unmentioned in the Fund's brief are the other far-reaching consequences of attaching fiduciary status to ordinary TPA activity or how a holding by this Court that BCBSMA is a fiduciary helps immunize the Fund from its own suspect conduct.

**A.** If TPAs readily are fiduciaries, then they will become key players in enforcing ERISA. The Supreme Court has emphasized that ERISA limits who may sue under ERISA, though it does not constrict who may be a defendant in an ERISA case. *See Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 246-47 (2000). Except for multi-employer plan situations not relevant here, the universe of plaintiffs who may sue pursuant to ERISA consists of participants, beneficiaries, *fiduciaries*, and the Secretary of Labor. *See id.* at 247; *see generally* 29 U.S.C. § 1132(a)(1)-(9). Service providers cannot resort to ERISA, *unless* they are fiduciaries.

Accordingly, if the Fund is right that TPAs become fiduciaries under the circumstances of this case, then BCBSMA and similarly situated TPAs will have earned the right to sue others under ERISA to ensure compliance with ERISA's terms. The Fund itself becomes a potential defendant to a TPA-instituted ERISA

suit if, as the Fund's allegations can be read to suggest, it (as a fiduciary in its own right) failed to use due diligence to prevent errors in claims processing, payment of unearned fees to the TPA, or other alleged misbehavior. *See infra* p. 18. Given that the federal courts have exclusive jurisdiction over most ERISA controversies, *see* 29 U.S.C. § 1132(e)(1), federal courthouses across the country will face this new species of ERISA cases.

**B.** Additionally, treating TPAs as fiduciaries will lessen the obligations on current fiduciaries vigilantly to comply with their obligations. Under current law, when a party in interest fails to comport with its obligations, the ERISA plan administrator (as a fiduciary) is obliged swiftly to seek to correct the activity, or else itself suffer the financial consequences of any loss the plan incurs as a result of the party in interest's conduct. Plan administrators, as fiduciaries, have the duty to monitor the behavior of their service providers and ensure best practices and even the best deal from the service providers. *See generally Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 741 (2022); *Ed Miniat, Inc. v. Globe Life Ins. Grp., Inc.*, 805 F.2d 732, 735-36 (7th Cir. 1986). And they must do so in real time because they have only very limited ability under ERISA to obtain monetary relief from the service provider, putting a premium on injunctive relief to prevent or immediately halt untoward practices before they become expensive liabilities to be borne alone by the monitoring fiduciary. *See infra* pp. 19-20.

If TPAs are now fiduciaries, the plan administrator need not as rigorously monitor and quickly remedy any alleged TPA bad acts. The plan administrator who fails to meet its own obligations will have the ability to sue *for money* the TPA fiduciary (a remedy not usually available against a party in interest). The impetus for rapid action by the plan administrator – *i.e.*, bearing the cost of loss itself – is eliminated by the plan administrator now being able, within ERISA's three- and potentially six-year statute of limitations for suing for breach of fiduciary duties, *see* 29 U.S.C. § 1113, to sue the TPA fiduciary for money.

**C.** Assuming the facts as the Fund alleges them (and the *amicus* should not be understood in any manner to be giving credence to those allegations), success by the Fund in this appeal conveniently allows it to escape the consequences of what amounts to its own mismanagement of the ERISA plan. As alluded to already, if BCBSMA is, as is the standard rule, just an ERISA party in interest (as a service provider to the Fund's ERISA plan), the Fund had – under its allegations – an ERISA cause of action against BCBSMA for BCBSMA purportedly participating in a fiduciary's ERISA violation. At bottom, many of the Fund's allegations devolve into BCBSMA facilitating the ERISA plan's money wrongly being used to pay providers or BCBSMA obtaining more money for its TPA role than envisioned by the Fund. It is now well-established that an ERISA fiduciary (here, the Fund) may sue under ERISA a party in interest for the party in interest's

role in *a fiduciary's* conduct or transactions contrary to ERISA.  *See Harris Tr.*,

530 U.S. at 248-49 ("if the Secretary may bring suit against an 'other person'

under subsection (a)(5) [of 29 U.S.C. § 1132], it follows that a participant,

beneficiary, or fiduciary may bring suit against an 'other person' under the

similarly worded subsection (a)(3) [of § 1132]"); *Depot, Inc. v. Caring for

Montanans, Inc.*, 915 F.3d 643, 659-60 (9th Cir. 2019).  In turn, ERISA prohibits

the fiduciary from entering service-provider arrangements under which more than

reasonable compensation is paid, 29 U.S.C. § 1108(b)(2)(A), and demands that the

fiduciary monitor the activity of its service providers.  *See supra* p. 16.

But the Fund forwent full-throated pursuit of this theory presumably because

*it* was the only possible fiduciary who could have engaged with BCBSMA in

wrongful conduct.  The Fund apparently was unwilling to malign its own behavior

and assert it was a "'culpable fiduciary'" – notwithstanding that *the Fund* had final

authority over the transactions it contends cost it money and that *the Fund* all along

failed to exercise the audit rights through which it could have policed BCBSMA.

*Depot, Inc.*, 915 F.3d at 660 (quoting *Harris Tr.*, 530 U.S. at 252).  The District

Court, therefore, rightly determined that "the Fund failed to allege any fiduciary

breach in which [BCBSMA] may have participated."  Appellants' Addendum at

AD029.

In any event, had the Fund alleged a fiduciary violation in which BCBSMA participated, its cause of action was doomed for an additional reason:  lack of any current, meaningful remedy.  Because the cause of action must be pursued under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), and BCBSMA would be a non-fiduciary, the scope of conceivable relief consists of injunctive relief or a constructive trust over a segregated fund under BCBSMA's control that contains the fruits of BCBSMA's alleged participation in the prohibited fiduciary conduct. *See Montanile v. Bd. of Trs. of Nat'l Elevator Indus. Health Ben. Plan*, 577 U.S. 136, 142-43 (2016); *US Airways, Inc. v. McCutcheon*, 569 U.S. 88, 94-95 (2013); *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002).

Here, there is no allegation that a relevant segregated fund under BCBSMA's control exists, and, in fact, nothing required BCBSMA to segregate working-capital amounts it received; thus, the Fund could obtain no constructive-trust remedy.  As to injunctive relief, it could only have been meaningful at an earlier time, when the supposed misconduct was occurring – *i.e.*, before or while BCBSMA was engaging in the alleged practices costing the Fund, so as to halt the activity in its tracks.  However, again, the Fund failed to conduct any audits of BCBSMA (though its contract expressly permitted them) that early on could have identified allegedly offending practices, which prompted (to play out the scenario) the monetary losses whose recompense cannot be forced into the constructive-trust

remedy.  Nor did the Fund exercise its final authority so as to investigate, rather than authorize, BCBSMA transactions that the Fund now condemns.  The upshot is that, insofar as an ERISA cause of action has existed for the Fund to use, no relief now is available under it, and due to the Fund's own fault.  The Fund's self-created predicament is insufficient reason to stretch the law to convert ordinary service-provider obligations into fiduciary duties.

**CONCLUSION**

The Court should affirm the District Court's decision.

December 7, 2022                    Respectfully submitted,

                                    */s/ Anthony F. Shelley*
                                    Anthony F. Shelley
                                    Miller & Chevalier Chartered
                                    900 Sixteenth St. NW
                                    Black Lives Matter Plaza
                                    Washington, DC 20006
                                    Telephone: (202) 626-5800
                                    Facsimile: (202) 626-5801
                                    Email:  ashelley@milchev.com

                                    *Counsel for Amicus Curiae Blue Cross Blue Shield Association*

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

Certificate of Compliance with Type-Volume Limitation, Typeface

Requirements, and Type Style Requirements

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

XX this brief contains 4,788 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

___ this brief uses a monospaced typeface and contains [state the number of lines] of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because:

XX this brief has been prepared in a proportionally spaced typeface using Microsoft Office, Word 365 in 14-point font in Times New Roman, or

___ this brief has been prepared in a monospaced typeface using [state name and version of word processing program] with [state number of characters per inch and name of type style].

December 7, 2022                    */s/ Anthony F. Shelley*
                                     Anthony F. Shelley